IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 12-4298

EDWARD M. SEAMANS,
Appellant

v.

TEMPLE UNIVERSITY,
Appellee

ON APPEAL FROM THE ORDER ENTERED ON OCTOBER 25, 2012
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 2:11-CV-06774-SD

**BRIEF OF APPELLEE TEMPLE UNIVERSITY**

Richard J. Perr
FINEMAN KREKSTEIN & HARRIS, P.C.
BNY Mellon Center, Suite 600
1735 Market Street
Philadelphia, PA  19103-7513
215-893-9000
215-893-8719 (facsimile)
rperr@finemanlawfirm.com
Attorneys for Appellee Temple University

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Rule 26.1, Temple University states that it is a non-governmental party with no affiliations or relationships with any parent company. Temple University is a non-profit corporation.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF RELATED CASES ..................................................1

STATEMENT OF THE CASE..............................................................1

STATEMENT OF FACTS ....................................................................4

    A.    Temple University Makes a Perkins Loan to Mr. Seamans..................4

    B.    The Loan Was Paid in Full by Mr. Seamans on April 28, 2011 ..........4

    C.    The Credit Reporting Fields Do Not Apply to Perkins Loans
        as Mr. Seamans Asserts ...........................................................5

        1. Date of First Delinquency .....................................................5

        2. Payment History ................................................................7

        3. Account Status...................................................................7

        4. Compliance Condition Code ..................................................8

    D.    Mr. Seamans's Disputes Are Not Bona Fide and Temple
        University's Consumer Reporting Is Accurate ...................................8

SUMMARY OF ARGUMENT ............................................................ 15

STANDARD OF REVIEW ................................................................ 17

ARGUMENT ................................................................................. 18

I.    THE DISTRICT COURT PROPERLY FOUND THE HIGHER
    EDUCATION ACT EXEMPTED APPLICATION OF CERTAIN
    CREDIT REPORTING CODES UNDER THE FAIR CREDIT
    REPORTING ACT ................................................................... 18

A.    The Fair Credit Reporting Act ............................................... 19

    1.    Consumer Reports ................................................... 19

    2.    Duty to Investigate ................................................. 19

B.    The Higher Education Act ..................................................... 22

C.    None of the Credit Status Codes Referenced by Mr. Seamans
Was to Be Reported While the Loan Was Not Repaid in Full ........... 24

D.    Re-Coding an Account After Payment in Full to Reflect
Delinquency or Collections Activity During the Repayment
Period Is Inconsistent with the Purpose of the Higher Education
Act ................................................................................. 26

E.    The Consumer Reporting Resource Guide Does Not Have the
Force of Law .................................................................... 32

II.    THE DISTRICT COURT PROPERLY FOUND THE HIGHER
EDUCATION ACT EXEMPTED APPLICATION OF CERTAIN
CREDIT REPORTING CODES UNDER THE FAIR CREDIT
REPORTING ACT ................................................................... 35

A.    Temple University's Reporting of the Tradeline Was Required
by Law ........................................................................... 39

B.    Temple University's Reporting of the Adverse History Was
Required by Law ............................................................... 40

C.    Temple University's Conduct Was Not a Willful Violation as
a Matter of Law ................................................................ 42

III.    THERE IS NO PRIVATE CAUSE OF ACTION FOR FAILING TO
MARK A CONSUMER REPORT AS DISPUTED UNDER THE
FAIR CREDIT REPORTING ACT .............................................. 43

A.    The Third Circuit Should Not Adopt *Saunders* and *Gorman* ............ 44

B.     Rules of Construction Do Not Yield a Cause of Action Under Section 1681s-2(b) for a Furnisher's Failure to Report a Disputed Debt .................................................................. 49

C.     Alternatively, this Case Does Not Warrant Application of *Saunders/Gorman* Because Appellant Did Not Advance a Bona Fide Dispute ...................................................................... 51

CONCLUSION ............................................................................ 54

CERTIFICATE OF BAR MEMBERSHIP ................................... 55

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a) .................. 56

CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS ........... 57

CERTIFICATE OF VIRUS CHECK ............................................ 58

CERTIFICATE OF SERVICE ..................................................... 59

# TABLE OF AUTHORITIES

## CASES

*Agosta v. Inovision, Inc.*, No. 02-806,
    2003 U.S. Dist. LEXIS 23889 (E.D. Pa. Dec. 16, 2003) .................................. 21

*Allen v. CitiMortgage, Inc.*, No. CCB-10-2740,
    2011 U.S. Dist. LEXIS 86077 (D. Md. Aug. 4, 2011) ...................................... 46

*Bartell v. Dell Fin. Serv.*, No. 1:06cv1941,
    2007 U.S. Dist. LEXIS 736 (M.D. Pa. Jan. 8, 2007) ........................................ 21

*Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611 (6th Cir. 2012) ............................ 37

*Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876 (9th Cir. 2010) .................... 37

*Chambers v. Sch. Dist. of Phila. Bd. of Educ.*,
    587 F.3d 176 (3d Cir. 2009) ............................................................................. 17

*Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26 (1st Cir. 2010) ....................... 37, 38

*Christensen v. Harris County*, 529 U.S. 576 (2000) .............................................. 33

*Coco v. N.J. Higher Educ. Student Assistance (In re Coco)*,
    335 Fed. Appx. 224 (3d Cir. 2009) .................................................................. 25

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992) .............................................. 50

*Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311 (E.D. Pa. 2003) ........................ 33

*Cushman v. Trans Union Corp.*, 115 F.3d 220 (3d Cir. 1997) ................... 33, 34, 42

*Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409 (4th Cir. 2001) ............... 38

*Duncan v. Walker*, 533 U.S. 167 (2001) ................................................................ 51

*Evantash v. G.E. Capital Mortg. Servs., Inc.*, No. 02-CV-1188,
    2003 U.S. Dist. LEXIS 23131 (E.D. Pa. Nov. 25, 2003) .................................. 21

*Farren v. RJM Acquisition Funding, LLC*, No. 04-995,
    2005 U.S. Dist. LEXIS 15230 (E.D. Pa. Jul. 26, 2005) ........................ 21, 22, 37

*Forte v. World Fin. Network Bank*, No. 12-704 (FLW),
    2012 U.S. Dist. LEXIS 110589 (D.N.J. Aug. 7, 2012) ..................................... 46

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147(9th Cir. 2009) ........... *passim*

*Gosnell v. State*, 681 S.W.2d 385 (Ark. 1984) ....................................................... 28

*Graziano v. Harrison*, 950 F.2d 107 (3d Cir. 1991) ............................................... 51

*Johnson v. MBNA America Bank, NA*, 357 F.3d 426 (4th Cir. 2004) .................... 21

*Kaucher v. County of Bucks*, 455 F.3d 418 (3d Cir. 2006)..................................... 17

*Kibbie v. BP/Citibank*, No. 3:CV-08-1804,
    2009 U.S. Dist. LEXIS 81806 (M.D. Pa. Sept. 9, 2009) .................................. 21

*Kokoszka v. Belford*, 417 U.S. 642 (1974)............................................................. 50

*Krajewski v. Am. Honda Fin. Corp.*,
    557 F. Supp. 2d 596 (E.D. Pa. 2008) ................................................. 21, 22, 35, 36

*Lawrence v. Trans Union LLC*, 296 F. Supp. 2d 582 (E.D. Pa. 2003).................. 42

*Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28 (D.D.C. 2012) ......... 46

*Mwantembe v. TD Bank, N.A.*, 669 F. Supp. 2d 545 (E.D. Pa. 2009) .................... 33

*National Association for the Advancement of Colored People
    "NAACP" v. North Hudson Regional Fire & Rescue*,
    665 F.3d 464 (3d Cir. 2012).............................................................................. 17

*Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057 (9th Cir. 2002)............ 50

*Nicini v. Morra*, 212 F.3d 798 (3d Cir. 2000)......................................................... 17

*Noel v. First Premier Bank*, No. 3:12-CV-50,
    2012 U.S. Dist. LEXIS 32595 (M.D. Pa. Mar. 12, 2012)............................ 48, 52

*People v. Field*, 31 Cal. App. 4th 1778 (Cal. Ct. App. 1995)...................................29

*Perez v. Trans Union, LLC*, 526 F. Supp. 2d 504 (E.D. Pa. 2007).........................42

*Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996) ..................................42

*Public Interest Research Group v. Powell Duffryn Terminals, Inc.*,
913 F.2d 64 (3d Cir. 1990)..................................................................................17

*Ray Evers Welding Co. v. Occupational Safety & Health Review Comm'n*,
625 F.2d 726 (6th Cir. 1980)...............................................................................32

*Rousseau v. Philadelphia*, 589 F. Supp. 961 (E.D. Pa. 1984) ...............................32

*Rubin v. United States*, 449 U.S. 424 (1981) .........................................................50

*Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142 (4th Cir. 2008) ....... *passim*

*Schweitzer v. Equifax Info. Solutions LLC*,
441 Fed. Appx. 896 (3d Cir. 2011) ....................................................................38

*Seamans v. Temple Univ.*, No. 11-6774, 2012 U.S. Dist. LEXIS 153899
(E.D. Pa. Oct. 25, 2012)..........................................................................4, 18, 53

*Sepulvado v. CSC Credit Servs.*, 158 F.3d 890 (5th Cir. 1998)..............................38

*Shames-Yeakel v. Citizens Fin. Bank*, 677 F. Supp. 2d 994 (N.D. Ill. 2009) .........47

*Shap v. Capital One Fin. Corp.*, No. 11-4461,
2012 U.S. Dist. LEXIS 45939 (E.D. Pa. Mar. 30, 2012)......................48, 49, 52

*SimmsParris v. Countrywide Financial Corp.*,
652 F.3d 355 (3d Cir. 2011).........................................................44, 45, 46, 47

*State v. Anderson*, 466 N.W.2d 681 (Wis. Ct. App. 1991)......................................29

*State ex rel. Barrick v. Stone*, 499 S.E.2d 298 (Va. 1997)......................................28

*Steed v. EverHome Mortg. Co.*, 308 F. Appx. 364 (11th Cir. 2009) ......................46

*Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189 (Pa. 2001) ...................... 33

*T. I. Const. Co., Inc. v. Kiewit E. Co.*, No. 91-2638,
  1992 WL 382306 (E.D. Pa. Dec. 10, 1992) .......................................... 32

*Tri State Maint. Corp. v. N. L. R. B.*, 408 F.2d 171 (D.C. Cir. 1968) .................... 32

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) .............................................. 51

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
  484 U.S. 365 (1988) .............................................................. 50

*United States v. Ferguson*, 776 F.2d 217 (8th Cir. 1985) ............................... 29

*United States v. Hines*, 133 F.3d 1360 (10th Cir. 1998) ............................... 28

*United States v. Tuerk*, 317 Fed. Appx. 251 (3d Cir. 2009) ............................ 25

*Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599 (E.D. Pa. 2012) ................... 36, 52

*Vartanian v. Portfolio Recovery Associates, LLC*,
  No. 2:12-CV-08358-ODW, 2013 U.S. Dist. LEXIS 32522
  (C.D. Cal. Mar. 7, 2013) ......................................................... 50

