**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| Anthony Pritchett | : | |
| 906 Rockland Street | : | |
| Philadelphia, PA 19141 | : | |
| | : | |
| Appellant/Plaintiff, | : | USCA NO.: 12-3906 |
| vii. | : | |
| | : | |
| City of Philadelphia, et al. | : | |
| 1515 Arch Street | : | United States District Court for the |
| Philadelphia, PA 19102 | : | Eastern District of Pennsylvania |
| | : | No.: 11-4682 |
| Appellees/Defendants. | : | |

**APPEAL FROM THE JUDGMENT AS A MATTER OF LAW ENTERED SEPTEMBER 18, 2012 IN THE UNITED STATES DISTRICT COURT, FOR THE EASTERN DISTRICT OF PENNSYLVNIA**
**CIVIL DOCKET NO.: 11-4682**

---

**APPELLANT'S APPENDIX VOLUME II**

---

Matthew B. Weisberg, Esquire
Weisberg Law, P.C.
Attorney for Appellant
Attorney ID No.: 85570
7 South Morton Avenue
Morton, PA 19070
(610) 690-0801

## TABLE OF CONTENTS—APPENDIX VOL. II

PP. 3A – 190A

| Page | Description of Document |
| --- | --- |
| 4A - 9A: | District Court Docket |
| 10A - 178A | Trial Transcript |
| 179A: | Affidavit of Probable Cause |
| 180A: | Criminal Complaint |
| 181A - 183A: | Statement of Sophie Solski |
| 184A - 186A: | Order Dated July 31, 2012 Denying Summary Judgment |
| 187A - 190A: | Criminal Docket |

CLOSED,APPEAL,CASREF,STANDARD

# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:11-cv-04682-TR

PRITCHETT v. WARRENDER et al
Assigned to: MAGISTRATE JUDGE TIMOTHY R. RICE
Demand: $149,000
Case in other court: USCA FOR THE THIRD CIRCUIT, 12-03906
Cause: 42:1983 Civil Rights Act

Date Filed: 07/26/2011
Date Terminated: 09/18/2012
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**ANTHONY PRITCHETT** represented by **MATTHEW B. WEISBERG**
WEISBERG LAW PC
7 SOUTH MORTON AVE
MORTON, PA 19070
610-690-0801
Fax: 610-690-0880
Email: mweisberg@ppwlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**GRAHAM F. BAIRD**
WEISBERG LAW PC
7 SOUTH MORTON AVE
MORTON, PA 19070
610-690-0801
Email: gbaird@weisberglawoffices.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SHAWN WARRENDER**
*INDIVIDUALLY & IN HIS OFFICIAL CAPACITY AS A DETECTIVE IN THE CITY OF PHILADELPHIA POLICE DEPARTMENT*

represented by **MATTHEW K. HUBBARD**
CITY OF PHILA. LAW DEPT
OFFICE OF THE CITY SOLICITOR, CIVIL RIGHTS UNIT
1515 ARCH STREET., 14TH FLOOR
PHILADELPHIA, PA 19103
215-683-5391
Email: matthew.hubbard@phila.gov

4A

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**NIYA L. BLACKWELL**
CITY OF PHILADELPHIA LAW DEPT
1515 ARCH ST.
PHILADELPHIA, PA 19107
215-683-5445
Email: niya.blackwell@phila.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**CITY OF PHILADELPHIA**
*TERMINATED: 07/31/2012*

represented by **NIYA L. BLACKWELL**
(See above for address)
*TERMINATED: 07/31/2012*

**Defendant**

**JOHN DOES 1-10**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/26/2011 | 1 | COMPLAINT against CITY OF PHILADELPHIA, SHAWN WARRENDER, JOHN DOES 1-10 ( Filing fee $ 350 receipt number 046967.), filed by ANTHONY PRITCHETT.(mima, ) (Entered: 07/26/2011) |
| 07/26/2011 | | DEMAND for Trial by Jury by ANTHONY PRITCHETT. (mima, ) (Entered: 07/26/2011) |
| 07/26/2011 | | Summons Issued as to CITY OF PHILADELPHIA, SHAWN WARRENDER. Two Forwarded To: Counsel on July 26, 2011 (mima, ) (Entered: 07/26/2011) |
| 08/16/2011 | 2 | 2 SUMMONS Returned Executed by ANTHONY PRITCHETT re: DOMINIC CICCOLONE served Summons and Complaint upon CITY OF PHILADELPHIA, SHAWN WARRENDER by OMAR HOGUE, LEGAL DEPT. ACCEPTED SERVICE FOR THE DEFENDANT SHAWN WARRENDER AND CITY OF PHILADELPHIA. CITY OF PHILADELPHIA served on 8/10/2011, answer due 8/31/2011; SHAWN WARRENDER served on 8/10/2011, answer due 8/31/2011. (kk, ) (Entered: 08/16/2011) |
| 08/31/2011 | 3 | ANSWER to 1 Complaint with Affirmative Defenses and Certificate of Service by CITY OF PHILADELPHIA, SHAWN WARRENDER.(BLACKWELL, NIYA) Modified on 9/1/2011 (ahf, ). (Entered: 08/31/2011) |
| 09/01/2011 | 4 | NOTICE of Hearing: PRELIMINARY PRETRIAL CONFERENCE SET FOR 10/5/2011 10:00 AM IN JUDGE CHAMBERS BEFORE HONORABLE JOHN R. PADOVA. (Attachments: # 1 Scheduling Information Report, # 2 Letter to Counsel)(gk, ) (Entered: 09/01/2011) |

5A

| | | |
|---|---|---|
| 09/30/2011 | 5 | Discovery Plan by ANTHONY PRITCHETT.(WEISBERG, MATTHEW) (Entered: 09/30/2011) |
| 10/03/2011 | 6 | NOTICE of Hearing: TIME CHANGE - PRELIMINARY PRETRIAL CONFERENCE RESCHEDULED FOR 10/5/2011 03:00 PM IN JUDGE CHAMBERS BEFORE HONORABLE JOHN R. PADOVA.(gk, ) (Entered: 10/03/2011) |
| 10/06/2011 | 7 | SCHEDULING ORDER: FINAL PRETRIAL CONFERENCE SET FOR 1/31/2012 02:00 PM IN JUDGE CHAMBERS BEFORE HONORABLE JOHN R. PADOVA. DISCOVERY DUE BY 12/15/2011. MOTIONS DUE BY 12/29/2011. MOTION IN LIMINE DUE BY 1/17/2012. PLAINTIFF PRETRIAL MEMO DUE BY 1/10/2012. DEFENDANT PRETRIAL MEMO DUE BY 1/17/2012. TRIAL POOL SET FOR 2/1/2012.. SIGNED BY HONORABLE JOHN R. PADOVA ON 10/6/2011. 10/6/2011 ENTERED AND COPIES E-MAILED.(kk, ) (Entered: 10/06/2011) |
| 10/06/2011 | 8 | Minute Entry for proceedings held before HONORABLE JOHN R. PADOVA: PRELIMINARY Pretrial Conference held on 10/5/2011 (kk, ) (Entered: 10/06/2011) |
| 11/14/2011 | 9 | ORDER REFERRING CASE TO MAGISTRATE JUDGE TIMOTHY R. RICE FOR A SETTLEMENT CONFERENCE. SIGNED BY HONORABLE JOHN R. PADOVA ON 11/14/2011. 11/15/2011 ENTERED AND COPIES E-MAILED.(kk, ) (Entered: 11/15/2011) |
| 11/15/2011 | 10 | NOTICE of Hearing: SETTLEMENT CONFERENCE SET FOR 1/10/2012 09:30 AM IN JUDGE CHAMBERS BEFORE MAGISTRATE JUDGE TIMOTHY R. RICE.(km, ) (Entered: 11/15/2011) |
| 12/02/2011 | 11 | ORDER THAT THE PLAINTIFF SHALL HAVE UNTIL 12/22/2011 WITHIN WHICH TO IDENTIFY AND MAKE SERVICE UPON DEFENDANTS JOHN DOES 1-10, OTHERWISE, THE COMPLAINT AS TO DEFENDANT JOHN DOES 1-10 WILL BE DISMISSED FOR LACK OF PROSECUTION. SIGNED BY HONORABLE JOHN R. PADOVA ON 12/1/2011. 12/2/2011 ENTERED AND COPIES E-MAILED.(kk, ) (Entered: 12/02/2011) |
| 12/19/2011 | 12 | MOTION for Extension of Time to Complete Discovery *and Compel Defendant, Warrender's Deposition* filed by ANTHONY PRITCHETT.Certificate of Service. (Attachments: # 1 Exhibit A)(WEISBERG, MATTHEW) (Entered: 12/19/2011) |
| 12/21/2011 | 13 | SCHEDULING ORDER: FINAL PRETRIAL CONFERENCE SET FOR 3/27/2012 02:00 PM IN JUDGE CHAMBERS BEFORE HONORABLE JOHN R. PADOVA. DISCOVERY DUE BY 2/15/2012. MOTIONS DUE BY 2/29/2012. MOTION IN LIMINE DUE BY 3/16/2012. PLAINTIFF PRETRIAL MEMO DUE BY 3/9/2012. DEFENDANT PRETRIAL MEMO DUE BY 3/16/2012. TRIAL POOL SET FOR 4/1/2012. PLAINTIFF SHALL HAVE UNTIL 2/6/20122 WITHIN WHICH TO IDENTIFY AND MAKE SERVICE UPON DEFENDANTS JOHN DOES 1-10, ETC. SIGNED BY HONORABLE JOHN R. PADOVA ON 12/21/2011. 12/21/2011 ENTERED AND COPIES E-MAILED.(kk, ) (Entered: 12/21/2011) |

6A

| | | |
|---|---|---|
| 01/05/2012 | 14 | NOTICE of Hearing: SETTLEMENT CONFERENCE SET FOR 2/7/2012 09:30 AM IN JUDGE CHAMBERS BEFORE MAGISTRATE JUDGE TIMOTHY R. RICE. NOTE DATE CHANGE FROM 1/10/2012.(km, ) (Entered: 01/05/2012) |
| 02/06/2012 | 15 | Minute Entry for proceedings held before MAGISTRATE JUDGE TIMOTHY R. RICE: Settlement Conference (Via telephone) held on 2/6/2012. (kk, ) (Entered: 02/07/2012) |
| 02/15/2012 | 16 | Minute Entry for proceedings held before MAGISTRATE JUDGE TIMOTHY R. RICE: Pretrial Conference held on 2/15/2012. (kk, ) (Entered: 02/16/2012) |
| 02/15/2012 | 17 | TRIAL ORDER THAT THE ABOVE-CAPTIONED CASE IS SCHEDULED FOR TRIAL TO COMMENCE OF SEPTEMBER 18, 2012, AT 9:30 A.M., IN COURTROOM 3G, U.S. COURTHOUSE, 601 MARKET STREET, PHILADELPHIA, PA. TRIAL IS EXPECTED TO LAST TWO DAYS. TRIAL COUNSEL ARE: MATTHEW B. WEISBERG & GRAHAM BAIRD (PLAINTIFF COUNSEL) NIYA L. BLACKWELL (DEFENSE COUNSEL). SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 2/15/12. 2/16/12 ENTERED AND COPIES E-MAILED.(mas, ) Modified on 2/16/2012 (lbc, ). (Entered: 02/16/2012) |
| 02/15/2012 | 18 | SCHEDULING ORDER THAT A FINAL PRETRIAL CONFERENCE IS SCHEDULED FOR 9/11/2012 AT 9:00 A.M. BEFORE MAGISTRATE JUDGE TIMOTHY R. RICE; DISCOVERY SHALL BE COMPLETED BY 5/15/2012; JURY SELECTION IS SCHEDULED FOR 9/18/2012 AT 9:30 A.M. BEFORE MAGISTRATE JUDGE TIMOTHY R. RICE; MOTIONS SHALL BE FILED BY 6/14/2012; MOTIONS IN LIMINE ARE DUE BY 8/13/2012; PLAINTIFF PRETRIAL MEMO IS DUE BY 8/27/2012; DEFENDANT PRETRIAL MEMO IS DUE BY 8/27/2012; A TRIAL DATE IS SCHEDULED FOR 9/18/2012 AT 9:30 A.M. BEFORE MAGISTRATE JUDGE TIMOTHY R. RICE. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 2/15/12. 2/16/12 ENTERED AND COPIES E-MAILED.(ky, ) (Entered: 02/16/2012) |
| 02/17/2012 | 19 | CONSENT to Jurisdiction by US Magistrate Judge by CITY OF PHILADELPHIA, ANTHONY PRITCHETT, SHAWN WARRENDER.. (WEISBERG, MATTHEW) (Entered: 02/17/2012) |
| 02/21/2012 | 20 | CONSENT AND ORDER TO JURISDICTION BY US MAGISTRATE JUDGE TOMOTHY R. RICE TO CONDUCT ALL PROCEEDINGS AND ORDER THE ENTRY OF A FINAL JUDGMENT IN ACCORDANCE WITH 28 U.S.C 636(c) AND FED.R.CIV.P. 73. SIGNED BY HONORABLE JOHN R. PADOVA ON 2/21/2012. 2/22/2012 ENTERED AND COPIES E-MAILED.(kk, ) (Entered: 02/22/2012) |
| 06/14/2012 | 21 | MOTION for Summary Judgment filed by CITY OF PHILADELPHIA, SHAWN WARRENDER.. (Attachments: # 1 Exhibit "A", # 2 Exhibit "B", # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4)(BLACKWELL, NIYA) (Entered: 06/14/2012) |
| 07/16/2012 | 22 | RESPONSE in Opposition re 21 MOTION for Summary Judgment *w/ Proposed Form of Order, Opposition to Defendant's Statement of Facts, and Statement of Undisputed Facts* filed by ANTHONY PRITCHETT, Memorandum, Certificate of |

7A

| | | |
|---|---|---|
| | | Service. (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F)(BAIRD, GRAHAM) Modified on 7/17/2012 (nd, ). (Entered: 07/16/2012) |
| 07/26/2012 | 23 | EXHIBIT "A" TO PLAINTIFFS' RESPONSE IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDMGMENT (DOC. NO.22) by ANTHONY PRITCHETT.(FILED IN HARD COPY DUE TO VIDEO SURVEILLANCE ON DISC). (kk, ) (Entered: 07/26/2012) |
| 07/31/2012 | 24 | ORDER THAT THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO.21) IS GRANTED WITH RESPECT TO PLAINTIFF'S CLAIM AGAINST THE CITY OF PHILADELPHIA (COUNT II), AND DENIED WITH RESPECT TO PRITCHETT'S C;AIMS AGAINST DEFENDANT SHAWN WARRENDER (COUNTS I AND III). SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 7/31/2012.8/1/2012 ENTERED AND COPIES E-MAILED. (kk, ) (Entered: 08/01/2012) |
| 08/27/2012 | 25 | PRETRIAL MEMORANDUM by ANTHONY PRITCHETT Certificate of Service. (BAIRD, GRAHAM) (Entered: 08/27/2012) |
| 08/28/2012 | 26 | PRETRIAL MEMORANDUM by SHAWN WARRENDER. (BLACKWELL, NIYA) (Entered: 08/28/2012) |
| 08/28/2012 | 27 | Proposed Verdict Sheet by ANTHONY PRITCHETT.. Certificate of Service (BAIRD, GRAHAM) (Entered: 08/28/2012) |
| 08/28/2012 | 28 | Proposed Voir Dire by ANTHONY PRITCHETT, SHAWN WARRENDER. Certificate of Service (BAIRD, GRAHAM) (Entered: 08/28/2012) |
| 08/29/2012 | 29 | Proposed Jury Interrogatories by ANTHONY PRITCHETT, SHAWN WARRENDER. Certificate of Service (BAIRD, GRAHAM) (Entered: 08/29/2012) |
| 08/29/2012 | 30 | NOTICE of Appearance by MATTHEW K. HUBBARD on behalf of SHAWN WARRENDER with Certificate of Service(HUBBARD, MATTHEW) (Entered: 08/29/2012) |
| 09/11/2012 | 31 | Minute Entry for proceedings held before MAGISTRATE JUDGE TIMOTHY R. RICE: Final Pretrial Conference held on 9/11/2012 (kk, ) (Entered: 09/12/2012) |
| 09/18/2012 | 32 | Minute Entry for proceedings held before MAGISTRATE JUDGE TIMOTHY R. RICE: Jury Trial (Day 1)on 9/18/2012 (kk, ) (Entered: 09/19/2012) |
| 09/18/2012 | 33 | ORDER THAT THE DEFENDANT SHAWN WARRENDER'S ORAL MOTION FOR JUDGMENT AS A MATTER OF LAW IS GRANTED FOR THE REASONS STATED ON THE RECORD IN OPEN COURT, JUDGMENT IS ENTERED FOR DEFENDANT. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 9/18/2012. 9/19/2012 ENTERED AND COPIES E-MAILED.(kk, ) (Entered: 09/19/2012) |
| 10/04/2012 | 34 | NOTICE OF APPEAL as to 33 Order Dismissing Case, by ANTHONY PRITCHETT. Copies to Judge, Clerk USCA, Appeals Clerk and Certificate of Service. (Attachments: |

| | | |
|---|---|---|
| | | # 1 Exhibit A)(WEISBERG, MATTHEW) Modified on 10/4/2012 (nd, ). (Entered: 10/04/2012) |
| 10/04/2012 | 35 | Clerk's Notice to USCA re 34 Notice of Appeal : (kk, ) (Entered: 10/05/2012) |
| 10/05/2012 | | USCA Appeal Fees received $ 455 receipt number PPE070486 re 34 Notice of Appeal filed by ANTHONY PRITCHETT (kk, ) (Entered: 10/05/2012) |
| 10/10/2012 | 36 | LETTER NOTICE by ANTHONY PRITCHETT *re: Trial Transcript Order* (WEISBERG, MATTHEW) Modified on 10/11/2012 (nd, ). (Entered: 10/10/2012) |
| 10/16/2012 | | NOTICE of Docketing Record on Appeal from USCA re 34 Notice of Appeal filed by ANTHONY PRITCHETT. USCA Case Number 12-3906 (ems) (Entered: 10/16/2012) |
| 11/15/2012 | 37 | TRANSCRIPT of held on 9/18/2012, before Judge TIMOTHY R. RICE. Court Reporter/Transcriber DENNIS TAYLOR. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 12/6/2012. Redacted Transcript Deadline set for 12/17/2012. Release of Transcript Restriction set for 2/13/2013. (kk, ) (Entered: 11/16/2012) |
| 11/15/2012 | 38 | Notice of Filing of Official Transcript with Certificate of Service re 37 Transcript - PDF, 11/16/2012 Entered and Copies Emailed. (kk, ) (Entered: 11/16/2012) |

## PACER Service Center

### Transaction Receipt

04/03/2013 14:05:07

| | | | |
|---|---|---|---|
| **PACER Login:** | pp1274 | **Client Code:** | calendrello |
| **Description:** | Docket Report | **Search Criteria:** | 2:11-cv-04682-TR |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

9A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

\- - -

| | |
|---|---|
| ANTHONY PRITCHETT, Plaintiff | : CIVIL ACTION NO. 11-4682 |
| v | : |
| SHAWN WARRENDER et al, Defendants | : Philadelphia, Pennsylvania<br>: September 18, 2012<br>: 11:02 p.m. |

\- - -

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

\- - -

APPEARANCES:

For the Plaintiff: GRAHAM F. BAIRD, ESQUIRE
Weisberg Law, PC
7 South Morton Avenue
Morton, PA 19070

For the Defendants: MATTHEW K. HUBBARD, ESQUIRE
NIYA L. BLACKWELL, ESQUIRE
City of Philadelphia
Law Department
14th Floor
1515 Arch Street
Philadelphia, PA 19107

Audio Operator: Dennis Taylor

Transcribed By: Jeff Nathanson

- - -

Proceedings recorded by electronic sound recording; transcript produced by computer-aided transcription service.

- - -

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

(The following was heard in open court at 11:02 a.m.)

(Jury voir dire was not requested to be transcribed.)

THE COURT: All right, folks. Counsel, is this the jury you selected?

MR. HUBBARD: Yes, Your Honor.

MR. BAIRD: Yes, Your Honor.

THE COURT: All right. Thank you very much. Members of the panel who were not selected I wanted to thank you for your participation in the process. If you would report back to the second floor for further instructions if there is any other trials. I appreciate it. Leave your cards right on the bench.

(Pause in proceedings.)

THE COURT: Folks, if you don't mind turning your chairs around. Ms. Settles, will you swear the jury.

COURTROOM DEPUTY: You can leave your numbers on the bench, please. Thank you.

(Jury was duly empaneled at this time.)

THE COURT: All right. Folks, now that you have been sworn let me give you some preliminary instructions that is going to guide your participation in the trial. I'm going to describe your role in very

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

basic terms. Can everybody hear me okay?

All right. I'm going to describe your role in very basic terms and I'll give you more detailed instructions on the law tomorrow at the close of the evidence. It will be your duty to find from the evidence what the facts are. You and you alone will determine the facts.

You will then have to apply those facts to the law that I give to you. You must follow the law whether you agree with it or not, and nothing I may say or do during the course of the trial is intended to indicate, or should be taken by you by indicating what your verdict should be.

Now, in this case the plaintiff, Anthony Pritchett, is the party who brought the lawsuit. The defendant, Detective Shawn Warrender, is the party against whom the lawsuit was filed. Mr. Pritchett alleges that Mr. Warrender violated his federal and state rights by unlawfully initiating a criminal prosecution against him July, 2010. Detective Warrender denies the claims.

I'm going to give you more detailed instructions on the law at the end of the case, and then those instructions will control your deliberations, but let me talk to you a little about

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

what constitutes evidence.