*W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007) ............................. 17

*Wal-Mart Stores, Inc. v. Regions Bank Trust Dept.*,
  69 S.W.3d 20 (Ark. 2002) ......................................................... 29

*Westra v. Credit Control of Pinellas*, 409 F.3d 825 (7th Cir. 2005) ............... 21, 36

*In re Zignis,* No. A-7900466, 1974 BIA LEXIS 14 (B.I.A. 1974),
  14 I. & N. Dec. 621 (Mar. 14, 1974) .............................................. 28

## STATUTES AND REGULATIONS

34 C.F.R. § 75.60 .................................................................... 2

34 C.F.R. § 674.31 ................................................................... 2

34 C.F.R. § 674.33 ............................................................................................2

11 U.S.C. § 523(a)(8) ...................................................................................... 25

15 U.S.C. §§ 1681-1681x.................................................................................3

15 U.S.C. § 1681c .................................................................................... 16, 19

15 U.S.C. § 1681c(a) ...................................................................................... 19

15 U.S.C. § 1681c(a)(4) ........................................................................... *passim*

15 U.S.C. § 1681c(a)(5) ...................................................................... 23, 41, 53

15 U.S.C. § 1681c(c)(1) ............................................................................ 5, 7, 19

15 U.S.C. § 1681i ........................................................................................... 34

15 U.S.C. § 1681i(a)(2) ................................................................................... 20

15 U.S.C. § 1681n ...................................................................... 45, 46, 50

15 U.S.C. § 1681o ...................................................................... 45, 46, 50

15 U.S.C. § 1681s-2(a) ............................................................................ *passim*

15 U.S.C. § 1681s-2(a)(1) ............................................................................. 21

15 U.S.C. § 1681s-2(a)(3) ....................................................................... *passim*

15 U.S.C. § 1681s-2(a)(8) ............................................................................. 53

15 U.S.C. § 1681s-2(b) ........................................................................... *passim*

15 U.S.C. § 1681s-2(b)(1) ...................................................................... 19, 20, 43

15 U.S.C. § 1681s-2(b)(1)(D) ................................................................. *passim*

15 U.S.C. § 1681s-2(c).......................................................................... 43, 50

15 U.S.C. §§ 1692-1692p .................................................... 44

15 U.S.C. § 1692e(8) ......................................................... 44

20 U.S.C. § 1001 *et seq.* ................................................... 15

20 U.S.C. § 1080a ............................................................... 6

20 U.S.C. § 1080a(f) ........................................................... 6

20 U.S.C. § 1080a(f)(3) .................................................. 6, 35

20 U.S.C. § 1087cc ............................................................. 6

20 U.S.C. § 1087cc(c) ................................................. *passim*

20 U.S.C. § 1087cc(c)(2) .................................................. 22

20 U.S.C. § 1087cc(c)(2)(B) .......................................... 22, 40

20 U.S.C. § 1087cc(c)(3) .................................. 3, 23, 24, 27, 40

20 U.S.C. § 1091a ............................................................. 25

20 U.S.C. § 1091a(a)(1) .................................................... 25

## RULES

Fed. R. Civ. P. 56(a) ......................................................... 17

Fed. R. Evid. 609 ............................................................. 29

## MISCELLANEOUS

S. Rep. No. 105-181, at 45 (1998) ............................... 15, 24, 26

Kristin K. Henson, *Can You Make This Go Away?: Alabama's Inconsistent Approach to Expunging Criminal Records*, 35 Cumb. L. Rev. 385 (2005) .......... 28

## STATEMENT OF RELATED CASES

This case has not previously been before this Court, and Temple University is not aware of any other case or proceeding that is in any way related, completed, pending or about to be presented before this Court or any other court or agency, state or federal.

## STATEMENT OF THE CASE

Mr. Seamans obtained two National Direct Student Loans ("Perkins loans") from Temple University in 1989.  Mr. Seamans was scheduled to begin repayment on the Perkins loans in January 1992.  Repayment took the form of fourteen (14) quarterly payments of $90.00 and one single, final payment of $40.71.  Although several payments were made on Mr. Seamans's behalf in the intervening years, Mr. Seamans consciously and knowingly ignored his repayment obligation for close to twenty (20) years.

Because of his delinquency, and in accordance with regulations promulgated by the United States Department of Education, Mr. Seamans was prevented from receiving additional student aid when he returned to complete his education at Drexel University.  In response, Mr. Seamans approached Temple University to pay his outstanding balance.  The amount included twenty (20) years of accrued

interest as well as contractually agreed penalties and fees authorized by federal regulation.\\[1]

On or about April 28, 2011, a payment for the outstanding balance of the Perkins loans was made on Mr. Seamans's behalf by his father. Mr. Seamans's account was then-current and paid in full. However, substantially each quarterly payment that had been due in the normal course of the installment loan was over 180 days past due as Mr. Seamans had failed to make a timely payment in twenty (20) years.

Mr. Seamans, upon reviewing his consumer report, disputed the very existence of the Temple University tradeline appearing on his consumer report. Mr. Seamans erroneously believed that the tradeline itself should not be reporting on his consumer report. Temple University, through its loan servicer, Affiliated Computer Services, Inc. ("ACS"), investigated Mr. Seamans's disputes and

---

[1] /    All borrowers must sign a promissory note stating that interest will accrue at a rate of "5 percent per annum on the unpaid balance" of a loan, once the "repayment period begins." 34 C.F.R. § 674.31. Payments are applied on an outstanding loan in the following order: (i) Collection costs; (ii) Late charges; (iii) Accrued interest; (iv) Principal. *See* 34 C.F.R. § 674.33. Federal regulations specifically state that "[a]n individual who is not current in repaying a debt, or is in default . . . on a debt under a fellowship, scholarship, discretionary grant, or loan program . . . and who has not made satisfactory arrangements to repay the debt, is ineligible" for a "Pell Grant." 34 C.F.R. § 75.60. Therefore, any suggestion that Temple University acted improperly in the manner in which Mr. Seamans's obligation increased in size or in allegedly preventing Mr. Seamans from receiving a Pell Grant represents a gross misinterpretation of Temple University's responsibilities under the Higher Education Act and accompanying regulations.

properly determined that the tradeline – (1) identifying the account as paid in full; and (2) reflecting that Mr. Seamans's was over 180 days late in making a timely payment over the course of the previous twenty-four (24) months – was accurate. The Date of First Delinquency credit reporting code, upon which Mr. Seamans bases his entire case, is inapplicable to Perkins loans because the United States Congress has expressly exempted Perkins loans from the section of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x ("FCRA"), invoking the Date of First Delinquency utilization.\[2]

On October 28, 2011, Mr. Seamans filed a Complaint against Temple University alleging violations of FCRA. (A46-53). Temple University filed an Answer to Mr. Seamans's Complaint on January 31, 2012. (A54-58). On May 11, 2013, the parties filed Stipulated Facts. (A59-60). On May 21, 2012, Temple University filed a Motion for Summary Judgment. (A61-298). Mr. Seamans filed his Response in Opposition to Temple University's Motion for Summary Judgment (A299-489) on June 6, 2012, and Temple University filed its Reply Brief in Support (A490-95) on June 12, 2012. On October 25, 2012, the United States District Court for the Eastern District of Pennsylvania issued a decision granting

---

[2] "Notwithstanding paragraphs (4) and (5) of subsection (a) of section 605 of the Fair Credit Reporting Act [15 U.S.C. §§ 1681c(a)(4), (a)(5)], a consumer reporting agency may make a report containing information received from the Secretary or an institution regarding the status of a borrower's account on a loan made under this part until the loan is paid in full." 20 U.S.C. § 1087cc(c)(3).

Temple University's Motion for Summary Judgment in its entirety. *See Seamans v. Temple Univ.*, No. 11-6774, 2012 U.S. Dist. LEXIS 153899 (E.D. Pa. Oct. 25, 2012); (A1-39).  Mr. Seamans now appeals from the District Court's decision granting summary judgment to Temple University.

## STATEMENT OF FACTS

**A.    Temple University Makes a Perkins Loan to Mr. Seamans.**

Temple University is satisfied with Mr. Seamans's statement.

**B.    The Loan Was Paid in Full by Mr. Seamans on April 28, 2011.**

Temple University is satisfied with Mr. Seamans's statement except as follows.  The record is devoid of any testimony or documents concerning the manner and method by which Temple University engaged in collection activity during the twenty (20) years of Mr. Seamans's delinquency.  Mr. Seamans's characterization of these activities is unsupported and irrelevant to the disposition of the decision by the District Court.

In addition, the amount of money paid by Mr. Seamans on April 28, 2011 is the direct result of Mr. Seamans's intentional disregard of his payment obligations. The Perkins loan has a forty-five (45) month repayment period.  Mr. Seamans failed to make a single timely payment, instead choosing to disregard his obligation until it suited him to have it repaid.  (A166-170 [Deposition of Edward M. Seamans, Jr. dated April 19, 2012 at 19:20-33:6]).  The repayment amount

included twenty (20) years of accrued interest as well as contractually agreed penalties and fees authorized by federal regulation. The Loan Terms Disclosure reflected that Temple University expected the loan to be repaid on time and within forty-five (45) months, not twenty (20) years late. (A86-92 [Perkins/National Direct Student Loan Disclosure Statement]).

## C.    The Credit Reporting Fields Do Not Apply to Perkins Loans as Mr. Seamans Asserts.

### 1.    Date of First Delinquency

Temple University generally agrees with Mr. Seamans's recitation of the history and purpose of the Date of First Delinquency for use in traditional credit transactions. However, the United States Congress expressly exempted Perkins loans from the application of 15 U.S.C. §§ 1681c(a)(4) and (c)(1). 20 U.S.C. § 1087cc(c). Therefore, after the Perkins loan is paid in full, the Perkins loan is not in collections and no delinquency exists for which a date need be reported. In addition, Temple University has no obligation to re-code the account.

Mr. Seamans would have the Court ignore a clear statutory authority governing the conduct involved in this case in lieu of a policy manual written by consumer reporting agencies and trade associations without the force of law, regulation or even adoption by a single governmental authority.

The Consumer Reporting Resource Guide ("CRRG") is a document created by the Consumer Data Industry Association ("CDIA"), an international trade

association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.\[3]  The CDIA warns the users of the copyrighted and proprietary CRRG that

> ALTHOUGH CDIA HAS USED COMMERCIALLY REASONABLE EFFORTS TO PROVIDE ACCURATE INFORMATION NEITHER CDIA NOR THE CRRG OFFERS ANY LEGAL OR OTHER PROFESSIONAL ADVICE. CDIA ALSO MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT THE SUITABILITY, COMPLETENESS, TIMELINESS, RELIABILITY, LEGALITY, OR ACCURACY OF THE CRRG FOR ANY PURPOSE.