Evidence from which you will find the facts will consist of the testimony of the witnesses, documents and other things received into the record as exhibits, and any facts which the lawyers agree or stipulate to, or that I instruct you to find.

Let me remind you of some things that are not evidence. The statements, arguments, and questions by the lawyers are not evidence, nor are any objections they make. Lawyers have an obligation to their client to make objections when they believe evidence is being offered that is improper under the law.

You should not be influenced by any objections or by my ruling on it. If the objection is sustained you should ignore the question. If it is overruled you should treat the answer like any other answer. If you were instructed that some piece of evidence is received for a limited purpose you have to follow that instruction.

If I exclude or tell you to disregard any testimony, it is not evidence and must not be considered. Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. Do not let rumors, suspicions, or anything else you have seen or heard outside of court

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

influence your decision in any way. You are to decide the case solely on the evidence presented here in the courtroom.

Don't concern yourself if I meet with the lawyers at the sidebar of the bench, or whisper with the lawyers, or ask you to leave the room. That means we are discussing legal matters that are not for your consideration. Nothing I do or say, including asking questions or ruling on objections should be taken by you as indicating that I have any feelings about the case. I assure you I do not.

Even if I had an opinion it would be totally unimportant because I will not be deciding this case, you will. You are the decision makers, and you are the most important people in the room. In recognition of your role and the sacrifice you are making from your personal lives to decide this case, whenever you as a jury enter or leave the room everyone in the courtroom will stand out of respect for your awesome responsibility.

Now, there is two types of evidence. There's something called direct evidence and there is something called circumstantial evidence. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is proof of facts

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

from which you may infer or conclude that other facts exist.

An example would be if let's say that this door was closed and you didn't know what the weather was like outside, and someone walked in and sat in the back of the courtroom, dripping wet with an umbrella and wet hat and a wet raincoat, you could infer from those facts that it started raining outside after you came in.

Even though you didn't see it rain and even though no one told you it was raining, you could draw a reasonable inference from those facts that it has started to rain. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any piece of evidence.

Now, as I said, you are the judges of the facts. That is, you have to decide what really happened in this case. An important part of your job will consist of making judgments about the testimony of the witnesses. You have to decide whether you believe what each witness had to say and how important that testimony was.

In making a decision you are going to apply the same common sense thought process that you use in

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

your everyday lives. Some of the questions you ask yourself when you are assessing the credibility or believability of someone include things like was the witness in question was being honest?

Did the witness have a particular reason not to tell the truth, did the witness have a personal interest in the outcome of the case or any motive, bias, or prejudice, did the witness have the opportunity and ability to observe accurately the things the witness testified about, did the witness seem to have a good understanding and memory, and did the witness appear to understand the questions and answer them correctly, or was the witness evasive and hesitant?

Did the witness's testimony differ from the testimony of other witnesses or other evidence you believe, and if so was the difference a major one or a minor one? What was the witness's demeanor or appearance on the stand?

In making up your mind and reaching a verdict do not make any decisions simply because there are more witnesses testifying for one side than the other. Your job is to think about all the testimony of each witness and decide how much you believe what each witness had to say.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Now, we do a lot of note taking and there is some rules you have to follow with that. First, write your name on your notebook, and remember the notes you take are for your own use. They should not be read or shown to anyone.

Don't leave your notebooks in the courtroom. Leave them in the jury room when you leave the courthouse. Also, I would suggest that you not take too many notes, because you could be busy writing things down and miss important testimony.

This is going to be a short trial. It's going to be over in a day, day and a half. So, there's not going to be a long time between when you hear the testimony and when you go to deliberate. So, it will be your recollection of the testimony that counts, so you are probably not going to need to take extensive notes.

Now, we have a court reporter here, Dennis Taylor. He's going to be transcribing the proceedings, but you should not assume that any transcript will be available for your review during deliberations, nor should you consider any notes that you or fellow jurors took as any written transcript. Instead, listen to the testimony and keep in mind you will be relying on your recollection of the testimony during deliberations.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Now, after the lawyers have asked their questions of each witness I am going to give each of you an opportunity to write down any additional questions you may have. Any questions you submit should be to clarify the testimony that the witness has given.

The question should not state an opinion, should not make critical or favorable comments about the case. It should not express any views about the case or attempt to argue with a witness. If you need testimony clarified you can submit a question seeking that clarification.

Somebody on the Court staff will collect your questions and give them to me, and I will privately review them with the lawyers. If I decide to ask the questions, I will ask them from the bench and the witness will answer in your presence. So, none of you will have to actually ask questions in the courtroom. You can write them down and I will ask them.

Now, keep in mind that the Rules of Evidence may prevent me from asking some questions. I am going to apply the same rules to your questions as I do to the questions that are asked by the lawyers. Some of your questions may be modified or rephrased, some may be asked as written, and others may not be asked at

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

all.

If a question you submitted is not asked you should not take it personally, nor should you attach any significance to my decision to allow the question. I caution you not to treat juror questions or the answers to those questions any differently than you would treat any other testimony.

You are to carefully consider all the testimony and other evidence in this case before deciding how much weight to give particular testimony. Any question you submit should be your alone and not the product of a discussion with other jurors. That is keeping with my overall instruction, and you must not discuss the case among yourselves until you have heard my final instructions on the law and you have been told to begin your deliberations.

That's probably going to be the hardest thing you have to do in this trial, because none of you know each other. You have been plucked out of your lives unexpectedly. You can't talk about the case until it's over, so you are going to have to find something else to talk about. The Eagles, or the weather, or your children or grandchildren, whatever that may be, but don't talk about the case until you have heard all of the evidence and I have given you the law.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Now, this is a civil case. Those of you who served as jurors on criminal trials may have heard of the term "Proof beyond a reasonable doubt." That requirement does not apply in a civil case. You should put it out of your mind.

In a civil case the plaintiff, Mr. Pritchett, has the burden of proving his case by what's called a preponderance of the evidence. That means the plaintiff has to produce evidence which considered in light of all the facts leads you to believe that what the plaintiff claims is more then likely true than not true.

So, if you were to put all the plaintiff's evidence one side of a scale and all of the defendant's evidence on the other side of the scale, the plaintiff's evidence would have to make the scales tip somewhat to his side.

If the plaintiff fails to meet this burden, meaning the scales tipped to the defendant's side or are evenly balanced, your verdict must be for the defendant. If you find after considering all the evidence that a claim or fact is more likely so than not so, then that claim or fact has been proved by a preponderance of the evidence.

In determining whether any fact is been

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

proved by a preponderance of the evidence in this case you may, unless otherwise instructed, consider the testimony of all witnesses regardless of who may have called them, and all exhibits received into evidence regardless of who may have produced them.

Now, in this case Mr. Pritchett must prove the following two elements by a preponderance of the evidence to establish his federal claim for malicious prosecution. First, that Detective Warrender acted under color of state law, and second, while acting under color of state law Detective Warrender deprived Mr. Pritchett of his federal right to be free from malicious prosecution.

Because the detective was acting as a detective for the City of Philadelphia at the time, I instruct you that he was acting under color of state law. So, the first element is proven. Therefore, your focus should be on the second element of this claim, whether Detective Warrender violated Mr. Pritchett's Fourth Amendment right to be free from malicious prosecution.

To establish this Mr. Pritchett must prove the following five elements by a preponderance of the evidence. First, Detective Warrender initiated a criminal proceeding against Mr. Pritchett, such as by

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

executing an affidavit of probable cause for his arrest and prosecution.

Second, Detective Warrender lacked probable cause to execute the affidavit of probable cause. Third, the criminal proceeding ended in Mr. Pritchett's favor. Fourth, Detective Warrender acted maliciously for a purpose other than bringing Mr. Pritchett to justice. Fifth, as a consequence of the proceeding Mr. Pritchett suffered a significant depravation of liberty consistent in the seizure.

For his malicious prosecution claim under Pennsylvania law Mr. Pritchett must establish by the preponderance of evidence the same five elements required for his federal claim with one additional element. He must prove under state law that Detective Warrender also acted with willful misconduct.

Now, let me talk to you a little bit about your conduct as jurors. First, during the trial, as I said, you can't discuss the case with anyone or permit anyone, including your fellow jurors, to discuss it with you. Until you retire and begin deliberations you may not talk about the case.

Second, don't read or listen to anything touching on this case in any way. If anyone should try to talk to you about the case bring it to my attention

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

or Ms. Settles' attention, or one of the staff member's attention immediately.

Third, do not communicate with anyone about the case on your cell phone, your e-mail, Blackberry, iPhone, text messages, or on Twitter, or through any blog or website, including Facebook, Google, My Space, Linkdin, or You Tube.

Some of you may know what all those things are. I don't necessarily. So, if you know what they are and you use them, just don't use them concerning this trial. That's the only thing you have to remember.

You may not use any similar technology or social media, if I have not specifically mentioned it. I expect you will inform me as soon as you become aware of another juror's violation of this Court's instruction.

Fourth, don't try to do any research or make any investigation about the case. So, don't use the internet to look up anybody's name or anything about what may have happened in the case. The lawyers are very well prepared, and everything you will need to know will be presented to you in this courtroom.

Don't take any exhibits from the courtroom and don't form any opinion about the case until all of

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

the evidence is in. You were carefully selected because you were the eight people who the lawyers decided would be fair and impartial and keep an open mind.

Finally, you may encounter the lawyers or their clients in the hallways. They will not speak to you. I don't want you to think they are being rude or unfriendly. Rather, they are trying to avoid any appearance that they are trying to influence you in any way.

If anyone should try to talk to you about the case, including a fellow juror, bring it to my attention promptly. As I said, we have good reasons for this ban on discussion, the most important is that you keep an open mind.

Now, I may have to have sidebar conferences with the lawyers. We're just talking about evidence. I ask you to please be patient. If we do that, you can stand and stretch if you want. We're not trying to hide information from you. Some jurors think we're trying to keep information from your ears.

We're talking about evidentiary or legal rules that is part of my job, to make sure all the evidence that comes in is consistent with the law. Now, if I do not grant somebody's request for a

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

sidebar don't consider that as any indication that I had an opinion about the case, because as I said, I don't.

Now, the trial is going to begin in a few minutes. Does anyone need a break before we start with opening statements? What I propose to do is we will have opening statements and then we will break for lunch, and then we will resume after lunch to hear the testimony.

Each side is going to make an opening statement. The opening statement is neither argument nor evidence. It's merely a brief outline of what that party intends to prove, and it is offered to help you follow the evidence as it is presented.

Then, the plaintiff will present his witness and the defendant may cross-examine them. The plaintiff goes first because the plaintiff has the burden of proof. Then, the defense will be permitted to present any witnesses it wants to offer and the plaintiff may cross-examine them.

Sometimes I might even ask a question, but remember that it is the answer to the question that is evidence, not the question itself. You should not speculate that a fact may be true merely because a lawyer asked a question in a way that suggests a fact

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

is true.

After all the evidence is presented I will give you your instruction on the law. Then, the attorneys will be -- well, before I give you the instructions on the law -- I'm going to give you the law, and then the attorneys will make their closing arguments, and then they will be able to summarize and interpret what you have heard and make argument about what you should find. As with opening statements, closing argument is not evidence.

At that point, you will be able to retire to deliberate, and keep in mind that you are going to have to select one of your eight jurors to be your foreperson. That person will be your spokesperson in court when you deliver your verdict.

I assure you that the lawyers are very well prepared and that everyone here, including the court staff, will make this a pleasant experience for you. If there's something you need you can just ask Ms. Settles, or Dennis, or one of my law clerks and we will try to help you with whatever need that you may have while you are here.

Are you prepared, Mr. Baird, to deliver your opening?

MR. BAIRD: Yes, Your Honor.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE COURT: All right. You may do so.

MR. BAIRD: Thank you. Your Honor, counsel, ladies and gentlemen, good morning again. My name is Graham Baird and I have the distinct privilege of representing Mr. Anthony Pritchett in a case that he has brought in federal court before you today against the defendant in this case, Shawn Warrender, an officer of the City of Philadelphia, a police officer of the City of Philadelphia.

First of all, I want to thank you all for your service on this jury, and I am sure that I speak for everyone, including the judge, his staff, as well as the parties in this case and counsel for the defendant, as well, that we are all thankful and happy that you are here.

Today you have the great privilege of sitting on a constitutional law case. Our case deals with the most basic and fundamental source of law, the constitution. Specifically, the Bill of Rights. our case is a Fourth Amendment case. The Fourth Amendment to the Bill of Rights says that "Individuals are free from the intrusion of an unreasonable search and seizure by the government." The government in this case is the police.

When we talk about Fourth Amendment cases

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

typically that's what we're dealing with, an intrusion by the police onto someone's liberty interest, their freedom, and that's what our case is about. It's about the depravation of Mr. Pritchett's freedom for five and a half months where he was in jail for a crime he didn't do, and for a crime that he was ultimately adjudged not to have done. That's why we're here today.

While we all thank you for your service, you also have a solemn obligation. The judge outlined that solemn obligation to you, and it is this, to listen very carefully to this case. It's a simple case, but it's not. The law itself is very complex in this area. You're going to hear towards -- after you have heard all of the facts of the case you're going to hear the judge give you instructions on the law, and they are complex.

So, when you are listening to the evidence itself I want you to focus on the evidence and testimony that you hear. Among that evidence and testimony that you're going to hear is you're going to hear from Mr. Pritchett, the plaintiff in this case, and you are going to hear about what happened to him back in June of 2010.

He was at work. He worked as a janitor, a

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

custodian for a company called Arthur Jackson. Basically, what Arthur Jackson does is they supply cleaning people, janitors, custodians, and cleaning people to the big office buildings and skyscrapers in Philadelphia.

What they do is they contract with the buildings to provide custodians and janitors. Mr. Pritchett was on June 3rd -- excuse me, on June 9th, 2010 Mr. Pritchett was performing his normal duties, picking up the garbage, taking around his -- cleaning up. He finished his shift that day and then he went home.

He comes back the next day and he is not allowed into the building. Okay. He comes back to work on June 10th, not allowed to enter back into the building. They said sorry, Anthony, need your pass, need your keys, you can't come in. He says what's going on, what's happening? We don't want to get into with you, you just got to go home. So, he goes home.

He contacts his union, okay, and he says what's going on here? Later on, he then finds out that he has subsequently been fired for theft, okay, the theft of the personal property of another employee of Arthur Jackson, and that employee's name is Sophie Solska.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Now, what you won't hear in this case, you won't see the property that was actually alleged to be taken, okay? You're going to, in fact, see a surveillance video of Mr. Pritchett performing his work the day of the incident, and you are going to hear about how this surveillance video is the reason that the defendant in this case, Officer Warrender, arrested Mr. Pritchett.

But, when you watch the video you're not going to see any criminal conduct at all. You're going to see a man walking around performing his janitorial duties, doing his job. So, again, I want you to focus very closely on the facts of this case. When you listen to the testimony of Mr. Pritchett, as well as the testimony of other witnesses who are going to take the stand, I need you to pay very close attention to what you hear.

Your evaluation at the end of this case, and it is up to you to basically decide the facts as to whether there were false statements contained in the warrant that defendant Warrender filled out which led to Mr. Pritchett's arrest. I want you to pay very close attention because there are false statements in that warrant. You will hear evidence, very clear evidence, to demonstrate those false statements.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

You're also going to hear about the fact that the investigation that defendant Warrender undertook took about two months. The incident itself happened on June 9th, 2010. Mr. Pritchett showed back up at work on June 10th, was told that he had to go home, finds out he was fired, and later on he is going to an unemployment compensation hearing.

When you file unemployment compensation claims and then your employer disputes those claims, you have to go and appear before a board and say why you didn't deserve to be fired. Mr. Pritchett had never got that opportunity, because when he appeared for his unemployment compensation board on July 28th, 2010 he was taken into custody and arrested by the police.

So, again, your solemn obligation here is to listen very closely to the facts of the case, listen to the testimony, watch the video, and as well as listen to the jury instructions that the judge gives you on the law at the end of the case. We are very confident that you will find in our favor that Mr. Pritchett was arrested in this case without probable cause, giving rise to a violation of his Fourth Amendment rights. Thank you.

THE COURT: Thank you, Mr. Baird. Ms.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Blackwell?

MS. BLACKWELL: Thank you, Your Honor. Ladies and gentlemen of the jury, this case is about one thing and one thing only, and that is credibility. I ask that you consider that one word throughout the course of this trial.

When you hear the testimony of both of the parties and the witnesses, I ask that you think about credibility. When you view the evidence that will be presented during the trial, I ask that you remember that one word, credibility.

My name is Niya Blackwell and my partner, Kevin Hubbard, and I represent the only defendant in this case, and that's Detective Shawn Warrender. Now, Detective Warrender conducted the investigation which led to the arrest of plaintiff in this case.

Now, you will hear from plaintiff and he will tell you that the day before he was suspended, or terminated and not allowed to go in the building, that he had an argument with his supervisor, and that will be a witness names Sophie Solska. He believes that that was the reason for his termination.

But, you are also going to hear from Detective Warrender, and he will tell you about the investigation that he conducted. He will tell you that

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

on June 10th while he was in the district he received what you will come to know as a 7448. That's a complaint or an incident report.

He will tell you that when he received that complaint or incident report there was an allegation of theft at a company called Arthur Jackson. Now, plaintiff works at Arthur Jackson -- plaintiff worked at Arthur Jackson Company.

Now, Detective Warrender then went to that location and he spoke with the building manager. The building manager then directed Detective Warrender to Sophie Solska. Now, you will hear from her throughout this trial. She was the supervisor of plaintiff. She was a person who gave plaintiff his assignments, she was the person who determined what hours plaintiff would work, and she just directed all of his activities.

Now, at the time that Detective Warrender arrived on that day at Arthur Jackson, Sophie Solska wasn't, you know, in her office. She worked the night shift. So, Detective Warrender wasn't able to speak with Sophie about the complaint or about the laptop on that day.

Several weeks later, Sophie Solska showed up at Central Detectives and she gave an official

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

statement to Detective Warrender. She told him exactly what happened, she told him about her laptop, she told him about the employer, she gave her account of what the employer was permitted -- or, the areas where the employer was permitted to go, where he wasn't permitted to go.

In addition to giving Detective Warrender this statement, she watched a video that you will also see in this trial, the video of what's -- the DVD, actually, was video surveillance of the area in Arthur Jackson where Mr. Pritchett worked. So, she watched the video in the presence of Detective Warrender and she pointed out certain things that transpired on June 9th. She also identified Mr. Pritchett on that video.

Now, after watching the video and also considering the interview and the statement given by Ms. Solska, Detective Warrender made out an affidavit of probable cause. He submitted that to the district attorney who reviewed it, approved it, and then issued an arrest warrant for Mr. Pritchett. Mr. Pritchett was then arrested for theft.

Now, that completed Detective Warrender's part in this case. That was his investigation, that was it. Now, at the time of plaintiff's arrest he had been on parole, and so plaintiff was then taken --

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

well, he was processed in the City of Philadelphia and then he was taken immediately to Graterford, and as his attorney said, that he stayed there for five months.

Now, those are simply the facts of the case. That's it, nothing less, nothing more. This case is not complicated, and as Your Honor told you, we don't expect that you will be here very long. But, we ask that you carefully consider everything that is presented.

At the close of the case my partner, Kevin Hubbard, will address you and he will sum up all the evidence, everything you have heard, everything that you have seen, and he will connect all of the dots that will lead you right back to that call too important word that I mentioned, credibility.

We are confident at that point that you will have all the information you need to have, you will know everything that you will need to know to find in favor of Detective Warrender. I thank you for your time.

THE COURT: Thank you, Ms. Blackwell. All right, folks. Why don't we take our lunch recess now and we will resume the trial at a quarter of one, 12:45, so we'll give you roughly an hour for lunch.

If you could all make sure you are gathered

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

back here by 12:40 so we can start right at 12:45 we will try to present all of the testimony to you today, and we'll try to wrap up the trial tomorrow morning. All right. So, keep an open mind, don't discuss the case, and enjoy your lunch.

(Jury out, 11:33 a.m.)

THE COURT: Please be seated, everyone. I just wanted to check to make sure my law clerk sent out a revised copy of the jury charge to you. Does anybody have any issues with that that we need to discuss?

MR. HUBBARD: Your Honor, I just have a -- not really issues as to a couple of typos in there.

THE COURT: Okay. Excellent.

MR. HUBBARD: Let me grab the copy I was looking at.

THE COURT: Part one, or two, or three?

MR. HUBBARD: It is at part two, Your Honor.

THE COURT: Okay.

MR. HUBBARD: I hope I have it. I thought I had one.

(Pause in proceedings.)

MS. BLACKWELL: I have an extra copy here if that will help you.

MR. HUBBARD: No, it's not that, I think the one that I was marking on I didn't bring with me.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Isn't that terrible? So, so much for the typos.

THE COURT: Do you happen to remember where they were?

MR. HUBBARD: I would have to look at it again, Your Honor.

THE COURT: All right. Well, we will proofread it again.

MR. HUBBARD: The other thing is, Your Honor, at the close of the evidence, depending on, you know, how the evidence pans out, I may be requesting an additional paragraph on the substantive law, malicious prosecution that comes directly from the Third Circuit model jury instruction. That's the very last paragraph, it's on of those bracketed optional language depending on the evidence.

THE COURT: Okay.

MR. HUBBARD: And it has to do essentially with "Even if you find the plaintiff has proven the elements of plaintiff's malicious prosecution claim, defendant asserts that he is not liable in this claim because plaintiff was, in fact, guilty of the offense with which he was charged."

It goes on to say that --

THE COURT: But, he was found not guilty, wasn't he?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

MR. BAIRD: The charges were nolle prossed.

THE COURT: They were nolle prossed.

MR. HUBBARD: That's not what I'm saying, Your Honor.

THE COURT: Okay.