In short, the manual Mr. Seamans holds up as a basis for the Court to disregard the statutes enacted by Congress, and the purposes for which Congress intended them, exclaims in its opening pages that it may not be suitable, complete, reliable, legal or accurate for any purpose.  Nowhere in the CRRG does it analyze 20 U.S.C. § 1080a(f)(3) or 20 U.S.C. § 1087cc(c) and apply these statutes, which clearly govern reporting federally-funded student loans.\[4]  The fact that this manual omits statutory sources underscores its unreliability and inapplicability to reporting of federally-funded student loans.

---

[3] /   The CDIA is not comprised of any entity governing the collection and reporting of federally-funded student loans.

[4] /   Mr. Seamans acknowledges that neither 20 U.S.C. § 1080a nor 20 U.S.C. § 1087cc is referenced in the CRRG.  (*See* Mr. Seamans's Appellate Brief at 26-27).

2.    **Payment History**

Temple University generally agrees with Mr. Seamans's recitation of the history and purpose of the Payment History field in traditional credit transactions. However, the United States Congress expressly exempted Perkins loans from the application of 15 U.S.C. § 1681c(a)(4) and (c)(1). The "collections" code "G" is utilized as a tie-in with the Date of First Delinquency in order to age an account off of a consumer report. As noted above, Congress expressly intended that delinquent Perkins loans not be aged off of a consumer report. Thus, after an account is paid in full, the account is not in collections and the payment history field is not retroactively modified.

3.    **Account Status**

Temple University generally agrees with Mr. Seamans's recitation of the history and purpose of the Account Status field in traditional credit transactions. However, the United States Congress expressly exempted Perkins loans from the application of 15 U.S.C. § 1681c(a)(4) and (c)(1). The "status" code "62" for collections is utilized as a tie-in with the Date of First Delinquency in order to age an account off of a consumer report. As noted above, Congress expressly intended that delinquent Perkins loans not be aged off of a consumer report. Thus, after an account is paid in full, the account is not in collections and the account status field is not retroactively modified.

### 4.    Compliance Condition Code

Temple University generally agrees with Mr. Seamans's recitation of the history and purpose of the Compliance Condition Code. However, 15 U.S.C. § 1681s-2(a)(3) does not afford an aggrieved party a private cause of action under this section, and back-door efforts to bootstrap a section 1681s-2(a)(3) violation within section 1681s-2(b)(1)(D) is in contravention of the express statutory scheme of the Fair Credit Reporting Act.

## D.    Mr. Seamans's Disputes Are Not Bona Fide and Temple University's Consumer Reporting Is Accurate.

According to Mr. Seamans, after having the Perkins loan paid in full, a tradeline from Temple University regarding the Perkins loan appeared on Mr. Seamans's consumer report. (A179-82 [Deposition of Edward M. Seamans, Jr. at 70:16-72:7, 76:20-78:21, 81:22-82:9]). On May 17, 2011 and May 20, 2011, Mr. Seamans made disputes to Trans Union related to the reporting of the Temple University Perkins loan on Mr. Seamans's consumer report. (A59 [Stipulated Facts at ¶ 7]).

The May 17 dispute was lodged via email, and claimed, "This account retroactively reported 120 days later for two years AFTER I paid." (A207 [Trans Union Dispute Record dated May 18, 2011]). The dispute further noted:

> Loan defaulted 1992. Temple didn't report in a decade+, and charged off long ago. I paid Temple on 4/30, they retroactively reported three years of 120d late payments, but it had been co'd. Nothing from

Temple was on my report until I fully paid to close account.  Why does report show two years of late payments?

(A207 [Trans Union Dispute Record dated May 18, 2011]).  The May 17 dispute was translated by Trans Union on the Automated Consumer Dispute Verification form ("ACDV") as "106: Disputes present/previous Account Status/Payment History Profile/Payment Rating.  Verify Payment Profile, Account Status, and Payment Rating."  (A209 [May 18, 2011 ACDV]).  The May 20 dispute was made to Trans Union via telephone, and added, "109 Disputes Current Balance – verify Original Loan Amount, Scheduled Monthly Payment Amount, Actual Payment Amount, Amount Past Due, Current Balance, and Original Charge-Off Amount." (A211 [Trans Union Dispute Record dated May 20, 2011); A213 (May 21, 2011 ACDV]).

Temple University received notice of the May 17 and May 20 disputes from Trans Union.  (A59 [Stipulated Facts at ¶ 8]).  Temple University investigated Mr. Seamans's claimed errors and inaccuracies with respect to the information Temple University furnished to the consumer reporting agencies upon Mr. Seamans making payment in full and determined that the information it was furnishing was accurate and complete: (a) Mr. Seamans had been over 180 days late for at least twenty-four (24) months prior to the time the Perkins loan was paid in full; (b) the Account Status was reporting as "Current; Paid or Paying as Agreed;" (c) the Balance was reporting as "$0;" (d) the High Balance was reporting as "$1180;" (e)

the Terms was reporting as "120 Monthly $30;" (f) the Date Open was reporting as "10/1991;" and (g) the Date Closed was reporting as "04/2011." (A135-37 [Deposition of David R. Glezerman dated April 12, 2012 at 113:15-117:5, 123:11-124:9]; A222-25, A227-34 [Deposition of Jane Sana dated April 30, 2012 at 23:2-29:3, 29:23-36:1, 41:3-41:21, 43:23-47:6, 49:15-58:18, 60:8-70:5]; A245-48 [Deposition of Shelly Hawkins dated April 19, 2012 at 17:5-18:12, 23:23-29:6]; A254 [Mr. Seamans's Consumer Report dated May 24, 2011]). Temple University verified the information being reported about the Perkins loan in responding to the May 17 and May 20 disputes. (A59 [Stipulated Facts at ¶ 9]).

On or about August 1, 2011, Mr. Seamans made a direct dispute in writing with Temple University related to Temple University's reporting of the Perkins loan to consumer reporting agencies, which Temple University received. (A59 [Stipulated Facts at ¶10]; A256 [Letter from Mr. Seamans to Shelly Hawkins undated]).

On August 1, 2011, Mr. Seamans made a dispute in writing with Trans Union related to the reporting of the Temple University Perkins loan on Mr. Seamans's consumer report. (A59 [Stipulated Facts at ¶ 11]). The August 1 dispute was lodged via U.S. Mail, and claimed:

> In 1989 I received a Perkins Loan while attending Temple University. I defaulted on the loan and the loan went to collection. No activity occurred on the account for some time, and the account eventually came off my credit reports for all three of the reporting agencies. I

recently began attending school again at Drexel University, and in order to qualify for financial aid, I had to settle the Perkins loan default. I walked into Temple's billing department and paid $2009 dollars on the spot, receiving a letter on Temple University letterhead that the debt was settled. Temple went on to *retroactively* report two years worth [sic] of 120-day late payments to the credit reporting agencies. It is important to note than there was no reporting on this account to the credit bureaus for many years, and then suddenly *after* the debt was paid, Temple reported two years worth [sic] of later payments all at once.

I previously disputed this online, and received a letter stating that the creditor has reviewed the account and wishes to make no further adjustments to my credit record.

To put it plainly, I want the Temple University account removed from my credit report. The account is closed, and well beyond the time limit imposed for the reporting of derogatory credit information. Therefore, it should not appear on my credit reports now. I have been a good consumer for years now, and the Temple reporting instantly negatively impacted my Trans Union score by approximately 80 points.

(A258 [Letter from Mr. Seamans to Trans Union dated August 1, 2011]).

The August 1 dispute was translated by Trans Union on the ACDV as "109: Disputes Current Balance – verify Original Loan Amount, Scheduled Monthly Payment Amount, Actual Payment Amount, Amount Past Due, Current Balance and Original Charge-off Amount. 110: Claims company will change. Verify all account information." (A262 [August 6, 2011 ACDV]). In addition, the dispute claims, "Never late and closed." (A260 (Trans Union Dispute Record dated August 5, 2011); A262-63 [August 6, 2011 ACDV]). Temple University received a copy of the August 1, 2011 letter Mr. Seamans sent to Trans Union. (A59

[Stipulated Facts at ¶ 12]). Temple University also received notice of the August 1, 2011 dispute from Trans Union. (A60 [Stipulated Facts at ¶ 13]).

Temple University investigated Mr. Seamans's claimed errors and inaccuracies with respect to the information Temple University furnished to the consumer reporting agencies upon Mr. Seamans making payment in full and determined that the information it was furnishing was substantially accurate and complete. Temple, however, did modify: (a) the Account Status from "Current" to "Closed;" (b) Payment Rating from nothing to "6;" (c) the MOP Code from "01" to "05;" (d) Remarks Code from nothing to "CLOSED;" (e) date of Account Information from "04-01-2011" to "08-08-2011;" (f) Date Closed from "04-01-2011" to "04-30-2011;" and (g) Date of Last Payment from nothing to "04-28-2011." (A60 [Stipulated Facts at ¶ 14]; A135-37, (Deposition of David R. Glezerman at 113:15-117:5, 123:11-124:9]; A222-25, A227-34 [Deposition of Jane Sana at 23:2-29:3, 29:23-36:1, 41:3-41:21, 43:23-47:6, 49:15-58:18, 60:8-70:5]; A245-248 [Deposition of Shelly Hawkins at 17:5-18:12, 23:23-29:6]; A262-63).

The material information Temple University was reporting in response to the dispute lodged by Mr. Seamans remained in Mr. Seamans's consumer report as accurate and complete: (a) Mr. Seamans had been over 180 days late for at least twenty-four (24) months prior to the time the Perkins loan was paid in full; and (b)

the Account Status was reporting as "Closed" with a zero balance. (A265 [Mr.

Seamans's Consumer Report dated April 11, 2012]).

On or about August 1, 2011, Mr. Seamans made a dispute in writing with

Equifax related to the reporting of the Temple University Perkins loan on Mr.

Seamans's consumer report. (A60 [Stipulated Facts at ¶ 15]). The August 1

dispute was lodged via U.S. Mail, and claimed:

> In 1989 I received a Perkins Loan while attending Temple University. I defaulted on the loan and the loan went to collection. No activity occurred on the account for some time, and the account eventually came off my credit reports for all three of the reporting agencies. I recently began attending school again at Drexel University, and in order to qualify for financial aid, I had to settle the Perkins loan default. I walked into Temple's billing department and paid $2009 dollars on the spot, receiving a letter on Temple University letterhead that the debt was settled. Temple went on to *retroactively* report two years worth [sic] of 120-day late payments to the credit reporting agencies. It is important to note than there was no reporting on this account to the credit bureaus for many years, and then suddenly *after* the debt was paid, Temple reported two years worth [sic] of later payments all at once.
>
> To put it plainly, I want the Temple University account removed from my credit report. The account is closed, and well beyond the time limit imposed for the reporting of derogatory credit information. Therefore, it should not appear on my credit reports now. I have been a good consumer for years now, and the Temple reporting instantly negatively impacted my Equifax score.

(A267 [Letter from Mr. Seamans to Equifax dated August 1, 2011]).