MR. HUBBARD: That's not what I am saying. What I am saying is even if they prove the elements of malicious prosecution, including a favorable determination in the criminal matter, it then says "If you find that the defendant has proven by a preponderance of the evidence that plaintiff was actually guilty of the offense, then defendant is not liable for the plaintiff's malicious prosecution claim." I have the model jury instruction right here, Your Honor.

THE COURT: Okay.

MR. HUBBARD: And this is depending on how the evidence pans out. I just wanted to bring it to the Court's attention and counsel's attention.

THE COURT: Okay.

MR. HUBBARD: That is an alternative.

THE COURT: All right. We'll wait and see what happens. Anything else we have to do before lunch?

MR. BAIRD: No, Your Honor.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

MR. HUBBARD: No, Your Honor.

THE COURT: All right. I know you two have some engagement, so you are going to kind of split up this afternoon?

MS. BLACKWELL: Yes.

MR. HUBBARD: Yes, Your Honor.

THE COURT: Okay. All right.

MR. HUBBARD: Mine is at 2:00, Your Honor, before Judge Tucker.

MS. BLACKWELL: Yes.

MR. HUBBARD: And Niya's is before Judge Robreno at three.

THE COURT: All right.

MR. HUBBARD: We will get through this, all of the testimony.

THE COURT: I understand. Okay.

MR. BAIRD: I agree.

THE COURT: I'll work with you.

MR. HUBBARD: Thank you, Your Honor.

THE COURT: Okay. I'll see you at a quarter of and we'll start with testimony.

MR. BAIRD: Thank you, Your Honor.

THE COURT: Thank you, folks, enjoy your lunch.

(Luncheon recess, 11:36 a.m.)

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

AFTERNOON SESSION

12:45 p.m.

(Jury in, 12:45 p.m.)

THE COURT: You guys thought I was kidding about a quarter to one. All right. Please be seated, jurors. Who is your first witness, Mr. Baird?

MR. BAIRD: Mr. Anthony Pritchett.

THE COURT: Okay.

ANTHONY PRITCHETT, Plaintiff, Sworn.

COURTROOM DEPUTY: Please state your name and spell your last name for the record.

THE WITNESS: Anthony D. Pritchett. P-R-I-T-C-H-E-T-T.

COURTROOM DEPUTY: Thank you, sir.

THE COURT: All right. Mr. Baird, you can turn the podium if you want.

MR. BAIRD: Okay. Is that all right?

THE COURT: Wherever you want it.

MR. BAIRD: Okay. Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BAIRD:

Q Good afternoon, Mr. Pritchett.

A Sir.

Q Where do you currently live, sir?

A 906 West Rockland Street, Philadelphia, PA 19141.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q And back in June of 2010 where did you live?
A In Yeadon.
Q Okay. And did you -- were you employed back in June of 2010?
A Yes, sir.
Q Okay. Who were you employed by?
A Arthur Jackson.
Q All right. What does Arthur Jackson do?
A It's a cleaning company.
Q Okay. Can you describe in any more detail what they do?
A Generally, at night the night crew actually does the cleaning, but the day crew, which we are called porters, we have our detail where we maintain, you know, keep the outside clean, the lobby, keep the restrooms stocked up, and stuff like that.
Q What kind of buildings do you clean?
A High-rise office buildings.
Q Okay. And I think you mentioned that back in June of 2010 you were a porter?
A Yes.
Q Okay. About how long did you work for Arthur Jackson?
A Almost -- a little bit more than -- about five years, but I was in this building for almost three

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

years.
Q Okay. And when you say this building, what building are you talking about?
A Four Penn Center.
Q Okay. And that's here in Philadelphia?
A Yes.
Q Okay. Now, in June of 2010 there was an incident giving rise to your separation from employment, is that right?
A Yes.
Q Okay. Tell me what happened.
A That particular day I left ten minutes early.
Q And what date was this, do you know?
A I believe it was the 9th.
Q Of June?
A Yes.
Q Okay. And you left early?
A Ten minutes.
Q Okay. What happened?
A Approximately 4:30 I got a call from our union rep. She works at night. She was telling me I was going to be suspended for a week for leaving ten minutes early.
Q Okay. Had you ever been suspended before?
A No.
Q Okay. And so you left ten minutes early and you

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

were informed that you were going to be suspended for a week?

A Yes.

Q What did you do?

A I told Barbara, who is the shop steward, union rep, for her to tell when Sophie gets in for her to call me so we can work this thing out.

Q Who is Sophie?

A My supervisor.

Q She was your supervisor at this building in June of 2010?

A Yes.

Q And how long had she been your supervisor?

A The whole time I was in the building.

Q About three years?

A Yes.

Q Okay. And talk about what was your relationship with your supervisor for those three years?

A We had a pretty good relationship.

Q Okay.

A I mean, we worked fine together. When she did her inspections I went with her, so --

THE COURT: Hang on one second, sir. Can I just see the lawyers?

MR. BAIRD: Sure.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

(Sidebar discussion as follows:)

THE COURT: Do you want her sequestered? She's here now.

MR. BAIRD: Yes.

THE COURT: That's Ms. Solska?

MR. HUBBARD: That is Ms. Solska.

THE COURT: Why don't we just have her right outside while he's testifying. Is that okay?

MR. BAIRD: Yes.

THE COURT: Thank you.

(Sidebar discussion concluded.)

THE COURT: Sorry for the interruption. Okay. Mr. Baird, you may proceed.

MR. BAIRD: Thank you, Your Honor.

(Pause in proceedings.)

MR. BAIRD: May I, Your Honor?

THE COURT: Of course, sure.

(Pause in proceedings.)

THE COURT: Go ahead, Mr. Baird.

MR. BAIRD: Thank you, Your Honor.

BY MR. BAIRD:

Q So, can you pick up where you left off? What was your relationship with your supervisor, Ms. Solska?

A Well, I was her lead man after the lead man before me, he had died, so that automatically put me, you

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

know, in the lead position. So, I took care of everything.

I gave out the supplies, you know, for the night crew. I was really the only one that had the keys to go anywhere in the building, that was my job. So, I basically just, you know, just checked on the other -- we have one female porter and one other porter that is male.

Q Describe for me in June of 2010 what were your job duties, what is a typical day for you as a porter?

A A typical day is first thing in the morning that I have to is sweep the outside of the building, all the way around, empty all the trash cans outside, because we have what's called -- it's like a loading area where people sit and smoke, and eat lunch and stuff. So, I have to, you know, empty all those trash cans, sweep up cigarette butts.

Then, I go inside, take care of the lobby, make sure there's no trash in the lobby, vacuum the elevators, make sure all the glass is clean, you know, both entrances because it has two entrances, one on JFK and one on Market. I sweep the stairwells. I stay pretty busy. I have -- oh, and trash, the cafeteria, the trash has to be taken out twice a day because, you know, a lot of people in the building eat in the

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

cafeteria.

Let's see, clean the engineer's office. That has to be done everyday. Empty the trash out of the men's restroom, and the other porter, he does all the paper products. I just do the trash.

Q Okay. So, when you found out that you were suspended what did you do?

A Well, I told Barbara to call Sophie and have her call me, because I thought that that was unfair to be given five days off for leaving ten minutes early.

Q Okay. How much were you paid back then?

A $15.77 an hour.

Q And how many hours did you work?

A 40 a week.

Q All right. And would you have lost that money had you been suspended for five days?

A Yes.

Q Okay. Did you eventually discuss this matter with Sophie?

A Yes.

Q Okay. What happened?

A She called me approximately about 7:30 that night.

Q On the 9th?

A Yes.

Q Okay.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A And we got into a really heated argument, and I says, you know, how could you suspend me for a week for leaving ten minutes early? I've never left early the whole time I've been there. We're just going back and forth, hollering and screaming. She says "We'll talk about this when I see you tomorrow." Basically, then she hung up.

Q Okay. Did you report for work the next day?

A Yes.

Q Okay. And what happened?

A I got there, I did the outside perimeter, checked the lobby, did some trash. I wasn't feeling too good, so I waited for my co-worker, Greg. He gets in -- he doesn't start until 7:30, but he gets in like super early, like seven, because I wanted to hand him the keys and for him to call Sophie to let her know that I was leaving.

Q And you were leaving because why?

A Because I felt like crap.

Q Okay. And when was your suspension scheduled to start?

A I never got an actual date for that.

Q Okay. So, after you left then what happened?

A Well, we called her. We both spoke to her on the phone.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Who is we?

A Me and my co-worker, Greg.

Q Okay.

A I got on the phone and told her, I says look, I'm not feeling good, I'm leaving. She said oh, God, you know, so I gave her time to get a replacement, a floater. That's what they call them, floaters. Gave Greg the keys, he took them to security, I went and got my bike, I keep my bike in the office, and I went home.

Q What happened next?

A Nothing.

Q Was there a point in time when you showed up for work and you weren't allowed back in?

A Yeah, I went as usual, got there before seven, and the doors are always --

Q When was this?

A Sir?

Q In relation to these arguments that you were having and the suspension that you got, when was this when you came back into work?

A The next day.

Q This would have been the 10th, the 11th?

A Yes, the 10th.

Q Okay. And what happened then?

A That's the day I was feeling like crap.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay. And at some point you were not allowed back into the building, correct?
A The next morning.
Q And was this the 10th or the 11th?
A It would have to be the 11th.
Q Okay. And what happened there, describe that for us, please.
A Well, every morning I get there I have to knock on a window to let security know I'm there. They unlock the door and they let me in, because I get there early and I ride my bike, so I have to carry it so I don't ride it across the marble floor that's in the lobby. Then, I go straight down to the concourse, to the office, change clothes and go wash up, and start my duties.
Q Okay. And what happened when you are not allowed back in the building?
A I said to security what's going on? He's like I don't know. I said fine, and I turned around.
Q Did the security guard approach you at all?
A No, we spoke --
Q When you first got there?
A We spoke through the glass.
Q Okay. So, he would not -- when you went to get the keys you couldn't get them from the security guard, is

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

that right?

A No.

Q Okay.

A I didn't even go inside the building.

Q Okay. All right. So, you were barred from going back into the building on the 11th, is that true?

A Yes.

Q Okay. What did you do next after that?

A I went home.

Q Okay.

A About two hours later I rode right back downtown to the union office, which is at 16th and Chestnut.

Q So, you were a union worker, then?

A Yes.

Q Okay. And what did you do at the union office?

A I spoke to one of the representatives, and she informed me that I was terminated.

Q Okay.

A And they advised me to go file for unemployment.

Q Did this supervisor provide a reason why you were terminated?

A No.

Q Okay. And did you apply for unemployment?

A Yes.

Q Was that unemployment contested?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A Yes, it was.

Q Okay. Did you ever appear for a hearing on that unemployment?

A Yes.

Q What happened at that hearing?

A The first hearing the representative of Arthur Jackson came, and they were contesting that I was never fired, I just failed to appear for work.

Q Okay.

A Or, I left work without permission.

Q Okay. When did you find out that there was an allegation, or did you ever find out there was an allegation that you stole a laptop?

A No.

Q You never found out about that?

A No.

Q Not even after you -- were you ever arrested for that?

A At the union meeting.

Q Okay. I'm trying to find out when you first found out that you were being accused of stealing.

A The day in the union meeting when the officer said "You know why we're here."

THE COURT: What officer?

THE WITNESS: That officer right there.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE COURT: The defendant, Detective Warrender?

THE WITNESS: Yes, sir.

THE COURT: Okay.

BY MR. BAIRD:

Q When was this union meeting?

A July 28th.

Q Okay.

A 2010.

Q So, a little under two months after you were barred from the Arthur Jackson work place you were arrested at a union meeting?

A Yes.

Q What was the purpose for that union meeting?

A To sit down with Sophie, Charles, and the building secretary to see what they were going to -- because then I was told I wasn't fired, so they kept going back and forth with this, telling me I was fired. I even went to another job site with Charles right there in Bala Cynwyd. He said I could continue to work until we go to this union meeting.

Q Okay. And at the union meeting you were arrested?

A Yes.

Q Were you informed as to what the charges were, as to why you were arrested?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A Yes, the officer read them to me.

Q And what were the charges, if you can remember?

A Theft by taking, conspiracy, and receiving stolen property.

Q Okay. So, you are charged with conspiracy, theft by unlawful taking, and receipt of stolen property, is that true?

A Yes, sir.

Q Okay. Did you have any conversations with the defendant, Officer Warrender, when you were arrested?

A Yeah, we had a few words.

Q Okay. What did you talk about?

A He kept asking me where is the stuff at.

Q Did you know what he was talking about when he said "stuff?"

A No.

Q Okay. Come to find out, did you -- were you -- did you ever find out that you were being arrested for allegedly taking a laptop?

A Yes.

MS. BLACKWELL: Objection.

THE COURT: What's your objection?

MS. BLACKWELL: Question asked and answered.

THE COURT: Well, he didn't answer that particular one, so I will overrule it. Go ahead.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

BY MR. BAIRD:

Q You found out you were being arrested for taking a laptop?

A Yes.

Q Okay. Did you ever find out who this supposed laptop belonged to?

A Yes.

Q Okay. How did you find that out?

A From the defendant.

Q Okay.

A From the officer.

Q Okay. What was your response to the officer when he asked you to tell him where the stuff was?

A I didn't know what he was talking about.

Q Okay. How soon after you arrived at this union meeting were you arrested?

A Well, I sat there for almost an hour, because Sophie and Charles were running late. So, I sat there and when they arrived, shortly after that's when the two detectives came from behind me, because my back was facing the door.

Q Okay. So, you never actually participated in any union meeting or grievance?

A No.

Q Okay. Describe for the jury what that was like, to

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

be arrested?

A Kind of really caught me off guard, because I had no idea why these guys were coming to arrest me. Like I said, my back was towards the door and I believe one of them tapped me on my shoulder, and when I turned around I see these two officers and they said "You're under arrest. You know why we're here." I says I have no idea why you are here.

They put the cuffs on me, took me down the elevator, and put me in a car. Well, they actually did something nice, they let me get my bike, because I had it locked up outside on a pole, and then they took me to the precinct.

Q Okay. And did you have any conversation with defendant Warrender at the precinct?

A Yes.

Q Okay. Tell us about those conversations.

A Basically, it was the same question, where is the stuff at? If you tell us where the stuff is at you will be out of here by tonight.

Q Okay. Did you ever take any laptop?

A No.

Q Okay. Did you ever receive any laptop from someone else who took it?

A No.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Did you go home that night, were you allowed to go home that night?
A The night of the arrest?
Q Right.
A No, sir.
Q Okay. What happened?
A They processed me, took me downstairs, put me in a cell, then I saw the video judge. He let me sign my own release, but he says you have one problem, there's a hold on it.
Q Okay.
A If I could get the hold off of me before the van arrives I could go home, you know, that morning, which never happened, so they took me straight to Graterford Prison.
Q Okay. All right. I would like you to take a look at that trial exhibit book, and I would like to direct your attention to what's been marked as Defendant's Exhibit 4. It's an affidavit of probable cause.
A Yes, sir.
Q Do you know who prepared that document?
A The defendant.
Q Okay. I would like you to review it carefully, the narrative portion under number two, if you don't mind.
A Okay. Is that the "Facts tending to establish the

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

grounds for the issuance of the warrant of arrest and the probable cause for my belief are as follows?"

Q Okay. And you can read it yourself, but I'm going to have a couple of questions about it for you. So, please let me know when you are done reading it, okay?

A Yes, sir.

(Pause in proceedings.)

A Okay.

Q All right. Is there anything in that narrative that's not true?

A Yes. As far as the office --

Q Well, what statement do you believe is not true? Let's start with that.

A Okay. For one, the statement that we are not allowed on the loading dock, that's not true.

Q Okay.

A Okay.

Q All right. Now, do you have keys to that loading dock area or does it require keys?

A No, it is open, anybody that walks through the concourse.

Q Okay. Anything else in there that is not true?

A Okay. Where it says "But has no legal right to be inside the office where the laptop was secured." That's not true, either, because it's a locker

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

room/lunch room/her office.

Q So, it's a place where you and the other employees are allowed to congregate, is that true?

A Yes.

Q Okay. Now, this affidavit of probable cause also makes reference to video surveillance, is that right?

A Yes.

Q Okay. I'm going to play for you and the jury, as well, some video that we have determined is some video that was reviewed by the defendant when he was making out this affidavit of probable cause.

THE COURT: What exhibit is this?

MR. BAIRD: This is referred to as Defendant's Exhibit 3, Your Honor.

THE COURT: All right. Is there any objection to admitting 3 and showing it to the jury?

MS. BLACKWELL: No, Your Honor.

THE COURT: All right.

(Defendant's Exhibit 3, videotape, is admitted into evidence.)

BY MR. BAIRD:

Q As I play the video, Mr. Pritchett, I'm going to have some questions for you to describe for the jury, basically, what they are seeing, because if you are someone who sees this for the first time it's a little

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

confusing.

THE COURT: Can everybody see the screen?

MR. BAIRD: Should I move it a little bit here?

THE COURT: Juror Number 8 down at the end, can you see?

JUROR NUMBER 8: Yes.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q Okay. Mr. Pritchett, can you tell us where this is?

A That's the loading dock.

Q Okay. That's the loading dock area of Four Penn Center?

A Yes.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q And what is that that you see up there in the corner?

A Where?

Q Can you see up there into the corner?

A Yes.

Q Right, the upper-right corner. What is that?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A That's a friend of mine.
Q Okay. And who is that?
A His name is Ron.
Q Okay. And what was Ron there to do for you?
A Pick up my personal effects.
Q Do you know what date this is?
A It would have to be the 10th.
Q Okay.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q Now, Mr. Pritchett, tell us what this is?

THE COURT: Is this a different tape?

MR. BAIRD: This is the same set of videos, it's different cameras.

THE COURT: All Exhibit 3?

MR. BAIRD: All Exhibit 3, different cameras throughout the building.

THE WITNESS: That's the freight area.

MR. HUBBARD: Just for the record, there is one that is called video three and one is called video one.

THE COURT: Okay. This is video one?

MR. BAIRD: Yes.

(Defendant's Exhibit 3, videotape, is being

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

played at this time.)

BY MR. BAIRD:

Q Is that you, Mr. Pritchett?

A Yes, sir.

Q What are you doing?

A Doing trash.

Q Okay.

A Because that's the can that I take outside. There is my dustpan and broom right there in the corner.

Q Okay. And what is that door that you are going in there?

A That's the trash room.

Q Okay. Now, where is this?

A That's in the concourse, that first entrance on your right is how you get up into the lobby of the building, and the freight elevator door is to the left next to the office, the door to the office.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q Now, what is this door here that just opened?

A That is the door to the freight elevator.

Q Okay.

A Now, that next door is the office.

Q Okay. Did we see you at all in that video?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A No.
Q Okay. Is this the same area?
A Yes.
Q Okay.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:
Q Is that you right there, Mr. Pritchett?
A Yes, sir.
Q Okay. Where are you going?
A To the supply room that is right behind that camera.
Q Okay. And what's in the supply room?
A All of our chemicals, our trash bags, paper products, everything that the night crew uses to, you know, to clean or vacuums, wet-vacs, mops, brooms, everything.
Q And do you have a key to that room?
A Yes, I'm the only one that has a key to that room.
Q All right.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:
Q Now, where are you going?
A All right. That room there is -- it belongs to

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Elsevier, but we keep a lot of extra boxes because we do a lot of trash from the clients, so we keep boxes in that room.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q Okay.

A Oh, and that's where I keep my trash can, too.

Q Okay. And what door -- where are you going now?

A Back to the supply room.

Q Okay. To your knowledge, are these videos all from the same date?

A Yes.

Q Okay.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q And that's you again, correct?

A Yes, sir.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q And what was that room that you were just going into there?

A Oh, that's to the freight area.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay. That's where those freight elevators were from the first clip?
A Yes.
Q Okay.
A Yeah, because our door doesn't have a window.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:
Q Is there a reason why this door is staying open?
A Either you prop it all the way open. We try to keep it closed to keep the homeless out. Actually, we're not even supposed to bother that door. It's the job of the engineers to prop it open, because too many times we have gone in and there would be homeless guys sleeping in there.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:
Q Now, can you say what you were doing inside that freight room at this point?
A In the trash room.
Q Okay.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay. Now, what's this room?
A That's the entrance that was on the right that you go up into the lobby of the building.
Q Okay.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:
Q Is that you right there, Mr. Pritchett?
A Yes, sir.
Q What room are you going in there?
A That's the office.
Q Okay. Do you have a key to the office?
A Yes.
Q Do other employees have a key to the office?
A Yes, my co-worker.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:
Q And did you take your trash, the garbage can in there with you?
A Yes.
Q To the office?
A Yes.

(Defendant's Exhibit 3, videotape, is being played at this time.)

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

BY MR. BAIRD:

Q Is that you coming out of the door?

A No, that was one of those -- yeah, that's me.

Q Okay.

THE COURT: Pushing a can?

THE WITNESS: Yes, sir.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q Okay. This is it. Can you tell us what this is?

A It's the loading dock.

Q Okay. Is that you right there?

A Yes, it is.

Q All right. What are you doing in that?

A Taking my stuff out.

Q Okay. Are you allowed in this area during working hours?

A Yes.

Q All right. What is in the loading dock area?

A There is two trash compactors.

Q Okay.

A To the right of that white truck, that last white truck right there.

(Defendant's Exhibit 3, videotape, is being played at this time.)

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

BY MR. BAIRD:

Q Obviously, it is used for deliveries and things of that nature, as well, right?

A Yeah, all day.

Q Okay.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q Does anyone need a key to access the loading dock area?

A No, that's wide open 24/7.

Q All right.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q All right. That's you again, right?

A Yes, sir.

Q Pushing a garbage can again?

A Yes.