The August 1 dispute was translated by Equifax on the ACDV as "106:

Disputes present/previous Account Status Payment History Profile Payment

Rating. Verify Payment History Profile, Account Status and Payment Rating."
(A269 [August 8, 2011 ACDV]). In addition, the dispute claims, "CONSUMER
STATES THAT THIS ACCOUNT WAS DEFAULTED AND WENT INTO
COLLECTION AND THIS ACCOUNT WAS PAID BUT THE TEMPLE
UNIVERSITY REPORT SHOWS TWO YEARS WORTH OF 180 DAY LATE
PAYMENT." (A269 [August 8, 2011 ACDV]). Temple University received a
copy of the August 1, 2011 letter Mr. Seamans sent to Equifax. (A60 [Stipulated
Facts at ¶ 16]). Temple University also received notice of the August 1 dispute
from Equifax. (A60 [Stipulated Facts at ¶ 17]).

Temple University investigated Mr. Seamans's claimed errors and
inaccuracies with respect to the information Temple University furnished to the
consumer reporting agencies upon Mr. Seamans making payment in full and
determined that the information it was furnishing was substantially accurate and
complete. Temple, however, did modify: (a) the Account Status from "Current" to
"Closed;" (b) Remarks Code from nothing to "CLOSED;" (c) date of Account
Information from "04-01-2011" to "08-08-2011;" and (d) Date Closed from
nothing to "04-30-2011." (A60 [Stipulated Facts at ¶ 18]; A135-37 [Deposition of
David R. Glezerman at 113:15-117:5, 123:11-124:9]; A222-34 [Deposition of Jane
Sana at 23:2-29:3, 29:23-36:1, 41:3-41:21, 43:23-47:6, 49:15-58:18, 60:8-70:5];

A245-48 [Deposition of Shelley Hawkins at 17:5-18:12, 23:23-29:6]; A267 [Letter from Mr. Seamans to Equifax dated August 1, 2011]).

The material information Temple University was reporting in response to the dispute lodged by Mr. Seamans remained in Mr. Seamans's consumer report as accurate and complete: (a) Mr. Seamans had been over 180 days late for at least twenty-four (24) months prior to the time the Perkins loan was paid in full; and (b) the Account Status was reporting as "Closed" with a zero balance. (A272-74 [Equifax Reinvestigation Report and Accompanying Documents]).

Equifax reported to Mr. Seamans that it had reviewed his concerns and concluded: "Paid as agreed accounts that have been paid in full will automatically be deleted ten years after date of last activity." (A272 [Equifax Reinvestigation Report and Accompanying Documents]; A288-91 [Deposition of LaTonya Munson dated April 5, 2012 at 48:12-50:4, 55:7-60:4]).

## SUMMARY OF ARGUMENT

The Higher Education Act, 20 U.S.C. § 1001 *et seq.* ("HEA"), was intentionally drafted to prevent borrowers from playing a game of "waiting out the clock" in order to avoid their obligation to repay Perkins loans. S. Rep. No. 105-181, at 45 (1998) ("These changes represent a simplification effort and provide consistency between the statute of limitations for collecting loans and the period for reporting negative credit information. The committee believes that reporting of

defaulted loans to credit bureaus is an effective tool and should be available to institutions and the Secretary of Education for the entire period that loan collection is allowed."). During the pendency of an unpaid Perkins loan, neither the Date of First Delinquency under 15 U.S.C. § 1681c nor its affiliated consumer reporting status fields – Payment History and Account Status – apply by express Congressional language for the intended purpose to prevent unpaid Perkins loans from aging off a consumer report, thereby continuing to incentivize borrowers to timely and fully pay their loans.

At the conclusion of the exemption period upon repayment in full, it would contravene the intended purpose of the HEA to retroactively re-code certain reporting fields such as Date of First Delinquency, Payment History and Account Status. Doing so would then allow any Perkins loan in delinquency in excess of seven years before repayment in full to immediately be removed from a consumer report rather than for the tradeline to age off of the consumer report at its natural rate following payment in full. In essence, the reporting statute of limitations is tolled until repayment in full and the accompanying activity during that period, such as collections or delinquency, are expunged for purposes of credit reporting going forward.

Temple University adhered to the requirements of the Fair Credit Reporting Act and the Higher Education Act as a matter of law. Mr. Seamans's disputes

were not bona fide and there exists no private cause of action for failing to mark an account as disputed under the Fair Credit Reporting Act.

## STANDARD OF REVIEW

This Court exercises plenary review over the District Court's grant of summary judgment. *W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 794 (3d Cir. 2007); *Public Interest Research Group v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 76 (3d Cir. 1990). Federal Rule of Civil Procedure 56(a) provides, in pertinent part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *National Association for the Advancement of Colored People "NAACP" v. North Hudson Regional Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2012). For a fact to be considered material, it "must have the potential to alter the outcome of the case." *Id.* (citing *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)). Disputes concerning facts which are irrelevant or unnecessary do not preclude the district court from granting summary judgment. *Id.* Further, the Court may affirm the District Court's grant of summary judgment on alternative grounds. *See Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 183-184 (3d Cir. 2009); *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc) ("We may affirm the District Court on any grounds supported by the record." (citation omitted)).

## ARGUMENT

### I. THE DISTRICT COURT PROPERLY FOUND THE HIGHER EDUCATION ACT EXEMPTED APPLICATION OF CERTAIN CREDIT REPORTING CODES UNDER THE FAIR CREDIT REPORTING ACT.

The crux of Mr. Seamans's argument is Temple University failed to apply certain credit reporting coding in response to disputes lodged by Mr. Seamans, which would have caused the Perkins loan tradeline on his consumer report to be removed. Mr. Seamans supplements his argument with a claim that even if the tradeline properly continued to appear on Mr. Seamans's consumer report, Temple University's failure to report the account as "disputed" triggered liability under the Fair Credit Reporting Act. (*See* Mr. Seamans's Appellate Brief at p. 22). The District Court properly found section 1087cc(c) of the Higher Education Act exempted Temple University from reporting the account as delinquent or in collections during the time period in which the Perkins loan was outstanding. The District Court further found after the Perkins loan was paid in full, Temple University, in its investigation, had no obligation to retroactively re-code the account. *See Seamans*, 2012 U.S. Dist. LEXIS 153899, at *14-22; (A13-20).

## A.    The Fair Credit Reporting Act

### 1.    Consumer Reports

15 U.S.C. § 1681c sets forth the basic requirements relating to information contained in consumer reports in circumstances not governed by the Higher Education Act.  It prohibits consumer reporting agencies from placing in any report:

> (4) Accounts placed for collection or charged to profit and loss which antedate the report by more than seven years.

> (5) Any other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.

15 U.S.C. § 1681c(a).

Section 1681c calculates the seven-year period referred to in paragraph (4) as beginning, with respect to any delinquent account that is placed for collection, "upon the expiration of the 180-day period beginning on the date of the commencement of the delinquency which immediately preceded the collection activity." 15 U.S.C. § 1681c(c)(1).  The seven-year period referred to in paragraph (5) is not calculated by 15 U.S.C. § 1681c(c)(1), but, instead, is calculated from the date of the specific adverse information.

### 2.    Duty to Investigate

Section 1681s-2(b)(1) provides:

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall--

> (A) conduct an investigation with respect to the disputed information;

> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

> (C) report the results of the investigation to the consumer reporting agency;

> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--

>> (i) modify that item of information;

>> (ii) delete that item of information; or

>> (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1). The duties outlined in section 1681s-2(b) are not imposed upon the furnisher of information until the furnisher receives notice pursuant to 15 U.S.C. § 1681i(a)(2), and that notice must come from a consumer reporting agency, and not the consumer, in order for the requirements of 15 U.S.C.

§ 1681s-2(b) to be triggered. *Kibbie v. BP/Citibank*, No. 3:CV-08-1804, 2009 U.S. Dist. LEXIS 81806, at *21 (M.D. Pa. Sept. 9, 2009) (citing *Bartell v. Dell Fin. Serv.*, No. 1:06cv1941, 2007 U.S. Dist. LEXIS 736, at *3 (M.D. Pa. Jan. 8, 2007)); *Krajewski v. Am. Honda Fin. Corp.*, 557 F. Supp. 2d 596, 609 (E.D. Pa. 2008). Courts have construed this provision to require a "reasonable investigation." *Farren v. RJM Acquisition Funding, LLC*, No. 04-995, 2005 U.S. Dist. LEXIS 15230, at *13 (E.D. Pa. Jul. 26, 2005) (citing *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004)); *Agosta v. Inovision, Inc.*, No. 02-806, 2003 U.S. Dist. LEXIS 23889, at *19-20 (E.D. Pa. Dec. 16, 2003); *Evantash v. G.E. Capital Mortg. Servs., Inc.*, No. 02-CV-1188, 2003 U.S. Dist. LEXIS 23131, at *21 (E.D. Pa. Nov. 25, 2003).

A furnisher of information is only obligated to investigate the information that is reported by a credit reporting agency as being in dispute. *See* 15 U.S.C. § 1681s-2(a)(1). Thus, when an ACDV merely indicates that a debtor is disputing an account by claiming that it did not belong to him, the furnisher conducts a reasonable investigation when the furnisher verifies the debtor's identification information. *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 826-27 (7th Cir. 2005). Under certain circumstances, such as a notice that the nature of the dispute concerned fraud, a more thorough investigation may be warranted. *Id.* at 827; *see also Krajewski*, 557 F. Supp. 2d at 609-10. In the absence of such a

notice, it is perfectly reasonable to rely upon the documents in the furnisher's possession. *See Krajewski*, 557 F. Supp. 2d at 609-10 ("Absent allegations of fraud, identity theft, or other issues not identifiable from the face of its records, the furnisher need not do more than verify that the reported information is consistent with the information in its records."); *Farren*, 2005 U.S. Dist. LEXIS 15230, at *20-21. ("The statute does not require . . . any data furnisher to take extraordinary means to investigate and discover disputed information but rather calls for a more passive investigation where the data furnisher is determining only that the information provided to it matches the information in its records.").

## B.    The Higher Education Act

In 1998, well after the creation of the Fair Credit Reporting Act, the United States Congress, through the Higher Education Act, modified the limitations of the FCRA as it applies to institutions of higher education credit reporting student loan obligations.  Section 1087cc(c) permits institutions of higher education to enter into cooperative agreements with consumer reporting agencies for the purpose of making consumer reporting.  20 U.S.C. § 1087cc(c)(2).  This section further *requires* that the agreement provide for the disclosure by the institution to the consumer reporting agencies of "information concerning the repayment and collection of any such loan, including information regarding the status of such loan." 20 U.S.C. § 1087cc(c)(2)(B).

The Higher Education Act expressly exempts the limitations on reporting contained in the FCRA as it pertains to Perkins loans through the time in which the loans are paid in full:

> Notwithstanding paragraphs (4) and (5) of subsection (a) of section 605 of the Fair Credit Reporting Act [15 U.S.C. §§ 1681c(a)(4), (a)(5)], a consumer reporting agency may make a report containing information received from the Secretary or an institution regarding the status of a borrower's account on a loan made under this part until the loan is paid in full.