Q All right.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MR. BAIRD:

Q Now, at any time in those videos did you see a laptop?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A No, sir.
Q All right. And I believe you testified earlier you were taken to Graterford?
A Yes.
Q All right. And how long did you stay there?
A Approximately seven months.
Q Do you know the date when you were release?
A February 2nd, 2011.
Q Okay. And did you ever go to court or trial during the time you were in jail?
A Yes, sir.
Q For this case?
A Yes.
Q All right. And about how many times did you go to court?
A Four.
Q Four times?
A Yes.
Q Okay. The first time you went what happened?
A They said they couldn't find the video.
Q Okay. So, after you appeared did you go back to jail?
A Yes, sir.
Q Okay. Now, the second time that you went to court what happened?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A The same thing, they couldn't find the video.
Q Okay. And the video we believe to be this video that we just watched, right?
A Yes.
Q Okay. The third time you went to court what happened?
A They claimed that my attorney didn't show up.
Q Okay. And then were you taken back to jail again?
A Yes, sir.
Q Okay. And then the fourth time what happened?
A The fourth time is when I was told that the charges were dismissed.
Q Did you ever appear in front of a judge?
A No, sir.
Q Okay. What was it like in jail in Graterford for six and a half months?
A Well, E block is rough because that's where all the new arrivals come and all the guys from other prisons, that's the block that they go to. So, it's a zoo.
Q Okay. And you were there for six and a half months, right?
A Yes, sir.
Q Okay.
A They wouldn't transfer me to another block because I don't have a home jail here in this state.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay.

A So, that's why they kept me on that transition block.

Q All right. And is it your understanding that the charges against you were dismissed?

A Yes.

Q All right.

MR. BAIRD: I have no further questions. Thank you, Mr. Pritchett.

THE COURT: Okay. Thank you, Mr. Baird. Ms. Blackwell?

MS. BLACKWELL: Yes, Your Honor.

THE COURT: Are you going to need the video, do you want me to leave the lights off?

MS. BLACKWELL: I will need the video.

THE COURT: Okay.

(Pause in proceedings.)

MS. BLACKWELL: The video can stay in, Your Honor. I may not use it with this witness, but I will use it with the next if I don't use it here.

THE COURT: Okay. Should I turn the lights back on then?

MS. BLACKWELL: Yes.

THE COURT: Okay.

(Pause in proceedings.)

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE COURT: Go ahead, you may proceed.

MS. BLACKWELL: Thank you, Your Honor.

THE COURT: It takes two lawyers to turn the lights on.

CROSS-EXAMINATION

BY MS. BLACKWELL:

Q Mr. Pritchett, do you have the exhibit book with you?

A Yes.

Q Okay. I'm going to direct your attention to -- if you turn to the tab that's number nine, number nine, please? Actually, go to the back of that. That's your complaint of a civil action, but towards the end there's a page that says "Municipal Court of Philadelphia County." Just let me know when you are with me.

A What page?

MS. BLACKWELL: Your Honor, may I approach to help him?

THE COURT: Sure.

MS. BLACKWELL: Okay.

THE COURT: You don't have ask.

(Pause in proceedings.)

BY MS. BLACKWELL:

Q Now, you just testified that you were incarcerated

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

as a result of the arrest, correct?

A Yes.

Q Now, there was a detainer on you at the time, correct, of the arrest?

A Well, that's why the detainer was put on me, because of the arrest.

Q Right, because you were on parole at the time, correct?

A Yes.

Q All right. Now, you testified that you appeared for several listings in court. I think you said four times?

A Yes.

Q Okay. Now, I'm going to direct your attention to the page that I just turned to, the Municipal Court of Philadelphia County.

A Yes, ma'am.

Q Turn -- I'm going to direct your attention to the bottom. Do you see where it says "Withdrawn?"

A Yes.

Q Now, there's a sentence there that says "ADA Moore, Attorney Kramer." Are you with me there?

A Yes.

Q It also at the end of that line "Witness failed to appear," do you see that?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A Yes, I see it.

Q Okay. And if you turn to the page before that, turn to the page before that, please. You see where it says "Trial continued," where it has number three at the bottom?

A Number three?

Q Yes, at the very bottom, that last little column. 10-4-2010, do you see that date?

A Yes.

Q And that also says "Witness failed to appear," correct?

A Yes.

Q Did I read that correctly?

A Yes, ma'am.

Q Okay. So, it was your testimony earlier that the video wasn't provided, and that's why the dates were continued, but it's also correct that the witness failed to appear on more than one occasion, correct?

A Yes.

Q Okay. Thank you. Now, you were initially told that you were being suspended on June 9th, correct?

A Yes.

Q And you were informed that you were going to be suspended by your union rep or shop steward?

A Shop steward, yes.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q And that's Barbara?
A Barbara Wright, yes.
Q Now, Barbara told you that you were going to be suspended when you went home that night, correct?
A Yeah, she called me when I was home.
Q And she called you around 4:30?
A Yes.
Q Okay. And she told you you were going to be given five days, didn't she?
A Yes, she did.
Q Okay. Now, Sophie, you spoke with her that night, too, didn't you?
A Yes, I did.
Q And I believe you said you had a heated discussion, correct?
A Yes.
Q Actually, it was more than a heated discussion, it was actually an argument, wasn't it?
A Yes, ma'am.
Q And you were cursing at your supervisor, weren't you?
A Yes, ma'am.
Q You felt comfortable cursing and talking to her that way, correct?
A No, not really.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q But, you did curse at her, didn't you?
A Yes, I did.
Q Okay. Now, the relationship that you had with Sophie, she was your supervisor, correct?
A Yes.
Q But, you also felt that she was a personal friend to you, didn't you?
A Yes.
Q And so it was more than just her being your supervisor?
A Yes.
Q Okay. So, you felt comfortable saying, you know, things to her that normally an employer may not say, correct?
A No, that's not correct.
Q Okay. Now, you said that because -- well, because of this relationship with Sophie being more than just an employer and supervisor, you had a lot of conversations with her, didn't you?
A Every day.
Q Every day. In fact, you had a kind of relationship where you would look at her homework, correct?
A Yes.
Q And she did her homework on her laptop, correct?
A Yes.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q And you see her doing her homework on the laptop, correct?
A Everybody did.
Q Everybody did. So, you know what her laptop looks like?
A Yes.
Q In fact, I think you know that she keeps that laptop in her cubicle, correct?
A Yeah, that's her office.
Q And she locks it up?
A Most of the time she doesn't lock it up, she just locks the door.
Q Okay.
A To the cubicle.
Q All right. But, you actually built that cubicle for her, didn't you?
A Yes, I did.
Q Okay. So, you knew where she put it?
A On her desk.
Q Okay. Now, I believe that on the day that you were notified that you were going to be suspended, that was the same day that you left early?
A Yes, that night.
Q Okay. And that was June 9th?
A Yes.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay. So, I believe your testimony earlier was that you never actually got a date that you were going to be suspended, correct?
A Right.
Q Okay. Now, was it your testimony, and I want to make sure I have things correctly, that on June 10th, the next day, after Barbara, the union rep, told you that you were going to be suspended you went to work the next day?
A Yes.
Q And you said that you completed certain duties? I think you said you did the perimeter?
A Yes, ma'am.
Q Okay. And then I believe you said you weren't feeling well, so you went home?
A Yes.
Q Okay.
A Well, I waited for my co-worker first.
Q All right. You waited for your co-worker, was that Greg?
A Yes.
Q Okay. And Greg comes in at around 8:00?
A No.
Q 7:00?
A Yes.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q So, it was in the morning?
A Yes.
Q Seven in the morning?
A Yes.
Q So, you left after you gave Greg your keys?
A I gave him my keys and we called Sophie in the concourse.
Q Okay. I'm going to direct your attention to -- first, do you recall having your deposition taken with regard to this case, meaning you were questioned in my office?
A Yes.
Q And in the presence of your attorney?
A Yes.
Q All right. It was on January 5th of this very year, correct?
A Yes, ma'am.
Q And you were under oath?
A Yes.
Q Okay. If you turn to that booklet that you have, and please turn to tab ten. Just let me know when you are with me.
A Okay. I'm here.

THE COURT: Did you want Exhibit 9 admitted?

MS. BLACKWELL: Yes, Your Honor.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE COURT: Any objection to 9?

MR. BAIRD: No, Your Honor.

THE COURT: Okay.

(Defendant's Exhibit 9, deposition, is admitted into evidence.)

BY MS. BLACKWELL:

Q Just let me know when you are with me.

A Yes, I'm here.

Q Do you need me to help you?

A No, I'm here.

Q Okay. I would like for you to turn to page 15, and the numbers are actually there. There are actually four pages on one page. So, just look at the top.

A Oh, okay.

Q Do you see that?

A Yes.

Q Okay. Turn to page 15.

A On page 26?

Q At the bottom it would say 29.

A Okay.

Q But, it's actually page 15, the transcript. This says 15.

A Okay.

Q So, I will be reading from 15. If you look at page 15 I am going to direct your attention to -- I'll start

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

reading from line four. I'm sorry, line three.

"Question: That you should not return?

"Answer: No. She told me I'm going to be suspended for five days. I was not told not to come back, so I went to work that morning, and that's when I was told I wasn't allowed back in the building because of these charges."

Did I read that correctly?

A That wasn't the next day, though.

Q But, is that what that -- that is what it says here on this transcript, that's what you said in your deposition, correct?

A Yes, ma'am.

Q Okay. The next question.

"Question: Okay. You went to work the next morning?

"Answer: Yes.

"Question: That would have been June 10th?

"Answer: Yes.

"Question: And so you showed up at work on June 10th as normal?

"Answer: Yes.

"Question: Did you clock in?

"Answer: No, I was not allowed in the building." Do you see that?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A Yes.

Q And did I read that correctly?

A Yes.

Q Okay. Now, it was your testimony this morning that when you went back to work you said you went on the 10th, and you said that you just did a few of your duties. I believe you said you did the outside perimeter, the trash, and then you waited for Greg?

A Yes.

Q But, that wasn't the only thing you did on that day, was it?

A I did the trash on the outside, that was basically it.

Q Okay. But, you emptied your locker and you put some of your personal things in a big box, didn't you?

A Yes, ma'am.

Q Okay. But, you didn't mention that you did that earlier in your testimony?

A Well, I said I packed my stuff.

Q Okay. Now, when you cleaned out your locker it was because you knew you were going to be suspended, correct?

A I didn't know when because Sophie wanted to see me when she came in, and I wasn't feeling good, so I just packed my stuff and I left.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q So, you packed your stuff, but the reason that you packed your stuff was because you knew you were going to be suspended?

A Pretty much.

Q Okay. Now, you packed what you consider to be your personal things, correct?

A Yes.

Q And you left your uniform in the locker, didn't you?

A I have more than one.

Q You have more than one uniform?

A Yes, ma'am.

Q Okay. Now, when you packed your things you put them in a bog box, correct?

A Medium sized box.

Q Okay. Now, you gave that box -- earlier, you said you gave that -- you called a friend and a friend came up to take your things away, your personal things?

A Yes.

Q And I believe you said that that friend's name was Ron today, correct?

A Yes.

Q But, do you recall having your deposition taken in this case?

A Yes.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q And at that time, and that was just a few months ago, that was this very year on January 5th, you said that you didn't even know that person's name, do you remember saying that?

A Well, the guy that came I don't know his name, but he was a friend of Ron's.

Q This morning you said that the person that picked up your things was your friend, Ron?

A No, that's not correct.

Q Okay. Now, when he left, this mysterious person, when he left with your things, now, if you didn't know that guy's name who picked up your things on that day you felt comfortable giving him your personal things and you didn't even know his name?

A It wasn't really nothing valuable.

Q Are you sure about -- you didn't consider any of those things valuable?

A Bike gear, just personal clothes, extra change of clothes, my bike shoes, a pair of sneaks, a whole bunch of crap because my locker, you know, is full.

Q Okay. And you were cleaning it out because you were expecting that you weren't going to come back there?

A For a week, yes.

Q Okay. And you were upset because you didn't think

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

that was fair that you would be suspended for a week without pay just for leaving ten minutes early?
A Yes, ma'am.
Q So, you expressed that to Sophie, didn't you?
A That heated argument. I never spoke to her again after that.
Q Okay. But, that was on 9th, before you packed your things up you spoke with Sophie the night before and told her how can you suspend me for leaving ten minutes early when you leave early all the time? You said that to Sophie, didn't you?
A Yes, ma'am, I did.
Q So, you were pretty much upset and that's why you went back and packed your things, because you knew you were going to be suspended?
A Yes.
Q Okay. Now, you said that you didn't consider those things to be of value. I'm going to direct your attention to that deposition transcript again. Please turn to page 40.
(Pause in proceedings.)
A Okay.
Q Please go to -- I'm going to start reading from line 19. Actually, I'm going to start reading from line 17.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

"Question: And what did your box have in it?

"Answer: It's all my stuff out in my locker.

"Question: So, you were cleaning out your locker because you were leaving for the day?

"Answer: Leaving for a week.

"Question: And this was on June 9th?

"Answer: Yes.

"Question: Okay. You took everything that you had?

"Answer: Well, stuff that I considered of value." Did I read that correctly?

A Yes, you did.

Q Okay. So, you said that that stuff was your valuable stuff, and that's why you were packing it up, correct?

A Yes.

Q And I believe it was your testimony earlier that you never got any notification, so you weren't sure if you were going to be suspended or not, but that's not what you said in your deposition?

A I don't understand.

Q Okay. I just read from your deposition transcript.

A Uh-huh.

Q And you said on June 9th, if you go back up to line 11 I will read it again.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

"Question: And did you do that on June 9th? Did you take any kind of storage box in the area of the loading dock?

"Answer: Yeah, I took my box.

"Question: Your box?

"Answer: Yeah.

"Question: And what did your box have in it?

"Answer: It's all my stuff out of my locker." That's where I was reading from, and then if you go down a little further, line 24.

"Question: Okay. You took everything that you had?

"Answer: Well, I took stuff that I considered of value."

A Yes.

Q Okay. Earlier in your testimony you said that you didn't know anything about when you would be suspended, you were never given any kind of notification?

A That's right.

Q But, you did all of this, meaning taking all of your valuables, because you knew you were going to be suspended?

A Pretty much.

Q Okay. When you were arrested and taken to be processed at the district, you were taken to Graterford

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Prison, I think I said that earlier -- I think you said that earlier? That was because you had been on parole and a detainer had been placed against you, correct?

A Yes.

Q Okay.

MS. BLACKWELL: The Court's indulgence?

THE COURT: Take your time.

(Pause in proceedings.)

THE COURT: Why don't we take a --

MS. BLACKWELL: Break? Okay.

THE COURT: Well, we'll take a break for ten minutes.

MS. BLACKWELL: Okay.

THE COURT: We'll resume at five of two.

MS. BLACKWELL: Thank you.

THE COURT: Thank you. Keep an open mind, folks, and don't discuss the case.

(Jury out, 1:45 p.m.)

(Recess, 1:45 p.m. to 1:58 p.m.)

(Jury in, 1:58 p.m.)

THE COURT: All right. Folks, welcome back. Please be seated. Ms. Blackwell, you may continue.

MS. BLACKWELL: Your Honor, I have nothing further for the plaintiff.

THE COURT: Okay. Mr. Baird, do you have any

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

follow-up?

MR. BAIRD: yes, Your Honor, just a brief redirect.

THE COURT: Okay.

MR. BAIRD: Thank you.

REDIRECT EXAMINATION

BY MR. BAIRD:

Q Mr. Pritchett, Ms. Blackwell asked you some questions about whether you were ever told when your suspension was going to occur, correct, do you remember that?

A Yes.

Q Okay. Were you ever officially notified as to when your suspension was going to occur?

A No, sir.

Q What made you think it was happening that day?

A Well, she wanted to talk. When I got in I said I was feeling like crap, and I waited for my co-worker, handed over my keys, called her, and I went home.

Q And you had had a pretty heated argument the night before, right?

A Oh, yes.

Q And during that argument did Ms. Solska ever agree to decline to suspend you or anything like that?

A No.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay. And just one other little bit of business. The document that Ms. Blackwell had you look at, it's under tab nine.

MR. BAIRD: May I approach, Your Honor?

THE COURT: Of course.

MR. BAIRD: To show him.

(Pause in proceedings.)

BY MR. BAIRD:

Q Now, there's a notation there that says "Witness failed to appear," right?

A Yes.

Q Okay. Under that "Trial continuance," correct? Do you see that?

A No, I don't, sir.

Q Okay. If you look under number three --

THE COURT: You can show him, go ahead.

MR. BAIRD: Okay.

THE WITNESS: Oh, okay, at the very bottom here?

BY MR. BAIRD:

Q Yes, at the very bottom. All right. Ms. Blackwell was asking you some questions about that notation that said "Witness failed to appear." Do you know who that is?

A Yes.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Who is it?
A Ms. Sophie.
Q Okay. And underneath that there's also a notation that says -- well, why don't you read that for me, what does that say?
A "Video missing."
Q Okay. Thank you.

MR. BAIRD: I have no further questions, Your Honor.

THE COURT: Any follow-up, Ms. Blackwell?

MS. BLACKWELL: Yes, Your Honor.

RECROSS-EXAMINATION

BY MS. BLACKWELL:

Q Just briefly, Mr. Pritchett, and I believe you said that it's your testimony that you still weren't officially given any date that you would be suspended, correct?
A Yes, ma'am.
Q I'm going to direct your attention to page 44 in that deposition transcript. Do you need my help? It's probably at tab 11.
A Yes.
Q Are you with me?
A Yes, ma'am.
Q Okay. At the bottom, line 22.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

"Question: And you were under the impression at that moment that you were under suspension or were going to be suspended?

"Answer: Yes." Do you see that?

A Yes.

Q Okay. So, it was your testimony on January 5th that at that moment, on June 9th, you knew or you were under the impression, as it states, that you were under suspension or were going to be suspended. Your answer was yes when I asked you that question?

A Yes.

Q Okay.

MS. BLACKWELL: Nothing further.

THE COURT: All right. Thank you. Does anyone in the jury have any questions of Mr. Pritchett, do you need testimony clarified? Does anybody need a minute to compose a question? Take your time, sir. Just put your note on the bar there when you're ready.

(Pause in proceedings.)

THE COURT: All right. Okay. Anybody else? Mr. Baird?

MR. BAIRD: Yes.

(Sidebar discussion as follows:)

THE COURT: All right. The first question is "Why did you leave work ten minutes early?" Does that

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

have anything to do with this?

MR. BAIRD: I don't think so.

THE COURT: Can I tell the jury it doesn't have anything to do it and they should just focus on whether there was a malicious prosecution, because that doesn't really have anything to do with the prosecution, does it?

MS. BLACKWELL: Not really.

THE COURT: Do you want it asked?

MS. BLACKWELL: You can ask it.

THE COURT: What's the answer?

MR. BAIRD: The answer is I didn't want to be at work. Frankly, I don't know what the answer is.

THE COURT: The next question is "Why did Mr. Pritchett leave ten minutes early?" Okay. "Has the situation happened with other people?"

MS. BLACKWELL: I think they think --

THE COURT: "If so, what is the time period until the employee gets suspended?" So, the malicious prosecution has nothing to do with him leaving early, it has to do with the computer.

MS. BLACKWELL: Yes.

THE COURT: I'll tell them that. Is that okay?

MR. BAIRD: That's fine.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

MS. BLACKWELL: Yes.

THE COURT: Okay. That's it.

(Sidebar discussion concluded.)

THE COURT: Okay. We reviewed your questions, and they all concern the underlying reason, the background on why Mr. Pritchett left work ten minutes early and whether other people were suspended, and things like that.

The lawyers and I agree that whether he left ten minutes early and why has nothing to do with what you are to decide in the case. The focus you should have on this case is whether the detective had basis, probable cause to believe that he stole the laptop and, therefore, was prosecuted for that.

So, the focus here is Mr. Pritchett's claim is he was maliciously prosecuted because he did not steal the laptop, or the officer didn't have a basis to believe that he did. Okay. Is everybody clear on that? So, it doesn't matter why he left ten minutes early, whether it's a good reason, a bad reason, or no reason. Okay. Thanks, folks. Do you want to call your next witness?

MR. BAIRD: Your Honor, we have no further witnesses. However, we would like Exhibit 4 to be offered into evidence, Your Honor.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE COURT: Okay. Exhibit 4 is what?

MR. BAIRD: It's the affidavit of probable cause.

THE COURT: Okay. Any objection to that?

MS. BLACKWELL: No objection, Your Honor.

THE COURT: Okay. So, you would admit 4 and 3, which is the tape, and 9.

MR. BAIRD: Correct, Your Honor.

THE COURT: And then you're going to rest?

MR. BAIRD: Yes, Your Honor.

THE COURT: All right.

(Defendant's Exhibit 4, affidavit, is admitted into evidence.)

THE COURT: Sir, you can step down. Thank you. All right. Where do we go next, Ms. Blackwell?

MS. BLACKWELL: May I see you for a moment, Your Honor?

THE COURT: All right. Folks, we're going to be talking to the lawyer briefly at sidebar. You can stand and stretch for a second.

(Sidebar discussion as follows:)

MS. BLACKWELL: Your Honor, the defendant's move that -- we believe that there's insufficient evidence for the jury to conclude that Detective Warrender lacked any probable cause to arrest

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

plaintiff.

MR. BAIRD: I would ask that that motion be denied on the grounds that there is evidence in the record that there were false statements made within the warrant of probable cause, the affidavit of probable cause.

THE COURT: What false statements?

MR. BAIRD: In terms of the false statements concerning Mr. Pritchett's access to the areas where the laptop was, as well as other areas in the office space, where in Mr. --

THE COURT: Can you move a little, please?

MR. BAIRD: Sorry about that.

THE COURT: That's all right. Go ahead.