20 U.S.C. § 1087cc(c)(3). Thus, there is no "statute of limitations" under the FCRA for reporting delinquent Perkins loan obligations or a limit for that information to appear on a consumer's report.\5 Upon payment in full, a consumer's report would reflect the account status as "Paid" and remain on the consumer report for ten (10) years from the date of the last activity. (A272 [Equifax Reinvestigation Report and Accompanying Documents]; A288-91 [Deposition of LaTonya Munson at 48:12-50:4, 55:7-60:4]). Any adverse payment history would fall off of the consumer report thereafter as the report aged in accordance with 15 U.S.C. § 1681c(a)(5).

---

5 / Similarly, Congress has altered the traditional time-period for reporting a borrower's defaulted Family Federal Education Loans (FFEL or Stafford Loans). 20 U.S.C. § 1080a(f). It is clear that Congress has specifically intended that defaulted student loans remain on a consumer's report far longer than other consumer obligations, and that borrowers will not simply be permitted to "run out the clock" by electing to cease paying their student loans for long periods of time.

### C.    None of the Credit Status Codes Referenced by Mr. Seamans Was to Be Reported While the Loan Was Not Repaid in Full.

This interplay between the Higher Education Act and the Fair Credit Reporting Act was referenced by Congress in particular when the Higher Education Act was amended in 1998:

> The committee has included a provision to clarify an institution of higher education's role in reporting information on Perkins loans to credit bureaus, the information to be reported on a loan on an ongoing basis, and the required frequency of reporting. <u>Further, S. 1882 makes changes to section 463(c) of the Higher Education Act to eliminate the prohibition on reporting on the status of a borrowers account, specifically negative credit information on defaulted Perkins loans, beyond 7 years, and requires instead, that information be reported until the loan is paid in full</u>. These changes represent a simplification effort and provide consistency between the statute of limitations for collecting loans and the period for reporting negative credit information. <u>The committee believes that reporting of defaulted loans to credit bureaus is an effective tool and should be available to institutions and the Secretary of Education for the entire period that loan collection is allowed.</u>

S. Rep. No. 105-181, at 45 (1998) (emphasis added). Congress made it clear that the "Date of First Delinquency" calculation under 15 U.S.C. § 1681c(a)(4) was inapplicable as it pertained to Perkins loans. This was done in order to avoid the inconsistent application of the FCRA's limitations period while efforts to obtain payment were still ongoing through the date payment was made in full. The final reporting of the status of the tradeline reflecting that payment in full was made is plainly protected by 20 U.S.C. § 1087cc(c)(3).

The United States Congress has clearly evidenced its intent that federally-funded student loans be treated differently from other obligations.  For example, student loans are not dischargeable in bankruptcy except under very narrow circumstances (e.g., only if repaying the debt would impose an "undue hardship" on the debtor).  *See* 11 U.S.C. § 523(a)(8); *see also Coco v. N.J. Higher Educ. Student Assistance (In re Coco)*, 335 Fed. Appx. 224, 226 (3d Cir. 2009).

There is also no statute of limitations on the collection of defaulted student loans.  *See* 20 U.S.C. § 1091a.  The Higher Education Technical Amendments of 1991 ("HETA"), Pub. L. No. 102-26, 105 Stat. 123 (1991) (codified at 20 U.S.C. § 1091a), expressly preempts state statutes of limitations. *See* 20 U.S.C. § 1091a(a)(1) ("It is the purpose of this subsection to ensure that obligations to repay loans and grant overpayments are enforced without regard to any Federal or State statutory, regulatory, or administrative limitation on the period within which debts may be enforced."); *see also United States v. Tuerk*, 317 Fed. Appx. 251, 253 (3d Cir. 2009).

The HEA expressly intends that all Perkins loans be reported to consumer reporting agencies regardless of the length of time that a borrower takes in repaying the loan.

**D.    Re-Coding an Account After Payment in Full to Reflect Delinquency or Collections Activity During the Repayment Period Is Inconsistent with the Purpose of the Higher Education Act.**

In exempting the reporting of student loans from the limitations period governed by 15 U.S.C. § 1681c(a)(4), the Higher Education Act does not require an institution of higher education after repayment of the loan in full to retroactively designate the payment history as having been in "collections" or to otherwise utilize similar coding in other areas so as to allow the grossly derelict student to be rewarded for failing to timely pay his or her loan. The Congressional record shows Congress's intent of reporting defaulted loans as an effective tool available during the entire pendency of the loan. *See* S. Rep. No. 105-181, at 45 (1998) ("The committee believes that reporting of defaulted loans to credit bureaus is an effective tool and should be available to institutions and the Secretary of Education for the entire period that loan collection is allowed.").

Mr. Seamans's argument that the account should have been identified as in "collections," and, thus, immediately aged off of his consumer report as soon as the loans were paid in full is just the type of circumstance Congress desired to be avoided – negative credit information being only reported for seven years from the date of delinquency.\[6]

---

[6] /    Had Temple University coded the Date of First Delinquency as "January 1992," the Payment History as "G" and the Account Status as "62" while the Perkins loan remained unpaid, the consumer reporting agencies, according to their

The "paid in full" language of 20 U.S.C. § 1087cc(c) indicates that, once an account status is changed to paid in full, any information regarding the delinquency is no longer available under 15 U.S.C. § 1681c(a)(4), and shielded from use pursuant to 20 U.S.C. § 1087cc(c)(3). At this stage, the account is in a "paid in full" status, no collection activity is taking place and the account is no longer delinquent. Reporting of the account this one final time reflects the current status of the account without regard to prior activity during the exemption period. Any subsequent investigation, then, cannot utilize information pertaining to exempt pre-"payment in full" activity.

The Congressional preclusion of identifying in the time period after the loan is paid in full an account having been in collection during the loan's period of delinquency has its roots in other areas of the law. Courts have continually found that it is inappropriate to refer to activity that has been specifically barred from application after the implementation of the barrier. It follows that to make use of something that has been barred after the fact only undermines the purpose of precluding the exposure of the activity in the first place.

When a record of a conviction is expunged or pardoned, a conviction or grand jury subpoena is treated as though it never existed. After expunction, such

procedures, would have aged Mr. Seamans's tradeline off of his consumer report by the end of 1999. As noted above, this is plainly contrary to the express Congressional intent that delinquent student loan tradelines remain on a consumer's report.

records cannot be utilized for any purpose and, to hold otherwise, would run contrary to the very purpose of expunction. *See United States v. Hines*, 133 F.3d 1360, 1365 (10th Cir. 1998) (citing Arkansas law that states expunged records "shall be sealed, sequestered, treated as confidential and only available to law enforcement and judicial officials; and further signifying that the defendant was completely exonerated of any criminal purpose and that the disposition shall not affect any civil rights or liberties of the defendant."); *State ex rel. Barrick v. Stone*, 499 S.E.2d 298, 299 (Va. 1997) (holding that, once expunged, prior records are "null and void for purposes of professional licensing, as well as for purposes of employment application and record, all handprints, thumbprints, mug shots, and all other records-computer and otherwise-of Petitioner's arrest and conviction."); *Gosnell v. State*, 681 S.W.2d 385, 387 (Ark. 1984) (Hollingsworth, J. dissenting) ("The reason a prior conviction . . . cannot be used to enhance a sentence is simple: the prior conviction no longer exists."); *In re Zignis,* No. A-7900466, 1974 BIA LEXIS 14 (B.I.A. 1974), at *4, 14 I. & N. Dec. 621, at 622-23 (Mar. 14, 1974) ("The desire of Congress to give youth a new chance would be thwarted by deportation. Its policy provides for expungement of offenses by juveniles is as important a congressional policy as the policy to deport narcotics offenders."); Kristin K. Henson, *Can You Make This Go Away?: Alabama's Inconsistent Approach to Expunging Criminal Records*, 35 Cumb. L. Rev. 385, 408 (2005)

("Under Arizona law, 'expungement' is actually a notation that one is cleared of an offense combined with an order to seal the record.    The statute forbids law enforcement agencies and courts to release a sealed record without a court order and creates a remedy in damages for noncompliance with the statute.").

This principle is perhaps most salient in the context of witness impeachment by evidence of a prior conviction.  *See, e.g.*, Fed. R. Evid. 609 (stating that a conviction cannot be used for impeachment "if more than 10 years have passed since the witness's conviction or release from confinement"); *United States v. Ferguson*, 776 F.2d 217, 222 (8th Cir. 1985) (ruling that an order of expungement signed by a state court judge is sufficient evidence to satisfy Federal Rule of Evidence 609(c)); *People v. Field*, 31 Cal. App. 4th 1778, 1786 (Cal. Ct. App. 1995) ("The California Legislature has seen fit to render convictions expunged pursuant to section 1203.4 as incompetent impeachment evidence for ordinary witnesses in civil or criminal trials."); *State v. Anderson*, 466 N.W.2d 681, 681 (Wis. Ct. App. 1991) ("The state argues that because the witness's conviction had been expunged . . . it was no longer a conviction which could be used to impeach the witness and, therefore, the state was not obliged to disclose the witness's conviction to the defendant. We agree."); *but see Wal-Mart Stores, Inc. v. Regions Bank Trust Dept.*, 69 S.W.3d 20, 29 (Ark. 2002) (holding that expunged check-

kiting conviction was admissible to impeach testimony because expunction was not accompanied by a finding of rehabilitation).

The argument advanced by Mr. Seamans would create inconsistent reporting of student loan obligations. As explained above, if an entity such as Temple University were required to report the account as in collections during the pendency of the loan, the tradeline would age off of the consumer report seven (7) years after the Date of First Delinquency regardless of whether the loan was paid in full or not. Congress clearly did not intend this result. Alternatively, if an entity such as Temple University were required to re-code an account after it was paid in full to reflect that it had been in collections during the prepayment period, then paying and non-paying borrowers would be treated differently.

For example, under Mr. Seaman's scenario, a non-paying borrower with a loan repayment period of four (4) years who failed to make payments during the four (4) year repayment period and then fully repaid his obligation four (4) years after the final payment was originally due, would see the tradeline age off of his consumer report immediately after repayment since the Date of First Delinquency was eight (8) years ago. The tradeline would have appeared on his consumer report for eight (8) years before being removed. A similar borrower under a four (4) year repayment plan who timely paid his obligation would see the tradeline age off of his consumer report fourteen years (14) after first being reported. It would

be on his consumer report during the four (4) years of repayment, and, then it would remain on his consumer report for ten (10) years after the date of last activity (final payment). (*See* A272 [Equifax Reinvestigation Report and Accompanying Documents]; A288-91 [Deposition of LaTonya Munson dated April 5, 2012 at 48:12-50:4, 55:7-60:4]). Thus, a borrower could get the tradeline off of his consumer report sooner by not paying, than by paying the account. Clearly, Congress did not intend for non-paying borrowers to see their consumer reports benefited by not paying nor did Congress desire for tradelines to appear on consumer reports in a non-uniform manner. The decision by the District Court reflects that all tradelines will appear on consumer reports for ten (10) years after repayment regardless of how long a consumer takes to repay his loan.