MR. BAIRD: The affidavit of probable cause says he didn't have any right to be there.

THE COURT: Okay. "No right to be in this area, he's not allowed on the loading dock during normal business hours." Okay. So, you are saying without those false statements there wouldn't be probable cause?

MR. BAIRD: Agreed.

MS. BLACKWELL: They are not false statements of the detective, Your Honor. They were taken directly from the witness's statement. They are not the

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

detective's words, they are not right, they are taken directly from what the victim or complainant stated about plaintiff's access.

So, it's not as if the detective was making up something false. It was taken directly from another document that's an exhibit.

MR. BAIRD: Some of those statements in the affidavit tend to indicate that it was from the other -- the statement of the independent witness. However, some of the statements say he had no lawful right to access.

MS. BLACKWELL: That was a statement by the complainant.

THE COURT: So, your point is that if somebody told him that, whether it was true or not, doesn't mean he is maliciously prosecuting.

MR. BAIRD: I understand, Your Honor. The motion should be denied because, Your Honor, there's clear evidence that there was statements contained in the affidavit. There's some that come from another source, and there's some that just are essentially legal conclusions, Your Honor, saying he had no lawful access to the --

THE COURT: She said according to the complainant's statement the offender had no right to be

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

in this area, is not allowed on the loading dock during business hours. It's a direct violation of company policy. So, I think it goes from somebody with the company. So, he's just repeating what somebody told him.

How is that malicious? Let's assume they lied. Let's assume they lied just for the sake of argument, how is this officer liable for a civil rights violation if it is reasonable for him to rely on what the owner of the company said?

MR. BAIRD: Because, Your Honor, in addition to those statements there is this issue of this video, and the video surveillance does not show any criminal conduct at all. It just shows a man pushing a garbage can.

THE COURT: In of the scenes there was a box on top of the garbage can. I don't know what was in it.

MR. BAIRD: Correct. No one knows what was in it, Your Honor.

MR. HUBBARD: I want to being to the Court's attention, if you notice when he is going through the loading dock towards the ramp down to the truck, now there's no box on top of it. When he gets to the truck you can see the lid being lifted up and something being

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

placed in the back of the truck, because he turns around and goes back in.

MR. BAIRD: That's an argument, Your Honor.

THE COURT: All right. Well, I'm going to reserve ruling on the motion. There are some issues that I think we need to sort out on this.

MR. BAIRD: Okay.

THE COURT: I'll reserve my ruling until the close of evidence.

MR. BAIRD: Okay.

THE COURT: All right.

MS. BLACKWELL: Thank you.

MR. BAIRD: Thank you, Your Honor.

THE COURT: Thank you.

(Sidebar discussion concluded.)

THE COURT: All right. Ms. Blackwell, does the defense have any witnesses?

MS. BLACKWELL: Yes, Your Honor. Defendant's call -- I'm sorry.

(Pause in proceedings.)

MS. BLACKWELL: Your Honor, the defendant's call Detective Warrender.

THE COURT: All right.

SHAWN WARRENDER, Defendant, Sworn.

COURTROOM DEPUTY: Please state your full

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

name and spell your last name for the record.

THE WITNESS: It's Detective Shawn Warrender, W-A-R-R-E-N-D-E-R.

COURTROOM DEPUTY: Thank you, sir.

THE WITNESS: You're welcome.

DIRECT EXAMINATION

BY MS. BLACKWELL:

Q Good afternoon.

A Good afternoon.

MS. BLACKWELL: Your Honor, before I begin with this witness, it's 2:10. I don't expect to go beyond the time, but I may need to stop and then go to Judge Robreno at three.

THE COURT: Okay. I understand. Ms. Blackwell has another brief court appearance that she has to make at 3:00.

MS. BLACKWELL: Thank you.

BY MS. BLACKWELL:

Q Detective Warrender, how long have you been with the Philadelphia Police Department?

A 16 years.

Q And how many assignments have you had in those 16 years?

A Countless, thousands.

Q Let me be more specific. You are a detective.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

When did you become a detective?

A 2004.

Q Okay. Prior to that, you were a beat officer?

A I was a corporal from 2002 to 2004, and prior to 2002 I was a patrol officer.

Q Okay. Which district were you a patrol officer in?

A As a patrol officer I was assigned to the 4th Police District, as a corporal I was in the 25th District, and promoted to detective in '04 at Central Detectives.

Q Okay. And that's where you are presently?

A That is correct.

Q Okay. Now, how do the duties of a detective differ from a corporal or a beat officer?

A Our aspect is investigating.

Q And what's the procedure or process for your -- well, first, what kind of investigations do you do?

A We investigate robberies, thefts, burglaries, all types of crimes with the exception of homicides and crimes sexual in nature.

Q And what are you required to do in your investigations?

A We're required to investigate all incidents to the fullest.

Q Okay. Do you conduct interviews?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A We conduct interviews, we track down witnesses, any possible video, any kind of additional evidence in addition to what is initially reported on our incident report.

Q Okay. I'm going to direct your attention to the incident which brings us to trial today. Did you conduct an investigation concerning a complaint against the plaintiff?

A Yes, I did.

Q And how did this investigation begin?

A This incident was sent to me. The patrol officers responded to a radio call for theft at Arthur Anderson, Four Penn Center. A patrol officer wrote up the incident. At that time it was sent to Central Detectives for investigation. In essence, is was technically my turn and it was given to me as an assignment.

Q Okay. So, you were provided with a document?

A That's correct.

Q And what police document is that again?

A It's a 7548, the complaint or incident report.

Q Okay. And when did you get that complaint or incident report?

A I believe it was around June 10th.

Q Okay. I'm going to direct your attention to, if

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

you turn to your exhibit book, if you would turn to tab one.

A Okay.

Q Do you see this document?

A I do.

Q And what is this document?

A That's the 7548, the complaint and/or incident report.

Q Okay. And I'm going to direct your attention to the very bottom of this complaint or incident report. It says "Report prepared by." Do you see that?

A That's also correct.

Q Okay. And I believe it says "P/O Sweeney." Would that mean Police Officer Sweeney?

A That's correct.

Q So, that wouldn't be you?

A That's not me.

Q Okay. So, does that mean that you didn't complete this complaint or incident report?

A I did not take this report, no.

Q Okay. I'm going to direct your attention to the top of the 7548. Do you see where it says "Date of occurrence?" It's about the third or fourth line.

A Yes, I do.

Q Okay. What's that date?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A June 9th, 2010.

Q Okay. Now, I'm going to direct your attention to where it says "Description of the incident," do you see that?

A Yes, I do.

Q Okay. And would you read that, just that small box, please?

A The actual job itself?

Q Where it says "Description of incident." There's just some handwriting, would you read that where it says "R/C theft?"

A Right, technically, it's radio call theft.

Q Radio call theft?

A Yes.

Q Okay. And what does it say below that line?

A It says that "The below complainant states she left above location at above date and time, and below items locked in a filing cabinet. Complainant states when she returned to the cabinet at three p.m. on June 10th, below items were missing. No forced entry. Below employee," and it's listed that the plaintiff "Is on video going to the loading dock with a trash barrel at 6:15 in the morning when employees are prohibited to be on that loading area."

Q Okay. Now, this is what was given to you?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A That's correct.

Q And you started this investigation based upon this very document?

A That's also correct.

Q Okay. Did you interview anyone as a result of this 7548?

A I interviewed Ms. Solska.

Q Okay. And why did you interview Ms. Solska?

A She is the complainant.

Q Okay. Where did you interview Ms. Solska?

A I interviewed her inside Central Detectives.

Q Okay. And when you interviewed her what was the allegation?

A The allegation was employee theft.

Q Okay. Now, did you make a record of the statement or the interview that you conducted?

A I did. It was typed.

Q Okay. Now, if you turn to tab two on the same booklet, do you recognize this document?

A I do.

Q What is it?

A That's our 7543. That's the investigation interview record.

Q For purposes of identification it is marked as D-2. Now, is this a form that is used when you conduct an

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

investigation interview?

A Yes, it is.

Q It's always used?

A Yes, it is.

Q And is this what you used for your interview of Ms. Solska?

A Yes, I did.

Q Okay. Now, at the top is a column that says "Name," do you see that?

A Yes.

Q And what is the name?

A Sophie Solska.

Q Okay. Now, if you go down to the middle of this document, I believe it's a Q & A, do you see that?

A Yes, I do.

Q Now, what would this be? Are these your question and --

A These are my questions to Ms. Solska, correct.

Q Okay. If you go down to the bottom of the page you see a signature line?

A Yes, I do.

Q Okay. There's a signature. Whose signature is that?

A That's also Ms. Solska's.

Q Okay. Then, there is a date line or column next to

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

that, do you see that?

A Yes, I do.

Q And what is the date on this?

A That is June 25th, 2010.

Q This is a two-page document? If you turn over to the next page is this still part of this 7543?

A That's also correct, yes.

Q There is a signature at the bottom, do you see that?

A Yes, I do.

Q And whose signature is that?

A That's also Ms. Solska's.

Q And the date?

A It's June 25th, 2010.

Q Okay. Now, when you are drafting, or when you are doing this investigation interview, would you please instruct the Court on how you would conduct this interview?

A Normally, we have the complainant come to Central Detectives, sit him or her down, ask them questions about the incident that they are alleging. We ask them basically what occurred and what evidence do you have to present to me that a crime has occurred?

In this specific instance, Ms. Solska gave me a statement alleging employee theft, in addition to a

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

video that was provided by her company, also that correlates her statement.

Q Okay. Now, are you asking the complainant questions and then typing all of this in a computer?

A Yes, I am.

Q Okay. Now, go back up to the column where the first question is. What was your first question of Ms. Solska?

A "Can you tell me what happened at 1600 JFK on June 9th, 2010 that brings you to Central Detectives?"

"Answer: I arrived for work at 3:15 p.m. I was looking for my laptop that was inside the file cabinet, which was locked. I saw a dent in the lock. This is how it was opened. I noticed that the items that were on a partition were knocked off, which told me that someone had moved the partition.

"I immediately noticed my laptop missing and 20 employee files were gone. I then went to the building manager and reviewed video together and saw unusual activity by the offender. I saw that he was working at 5:50 a.m., but is not scheduled until seven a.m.

"Also, he didn't punch in until 6:50 a.m. His duties was to sweep the lobby and outside the building. He was doing what appeared to be trash

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

removal, which wasn't his scheduled assignment that day. I saw him take a large trash can into the room where the laptop was located.

"There was no reason, there was no trash in that room. Then, I saw him with a storage box on top of the trash can. He didn't have it when he walked in there. He then proceeded to the loading dock. It was now 7:15 a.m. He is not supposed to be there at all. No trash is to be placed in the loading during daytime hours. Trash is supposed to be placed in the trash room."

Q Okay. Now, what was your understanding of Ms. Sophie Solska's relationship with Mr. Pritchett when she came into the district?

A She was his immediate supervisor.

Q Okay. Now, in addition to this interview that she gave you were you provided with any other documents or anything else in relation to this incident?

A The video surveillance.

Q You were provided with video surveillance?

A The video surveillance I had, yes.

Q Okay. And the video surveillance, who provided you with that?

A That was provided by her building manager from Arthur Jackson.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay. So, when you conducted this interview did you have that with you?

A I did have it present, correct.

Q Okay. And did you view that with Ms. Solska?

A I did view it with her, yes.

Q Okay. Now, I'm going to direct your attention to that video surveillance.

THE COURT: Okay. Exhibit 3.

MS. BLACKWELL: It may take me a second.

THE COURT: Mr. Baird can help you.

MR. BAIRD: Sure.

(Pause in proceedings.)

BY MS. BLACKWELL:

Q While we are getting together I want to make sure I understand. You took the interview of Ms. Solska, and at the same time that you were taking her statement you were viewing the video?

A That's correct.

Q Okay. And it was surveillance of what again?

A It's surveillance of the interior of the building.

Q Okay. I think I had directed your attention to the 7543, and I think I said it was a two-page document.

A Two and a half, right.

Q It's two and a half?

A Right.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q There is actually a third page, correct?

A Right, correct.

Q Thank you.

(Pause in proceedings.)

MS. BLACKWELL: Thank you.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MS. BLACKWELL:

Q Now, is this an area that you viewed with Ms. Solska?

A Yes, I did.

Q What was your understanding of what was going on here?

A It was that she guided me through basically his goings on through the course of the day. I'm not familiar with the layout of Four Penn Center, so she was telling me what he was doing at these particular times.

THE COURT: What time of day was this?

THE WITNESS: This was early morning.

BY MS. BLACKWELL:

Q Do you recall what day this was? What were the dates that are in question, do you know which dates we were in?

A It should have been on June 10th. June 9th, June

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

9th.

Q June 9th or 10th?

A June 9th, yeah.

(Defendant's Exhibit 3, videotape, is being played at this time.)

THE COURT: Which is it, do you know?

MS. BLACKWELL: Since there is no date I don't want him to speculate.

THE COURT: Does counsel agree on what date these tapes were made?

THE WITNESS: It had to be June 9th.

MS. BLACKWELL: I think there is a dispute there, Your Honor.

THE COURT: Oh, there is a dispute?

MS. BLACKWELL: There is a dispute on some factual issues. There is paperwork that we will be able to make an argument with.

THE COURT: Okay.

MS. BLACKWELL: After further testimony.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MS. BLACKWELL:

Q Now, did you view this area with Ms. Solska, as well?

A I did.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q What was your understanding of this area?

A This area, according to Ms. Solska, was where her office was. I believe to the left.

Q Where was her office?

A I think it's right off to the left-hand side, right -- when the door opens in the video you will see the loading dock. It's the next room, I believe it's the next room down, I believe.

Q So, it would be on this side?

A I believe so, yes.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MS. BLACKWELL:

Q And how do you know this again?

A She told me.

Q She was directing you?

A That's correct, she directed me.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MS. BLACKWELL:

Q Would this be that same area?

A That's the same area.

MS. BLACKWELL: Your Honor, what I think is going on, I think the video is just running through all of the areas.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

MR. BAIRD: That's right.

THE COURT: Okay.

MS. BLACKWELL: So, even though I wasn't interested specifically in this clip, it's just running through them.

THE COURT: Okay.

MS. BLACKWELL: It's probably better --

MR. BAIRD: You can stop it if you want.

MS. BLACKWELL: I can stop it?

MR. BAIRD: Yes.

MS. BLACKWELL: Will it take me a long time to get back to where I need to be?

MR. BAIRD: No, just hit stop and it will go back to the menu.

(Pause in proceedings.)

MS. BLACKWELL: I'm actually relying on plaintiff's video. The menu is a little different.

THE COURT: Okay. He will help you, just get the pointer.

MR. BAIRD: You have to point it at the --

THE COURT: Down there.

MR. BAIRD: There you go.

(Pause in proceedings.)

MS. BLACKWELL: The clip that we have actually has times on it, and that's what I wrote down

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

in my notes. It will be easier for us to find the particular clip that was at a certain time, and that's what I don't have.

(Pause in proceedings.)

MS. BLACKWELL: Okay. This is fine.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MS. BLACKWELL:

Q What was your understanding of this area?

A This is the loading dock under Four Penn Center. Ms. Solska indicated that she told me that she observed -- when she reviewed these tape she saw the plaintiff walking down the loading dock here, which according to her that he has no right to be down there during daytime business hours.

Q Was plaintiff identified in this video?

A He was identified -- yes, he was identified by Ms. Solska.

Q Do you see the person who was identified in the video?

A Yes, I do.

Q Where is he?

A He is to the left --

MS. BLACKWELL: You can -- Your Honor, can he stand?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE COURT: Yes, sure.

BY MS. BLACKWELL:

Q You may stand up, it may make it easier.

A He is to the left of the trash can. As the lid --

Q You can walk over and point to it so that the jury can understand what you are saying.

A Okay.

Q On that side, Detective.

A All right. I believe it's the can right here, it's a little grainy, but that's the plaintiff over here and this is the driver of the truck. As he comes down the ramp here you will see the trash can open. At that point, his friend reached in, grabbed the box that he provides to him, sits in the back of the pickup truck, and at that point the pickup truck drives away. If you freeze it you can see the box right there in the back of the bed.

Q Okay. Thank you.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MS. BLACKWELL:

Q Do you recall seeing this area when you watched the video?

A Yes, I do.

Q And what does this depict?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A That's the plaintiff -- this is the video right before the one we just viewed, this is him actually walking down the loading dock to the arrival of that pickup truck.

Q Okay. Was this person ever identified?

A No.

(Defendant's Exhibit 3, videotape, is being played at this time.)

THE COURT: How do you know that?

THE WITNESS: He has nothing to do with the case.

THE COURT: No, how do you know that that's what that video is?

THE WITNESS: Oh, Ms. Solska guided me and told me who that was.

THE COURT: Okay.

MS. BLACKWELL: Thank you.

(Defendant's Exhibit 3, videotape, is being played at this time.)

BY MS. BLACKWELL:

Q How about these people?

A No.

Q Okay. Thank you.

(Defendant's Exhibit 3, videotape, is being played at this time.)

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

BY MS. BLACKWELL:

Q So is there anything else -- was it Ms. Solska's interview and then you -- in connection with the DVD --

A Yes.

Q -- is that the information that you had on that day?

A That's correct.

Q What did you do after you watched this video?

A After I viewed the video and concluded the interview with Ms. Solska I submitted an affidavit of probable cause to the district attorney's office.

Q Okay. And did you have any reason to believe that the information that was given to you in the interview and the statement and watching the video, did you have any reason to believe it was false?

A Not at all.

Q Okay. Now, what is an affidavit of probable cause?

A In essence they're just like the facts and circumstances that would lead a reasonable person to believe that some crime has occurred.

Q I'm going to call your attention to defendant's exhibit -- the exhibit that has been marked for identification, Number 4.

A Number 4. Okay.

Q Do you see Exhibit 4?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A I do.

Q And what is it?

A That's my affidavit of probable cause to the District Attorney's Office.

Q Okay. And there is a signature line at the bottom, do you see that?

A I do.

Q Would that be your signature?

A That is my signature.

Q Okay. Now, I'm going to call your attention to paragraph two, do you see that number two?

A I do.

Q Okay. And would you read that, please?

A "The facts tending to establish the grounds for issuance of a warrant of arrest and probable cause from my belief are as follows.

"On June 25, 2010 at 8:45 a.m., inside Central Detectives the complainant did make the following statement. On June 9th, 2010, at 3:15 p.m., at 1600 J.F.K. Boulevard, Concourse level, the complainant reported to work to find her HP laptop, valued $1,200, along with 20 employee files missing from her work station. The laptop was removed from a locked file cabinet. There was a dent in the locking mechanism allowing access, and the immediate

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

surrounding area was in disarray.

"She immediately viewed the security cameras and witnessed an employee who has worked for the company for the last two years enter the office where the laptop was located and then exit with a storage box and proceed to the loading dock.

"According to the complainant's statement the offender has no right to be in this area and is not allowed on the loading dock during normal business hours, a direct violation of company policy."

Q Now, I'm going to stop you right there for a moment and then I'll let you continue. We just watched several clippings from the surveillance, correct?

A Correct.

Q Now, in this affidavit of probable cause, I believe you just read according to the complainant's statement the offender has right to be in this area, and so were you referring to areas that you viewed in the video surveillance?

A That's correct.

Q And was it the complainant's statement that you were relying on when you said that the plaintiff, meaning Mr. Pritchett, was in an area that he should not have been in?

A Yes, I was.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q This wasn't your own thought or theory?
A No, it was not.
Q Okay. You can continue, please. I believe you were at where it says "additional surveillance."
A "Additional surveillance shows the offender placing the storage box in the back of a pickup truck, and that truck flees the parking area, no tag was captured. The offender then returns to work for 20 more minutes, leaves and never returns back to work. The offender still had several hours left to the completion of his shift. The identity of the second male is unknown.

"The offender is a custodian and does have right to be in the areas surrounding the scene of the theft outside of the office, but has no legal right to be inside the office where the laptop was secured."
Q And where did you get that information that the plaintiff, it's termed as the offender here, has no legal right to be inside the office where the laptop was secured?
A Ms. Solska.
Q So that wasn't your own theory?
A It was not.
Q Okay. Please continue.
A "The affiant believes that sufficient probable cause exist for the issuance of an arrest warrant for

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

the offender for theft and receiving stolen property."

Q And the affiant would be you?

A The affiant would be me, correct.

Q And your belief that there was probable cause was based upon what?

A Based upon the statement with Ms. Solska and the video that she got for me indicating what was occurring.

Q Okay. So once you completed this affidavit of probable cause, you know, what happens with it, what happens next?

A After the affidavit of probable cause is submitted to the district attorney's charging unit, they review all the facts that are submitted. At that point they review it, they approve the charges --

THE COURT: So an assistant district attorney looks at it?

THE WITNESS: Yeah, it's an ADA, correct. An ADA, assistant district attorney reviews the charges. If they don't have any questions of me, they will go ahead and approve it. At that point I have to swear it out in front of a bail commissioner, a third independent party, at that point it becomes a warrant.

BY MS. BLACKWELL:

Q Okay. Now, does the district attorney always issue

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

a warrant in response to receiving an affidavit of probable cause?

A No, not always, no.

Q Okay. But they were in this particular instance?

A Correct, in this case they did.

Q Okay. So what did you do when you received the arrest warrant?

A When the arrest was -- when I received the arrest warrant, I contacted Ms. Solska, let her know that there was a warrant for the plaintiff. At that point she said that there was a unemployment hearing coming up and she would inform me when the day was which was in the very near future.

At that point I, along with my partner, went to the location that she provided and she showed me what was going on, where he was. I went in and told the plaintiff that he was under arrest for theft.

Q Okay. I'm going to call your attention to what has been identified as Defendant's Exhibit 5. Would you please turn with me.