Accordingly, Temple University was not required in its investigation to re-code the account as it was reporting the information accurately – (1) the account was current with a zero balance as of the payment on April 28, 2011;\[7] and (2) the

---

[7] /    There is no material difference between reporting of the account as "Paid; current" (Code 11) with a zero balance and "Paid; closed" (Code 13) with a zero balance for purposes of an alleged injury to credit score. Mr. Seamans did not present any evidence showing how the scoring of his consumer report would have been different in May 2011 when the account was first disputed than in August 2011 when the account Code was changed from 11 to 13. Mr. Seamans's alleged injury (a change in credit scoring) stems from the appearance on his consumer report of the Temple University tradeline in May 2011 following his paying of the account in full. The very existence of the entire tradeline changed the score; not whether the tradeline was reporting a positive notation of 11 or a positive notation of 13.

Perkins loans were in arrears for over 180 days for the twenty-four (24) month time-period prior to Mr. Seamans making payment on April 28, 2011.[8]

### E.    The Consumer Reporting Resource Guide Does Not Have the Force of Law.

Industry standards, customs and trade usages do not carry the force of law and are not binding, unless otherwise specified or utilized in contract interpretation. *See T. I. Const. Co., Inc. v. Kiewit E. Co.*, No. 91-2638, 1992 WL 382306 (E.D. Pa. Dec. 10, 1992) ("[M]anuals and handbooks do not have the binding force of law."); *Rousseau v. Philadelphia*, 589 F. Supp. 961, 971 (E.D. Pa. 1984) (holding that Housing and Urban Development Handbook "does not necessarily raise its provisions to the level of a federal rule or regulation" because "[h]andbooks . . . are considered to be nonbinding instructions or internal operating procedures."); *see also Ray Evers Welding Co. v. Occupational Safety & Health Review Comm'n*, 625 F.2d 726, 732 (6th Cir. 1980) ("Industry standards and customs are not entirely determinative . . . because there may be instances where a whole industry has been negligent . . ."); *Tri State Maint. Corp. v. N. L. R. B.*, 408 F.2d 171, 173 (D.C. Cir. 1968) ("It should be noted also that the industry custom . . . . imposes no binding obligation on petitioner.") (internal quotation omitted).

---

[8] /    For all intents and purposes, the Perkins loans have been in arrears since Mr. Seamans intentionally failed to make the first payment in January 1992.

Rather, industry practices are more akin to administrative interpretations, which may address or compliment a statutory scheme, but do not have the force of law. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters -- like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law . . ."); *Mwantembe v. TD Bank, N.A.*, 669 F. Supp. 2d 545, 553 (E.D. Pa. 2009) (recognizing that "a policy statement, guidance or letter, does not have the force of law"). Industry customs and trade usages are only admissible for the purposes of contract interpretation and cannot be equated with express provisions of law. *See Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001) ("In the law of contracts, custom in the industry or usage in the trade is . . . admissible in construing commercial contracts . . .").

The United States Court of Appeals for the Third Circuit has already determined that mere industry customs and practices in the credit reporting context do not have the force of law. In *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997), this Court rejected a longstanding industry-wide practice whereby consumer reporting agencies notified of a "dispute regarding the completeness or accuracy of information contained in the consumer's credit report" placed the burden upon the data furnishers or creditor to "reinvestigate the disputed information." *See also Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311,

318 (E.D. Pa. 2003) (recognizing that the parroting of information is a "knowing or reckless violation of the FCRA," despite existence of prior industry practice). The Court held that 15 U.S.C. § 1681i imposed a more stringent duty that prevented agencies from "parroting information received from other sources" as a means of escaping liability. *Cushman*, 115 F.3d at 225. Consumer reporting agencies had an independent duty to review disputed information received from furnishers under the FCRA, contrary to then-industry practice. *Id.* at 228.

Similarly, Mr. Seamans would have the Court ignore a clear statutory authority governing the conduct involved in this case in lieu of a policy manual written by consumer reporting agencies and trade associations without the force of law, regulation or even adoption by a single governmental authority.

The CRRG is a document created by the CDIA, an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries. The CDIA warns the users of the copyrighted and proprietary CRRG that

> ALTHOUGH CDIA HAS USED COMMERCIALLY REASONABLE EFFORTS TO PROVIDE ACCURATE INFORMATION NEITHER CDIA NOR THE CRRG OFFERS ANY LEGAL OR OTHER PROFESSIONAL ADVICE. CDIA ALSO MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT THE SUITABILITY, COMPLETENESS, TIMELINESS, RELIABILITY, LEGALITY, OR ACCURACY OF THE CRRG FOR ANY PURPOSE.

In short, the manual Mr. Seamans holds up as a basis for the Court to disregard the statutes enacted by Congress, and the purposes for which Congress intended them, exclaims in its opening pages that it may not be suitable, complete, reliable, legal or accurate for any purpose. Nowhere in the CRRG does it analyze 20 U.S.C. § 1080a(f)(3) or 20 U.S.C. § 1087cc(c) and apply these statutes, which clearly govern reporting federally-funded student loans. The fact that this manual omits statutory sources underscores its unreliability and inapplicability to reporting of federally-funded student loans.

The District Court did not, and this Court should not, give any weight to what amounts to an incomplete policy manual utilized by private actors.

## II.   THE DISTRICT COURT PROPERLY FOUND THE RESULTS OF TEMPLE UNIVERSITY'S INVESTIGATION WERE REASONABLE AS A MATTER OF LAW.

Mr. Seamans could not establish a claim under the FCRA because there was no evidence that Temple University failed to conduct a reasonable investigation after receiving the disputes from Trans Union and Equifax, and there was no evidence that the information being reported was inaccurate, as noted above.

The only private cause of action a plaintiff can bring against a data furnisher like Temple University is under 15 U.S.C. § 1681s-2(b). *See* 15 U.S.C. §1681s-2(b); *see also Krajewski*, 557 F. Supp. 2d at 609 n. 9. However, the FCRA limits liability on data furnishers, such as Temple University, to their failure to conduct a

reasonable investigation with respect to the disputed information following a dispute "provided by a person to a consumer reporting agency." 15 U.S.C. §1681s-2(b). Section 1681s-2(b) deals solely with the furnisher's duty to investigate alleged inaccuracies and correct them where they are found by the furnisher to be incorrect. The standard for data furnishers is only to:

> (1) conduct an investigation with respect to the disputed information; (2) review all relevant information provided to it by the consumer reporting agency; (3) report the results of the investigation to the agency; and (4) if the information is found to be inaccurate or incomplete, report the results to all consumer reporting agencies to which it originally provided the erroneous information.

*Farren*, 2005 U.S. Dist. LEXIS 15230, at *19-20 (citing *Westra*, 409 F.3d at 827). Whether a reinvestigation conducted by a furnisher in response to a consumer's notice of dispute is reasonable thus depends in large part on the allegations made by the consumer and the notice of the allegations provided to the furnisher by the consumer reporting agency. *Krajewski*, 557 F. Supp. 2d at 610; *see also Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599, 606 (E.D. Pa. 2012) ("[T]he notice provided to the furnisher [in the CDV] determines the baseline against which Defendant's investigations are to be measured.")

"Absent allegations of fraud, identity theft, or other issues not identifiable from the face of its records, the furnisher need not do more than verify that the reported information is consistent with the information in its records." *See Krajewski*, 557 F. Supp. 2d at 609-10 (citing *Westra*, 409 F.3d at 827 ("Had Trans

Union given Credit Control notice that the nature of the dispute concerned fraud, then perhaps a more thorough investigation would have been warranted.")). "The statute does not require . . . any data furnisher to take extraordinary means to investigate and discover disputed information but rather calls for a more passive investigation where the data furnisher is determining only that the information provided to it matches the information in its records." *Farren*, 2005 U.S. Dist. LEXIS 15230, at *20-21.

A section 1681s-2(b) claim requires a plaintiff to show "actual inaccuracies that a furnisher's objectively reasonable investigation would have been able to discover." *Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 29-30 (1st Cir. 2010). In the context of a furnisher's obligation to provide accurate information under section 1681-2(b), the term "accurate" has been defined similarly by several circuits. *See Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617-18 (6th Cir. 2012) ("[F]alse information about a consumer is clearly inaccurate."); *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010) ("An item on a credit report can be incomplete or inaccurate within the meaning of the FCRA's furnisher investigation provision, 15 U.S.C. § 1681s-2(b)(1)(D), because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.") (internal quotations omitted) (citing *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir.

2009)); *Chiang*, 595 F.3d at 38 ("[J]ust as in suits against CRAs, a plaintiff's required showing is *factual* inaccuracy, rather than the existence of disputed legal questions."); *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008) ("Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading.").

The United States Court of Appeals for the Third Circuit has adopted the definition of inaccuracy used by the United States Court of Appeals for the Fourth Circuit:

> "A report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse[]' effect." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001) (quoting *Sepulvado v. CSC Credit Servs.*, 158 F.3d 890, 895 (5th Cir. 1998)). Thus, "a consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression." *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008).

*Schweitzer v. Equifax Info. Solutions LLC*, 441 Fed. Appx. 896, 902 (3d Cir. 2011). A consumer report is not inaccurate simply because it may contain a technical difference or alteration which is not materially significant to the substance of the report.

Mr. Seamans's disputes with the consumer reporting agencies, and his subsequent attempt to articulate a cause of action, can be simplified into two areas:

(1) Mr. Seamans disputed that the Temple University tradeline "suddenly" appeared on his consumer report after being absent for many years; and (2) Mr. Seamans disputed the payment history on the account. Both of these areas of dispute are without merit. (A170-72, A182, A183-85 [Deposition of Edward M. Seamans, Jr. at 36:9-37:12, 40:15-41:4, 41:17-43:6, 43:23-44:11, 81:22-82:9, 88:7-89:13, 91:20-93:7]).

### A.    Temple University's Reporting of the Tradeline Was Required by Law.

Temple University is without knowledge as to whether its tradeline actually appeared on Mr. Seamans's consumer report prior to being paid in full on April 28, 2011. Deposition testimony of Temple University and its third-party vendor, ACS, suggests that Temple University consistently reported the tradeline to the three consumer reporting agencies from inception to paid in full. Neither of the representatives of the consumer reporting agencies had any knowledge whether the tradeline was being reported by Temple University or not, or what reason, if any, the consumer reporting agencies had for not reporting the tradeline. Mr. Seamans testified that the tradeline did not appear prior to being paid in full on April 28, 2011. (A179-82 [Deposition of Edward M. Seamans, Jr. at 70:16-72:7, 76:20-78:21, 81:22-82:9]).

None of this is relevant to Mr. Seamans's dispute. Congress directed institutions of higher education to report information regarding "the repayment and

collection of any such loan, including information concerning the status of such loan," 20 U.S.C. § 1087cc(c)(2)(B), and to do so through the time that the loan is paid in full. 20 U.S.C. § 1087cc(c)(3). Following payment on April 28, 2011, Temple University properly reported the information to the consumer reporting agencies. That it may not have appeared on Mr. Seamans's consumer report prior to that date and then appeared thereafter is not a valid complaint.[9] Thus, Mr. Seamans's dispute concerning the appearance of the tradeline is meritless.