A Okay.

Q Do you see that?

A I do.

Q And what is this, please?

A That's the warrant, warrant of arrest.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Warrant of arrest?

A Correct.

Q And that was provided from the district attorney's office?

A That's correct.

Q Okay. If you go --

THE COURT: Is that signed by the bail commissioner?

THE WITNESS: It's signed by, yes, the bail commissioner, that's correct.

THE COURT: So that means that person like functions as a judge.

THE WITNESS: That's exactly what it is.

THE COURT: And they have to approve it?

THE WITNESS: Yes, it's a third -- it goes through the district attorney's office first, they do the charges. If they see no problem with it, it comes back to me, then I contact the bail commissioner. I have to swear it out in front of him and true and fact -- he also reads the facts of the case, concurs, and then at that point he signs off on it and then it becomes a warrant.

MS. BLACKWELL: Okay. May I, Your Honor?

THE COURT: Oh, I'm sorry.

MS. BLACKWELL: No, I want to make sure Your

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Honor was finished. No, I wanted to make sure I wasn't in --

THE COURT: Go ahead. Sorry.

BY MS. BLACKWELL:

Q Now, on the arrest warrant at the beginning, or at the top of the page, I should say, near the middle I see where it says, "charges," do you see that?

A Charges, yes.

Q And then there are three charges if we count them, do you see those?

A I do.

Q Now, are you the person who charges or would charge the plaintiff with these -- I believe --

A No, no, I don't charge. I recommend. The district attorney could either approve or decline them.

Q Okay. Now, what happened when you arrested Mr. Pritchett?

A After Mr. Pritchett was arrested he was transported to Central Detectives. At that point that was the last I saw of him --

Q Okay.

A -- and at that point it's out of my hands. I don't do anything more with it at that point.

Q Now, when you arrived on location to make the arrest of Mr. Pritchett, do you recall asking him

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

anything?

A No, I don't ask him any question pertinent to the case.

Q Now, you heard his testimony today, correct?

A I did.

Q And you heard him say that you asked him "Where's the stuff"?

A Right.

Q Did you do that?

A I did not.

Q Are you sure of that?

A I'm actually positive.

Q Okay. Now, did you testify at any criminal proceeding in connection with these charges?

A No, I was never subpoenaed.

Q Okay. Now, did you know Mr. Pritchett prior to receiving that 7548 on the first day?

A Never saw him before.

Q Okay. Did you know Mr. Solska, I'm sorry, Ms. Solska prior to receiving that 7548?

A No, I never saw her before.

Q Did you know anyone at Arthur Jackson?

A No, I did not.

Q Okay. Now, were you ever -- I noticed that you said that you weren't subpoenaed to testify.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A No.

Q Do you ever recall being asked to provide a video surveillance DVD for court or for any other purposes?

A Until I found out I was being sued, that was the only time I found out I produced the videos, but nothing criminal, no.

Q Meaning being sued in the case for which --

A Right.

Q -- we are here for today --

A Right, that's correct.

Q -- that was the first time that you were asked for the video?

A That's the first time, correct.

MS. BLACKWELL: Okay. Thank you, Officer. Nothing further -- or detective.

THE COURT: Mr. Baird.

MR. BAIRD: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BAIRD:

Q Good afternoon, Detective.

A Good afternoon.

Q I think you testified that you have had thousands of cases over the years, right?

A I mean from patrol officer up, I would say, yes, a thousand cases, yes, there was a lot.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay. And you testified in many of those cases, correct?

A I have, yes.

Q Okay. Testified hundreds of times probably?

A It's quite a few.

Q Now, Ms. Blackwell asked you some questions about the affidavit of probable cause, do you recall that?

A I do.

Q And you recited what you swore out in the affidavit of probable cause in court today, right?

A Yes.

Q Okay. And I want to draw your attention -- and the reason that you put these statements in the affidavit of probable cause is to enable the bail commissioner, the judicial officer to essentially make a decision as to whether there should be charges or a warrant issued, is that right?

A That's correct.

Q Okay. And it's very important that you make statements to enable that person to make a proper determination, correct?

A Correct.

Q And the information that you're putting in here, you decide what information goes in there, right?

A Correct.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay. And it would be very important for you not to omit certain things, right?
A What do you mean, omit?
Q Omit information to allow the bail commissioner to make a determination on a warrant?
A I would never -- you mean omit facts of the case?
Q Yes.
A No, I would never omit facts.
Q Okay. And what about a false statement, if you put a false statement in here, that would also be problematic, right?
A That would be trouble, yes.
Q Okay. I want to draw your attention to one statement in the affidavit of probable cause where it indicates -- it's about -- and this is under tab four, Detective.
A Tab four, okay.
Q It's the tenth line down and be begins "The offender," do you see that? Take your time.
A Yes, "The offender," I got it.
Q "The offender then returns to work for 20 more minutes, leaves and never returns back to work." Did I read that accurately?
A That's in there, yes.
Q Okay. And where did you get the information set

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

forth in that statement?

A That's from Ms. Solska.

Q Okay. I want to draw your attention to her statement which is tab two. And if you look at page two of tab two, that's her statement.

A Okay.

Q And I want to draw your attention to the middle of that statement on page two of tab two where it says, "Has he been back to work since 6-9-10?"

And then that's the question that you ask Ms. Solska. And then the answer is, "Yes, he came back on the 10th of June, but he wasn't allowed in the building."

Do you see where that says that?

A "Came back," I got it, yes.

Q Okay. So your statement set forth in the affidavit of probable cause that he left and never returned back to work, that's inaccurate?

A I would say, yes, I guess.

Q Okay. Now, you testified that all of your information in formulating your affidavit of probable cause came about through the statement of Sophie as well as this video surveillance that we've been watching today, is that true?

A That's correct.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q You didn't take any other interviews, is that true?
A No.
Q You never took a statement from Mr. Pritchett about this, right?
A No.
Q Okay. You never did any investigation other than talk to Sophie as to whether Mr. Pritchett had access to the areas that were depicted int he video, right?
A She indicated, yes, he doesn't have access to the areas.
Q Okay. But you didn't talk to anybody else about that, right?
A No. She was his immediate supervisor. I didn't feel it necessary to speak to anyone else.
Q You didn't ask her whether he had keys to those areas?
A No.
Q Okay. You didn't ask Mr. Pritchett whether he had access to those areas?
A I didn't speak to Mr. Pritchett at all.
Q Okay. You never asked Mr. Solska whether she had any reason to be angry with Mr. Pritchett, right?
A No.
Q You never talked to her about any argument she was in with him the night before?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A No.

Q Where he cursed at her and swore at her, you had no information about that?

A No, none.

Q You never asked anything about that?

A I did not.

(Pause in proceedings.)

Q There's another person in this video, a truck driver that you pointed out.

A On the loading dock?

Q Yes, in the loading dock video clip.

A Okay.

Q You never made any effort to find that person, did you?

A No, I did not.

Q Okay. Now, in this video you never actually saw the laptop, is that correct?

A I never saw the laptop, no.

Q Now, in Sophie's statement she talks about a dent in her locker area?

A Correct.

Q You never inspected the dent in the locker area?

A If you read the 7548, which is the initial report that I received that shows that there is no signs of force, there's no signs of force entry and no damage.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

So it implies that there was no scene to process until after I spoke to her several weeks later that she actually said there was damage.

Q Okay. So the incident report that was prepared by Patrol Officer Sweeney actually indicates that there was no damage at all to the locker?

A No.

Q Is that true?

A That's true.

Q Okay. But, yet a few days later when you talked to Sophie, now all of a sudden she's saying there's a dent in the locker, is that right?

A According to her statement, yes.

Q Okay. So now she has some conflicting statements that you've heard about this dent, is that true?

A That's correct.

Q Okay. And that was at the time that you prepared the affidavit of probable cause?

A That's correct.

Q Okay. And you never made any effort to actually look at the cabinet where supposedly Sophie is saying there's a dent, right?

A No.

Q Okay. And I believe you've also testified, Detective, that you never appeared for any court

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

hearings for Mr. Pritchett on this criminal matter, right?

A No subpoenas, no.

Q Okay. And when you say there's no subpoenas, that means there was never any request made to you to actually go and appear?

A Exactly.

Q Okay. And you were never told to actually bring the video, correct?

A No.

Q Yet in these documents we have it indicates that there was no witness present and that there was a missing video, correct?

A Right.

Q Okay. Did you ever ask Sophie whether she had a photograph of her with the laptop or any receipt to represent what the value of the laptop was?

A No, I don't recall asking her that, no.

MR. BAIRD: All right. That's all I have. Thank you, Detective.

THE WITNESS: Okay. Thank you.

THE COURT: Mr. Hubbard?

MR. HUBBARD: Yes, Your Honor. I just have a few questions.

THE COURT: Okay.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

REDIRECT EXAMINATION

BY MR. HUBBARD:

Q Good afternoon.

A Good afternoon.

Q Detective, I would like you to go back to D-4, the affidavit of probable cause, and that very sentence that Mr. Baird went through with you where it begins, "The offender then returns to work for 20 more minutes."

A Correct.

Q And as I understand it, you were asked about this particular statement that on the 10th of June, he didn't return to work, but wasn't allowed to enter the building, is that correct?

A To my knowledge, yes, he wasn't allowed.

Q But as you testified earlier, the information that's contained in this statement on the affidavit of probable cause, this is the information that was provided to you from the complainant, is that correct?

A That's correct.

Q And when we say "complainant" in an affidavit of probable cause or any paperwork regarding police work, what do we mean by complainant?

A Complainant would be the witness, in essence, the person bringing the complaint against whoever she's

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

accusing of a theft.

Q Okay. So in other words, is it fair to say it's basically the victim?

A Yes.

Q Okay. Now, I want to direct your attention to D-2, which is the investigation interview record of Sophie Solska and specifically the last page of that, which is page three.

A Okay.

Q At the beginning of that page there is an answer, do you see that?

A The last page, right?

Q Yes.

A Yes, answer.

Q And that answer is Ms. Solska's answer, correct?

A That's her, yes, that's her answer.

Q And that answer was in the context of you viewing a disk number three and asking her what was occurring, correct?

A Correct.

Q And she gives you a narrative of what was occurring, is that correct?

A That's also correct.

Q And as she was giving you this narrative, you were typing out her responses, correct?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A I was.

Q Okay. And what's the very last sentence in that answer?

A "Anthony then returns back to work for another 20 minutes and never returns."

Q Okay. So if we compare that statement from Ms. Solska with what appears in D-4, the sentence that begins with "The offender," do you see that?

A In the affidavit of probable cause?

Q Right.

A Right.

Q How is that different from what appears in Mr. Solska's interview?

A They are not, they're identical.

Q Okay. In fact, just for the jurors clarification, read what appears in the affidavit of probable cause?

A It reads, "The offender then returns to work for 20 more minutes, leaves, and never returns back to work."

Q Okay. Now, I just want to -- you were asked questions about this investigation, whom you interviewed and whom you didn't interview, and you were asked specifically, did you interview Mr. Pritchett.

Let me ask you this. Who is being accused here of a crime?

A Who is being accused of a crime?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Who was being accused of a crime?
A Mr. Pritchett.
Q Are you familiar with the Fifth Amendment?
A Yeah.
Q What is your familiarity with the Fifth Amendment?
A I mean I can't -- I have to Mirandize him before I speak to him about any kind of facts.

THE COURT: I will --

THE WITNESS: I'm sorry, go ahead.

THE COURT: Those are legal issues --

THE WITNESS: Okay.

THE COURT: -- so I'm going to strike that.

THE WITNESS: Okay.

MR. HUBBARD: All right.

THE COURT: Ask another question.

MR. HUBBARD: Very well, Your Honor.

BY MR. HUBBARD:
Q Well, let me ask you this. Why didn't you question Mr. Pritchett?
A He was being accused of a crime.
Q Okay. And, again, I just want to understand this clearly. Why didn't you interview anyone else in connection with this?
A There was no need to interview anyone else. There was no reason for Ms. Solska to lie to me. I didn't

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

see why she would lie to me. I didn't know her. She made a simple complaint and she had video to corroborate her story. Based on that I found sufficient probable cause.

MR. HUBBARD: All right. Great. Thank you.

THE COURT: Mr. Baird?

MR. BAIRD: Yes, Your Honor. Thank you.

RECROSS-EXAMINATION

BY MR. BAIRD:

Q You testified that there was no reason at that time for you to believe that Ms. Solska was lying, correct?

A At that time or today.

Q At the time of the affidavit, I'm sorry --

A Okay.

Q -- there was no reason for you to suspect she was lying, correct?

A Not at all.

Q Other than the fact that she had made a statement about a dent in a locker which conflicted with what Patrol Officer Sweeney said in his incident report, right?

A I mean you're going to have to speak to Police Officer Sweeney when he took it. If she's telling him -- you know what, let's put it this way.

That initial report, if I'm not mistaken, was

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

not made by her. If you look at the complainant box it says, Arthur Jackson & Company. Now, Arthur Jackson & Company, if I'm not mistaken is, there's a gentleman by the name of Michael who is the building manager, who is the initial, probably, if I'm not mistaken contacted and --

THE COURT: You can't guess.

THE WITNESS: Yeah.

THE COURT: You can't guess.

THE WITNESS: -- contacted and made that initial police report, and because it was her laptop it was basically her problem, so that's why I had to reach out to Ms. Solska to find out what had occurred.

MR. BAIRD: Okay.

THE WITNESS: Exactly. So if Michael, the project manager, says there was no damage, Officer Sweeney put "there's no damage" --

THE COURT: Hold on, hold on --

MR. BAIRD: But wait a minute.

THE WITNESS: Okay,

THE COURT: Let's hold on a second. Did it say on the report Officer Sweeney took, who he has talked to?

MR. BAIRD: It appears that he spoke to Ms. Solska, Your Honor.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

MR. HUBBARD: Objection --

THE COURT: What does it say? Read it to the jury.

MR. BAIRD: It says, "Complainant, Arthur Jackson Company, age: 39, race: white, sex: female." And then down on the bottom it says, "Manager: Sophie Solska," on the complainant report.

THE COURT: Okay. All right. Let's leave it at that. Detective, you weren't there, so you can't speculate about who said what to who then.

THE WITNESS: Okay.

MR. BAIRD: Yes.

BY MR. BAIRD:

Q Going back to my question, Detective.

A Yes.

Q This complaint report says, "No forced entry," correct?

A That's correct, no forced entry.

MR. BAIRD: Okay. That's all I have. Thank you.

THE WITNESS: Okay.

MR. HUBBARD: Nothing further.

THE COURT: Any questions for the detective? Anyone in the jury?

THE COURT: Okay. There's one question.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE WITNESS: Thank you.

THE COURT: No, you have to stay, you have another question. Sorry.

THE WITNESS: Oh, one more, okay.

(Sidebar discussion as follows:)

THE COURT: The first question is, "What percentage of affidavits become warrants?"

MR. HUBBARD: That's a great question.

THE COURT: The second one is, "Does the detective feel that the evidence against the plaintiff is circumstantial?"

MR. HUBBARD: I really think these are not relevant or it calls for a legal conclusion. Your Honor could explain what circumstantial evidence is.

THE COURT: Yes, I have, I thought. I don't know whether it matters if it's direct or circumstantial, I don't think it matters. And the percentage of affidavits that become warrants, I mean --

MR. BAIRD: There was a question put to you that a detective as to, you know, this is -- the process was described, and then it was asked, do they always become warrants?

THE COURT: Well, I guess we can ask him of his warrants how many of them customarily get approved.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

MR. HUBBARD: I think that in a 403 that's misleading. He's not the proper witness to ask that question.

THE COURT: Who is?

MR. HUBBARD: It would be somebody who would have tracked that type of data.

THE COURT: In the sense of affidavits that he drafts personally, just his cases, not --

MR. HUBBARD: Well, that is still a question the relevance of it and also the 403.

THE COURT: Yes, it is. It doesn't have strong relevance, but I don't see any unfair prejudice or it's not going to waste time or confuse the jury.

MR. HUBBARD: I think it's misleading.

THE COURT: How?

MR. HUBBARD: Because they might think that he's rubber stamping.

MR. BAIRD: And there were questions asked to him by the counsel for the detective as to whether, you know, do these always becomes warrants, and he said, no, not always.

MR. HUBBARD: Well, then he answered the question.

MR. BAIRD: He didn't ask him that question.

THE COURT: I'll ask it. I don't find the

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

403 a problem. Thanks.

(Sidebar concluded at this time.)

THE COURT: All right. Folks, we had two questions. The first is, "Does the detective feel the evidence against the plaintiff is circumstantial?"

It doesn't matter. The fact remains whether it's direct evidence or circumstantial evidence, he presented evidence to the DA and to the bail commissioner.

The second question I'll ask you, Detective, is in the cases that you submit for warrants for probable cause, what percentage of those actually are approved, if you know, just your cases.

THE WITNESS: My cases?

THE COURT: Yes.

THE WITNESS: I would say pretty much all of them.

THE COURT: Okay. All right. Thank you. Any follow-up?

MR. BAIRD: No, Your Honor.

THE COURT: All right. Thank you. You may step down. Thank you.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

THE COURT: Any other witnesses, Mr. Hubbard?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

MR. HUBBARD: Yes, Your Honor, the defense calls Sophie Solska.

THE COURT: All right.

MR. HUBBARD: May I, Your Honor.

THE COURT: Of course.

SOPHIE SOLSKA, Defendant's Witness, Sworn.

COURTROOM DEPUTY: Please state your name and spell your last name for the record.

THE WITNESS: Sophie Solska, S-O-L-S-K-A.

COURTROOM DEPUTY: Thank you.

THE COURT: All right. Mr. Hubbard.

MR. HUBBARD: Yes, Your Honor.

DIRECT EXAMINATION

BY MR. HUBBARD:

Q Good afternoon, Ms. Solska. Ms. Solska, are you here appearing under a subpoena?

A Yes.

Q Okay. Ms. Solska, the matter before the Court is Anthony Pritchett versus Detective Shawn Warrender regarding a complaint of a theft of a laptop and 20 employee files. Are you familiar with that matter?

A Yes.

Q And do you know the plaintiff here, Anthony Pritchett?

A Yes.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q How do you know Anthony Pritchett?
A He was working for me for about three years.
Q And for which company?
A Arthur Jackson.
Q Now, you just testified that you're familiar with an incident, the theft of a laptop that took place on or about June 9th, 2010. Were you interviewed by Detective Shawn Warrender regarding this?
A Yes.
Q Prior to being interviewed by Detective Shawn Warrender, did you, when you discovered your laptop was missing, did you have an occasion to view the video?
A Yes.
Q Okay. And that was video that is maintained in the concourse level at 1600 J.F.K.?
A Actually there was three different camera, we viewed each angles.
Q Okay. And this was all before you ever met Detective Shawn Warrender, is that correct?
A Yes.
Q Okay. So at some point you went down to Central Detectives and met with Detective Warrender, is that correct?
A Yes.
Q Do you recall that interview?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A Yes.
Q Okay. I want to direct your attention to a notebook right there in front of you. I want you to open it to tab two.
A I'm ready.

Q All right, ma'am. I would just like you to take a moment. Let's go through it page-by-page. On the first page there you see the block where it says "name"?
A Yes.
Q And it's your name, correct?
A That's correct.
Q And I hope I'm pronouncing your name correctly, is it Solska?
A Yeah.
Q All right. And it indicates if you go down a little further, it indicates that you were interviewed at Central Detective Division, correct?
A Yes.
Q And it says the date of the interview is June 25th, 2010, correct?
A That's correct.
Q And the time of the interview is 8:45 in the morning?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A Yeah.

Q Okay. And at the bottom of that page there is on the signature line, there is a signature, is that your signature?

A Yes.

Q And I want you to look on the second page. There is a signature. Is that your signature as well?

A Yes.

Q And then on the last page there is a signature. Is that your signature as well?

A Okay. And they are all signed on the date of June 25th, 2010, correct?

A Yes.

Q And is that in your handwriting as well?

A Yeah.

Q All right. And on the last page you see there is in capital letters there is a sentence. Do you see where I am talking about, up towards the top?

A Yeah.

Q And it says "At this point I want you to read this interview and make any corrections that need to be made." Does it say that?

A Yes.

Q And did you, in fact, read the interview and make any corrections that needed to be made?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A (Indiscernible), yes.
Q Do you see anywhere in this statement where you actually made a correction? You can take your time and look through it?
A No, I don't remember.
Q Okay. Let's scroll and look through. Do you see anywhere where you made a correction?
(Pause in proceedings.)
A Okay. The corrections I believe should be here, and it's not here.
Q Where is that?
A Where is the date?
Q The date of what?
A June 9 --
Q Yes, ma'am.
A -- 2010 --
Q Yes, ma'am.
A -- that was Wednesday I believe.
Q Yes, ma'am.
A He was working that day.
Q Yes, ma'am.
A Almost full day. He come back to that building on June 10th if that's Thursday and was -- he come back 5:00 in the morning, like he shouldn't be. He start 7:00. He left the building I believe 7:30, something

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

like that.

THE COURT: All right. Hold on, ma'am. The witnesses or the jury can't hear you. You've got to speak into the microphone.

THE WITNESS: All right. I'm sorry.

THE COURT: Start again. What is the question?

BY MR. HUBBARD:

Q So you're saying on June 10th he came back to the building?

THE COURT: Hold on. Go ahead. Start again. Say that all again.

THE WITNESS: Okay. The correction should be that --

THE COURT: Speak into the microphone.

THE WITNESS: The correction should be June 9th, 2010 that was Wednesday I believe. He was working almost full day that day. He left I believe ten minutes earlier.

He come back to the building on June 10th, 2010 at 5:00 in the morning and he left, I believe, 7:30, something like that.

BY MR. HUBBARD:

Q Okay.