In addition, as explained more fully above, because the Higher Education Act did not require Temple University to go back and re-code Mr. Seamans's account to reflect activity during the exemption period, the codes supplied at the time of payment in full were accurately reporting.

**B.** **Temple University's Reporting of the Adverse History Was Required by Law.**

The gist of Mr. Seamans's second area of dispute is that the adverse payment history, the section of the tradeline on the consumer report that identifies when and if a consumer has made payments on time, should not have appeared on

---

[9] / Since the tradeline should have appeared on Mr. Seamans's consumer report from inception through the date it was paid in full, Mr. Seamans actually accidentally benefited in that time period from not having his consumer report reflect a student loan obligation that went unsatisfied for twenty (20) years.

his consumer report as it should have been time-barred under the FCRA.\[10]   Mr. Seamans has argued all of the adverse payment history should have dropped off of the report under 15 U.S.C. § 1681c(a)(4) because he was delinquent from the inception of the repayment period of the Perkins loan (January 1992), having substantially never made a payment in twenty (20) years, and it being greater than seven years since that initial delinquency.\[11]   As explained more fully above, this argument ignores the express language of the Higher Education Act and its interplay with the Fair Credit Reporting Act.

Temple University reviewed its records in responding to the dispute and found nothing inaccurate in its prior reporting that warranted a change at the time of the dispute.   The investigation was reasonable as a matter of law, and the account as reported was accurate as a matter of law.   Because there was no legal obligation to re-code the account, the District Court properly concluded that the investigation by Temple University was reasonable as a matter of law.

---

[10] /    At the time of the disputes, Mr. Seamans's consumer report reflected that the obligation was over 180 days late for the twenty-four (24) months preceding May 2011. This is factually accurate. (A254 [Mr. Seamans's Consumer Report dated May 24, 2011]; A265 [Mr. Seamans's Consumer Report dated April 11, 2012]; A272-74 [Equifax Reinvestigation Report and Accompanying Documents]).

[11] /    Otherwise, the adverse payment history is governed by 15 U.S.C. § 1681c(a)(5), which ages off each month of late payment one month at a time beginning seven (7) years after the earliest reporting late month. The consumer report would be clean of all adverse payment history seven (7) years after April 28, 2011.

**C.    Temple University's Conduct Was Not a Willful Violation as a Matter of Law.**

The District Court properly held that Mr. Seamans could not demonstrate that Temple University's actions were willful as a matter of law. To show willful noncompliance with the FCRA, a plaintiff must show that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others, but [a plaintiff] need not show malice or evil motive." *Perez v. Trans Union, LLC*, 526 F. Supp. 2d 504, 510 (E.D. Pa. 2007) (quoting *Philbin v. Trans Union Corp.*, 101 F.3d 957, 970 (3d Cir. 1996)). Further, to justify an award of punitive damages in an FCRA case, a defendant's actions must be on the same order as willful concealments or misrepresentations. *Lawrence v. Trans Union LLC*, 296 F. Supp. 2d 582, 590 (E.D. Pa. 2003) (citing *Cushman*, 115 F.3d at 227).

There is absolutely no evidence that Temple University acted knowingly and intentionally in a conscious disregard for Mr. Seamans's rights. Temple University received Mr. Seamans's disputes, and, applying the standards set forth in the Higher Education Act, did not delete the tradeline or the accurate adverse history, which identified Mr. Seamans as having been over 180 days late on his obligation, which remained unpaid for twenty (20) years. Even if this Court were to find that the Higher Education Act did not exempt Temple University from reporting the tradeline beyond seven years from when Mr. Seamans first went delinquent, which would be incorrect, there is nothing from which Temple University's reliance on

this issue of first impression could constitute an act of knowing and intentional conscious disregard for Mr. Seamans's rights.

Accordingly, the District Court's dismissal of Mr. Seamans's claim for a willful violation of the FCRA should be affirmed.

## III. THERE IS NO PRIVATE CAUSE OF ACTION FOR FAILING TO MARK A CONSUMER REPORT AS DISPUTED UNDER THE FAIR CREDIT REPORTING ACT.

Under section 1681s-2(a) data furnishers are prohibited from providing information to a consumer reporting agency that the furnisher knows is inaccurate. 15 U.S.C. § 1681s-2(a). As explained above, data furnishers have duties under 1681s-2(b) that are triggered when a consumer disputes the accuracy of information reported by the furnisher to a consumer reporting agency. 15 U.S.C. § 1681s-2(b). Included is the duty to conduct an investigation and report the results to the consumer reporting agency. 15 U.S.C. § 1681s-2(b)(1).

The FCRA creates a private cause of action for violations of section 1681s-2(b), but explicitly bars private suit for violations of 15 U.S.C. § 1681s-2(a), which can only be brought by federal agencies and officials. 15 U.S.C. § 1681s-2(c); *but see Saunders*, 526 F.3d at 148 (permitting cause of action under section 1681s-2(b) against furnisher who failed to report debt as in dispute to consumer reporting agencies); *Gorman*, 584 F.3d at 1163 (finding that private right of action exists to challenge furnisher's subsequent failure to so notify consumer reporting agencies

of dispute after receiving notice of dispute pursuant to the FCRA). Thus, a data furnisher may incur liability for its failure to report or modify inaccurate information under section 1681s-2(b), but it may not be sued for failing to mark an account as disputed under section 1681s-2(a).

While the District Court properly determined that Temple University did not violate the FCRA for refusing to notate Mr. Seamans's consumer report as disputed, this Court should nevertheless clearly reject any effort to create liability under section 1681s-2(b) for the failure to act in accordance with section 1681s-2(a), which expressly precludes liability under a private cause of action.\[12]

### A.     The Third Circuit Should Not Adopt *Saunders* and *Gorman*.

This Court should reject *Saunders* and *Gorman* because they require this Court to allow a private cause of action under section 1681s-2(b)(1)(D) that is expressly forbidden under section 1681s-2(a). *See SimmsParris v. Countrywide Financial Corp.*, 652 F.3d 355, 357 (3d Cir. 2011) (holding that a private individual cannot assert a claim for a violation of section 1681s-2(a) because such claims are available only to the Government). Mr. Seamans nevertheless contends that *Saunders* and *Gorman* authorize a private cause of action under section 1681s-

---

[12] /    An aggrieved consumer has a private remedy through the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p ("FDCPA"), which provides that it is a violation of that statute to "communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8).

2(b)(1)(D) for a data furnisher's failure to report a debt as disputed to the consumer reporting agencies after receiving notice pursuant to the FCRA. However, such an obligation is only enumerated in section 1681s-2(a)(3), a provision that bars any private right of action for a data furnisher's failure to notify a consumer reporting agency that "such information is disputed by the consumer." *See* 15 U.S.C. §§ 1681s-2(a)(3), 1681n, 1681o. Mr. Seamans argues that Temple University's failure to comply with section 1681s-2(a)(3) – a provision for which Congress has explicitly barred private enforcement – is a sufficient stand-alone basis for suit under section 1681s-2(b)(1)(D).

While *Saunders* and *Gorman* appear to support Mr. Seamans's argument that a back-door private cause of action may exist under certain circumstances, they represent a fundamental misinterpretation of the FCRA. The FCRA provides a private cause of action "for the willful and negligent violations of the FCRA." *See* 15 U.S.C. §§ 1681s-2(b), 1681n, 1681o; *see also SimmsParris*, 652 F.3d at 358 ("This leaves 15 U.S.C. § 1681s-2(b) as the only section that can be enforced by a private citizen seeking to recover damages caused by a furnisher of information."). Nevertheless, the Fourth and Ninth Circuits have determined that a furnisher may be liable for providing notice to any consumer reporting agency "without notice that such information is disputed by the consumer," 15 U.S.C. § 1681s-2(a)(3), under the mistaken assumption that such failure to provide notice of a dispute is

"incomplete or inaccurate" under section 1681s-2(b)(1)(D). *Saunders*, 526 F.3d at 148 (noting that it is wrong to conclude that "reporting a debt without reporting its disputed nature can never be deemed inaccurate as a matter of law"); *Gorman*, 584 F.3d at 1163.

Such a result is incongruous with the structure of the FCRA, which specifically provides that no cause of action may lie under section 1681s-2(a), regardless of the specific violation being alleged. *See SimmsParris*, 652 F.3d at 358 ("These provisions, however, cannot be used by a private individual to assert a claim for a violation of § 1681s-2(a), as such claims are available only to the Government."); *Forte v. World Fin. Network Bank*, No. 12-704 (FLW), 2012 U.S. Dist. LEXIS 110589, at *8 (D.N.J. Aug. 7, 2012) ("Subsection (a) does not avail Plaintiff here."); *Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28, 34 (D.D.C. 2012) ("The Act, however, expressly excludes Section 1681s-2(a) from the purview of Sections 1681n and 1681o . . . . Section 1681s-2(a) thus does not provide for a private right of action . . . ."); *Steed v. EverHome Mortg. Co.*, 308 F. Appx. 364, 370 (11th Cir. 2009) ("[T]he statute explicitly bars private suits for violations of this section."); *Allen v. CitiMortgage, Inc.*, No. CCB-10-2740, 2011 U.S. Dist. LEXIS 86077, at *32 (D. Md. Aug. 4, 2011) ("[T]he Fourth Circuit has held that the FCRA explicitly bars consumers from bringing private suits for violations of § 1681s-2(a).").

Nevertheless, *Saunders* noted that section 1681s-2(a)(3) imposes a duty to report consumer disputes, enlarging the scope of the section 1681s-2(b) duty to investigate, because of the interplay between sections 1681s-2(a) and (b). *Saunders*, 526 F.3d at 149. One court adopting *Saunders* reasoned that "[d]istinguishing between the two subsections is important, because private liability is barred under section 1681s-2(a) but not under section 1681s-2(b). *Shames-Yeakel v. Citizens Fin. Bank*, 677 F. Supp. 2d 994, 1005 (N.D. Ill. 2009). The court continued, finding that "[s]ubsection (a) imposes a number of requirements relating to the furnisher's duty to report accurate information, while subsection (b) briefly explains how a consumer dispute triggers the furnisher's duty to investigate its original report for completeness and accuracy." *Id.* According to this reasoning, "if a furnisher has a duty to report information under the subsection (a) standard, that information must also be covered by the subsection (b) duty to investigate and correct 'incomplete or inaccurate' information." *Shames-Yeakel*, 677 F. Supp. 2d at 1005 (citing *Saunders*, 526 F.3d at 149-50).

What courts such as the court in *Shames-Yeakel* have failed to grasp is that "all private litigants [are] unable to maintain a cause of action under 15 U.S.C. § 1681s-2(a)," and the specific duty to report a debt as disputed is exclusively in the province of that subsection. *SimmsParris*, 652 F.3d at 359.