A So I never see him that day, but he was in the

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

building.

THE COURT: Was he supposed to be working at 5:00 in the morning?

THE WITNESS: No, he start 7:00 and usually he punch his time card around 6:50. That day he come 5:00, he was walking through the building, but he don't punch the time clock until his regular time, 6:50.

THE COURT: Say that last part again?

THE WITNESS: He come to the building that day around 5:00, after 5:00 --

THE COURT: Speak into the microphone. Okay.

THE WITNESS: He come to the building -- to the building at that day after 5:00, and he --

THE COURT: 5:00 a.m.?

THE WITNESS: 5:00 a.m. and he don't punch his time card till I believe 6:50 a.m.

THE COURT: Okay. Go ahead.

MR. HUBBARD: Okay. Thank you, Your Honor.

BY MR. HUBBARD:

Q Ms. Solska, the video that you viewed when you discovered that your laptop was missing, what date was that that you viewed it?

A The video I believe it was June 10th, 2010.

Q Okay. And so when you were viewing that video, does that mean that you noticed the laptop was missing

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

later that day, June 10th, 2010?

A No. After I noticed the laptop was missing and the files, that's when me and the building manager went to the command center and we viewed the videos.

Q And that was on which date, ma'am?

A The Thursday.

Q And that was June 10th?

A I believe so, yes.

Q 2010, okay. And when you viewed the video what, if anything came to your attention about Mr. Pritchett as you were viewing the video?

A Okay. Like I said, the different sense of the cameras. One camera, the one which faced the hallway downstairs, the way he opened the door to the loading dock, it shouldn't he opened like straight like that. Either open full way or close it, because if you open like that you block the camera and he knows about it, and somebody can get hurt because it's in the hallway, people walking. That's from angle one camera.

From the other camera he went to one of the tenant's supply room where he shouldn't be.

Q And that would have been Elsevier, correct?

A Elsevier, yeah.

THE COURT: What does Elsevier mean?

MR. HUBBARD: I have no idea, Your Honor.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE WITNESS: Your Honor, that would be short for the medical books.

THE COURT: The what?

THE WITNESS: Publishing medical books.

THE COURT: Oh, that's a tenant of the building?

THE WITNESS: It's a tenant in the building that has five floors.

MR. BAIRD: LexisNexis I think is part of that, Elsevier.

MR. HUBBARD: Oh, good to know.

BY MR. HUBBARD:

Q So he went to this door that belonged to one of the tenants or a place where one of the tenant's --

A Yeah.

Q -- had an office and he wasn't supposed to go in there?

A No.

Q And you saw this on the video, correct?

A I saw this on the video, and he picked up a big barrel, like on the wheels. I don't know if I'm --

Q A trash barrel?

A Yeah.

Q Okay. And then what else did you observe?

A He took this barrel inside the locker room, and

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

then after a while he -- he come with the barrel and the bags on the top of the barrel. The bags you can observe on the video, it's full, and he go with the barrel, I don't know exactly the time, to the loading dock.

Under no circumstances you should go to the loading dock if you don't have -- because that's -- we don't do nothing there. We don't put trash here because we don't have dumpsters sitting there. The trash should go to the trash room next to the freight elevator.

So under no circumstances do we go and put anything out of the building, and if you do, you need a release form from security, which I sign or the building manager would sign, and there was none.

Q Okay. And what else did you notice when you observed the video?

A Well, there's another video from the loading dock. He puts the bags in the back of somebody's truck and the truck just drive away. And, again, there should be a release form if you remove even empty box. You should have release form from the building to remove anything from the building.

Q So, let me just go back. When was the first time that you realized your laptop was missing?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A Thursday around 3:20 p.m.

Q In the afternoon, okay. Let me ask you this. There has been testimony from Mr. Pritchett that he had a pretty good relationship with you up until he was suspended and then terminated. Is that true?

A He was very good employee up -- but I would say up to January. In January there are some stuff going on when the building manager bring to my attention that he wasn't doing it.

But, he was still, you know, good employee up to the middle of March, and from the middle of March everything just started going down the drain. I don't know what happened.

Q And he also testified that before he went back to the building and he says it was the 11th, but that the day before he had been informed by the union rep while he was at home, that he was going to be suspended for leaving work ten minutes early, is that true?

A I don't know.

Q Okay.

A What I know, that day he supposed to bring me medical note and he didn't, and I went to the shop steward and told her, listen, he supposed to bring this note and it's not here. Can you please call and ask him because he leave early.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

In the case you leave early, you have to notify the building or my company or me,. He don't call nobody, he just left. So I said could you please let him know he cannot leave like this, he should let somebody know and where is the doctor note.

Q Okay.

A So at that time when she call him, the name he call me I don't want to repeat, and I said "Barbara, tell him tomorrow 3:00 we are going to have meeting. The three of us have to sit and talk about all this situation."

I do not talk to him right now because he was, I don't know, very, very upset and call me all these names. I said just tell him tomorrow, 3:00, you come to work, I come to work and him, we have to sit and talk. That's what I know. If she call him again, whatever, I don't know. It wasn't said in front of me that he going to be suspended.

Q So, it wasn't decided at that point that he was going to be suspended?

A No. We supposed to have meeting next day 3:00.

Q All right. Thank you.

MR. HUBBARD: That's all I have.

THE COURT: Okay. So the next day would have been?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE WITNESS: Thursday, the 10th.

THE COURT: Thursday. That's the day you said he came to work at 5:00 a.m.?

THE WITNESS: I usually come to work around 3:00.

THE COURT: No, did he come to work Thursday at 5:00 a.m.

THE WITNESS: Yeah, after five a little bit, yeah.

THE COURT: Okay. Any questions?

MR. BAIRD: Yes, just a few, Your Honor.

THE COURT: All right.

MR. BAIRD: Thank you.

CROSS-EXAMINATION

BY MR. BAIRD:

Q Ms. Solska, my name is Graham Baird.

A Hi.

Q We have never met before, right?

A No.

Q Okay.

A No.

Q I represent Mr. Pritchett in this case that he brought against Detective Warrender.

A Okay.

Q I just have a few questions to follow up on what

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Mr. Hubbard asked you, okay?

A Okay.

Q Now, Mr. Pritchett, he had keys to all these various rooms, is that right?

A Yes, he has a master key.

Q Okay. And we've heard today that the office where your laptop was kept --

A Yeah.

Q -- was somewhat of a common area. The employees ate lunch there, you could sit and take a break, is that accurate?

A Yes and no, because the office was -- you know, it was like partition, high partition and the door was closed, lock and key. So the employee don't have no access to that particular area where the file cabinet was.

Q Okay. And Mr. Pritchett had access to the loading docket, correct?

A We don't use loading dock.

Q But he could have access there, right?

A Sure, yeah.

Q Okay. And are there garbage compactors out in the loading dock?

A Not for us, no.

Q Okay. But, there are -- whether they are for you

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

or not, are there garbage compactors out there on the loading dock?

A Yes, for other buildings, yeah. We don't use them.

Q All right. Thank you.

MR. BAIRD: That's all I have. Thank you.

MR. HUBBARD: No further questions, Your Honor.

THE COURT: Do you have any questions for this witness? Oh, you have one. Very efficient. All right. Dennis, we have a couple. Stay there a second, ma'am.

THE WITNESS: Okay.

(Pause in proceedings.)

(Sidebar discussion as follows:)

THE COURT: That's a good question. "How does she know he got there at 5:00 a.m."

MS. BLACKWELL: She observed it.

THE COURT: I told you it was a good question.

MR. BAIRD: It's a great one.

THE COURT: "Did he call you on June 10th to say he wasn't feeling well and that he was going home"? Why did you not tell him he was not supposed to be there? That's fair enough.

MR. BAIRD: Great questions.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

MR. HUBBARD: Yes, great.

(Sidebar discussion concluded.)

THE COURT: All right. Ma'am, I have a few questions for you, all right?

THE WITNESS: Okay.

THE COURT: And when you answer, just turn to the jury and speak into the microphone even though I'm talking to you --

THE WITNESS: Okay.

THE COURT: -- I know it's a little awkward. Did Mr. Pritchett -- how do you know that Mr. Pritchett was at work at 5:00 a.m. on the 10th?

THE WITNESS: Because of the video camera, and when you watch video camera there is a time stamp, what time the video was taken and it's the time it's going while the video is working.

THE COURT: Okay. So you could tell by the video camera?

THE WITNESS: Yes.

THE COURT: Was there a sign-in system in the building, a punch clock also?

THE WITNESS: Yes.

THE COURT: Did he punch in at 5:00 a.m.?

THE WITNESS: No. He punch in 6:48 to be exact.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE COURT: Okay. Did Mr. Pritchett call you on June 10th to say he wasn't feeling well and that he was going home?

THE WITNESS: No.

THE COURT: Okay. Did you at any point on June 10th tell him that he wasn't supposed to be in the building?

THE WITNESS: No.

THE COURT: Any follow-up?

MR. BAIRD: I do, Your Honor.

THE COURT: Okay. Go ahead.

MR. BAIRD: Thank you.

MR. BAIRD: And if Your Honor will indulge me, I would like to play just a couple of the clips of the video.

THE COURT: Sure.

CROSS-EXAMINATION

BY MR. BAIRD:

Q Just bear with me, Ms. Solska.

A Okay.

MR. BAIRD: Just bear with me, Ms. Solska.

THE COURT: This is Exhibit 3?

MR. BAIRD: Yes, this is Exhibit 3.

MR. HUBBARD: Your Honor, just for clarification, that's his version. That's not D-3.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

D-3 we had a disk that actually showed the dates and time on the bottom.

THE COURT: Where is it?

MR. HUBBARD: We gave it to the guy, and I don't know why it's not --

THE COURT: All right. Well, we've got to find it.

MR. HUBBARD: Yes, I don't know. Ms. Blackwell brought that up and she says that's --

THE COURT: Is it in the machine.

MR. HUBBARD: -- his video --

THE COURT: Gave it to what guy?

MR. HUBBARD: Whoever this video guy who was here.

THE COURT: Is that a court person?

MR. BAIRD: It was a court person, Your Honor.

MR. HUBBARD: Yeah, I don't know where he put the disk.

THE COURT: Well, is it around? All right. Why don't we take a five-minute recess, we will try and find it, okay.

MR. HUBBARD: That would be great.

(Pause in proceedings.)

(Videotape is being played at this time.)

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

BY MR. BAIRD:

Q Now, Ms. Solska, is this the video that we have been talking about?

A One of them.

Q Okay.

A That's the loading dock. This don't belong to my building. It's the loading dock video.

Q Okay. So this video belongs to the loading dock?

A Yeah.

Q Okay. Does this video to your knowledge -- have you ever seen this video before?

A Yeah.

Q Okay. And did this video when you first reviewed it have time stamps on it and dates?

A I don't remember about this video. I was looking at the video from my building.

Q Okay. Understood. So, you're talking about the video of the hallway.

A Yeah.

THE COURT: Let's show her that one.

MR. BAIRD: Okay.

(Videotape is being played at this time.)

BY MR. BAIRD:

Q Now, these are the videos that we're talking about, right?

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

A Yeah.

Q Okay. Now, does this video have date and time stamps when you first reviewed it?

A Yeah.

Q Okay. And now this copy of it does not?

A Are you asking --

THE COURT: I guess the question is, is there a copy on there that does.

MR. BAIRD: Maybe this has the time stamps.

(Pause in proceedings.)

MR. BAIRD: Okay. So there is the date and time stamp. So it's 6:10.

THE COURT: And what does that time say?

MR. BAIRD: This is at 6:00 a.m.

THE WITNESS: Yes.

MR. BAIRD: I'm sorry.

THE COURT: Sorry, go ahead.

BY MR. BAIRD:

Q And so is this the one we're talking about, Ms. Solska?

A Yeah. I just don't know why the time is 6:00.

Q Okay. You have no explanation for why that time say 6:00?

A Yes, because I know it was after 5:00. I don't remember exactly the time, but it was after five.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Q Okay.

MR. BAIRD: I don't have anything further, Your Honor.

THE COURT: Okay. Mr. Hubbard.

REDIRECT EXAMINATION

BY MR. HUBBARD:

Q Do you know at which point you saw where it was indicating it was around 5:00 a.m.?

Let me ask you this in fairness to you, Ms. Solska.

A Yeah.

Q Are you familiar with military time?

A No. Not at all.

Q So you don't even know whether or not that's military time or just the regular time that we go on?

A From this regular time we going by.

Q Okay. Thank you.

MR. HUBBARD: That's all I have, Judge. We'll argue about that.

THE COURT: Well, let's turn it off, number one. Is there other disks that anybody wants to show her with the times, or is that it?

MR. HUBBARD: We're fine.

MR. BAIRD: That's it.

THE COURT: Okay. All right. Thank you.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

You can step down. Thank you for your help, Mr. McNally. You can step down, ma'am.

(Witness excused.)

THE COURT: Any other evidence.

MR. HUBBARD: No, Your Honor. At this time we would -- I think we have already -- some of the exhibits have been admitted into evidence, but I want to make sure.

THE COURT: Okay.

MR. HUBBARD: Do you want to do that now, Your Honor --

THE COURT: Sure.

MR. HUBBARD: -- or after we rest?

THE COURT: Do you rest subject to moving your exhibits?

MR. HUBBARD: Yes, Your Honor.

THE COURT: All right. Well, why don't I do this. Why don't I excuse the jury for about 15 minutes, and do you have some legal business to take care of?

MR. HUBBARD: Yes, Your Honor, we do have some legal business to take care of.

THE COURT: So, jurors, we'll take a break until 3:35. Keep an open mind, don't discuss the case.

(Jury exits, 3:20 p.m.)

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

THE COURT: All right. Please be seated, everyone. So what exhibits do you want moved in?

MR. HUBBARD: Well, Your Honor, actually before I would still like to renew that motion.

THE COURT: All right. Well, let's move the exhibits and then we'll talk about the motion.

MR. HUBBARD: All right. We're going to move for D-1.

THE COURT: What is D-1?

MR. HUBBARD: That's the 7548 that Officer Sweeney completed.

THE COURT: All right. That's it.

(Defendant's Exhibit 1, 7548 form, is admitted into evidence.)

MR. HUBBARD: D-2 which is the interview of Ms. Solska.

THE COURT: Any objection to that?

MR. BAIRD: No, Your Honor.

THE COURT: All right. That's in.

(Defendant's Exhibit 2, Solska interview, is admitted into evidence.)

MR. HUBBARD: Of course D-3 which actually showed the --

THE COURT: 3 is in, 4 is in.

MR. HUBBARD: And 4 is already in. I believe

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

5 is already in, and that's it, Your Honor.

MS. BLACKWELL: 9 is already in, too.

MR. HUBBARD: D-9.

MR. HUBBARD: Oh, 9, excuse me, 9.

THE COURT: So, the evidence is in, the evidence is closed.

MR. BAIRD: And 1 is in as well, Your Honor.

THE COURT: 1, yes, the 7548.

MR. BAIRD: Right.

MS. BLACKWELL: It's in.

THE COURT: It's in. All right. Now, what is your motion?

MR. HUBBARD: Yes, Your Honor. I want to move again under Rule 50 for judgment as a matter of law. May I approach, Your Honor?

THE COURT: Yes, sure.

MR. HUBBARD: We base the motion on this. This case is not about whether or not Ms. Solska's version of what happened is true or not. The case is really about Detective Warrender's state of mind.

As Your Honor knows, one of the elements to a malicious prosecution claim is that the plaintiff has to prove by a preponderance of the evidence that Detective Warrender initiated this criminal proceeding, and that would have to be done by presenting sufficient

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

evidence for a reasonable jury to conclude that he knowingly provided false information to a district attorney, or in the alternative somehow interfered with the prosecutor's discretion in deciding whether or not to proceed with the charges.

THE COURT: And he did it with malice and for a purpose other than bringing Mr. Pritchett to justice.

MR. HUBBARD: Precisely, Your Honor, exactly, and there really is no evidence of that. As a matter of fact, the evidence as I understand the testimony first, Detective Warrender didn't even know who Mr. Pritchett was until it was brought to his attention, and he didn't know who Ms. Solska was.

So there is no evidence for a reasonable jury to even infer malice, and there's no direct evidence of malice obviously. We wouldn't even be here if there were such.

But also based on -- even if we were to say, you know, Detective Warrender may have been mistaken, as Your Honor knows, that still is not going to carry the day for a malicious prosecution claim.

If he made a mistake or maybe was negligent in the way he conducted his investigation as Mr. Baird, you know, aptly tried to explore, that's not enough

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

because that's negligence or it's making a mistake. It's not meeting the standard that's sufficient to go to a jury. It's our position that the jury shouldn't even consider this.

And as to the state law claim, let's assume -- well, first, there is absolutely no evidence of wilful misconduct. There is no evidence that he knew that what he was doing was unlawful.

So, it's for those reasons, Your Honor, this case should not go to the jury and Your Honor should grant judgment as a matter of law.

THE COURT: Okay. Thank you. Mr. Baird.

MR. BAIRD: Thank you, Your Honor. May I approach?

THE COURT: Yes, of course.

MR. BAIRD: All right. Thank you. Two things, Your Honor. Detective Warrender testified very clearly that there was a false statement that he made contained within there that contradicted directly what he was told by Ms. Solska, and what was set forth in Ms. Solska's statement and that --

THE COURT: But I thought after on redirect that became more of an ambiguous statement because the issue whether he actually came back to work or whether he just showed up that day and it was

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

determined when.

Even if that is true -- let's just assume that's not true, is that material to the affidavit, number one, was it a knowing falsehood, number two, and was it made with malice, and on the state thing was it wilful misconduct to do it?

I mean, this is a really high burden. You have to show that he had it out for Mr. Pritchett. The law says for malice the detective acted out of spite, did not himself or either the proceeding was proper, or acted for a purpose unrelated to bringing Mr. Pritchett to justice.

What is the evidence that he did it because of that as opposed to he was just relying on Ms. Solska, and whether that was good or bad, is not the issue for this jury to decide.

MR. BAIRD: I agree, Your Honor.

THE COURT: So what is the malice?

MR. BAIRD: Your Honor, the fact that there is the false statement set forth within there that Defendant Warrender clearly stated, "I'm putting these statements all in here so that the judicial officer can make a reasonable determination of whether there should be a warrant."

THE COURT: Okay. Let's assume for the sake

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

of argument that he did that. Let's assume for the sake of argument that he put that one statement in there, it wasn't true and he knew it wasn't true, or he was reckless about whether it was true. You still have to show malice?

How did he act out of spite, how did he not believe the proceeding was proper, or what purpose did he have unrelated to bringing him to justice for doing all this if he didn't even know any of the players?

MR. BAIRD: Your Honor, there is evidence as well, Your Honor, that Defender Warrender had reason to believe that perhaps Ms. Solska was not telling the truth due to the issue of the dent, Your Honor.

There is conflicting statements given to him that --

THE COURT: Okay. So that is reckless. That might show he's reckless. All right.

MR. BAIRD: It would be the province of the jury to decide whether it's reckless, or whether there is any --

THE COURT: No, I'm giving him reckless. Let's just say he made it with reckless disregard for the truth. That's the second element.

How do you prove -- you also have to prove he did it with malice. You have to prove that it was

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

knowingly false or he had reckless disregard for the truth.

Let's assume you proved that, what is his intent? What is his malice? What is his spite, what is his reason for doing all this? That is the issue we're stuck at. I don't think you can prove that.

I don't think there is evidence, even after considering the defense case, that's why I let it go, because I wanted to hear what the detective had to say. I don't think you can show that this detective was engaged in wilful misconduct.

I mean, usually those types of cases are where he's having an affair with the complainant, or he's getting paid off by the complainant, or the complainant is his neighbor the neighbor asked him to get rid of this guy because he didn't like him and he misused his badge to do this.

Or, let's say he had stopped him five or six times before and he decided, you know, I don't like this guy, I don't like his attitude, so I'm going to roust him just to make his life miserable, throw him in Graterford for seven months.

We don't have that here. I mean, those are the types of things that give rise to prosecutions against police officers for malicious prosecution.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

cause because you lied to the judge. But, even if you show all that, you have to show malice or improper purpose.

Let's assume we let the case go to the jury now, I charge them and they came back with a verdict in favor of your client against the detective and the detective moves post-verdict for me to overturn it because there is not sufficient evidence even if you draw all reasonable inferences in favor of Mr. Pritchett.

What evidence would you cite to show that he had malice, an evil mind?

MR. BAIRD: Aside from the false statement, I don't have anything, Your Honor.

THE COURT: Yes, I think that is not enough. I think you need more than a false statement as I read the law. So, I am going to have to grant the judgment, I am going to have to grant Rule 50. I am going to grant judgment in favor of the detective.

Mr. Pritchett, I am going to grant judgment for the detective. I am not going to let the jury hear the case, and I am going to dismiss it. So, thank you very much. I will go back and tell the jury what is happening. Thanks all of you for coming in. I appreciate it.

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

ALL: Thank you, Your Honor.

THE COURT: Mr. Baird, I know it's a tough loss for you, especially in the middle of trial, but it was a pleasure having you in the courtroom.

MR. BAIRD: Thank you, Your Honor.

THE COURT: You're very welcome. Thanks, Dennis.

AUDIO OPERATOR: You're welcome, Judge.

(Proceedings adjourned, 3:30 p.m.)