Although trial courts in this Circuit, including the District Court, have adopted *Saunders* and *Gorman*, they have done so with haphazard results, presenting the need for this Court to reject the adoption of those cases. In *Noel v. First Premier Bank*, No. 3:12-CV-50, 2012 U.S. Dist. LEXIS 32595, at *19-20 (M.D. Pa. Mar. 12, 2012), the court adopted *Saunders* and *Gorman*, finding plaintiff's argument that the defendant failed to report a dispute to the consumer reporting agency "based on the proposition that information about an account is not 'incomplete or inaccurate' for purposes of section 1681s-2(b)(1)(D) if the information does not include an account holder's dispute." However, this Court, like most others, has not recognized 15 U.S.C. § 1681s-2(b)(1)(D) as providing an obligation to provide consumer reporting agencies with notice of a consumer dispute. Only in 15 U.S.C. § 1681s-2(a) is this duty made explicit.

In *Shap v. Capital One Fin. Corp.*, No. 11-4461, 2012 U.S. Dist. LEXIS 45939, at *7 (E.D. Pa. Mar. 30, 2012), the court readily admitted that "1681s-2(b) does not expressly require a furnisher to notify a CRA that an account is disputed when verifying the account." Nonetheless, the court continued, reasoning that 1681s-2(b) "requires a furnisher, upon notice from a CRA that a consumer has disputed the account to the CRA, to ensure that the information provided to the CRA is complete and accurate." *Id.* Despite the fact that that section 1681s-2(b) does not address the issue, the court stated that the real issue was whether the

defendant "may be held liable for failing to notify the CRAs that Plaintiff disputed her account," a question that "depends on whether the Court finds that the failure to mark an account as disputed affects the completeness or accuracy of the information provided to the CRAs thereby giving rise to liability under § 1681s-2(b)." *Shap*, 2012 U.S. Dist. LEXIS 45939, at *7. As such, the court adopted *Gorman* and *Saunders*, ruling "that a furnisher's 'technically accurate' report of a delinquent debt may be misleading and negatively effect [sic] a consumer's credit report if the furnisher fails to mark the debt as disputed." *Id.* at 10. As in *Noel*, the *Shap* court overlooked the unavailability of a private cause of action under 15 U.S.C. § 1681s-2(a), the only provision that explicitly requires a furnisher to report a debt as disputed.

### B. Rules of Construction Do Not Yield a Cause of Action Under Section 1681s-2(b) for a Furnisher's Failure to Report a Disputed Debt.

As noted above, within the FCRA, language requiring data furnishers to report notice of a dispute to consumer reporting agencies is found only in section 1681s-2(a), a provision that is explicitly barred from private enforcement. Reading a private right of action for a section 1681s-2(a) violation into the text of section 1681s-2(b) would not only render section 1681s-2(a)(3) superfluous, but contravene the Congressional prohibition on the private enforcement of that provision by incorporating it into 1681s-2(b). *See* 15 U.S.C. §§ 1681s-2(a), 1681s-

2(c), 1681n, 1681o. "To think that Congress clumsily left behind a Trojan horse that a litigant could employ . . . and destroy FCRA's delicately crafted . . . scheme is irrational." *Vartanian v. Portfolio Recovery Associates, LLC*, No. 2:12-CV-08358-ODW, 2013 U.S. Dist. LEXIS 32522, at *19 (C.D. Cal. Mar. 7, 2013).

When interpreting the FCRA, courts must first read the statute itself and determine if the language is ambiguous. If "words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (citing *Rubin v. United States*, 449 U.S. 424, 430 (1981)). In examining a particular provision of a statute, it is important to interpret that provision in the context of the full statutory scheme. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988). Moreover, courts do not merely look "to a particular clause in which general words may be used," but rather examine those words "in connection with it the whole statute . . . and give to it such a construction as will carry into execution the will of the Legislature." *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974); *see also Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002) ("It can be inferred from the structure of the [FCRA] that Congress did not want furnishers of credit information exposed to suit by any and every consumer dissatisfied with the credit information furnished").

It is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citing *Duncan v. Walker*, 533 U.S. 167 (2001)). Moreover, the Third Circuit has expressed disdain for statutory interpretations that "attribute to Congress an intent to create [an incoherent system.]" *Graziano v. Harrison*, 950 F.2d 107, 112 (3d Cir. 1991).

Therefore, the United States Court of Appeals for the Third Circuit should expressly reject *Saunders* and *Gorman*, instead holding that there exists no private cause of action for any violation of 15 U.S.C. § 1681s-2(a).

### C.    Alternatively, this Case Does Not Warrant Application of *Saunders/Gorman* Because Appellant Did Not Advance a Bona Fide Dispute.

As explained above, 15 U.S.C. § 1681s-2(b) does not expressly require a data furnisher such as Temple University to notify a consumer reporting agency that an account is disputed when verifying the account. Rather, it requires a furnisher, upon notice from a consumer reporting agency that a consumer has disputed the account to the consumer reporting agency, to ensure that the information provided to the consumer reporting agency is complete and accurate. Thus, whether Temple University may be held liable for failing to notify the consumer reporting agencies that Mr. Seamans disputed his account depends on

whether the failure to mark an account as disputed affects the completeness or accuracy of the information provided to the consumer reporting agencies thereby giving rise to liability under section 1681s-2(b).

In *Gorman*, the Ninth Circuit found the reasoning in *Saunders* persuasive, holding that a furnisher's failure to report that a debt is disputed may give rise to a private cause of action under section 1681s-2(b). *Gorman*, 584 F.3d at 1163. *Gorman* went a step further than *Saunders*, however; while *Saunders* "assume[d] without deciding that a furnisher incurs liability under § 1681s-2(b) only if it fails to report a meritorious dispute," *Saunders*, 526 F.3d 142 at 151, *Gorman* explicitly held that "[i]t is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s-2(b)." *Gorman*, 584 F.3d at 1163.

Several federal district court decisions, including three in this state, have qualified this holding as did the court in *Gorman*; the dispute submitted by the consumer to the furnisher must be bona fide to create furnisher liability under section 1681s-2(b). *Shap*, 2012 U.S. Dist. LEXIS 45939, at *9-12; *Van Veen*, 844 F. Supp. 2d 599 at 606 (holding that "a furnisher may be held liable for failing to report a debt as disputed if the Plaintiff has lodged a bona fide dispute."); *Noel*, 2012 U.S. Dist. LEXIS 32595, at *21-22 ("We conclude that *Gorman's* determination that failing to report a meritless dispute does not give rise to a

violation of § 1681s-2(b) is consistent with the purpose of the FCRA and is supported by requirements concerning a consumer dispute in other sections of the Act.").

This is consistent with at least one other section of the FCRA. Section 1681s-2(a)(8) provides that the duty to report disputes does not apply where the consumer's dispute is "frivolous or irrelevant."

Here, the District Court correctly concluded that Mr. Seamans's disputes are not bona fide; and the lack of a "dispute" tag on the tradeline did not make the tradeline inaccurate or incomplete. *Seamans*, 2012 U.S. Dist. LEXIS 153899 at *37-39; (A35-37). Quite the opposite, the tradeline as it is presently reporting is accurate and complete. As explained above, Temple University is obligated by statute to report the tradeline through the time that the loan is paid in full. In addition, the Higher Education Act is designed to keep adverse history reporting on a consumer's report following payment in full in accordance with the seven year period set forth in 15 U.S.C. § 1681c(a)(5). Mr. Seamans's disputes attempting to have both the tradeline and adverse history deleted from the consumer report are frivolous and contrary to existing law.

Temple University had no obligation to have an account marked "disputed" following unmeritorious disputes, and the order of the District Court awarding summary judgment to Temple University should be affirmed.

## CONCLUSION

For the foregoing reasons, and for the reasons expressed in the Memorandum of the United States District Court for the Eastern District of Pennsylvania dated October 25, 2012, the Order of the United States District Court for the Eastern District of Pennsylvania dated October 25, 2012, granting summary judgment in favor Temple University and against Edward M. Seamans should be affirmed.

Respectfully submitted,

FINEMAN KREKSTEIN & HARRIS, P.C.

/s/ Richard J. Perr
BNY Mellon Center, Suite 600
1735 Market Street
Philadelphia, PA  19103-7513
215-893-9300
215-893-8719 (facsimile)
rperr@finemanlawfirm.com
Attorneys for Appellee Temple University

Dated:       April 25, 2013

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies that, pursuant to 3d Cir. L.A.R. 28.3(d), Richard J. Perr, Esquire, is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Richard J. Perr
Richard J. Perr
FINEMAN KREKSTEIN & HARRIS, P.C.
BNY Mellon Center, Suite 600
1735 Market Street
Philadelphia, PA  19103-7513
215-893-9300
215-893-8719 (facsimile)
rperr@finemanlawfirm.com
Attorneys for Appellee Temple University

Dated:       April 25, 2013

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)

1. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7(B) because this brief contains 12,989 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14.

/s/ Richard J. Perr
Richard J. Perr
FINEMAN KREKSTEIN & HARRIS, P.C.
BNY Mellon Center, Suite 600
1735 Market Street
Philadelphia, PA  19103-7513
215-893-9300
215-893-8719 (facsimile)
rperr@finemanlawfirm.com
Attorneys for Appellee Temple University

Dated:       April 25, 2013

## CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS

The undersigned hereby certifies that pursuant to 3d Cir. L.A.R. 31.1(c), the text of the E-Brief and Hard Copies submitted in this matter are identical.

/s/ Richard J. Perr
Richard J. Perr
FINEMAN KREKSTEIN & HARRIS, P.C.
BNY Mellon Center, Suite 600
1735 Market Street
Philadelphia, PA 19103-7513
215-893-9300
215-893-8719 (facsimile)
rperr@finemanlawfirm.com
Attorneys for Appellee Temple University

Dated:     April 25, 2013

## CERTIFICATE OF VIRUS CHECK

The undersigned hereby certifies that pursuant to 3d Cir. L.A.R. 31.1(c), a virus check was performed on the E-Brief submitted in this matter by McAfee and no virus was detected.

/s/ Richard J. Perr
Richard J. Perr
FINEMAN KREKSTEIN & HARRIS, P.C.
BNY Mellon Center, Suite 600
1735 Market Street
Philadelphia, PA  19103-7513
215-893-9300
215-893-8719 (facsimile)
rperr@finemanlawfirm.com
Attorneys for Appellee Temple University

Dated:       April 25, 2013

## CERTIFICATE OF SERVICE

I, RICHARD J. PERR, ESQUIRE, hereby certify that on this date, I hand

delivered ten copies of the foregoing Brief of Appellee, to the following:

> Clerk's Office
> U.S. Court of Appeals
> 21400 U.S. Courthouse
> 601 Market Street
> Philadelphia, PA  19106-1790

and served a true and correct copy of the foregoing Brief of Appellee, via first-

class mail, postage prepaid, and electronically on the following:

> Mark D. Mailman, Esquire
> Gregory J. Gorski, Esquire
> Francis & Mailman, P.C.
> Land Title Building, 19th Floor
> 100 South Broad Street
> Philadelphia, PA  19110
> (v) 215-735-8600; (f) 215-940-8000
> mmailman@consumerlawfirm.com
> ggorski@consumerlawfirm.com
> Attorneys for Plaintiff/Appellant

> /S/ Richard J. Perr
> RICHARD J. PERR, ESQUIRE

Dated:    April 25, 2013