* * *

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

INDEX

| PLAINTIFF'S OPENING STATEMENT | PAGE NUMBER |
|---|---|
| By Mr. Baird | 19 |

| DEFENDANT'S OPENING STATEMENT | PAGE NUMBER |
|---|---|
| By Ms. Blackwell | 24 |

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Anthony Pritchett | | | | |
| By Mr. Baird | 34 | | 80 | |
| By Ms. Blackwell | | 63 | | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Shawn Warrender | | | | |
| By Ms. Blackwell | 91 | | | |
| By Mr. Baird | | 118 | | 130 |
| By Mr. Hubbard | | | 126 | |
| Sophie Solska | | | | |
| By Mr. Hubbard | 136 | | 156 | |
| By Mr. Baird | | 148 | | |

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

176A

INDEX

| DEFENDANT'S EXHIBITS | | ADMITTED INTO EVIDENCE |
|---|---|---|
| 3 | Videotape | 50 |
| 9 | Deposition | 71 |
| 4 | Affidavit | 86 |
| 1 | 7548 Form | 158 |
| 2 | Solska Interview | 158 |

* * *

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

CERTIFICATION

I, Jeff Nathanson, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.

11-15-12
Date

Jeff Nathanson

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

**Commonwealth of Pennsylvania**
**County of Philadelphia**

**AFFIDAVIT OF PROBABLE CAUSE**

Copy

Police Incident Number (DC#):
1009027767

Warrant Control Number:
**AFF-0004715-2010**

DET SHAWN WARRENDER SHAWN 8130 Central Detective Division

**PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:**

1. That after investigation I have probable cause to believe that a warrant of arrest should be issued for:

Defendant Name: ANTHONY PRITCHETT Gender: M Race: Black

Alias:

DOB: 10/21/1961 Pid:

Address: 913 Chester AV Yeadon, PA 19050

CRIMES:

| DC Number | Code | Grade | Description | Count |
|---|---|---|---|---|
| 1009027767 | CC3921 | M1 | THEFT-UNLWF TAKING | 1 |
| | CC3925 | M1 | THEFT-RSP | 1 |
| | CC0903 | M1 | CRIMINAL CONSPIRACY | 1 |

2. That the facts tending to establish the grounds for the issuance of the warrant of arrest and the probable cause for my belief are as follows: ( Note: If extended text exists, see following page(s))

1009027767 On 6/25/2010 at 8:45am Inside Central Detectives the complainant did make the following statement: On 6/9/2010 at 3:15pm at 1600 JKF Blvd, Concourse level, the complainant reported to work to find her HP laptop valued at $ 1200.00 along with twenty employee files missing from her work station. The laptop was removed from a lock file cabinet. There was a dent in the locking mechanism allowing access, and the immediate surrounding area was in disarray. She immediately viewed security cameras and witnessed an employee who has worked for the company the last two years enter the office where the laptop was located and then exit with a storage box and proceed to the loading dock. According to the complainant's statement, the offender has no right to be this area and is not allowed on the loading dock during normal business hours, a direct violation of company policy. Additional surveillance shows the offender placing the storage box in the back of a pickup truck and that truck flees the parking area. No tag was captured. The offender then returns to work for twenty more minutes, leaves and never returns back to work. The offender still had several hours left to the completion of his shift. The identity of the second male is unknown. The offender is a custodian and does have a right to be in the areas surrounding the scene of the theft (outside of the office) but has no legal right to be inside the office where the laptop was secured. The affiant believes that sufficient probable cause exists for issuance of an arrest warrant for the offender for theft and RSP.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF AND THAT PROBABLE CAUSE TO ARREST EXISTS.

Affiant: DET SHAWN WARRENDER SHAWN 8130 Central Detective Division

Sworn to or affirmed and subscribed before me this 13 day of July , 2010

Affiant Signature

Issuing Authority Signature

THE CITY OF PHILADELPHIA

ANTHONY PRITCHETT

Printed: 07/13/2010 11:35 AM

179A

FELONY Fax:215-686-8794 Nov 26 2010 13:48 P.08

PHILADELPHIA POLICE DEPARTMENT

## COMPLAINT OR INCIDENT REPORT

| YEAR | DIST./OCC. | D.C. NO. | SECT. | DIST. | VEH. NO. | REPORT DATE |
|---|---|---|---|---|---|---|
| 10 | 9 | 27767 | 2 | 9TH | 922 | 06-10-10 |

CRIME OR INCIDENT CLASSIFICATION: FRAUD — CODE: 1202 — TIME OUT: 4:47 A — TIME IN: 6:45 P

LOCATION OF OCCURRENCE: 1600 JFK BLVD — ☒ IN ☐ OUT — TYPE OF PREM.: 37

DATE OF OCCUR.: 06-09-10 — DAY CODE: 3 — TIME OF OCCUR.: 8:00 P — NATURE OF INJURY: NONE

COMPLAINANT: ARTHUR JACKSON, CO — AGE: 39 — RACE: W — SEX: F — PHONE (HOME): 267 716-2577

ADDRESS: 1600 JFK BLVD — PHONE (BUSINESS):

FOUNDED: ☒ Yes ☐ No — REPORT TO FOLLOW: ☒ Yes ☐ No ☐ Close Out — UNIT: 6200 — CODE: — INV. CONT NO.: 5201

WITNESS: ☐ Yes ☐ No — TRACEABLE PROP.: ☐ Yes ☐ No — UNIQUE DESCRIPTION OF OFFENDER: ☐ Yes ☐ No — OTHER EVIDENCE: ☐ Yes ☐ No

DESCRIPTION OF INCIDENT (*Include Description of Crime Scene if Applicable*)

R/C - THEFT

BELOW COMPL. STATES SHE LEFT ABOVE LOCATION AT ABOVE DATE AND TIME WITH BELOW ITEMS LOCKED IN FILE CABINET. COMPL. STATES [illegible] OPENED FILE CABINET AT 3:00 PM. ON 06-10-10 BELOW ITEMS WERE MISSING. NO FORCED ENTRY. BELOW EMPLOYEES ON VIDEO GOING TO LOADING DOCK WITH A TRASH BARREL

WITNESS: MANAGER SOPHIE SCLBEL — ADDRESS: 1600 JFK BLVD — PHONE NO.: 267 716-2577

OFFENDER INFORMATION

ANTHONY PRITCHETT 49/W/M 10-21-60 610 623-1261
913 CLINTON AVE. YEADON PA 19050 (C) 610-909-4190

PROPERTY DESCRIPTION (*Include Make, Model, Color and Serial No. Where Applicable*) — PROP. CODE: B — INSURED: ☐ Yes ☐ No — STOLEN VALUE: $1200.00

AT 7:15 A.M. ABOVE EMPLOYEE AS PROHIBITED AND THEN LEFT FROM [illegible] AREA SHORTLY AFTER PRIOR TO [illegible] BEING COMPLETE.

(1) BLACK HP LAPTOP COMPUTER (20) EMPLOYEE PERSONAL FILES

DC NO.

VEHICLE 1 — OWNER'S NAME: — VEHICLE 2 — OWNER'S NAME:

VEHICLE 1 — OPERATOR'S NAME: — VEHICLE 2 — OPERATOR'S NAME:

WANTED/STOLEN MESSAGE SENT General No: Date — DIST./UNIT TERMINAL — RECEIPT NO. — SENT BY

REPORT PREPARED BY: P/O SHASBLEY 263714 — NO.: 4615 — DIST./UNIT: 9 — TOTAL PAGES: — PAGE NO.: 1

REVIEWED BY: [signature] — NO.: 7459 — DIST./UNIT: 9 — REFERRAL DATE: — CEN NO.:

PURSUANT TO ACT 155 OF 1992, THE BELOW PERSON ACKNOWLEDGES RECEIPT OF THE NOTIFICATION OF VICTIM SERVICES FORM: [signature]

75-48 Front (Rev. 11/09)

180A



**Philadelphia Police Department**
**Central Detective Division**
**Investigation Interview Record**

| | | | | |
|---|---|---|---|---|
| Case No. 5201 | | | | |
| Interviewer: Det. Warrender # 8130 | | | | |
| Name: Sophie Solski | Age: 40 | Race: White | Sex: Female | Dob: 09 21 1970 |
| Address: 1 wheelwright lane cherry hill nj 08003 | | Apt # | Phone Number: 267 716 2577 | |
| Name of Employer/School: Arthur jackson Co | | | Soc. Sec. No: | |
| Address of Employer/School: 1600 JFK Blvd | Department: | | Phone Number: | |
| Dates of Planned Vacations: | | Dates of Planned Business Trips: | | |
| Name of Closest Relative: | | Address of Relative: | Phone Number: | |
| Arresting Officer: | | Arresting Officer: | | |
| Location of Arrest: | | | Time of Arrest: | |
| Place of Interview: Central Detective Division | Date of Interview: 6/25/10 | | Time of Interview: 8:45am | |
| Brought In By: | Date: | | Time: | |
| We are questioning you concerning: | | Witness: | | |
| Warnings Given By: | Date: | | Time: | |

| Answers: (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|
| | | | | | | |

Q: can you tell me what happened at 1600 JFK Blvd on 6/9/2010 that brings you to CDD

A: I arrived for work at 3; 15pm and was looking for my laptop which was inside the file cabinet, which was locked. I saw a dent in the lock. This is how it was opened. I noticed that the items that were on the partition was knocked off, which told me that someone had moved the partition. I immediately noticed my laptop missing and twenty employee files were gone. I then went to the building manager and reviewed video together and saw unusual activity by the offender. I saw that he was working at 5: 50am, but is not scheduled until 7:00am. Also, he didn't punch in until 6:50am. His duties was to sweep the lobby, and outside of the building. He was doing what appeared to be trash removal, which wasn't his scheduled assignment that day. I saw him take a large trash can into the room where the laptop was located, there is no reason, there is no trash I that room. Then I saw him with a storage box on top of the trash can; he didn't have it when he walked in there. He then proceeded to walk

Signature [signature] Date: 6-25-10

Police (75-483)

181A

PLAINTIFF'S EXH. 3

FELONY Fax:215-686-8794 NOV 26 2010 13:50 P.15

to the loading dock; it was now 7:15am. He is not supposed to be there at all. No trash is too placed in the loading during day time hours, trash is supposed to be placed in the trash room.

Q: What company does the Anthony work for?
A: Arthur Jackson
Q: What is job description?
A: day porter, he does everything we ask him to do
Q: What is schedule that day on 6/9/2010?
A: 7:00am - 3:30pm, every day
Q: Who owns the laptop?
A: it's my personal laptop, HP
Q: What is the value?
A: $1200
Q: have you spoken with Anthony since the incident
A: no
Q: Has he been back to work since 6/9/10
A: yes, he came back on the 10th of June, but he wasn't allowed in the building
Q: how long has Anthony been employed with you
A: 2 years
Q: does Anthony have a drinking problem
A: yes, he drinks heavily and has been known to come to work intoxicated.

Q: we are going to view video #1 please tell what is occurring
A: it shows Anthony going into a El Savir and removing a large trash barrel, then proceed to supply room and then to the locker room. He opens the door to the freight elevator, half way blocking the camera. He was told that this door is to be left open completely or closed, never half way. In the background you can see the door to locker room opening, where the laptop was stored. He then walks to the freight elevator with a box on top of the trash barrel.

Q: we are going to view disc # 2, please tell me what is occurring
A: nothing of evidentiary value

Q: we are going to view disc # 3 can you tell what is occurring?

Signature [signature] Date: 6-25-10

Police (75-483)

A: it shows Anthony entering the loading dock with the trash barrel and the storage box on top, then walk down the ramp to the parking area and then reach inside the barrel and place the storage box in the back of a pickup truck. The male (who remains unidentified) then drives away. Anthony then returns back to work for another 20 minutes and never returns.

AT THIS POINT, I WANT YOU TO READ THIS INTERVIEW AND MAKE ANY CORRECTIONS THAT NEED TO BE MADE.

Final: You have read your statement, and by signing, you affirm as to its truthfulness and accept it as your spoken word.

Signature: ______________________ Date: ______________

Interview concluded at

Signature ______________________ Date: 6-25-10

Police (75-483)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY PRITCHETT,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| **vs.** | : | **No. 11-4682** |
| **SHAWN WARRENDER, et al.,** | : | |
| **Defendants.** | : | |

**ORDER**

And now, this **31st** day of **July, 2012**, upon consideration of Defendants' Motion for Summary Judgment (doc. 22), and Plaintiff Anthony Pritchett's response thereto, it is hereby **ORDERED** that Defendants' Motion is **GRANTED** with respect to Plaintiff's claim against the City of Philadelphia (Count II), and **DENIED** with respect to Pritchett's claims against Defendant Shawn Warrender (Counts I and III).

Pritchett was arrested on July 29, 2010 and charged with stealing his supervisor's laptop computer from her office. The charges were withdrawn six months later. On January 26, 2011, Pritchett sued Warrender and the City under 42 U.S.C. § 1983, alleging two counts of Malicious Prosecution against Warrender and one count of Municipal Liability against the City. Warrender and the City seek summary judgment.

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must "view the facts and draw inferences in the light most favorable to the nonmoving party." Ray v. Twp. of Warren, 626 F.3d 170, 173 (3d Cir. 2010). A genuine issue as to a material fact exists when "there are any genuine factual issues that properly can be resolved only by a finder of

fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

To prevail on his claim of malicious prosecution, Pritchett must demonstrate: 1) Warrender initiated criminal proceedings against him; 2) the criminal proceedings ended in Pritchett's favor; 3) the proceedings were initiated without probable cause; 4) Warrender acted maliciously or for a purpose other than bringing Pritchett to justice; and 5) Pritchett has suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005).[1]

Summary judgment is granted with respect to Pritchett's claim against the City because Pritchett has abandoned that claim. See Mem. Law Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. at 3, Pritchett v. Warrender, No. 11-4682 (E.D.Pa. July 16, 2012). Several genuine disputes remain, however, regarding facts material to Pritchett's claims against Warrender, including:

- Whether Pritchett had permission to be in the rooms or on the loading dock where he was observed on video surveillance;
- Whether Pritchett entered the area containing the laptop, and if so, how long he remained there;
- Whether the box loaded into the pick-up truck contained a laptop computer or Pritchett's valuables;
- Whether Warrender recklessly omitted material facts in his affidavit of probable cause;

---

[1]Pritchett's state-law malicious prosecution claim is subject to a similar standard. Pritchett would have to establish that Warrender instituted the proceedings against Pritchett: 1) without probable cause; 2) with malice; and 3) the proceedings must have terminated in favor of Pritchett. Kelley v. Gen. Teamsters, Chauffeurs, & Helpers, Local Union 249, 544 A.2d 517, 520-21 (Pa. 1988); see LaFrankie v. Miklich, 618 A.2d 1445, 1448 (Pa. Commw. Ct. 1992).

- Whether Warrender's affidavit of probable cause misrepresented the contents of the video tape; and
- Whether a reasonable police officer in Warrender's position would have conducted further investigation, such as visiting the crime scene or speaking to witnesses, before seeking an arrest warrant.

These disputes cannot be resolved as a matter of law after viewing the video footage submitted by the parties; the video is ambiguous and will require consideration by a jury.[2]

BY THE COURT:

/s/ Timothy R. Rice
TIMOTHY R. RICE
United States Magistrate Judge

[2] The same factual disputes preclude a finding at this time that Warrender is entitled to qualified immunity.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: MC-51-CR-0032386-2010**

**CRIMINAL DOCKET**

**Court Case**

Commonwealth of Pennsylvania
v.
Anthony Pritchett

## CASE INFORMATION

Cross Court Docket Nos: PARS-MC-51-CR-0032386-2010

Judge Assigned:
Date Filed: 07/29/2010
Initiation Date: 07/28/2010
OTN: N6938562
Lower Court Docket No: MC-51-CR-0032386-2010
Initial Issuing Authority:
Final Issuing Authority:
Arresting Agency: Philadelphia Pd
Arresting Officer: DOYLE, JOSEPH J
Case Local Number Type(s): District Control Number
Case Local Number(s): 1009027767

## STATUS INFORMATION

Case Status: Closed

Arrest Date: 07/28/2010

| Status Date | Processing Status |
|---|---|
| 01/13/2011 | Completed |
| 09/10/2010 | Awaiting Trial |
| 07/29/2010 | Awaiting Status Listing |
| 07/29/2010 | Awaiting Preliminary Hearing |

Complaint Date: 07/28/2010

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Preliminary Arraignment | 07/29/2010 | 1:48 am | B08 | Arraignment Court Magistrate James O'Brien | Scheduled |
| Arraignment Status | 09/10/2010 | 8:00 am | 503 | Judge Marsha H. Neifield | Scheduled |
| Trial | 10/04/2010 | 9:00 am | 404 | Judge Joseph C. Waters | Continued |
| Trial | 11/23/2010 | 8:00 am | 903 | Judge Thomas F. Gehret | Continued |
| Trial | 01/13/2011 | 8:00 am | 903 | Judge Joseph J. O'Neill | Scheduled |

## CONFINEMENT INFORMATION

| Confinement Known As Of | Confinement Type | Destination Location | Confinement Reason | Still in Custody |
|---|---|---|---|---|

## DEFENDANT INFORMATION

Date Of Birth: 10/21/1961
City/State/Zip: Yeadon, PA 19050

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Pritchett, Anthony |

AOPC 2220 - Rev 07/05/2011

Printed: 07/05/2011

187A

PLAINTIFF'S EXH. 2

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: MC-51-CR-0032386-2010**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania
v.
Anthony Pritchett

## BAIL INFORMATION

**Pritchett, Anthony**

**Nebbia Status: None**

| Bail Action | Date | Bail Type | Percentage | Amount | Bail Posting Status | Posting Date |
|---|---|---|---|---|---|---|
| Set | 07/29/2010 | ROR | | $0.00 | Posted | 07/29/2010 |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | **18 § 3921 §§** | Theft By Unlaw Taking-Movable Prop | 06/09/2010 | N6938562 |
| 2 | 2 | | **18 § 3925 §§** | Receiving Stolen Property | 06/09/2010 | N6938562 |
| 3 | 3 | | **18 § 3921 §§** | Criminal Conspiracy Engaging Theft By Unlaw Taking-Movable Prop | 06/09/2010 | N6938562 |

## DISPOSITION SENTENCING/PENALTIES

Disposition
Case Event — Disposition Date — Final Disposition
Sequence/Description — Offense Disposition — Grade — Section
Sentencing Judge — Sentence Date — Credit For Time Served
Sentence/Diversion Program Type — Incarceration/Diversionary Period — Start Date
Sentence Conditions
Linked Offense - Sentence — Link Type — Linked Docket Number

**Proceed to Court**

| | | | |
|---|---|---|---|
| Preliminary Arraignment | 07/29/2010 | Not Final | |
| 1 / Theft By Unlaw Taking-Movable Prop | Proceed to Court | | 18§3921§§A |
| 2 / Receiving Stolen Property | Proceed to Court | | 18§3925§§A |
| 3 / Criminal Conspiracy Engaging Theft By Unlaw Taking-Movable Prop | Proceed to Court | | 18§903§§A1 |

**Withdrawn**

| | | | |
|---|---|---|---|
| Trial | 01/13/2011 | Final Disposition | |
| 1 / Theft By Unlaw Taking-Movable Prop | Withdrawn | | 18§3921§§A |
| 2 / Receiving Stolen Property | Withdrawn | | 18§3925§§A |
| 3 / Criminal Conspiracy Engaging Theft By Unlaw Taking-Movable Prop | Withdrawn | | 18§903§§A1 |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: MC-51-CR-0032386-2010**

**CRIMINAL DOCKET**

**Court Case**

Commonwealth of Pennsylvania
v.
Anthony Pritchett

## COMMONWEALTH INFORMATION

Name: Philadelphia County District Attorney's Office
Prosecutor

Supreme Court No:

Phone Number(s):
(215) 686-8000 (Phone)

Address:
3 South Penn Square
Philadelphia PA 19107

## ATTORNEY INFORMATION

Name: Scott Lawrence Kramer
Private

Supreme Court No: 093165

Rep. Status: Active

Phone Number(s):
(610) 891-1499 (Phone)
(610) 565-6488 (Fax)

Address:
11 S Olive St Ste 100
Media PA 19063

Representing: Pritchett, Anthony

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 PARS Transfer | 07/29/2010 | | Municipal Court - Philadelphia County |
| 2 Bail Set - Pritchett, Anthony | 07/29/2010 | | O'Brien, James |
| 3 Bail Posted - Pritchett, Anthony | 07/29/2010 | | Pritchett, Anthony |
| 1 Trial Scheduled 10/4/2010 9:00AM | 09/10/2010 | | Municipal Court - Philadelphia County |
| 1 Trial Scheduled 11/23/2010 8:00AM | 10/04/2010 | | Municipal Court - Philadelphia County |
| 3 Trial Continued | 10/04/2010 | | Waters, Joseph C. |

Commonwealth Request - Witness Failed To Appear
Video Missing -- Must pass video ten (10) days prior to next listing
NCD: 11/23/10 Room 903

By The Court,

____________________, J.

AOPC 2220 - Rev 07/05/2011

Printed: 07/05/2011

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: MC-51-CR-0032386-2010**

**CRIMINAL DOCKET**

**Court Case**

Commonwealth of Pennsylvania
v.
Anthony Pritchett

ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 11/23/2010 | | Municipal Court - Philadelphia County |

Trial Scheduled 1/13/2011 8:00AM

---

| 3 | 11/23/2010 | | Gehret, Thomas F. |
|---|---|---|---|

Order Granting Motion for Continuance

Defense: Advance request for continuance.
Commonwealth: Not ready; Discovery is incomplete.
Video is needed.

NCD: 01/13/2011, Room 903
ADA: Tanner Rouse; Defense: Tricia Henning
Court Reporter: Danielle O'Connor; Court Clerk: Alyssia Williams

By the Court,

________________________J.

---

| 1 | 01/13/2011 | | O'Neill, Joseph J. |
|---|---|---|---|

Withdrawn

ADA Moore, Atty S. Kramer, Steno McShane, Court Clerk Washington. Commonwealth not ready - witness failed to appear

---

AOPC 2220 - Rev 07/05/2011

Printed: 07/05/2011

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.