# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

Anthony Pritchett                      :
906 Rockland Street                    :
Philadelphia, PA 19141                 :
                                       :
      Appellant/Plaintiff,    :          USCA NO.: 12-3906
   viii.                           :
                                       :
City of Philadelphia, et al.           :
1515 Arch Street                       :          United States District Court for the
Philadelphia, PA 19102                 :          Eastern District of Pennsylvania
                                       :          No.: 11-4682
     Appellees/Defendants.   :


## APPEAL FROM THE JUDGMENT AS A MATTER OF LAW ENTERED SEPTEMBER 18, 2012 IN THE UNITED STATES DISTRICT COURT, FOR THE EASTERN DISTRICT OF PENNSYLVNIA CIVIL DOCKET NO.: 11-4682

---

## APPELLANT'S APPENDIX VOLUME III

---

Matthew B. Weisberg, Esquire
Weisberg Law, P.C.
Attorney for Appellant
Attorney ID No.: 85570
7 South Morton Avenue
Morton, PA 19070
(610) 690-0801

# TABLE OF CONTENTS—APPENDIX VOLUME III
## PP. 191A – 386A

Page   Description of Document

191A-261A       Defendants' Motion for Summary Judgment with Exhibits

262A-386A       Plaintiff's Opposition to the Defendants' Motion for Summary
                Judgment with Exhibits

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTHONY PRITCHETT** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **11-4682** |
| | : | |
| **CITY OF PHILADELPHIA and** | : | |
| **Det. SHAWN WARRENDER** | : | |

### ORDER

And now, this _____ day of _____, 2012 upon consideration of Defendants' Motion for Summary Judgment, and Plaintiff's response thereto, it is hereby **ORDERED and DECREED** that Defendants' Motion for Summary Judgment is granted and Plaintiff's claims are **DISMISSED** with prejudice.

_____
J.

191 A

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTHONY PRITCHETT** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **11-4682** |
| | : | |
| **CITY OF PHILADELPHIA and** | : | |
| **Det. SHAWN WARRENDER** | : | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, City of Philadelphia and Detective Shawn Warrender hereby file this Motion

for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Pursuant to Local Rule 7.1(c) Defendants incorporates by reference the attached

Memorandum of Law as though fully set forth at length.

Respectfully submitted,

/s/ Niya L. Blackwell
NIYA L. BLACKWELL
Deputy City Solicitor
1414 Arch Street, 14th Flr
Philadelphia, PA 19129
(215) 683-5445 phone
(215) 683-5397 fax

192 A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTHONY PRITCHETT** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **11-4682** |
| | : | |
| **CITY OF PHILADELPHIA and** | : | |
| **Det. SHAWN WARRENDER** | : | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS THE CITY OF PHILADELPHIA AND DETECTIVE SHAWN WARRENDER'S MOTION FOR SUMMARY JUDGMENT

Defendants , The City of Philadelphia and Detective Shawn Warrender hereby move for summary judgment on all claims made by Plaintiff against the City of Philadelphia and Detective Shawn Warrender. As fully set forth herein, Plaintiff's civil rights claims against the City of Philadelphia and Detective Shawn Warrender can survive summary judgment only if Plaintiff can establish that the City of Philadelphia, through a custom, policy or practice, has exhibited deliberate indifference to the constitutional rights of the Plaintiff and if he can establish that Detective Warrender caused a Malicious Prosecution of Plaintiff.  In this case, Plaintiff has adduced no such evidence.

Accordingly, summary judgment should be entered in favor of defendants , the City of Philadelphia and Detective Shawn Warrender.

### I.    PROCEDURAL HISTORY

On January 26, 2011, Plaintiff initiated this action by filing a Complaint in Civil Action, alleging that on or about June 9, 2010, he sustained damages when his civil rights were violated by the Defendants. Discovery opened on February 15, 2012 and depositions of Plaintiff Anthony

193 A

Pritchett and Defendant Detective Shawn Warrender were taken on January 5, 2012. No other depositions were taken in this case. Discovery ended on May 15, 2012.

## II.    **STATEMENT OF UNDISPUTED FACTS**

1.    On January 26, 2011, Plaintiff, Anthony Pritchett filed a Complaint in Civil Action, alleging that his civil rights were violated by The City of Philadelphia and Detective Shawn Warrender. See Plaintiff's Complaint attached hereto as Exhibit "A".

2.    The allegations in Plaintiff's Complaint stem from his arrest on July 29, 2010. See Plaintiff's Complaint, paragraph 19, attached hereto as Exhibit "A".

3.    On June 9, 2010, Plaintiff was employed by the Arthur Jackson Company. See Plaintiff's Deposition Transcript, page 10, ln 7-12, attached hereto as Exhibit "B".

4.    Plaintiff held the position of a day porter. See Plaintiff's Deposition Transcript, page 10, ln 18-20, attached hereto as Exhibit "B".

5.    Plaintiff 's hours were from 7:00 am – 3:00 pm. See Plaintiff's Deposition Transcript, page 11, ln 16-18, attached hereto as Exhibit "B".

6.    On June 10, 2010, Plaintiff was suspended by his supervisor Sophie Solski. See Plaintiff's Complaint paragraph 13, attached hereto as Exhibit "A".

7.    On June 10, 2010, Sophie Solski made a complaint with the City of Philadelphia Police Department, alleging that her laptop computer was stolen. See Plaintiff's Complaint, paragraph 14, attached hereto as Exhibit "A".

8.    On June 25, 2010, Defendant Det. Warrender interviewed Solski. See Philadelphia Police Department Central Detective Division Investigation Interview Record, attached hereto as Exhibit "3".

9.    Sofie Solski, Plaintiff's immediate supervisor made the following claims in her interview:

194 A

**Q:**     Can you tell me what happened at 1600 JFK Blvd. on June 9, 2010 that brings you to

CDD (Central Detective Division)?

**A:**     I arrived for work at 3:15 p.m. and was looking for my laptop which was inside the file

cabinet, which was locked. I saw a dent in the lock. This is how it was opened. I noticed that the

items that were on the partition was knocked off, which told me that someone had moved the

partition. I immediately noticed my laptop missing and twenty employee files were gone. I then

went to the building manager and reviewed video together and saw unusual activity by the

offender (plaintiff). I saw that he was working at 5:50 am, but is not scheduled until 7:00 a.m.

Also, he didn't punch in until 6:50 a.m. His duties was to sweep the lobby, and outside the

building. He was doing what appeared to be trash removal, which wasn't his scheduled

assignment that day. I saw him take a large trash can into the room where the laptop was located.

There is no reason, there is no trash  I (sic) that room. Then I saw him with a storage box on top

of the trash can. He didn't have it when he walked in there. He then proceeded to walk to the

loading dock; it was now 7:15 am. He is not supposed to be there at all. No trash is too (sic)

placed in the loading during day time hours. Trash is supposed to be placed in the trash room.

See Philadelphia Police Department Central Detective Division Investigation Interview Record,

attached hereto as Exhibit "3".

10.     During the interview, Defendant Det. Warrender and Solski watched a video surveillance

of the room where the locker was broken in to. See Philadelphia Police Department Central

Detective Division Investigation Interview Record, attached hereto as Exhibit "3".

11.     The video surveillance showed Plaintiff entering the locker room . See Philadelphia

Police Department Central Detective Division Investigation Interview Record, attached hereto as

Exhibit "3".

195 A

12.    Based upon the video surveillance, Defendant Det. Warrender made out an Affidavit of

Probable cause. See Affidavit of Probable Cause attached hereto as Exhibit "1".

13.    Based upon the Affidavit of Probable Cause, an Arrest Warrant was issued for Plaintiff.

See Arrest Warrant attached hereto as Exhibit "2".

14.    On July 29, 2010, Plaintiff was arrested and charged with Theft by Unlawful Taking,

Receipt of Stolen Property and Conspiracy. See Plaintiff's Complaint, paragraph 19, attached

hereto as Exhibit "A".

15.    At the time of Plaintiff's arrest, he was on parole. See Plaintiff's Deposition Transcript,

page 51, ln 18-19.

16.    As a result of Plaintiff's parole, a detainer was placed on him. See Plaintiff's Deposition

Transcript, page 51, ln 12-19.

17.    Plaintiff was incarcerated on the aforementioned charges from July 29, 2010, until

January 13, 2011. See Plaintiff's Complaint, paragraph 27, attached hereto as Exhibit "A".

18.    The Commonwealth's witness and Complainant, Sophie Solski, failed to appear for

testimony. See Plaintiff's Complaint attached hereto as Exhibit "A" (exhibit "B" of plaintiff's

complaint- Municipal Court Docket).

19.    On January 13, 2011, all charges against Plaintiff were withdrawn. See Plaintiff's

Complaint, paragraph 22, attached hereto as Exhibit "A".

III.    **SUMMARY JUDGMENT STANDARD**

The court shall render summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is a sufficient

196A

evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. See id. All inferences must be drawn, and all doubts resolved in favor of the non-moving party. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

On motion for summary judgment, the moving party bears the initial burden of identifying these portions of the record that it believes demonstrate the absence of material fact disputes. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the moving party, and may not rest on mere denials. See id. at 321, n.3; First Natl. Bank of Pa. v. Lincoln Natl. Life Ins. Co., 824 F.2d 277, 282 (3d Cir. 1987).

In a case where the non-moving party is the plaintiff and therefore bears the burden of proof, the non-moving party must, by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish the existence of [every] element essential to that party's case." Celotex, 477 U.S. at 322-24. The non-moving party must adduce more than a mere scintilla of evidence in its favor to defeat the moving party's summary judgment motion. See Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989). Although all justifiable inferences must be drawn in favor of the non-moving party, the "moving party is entitled to summary judgment where no reasonable resolution of conflicting evidence and inferences therefrom could result in a judgment for the non-moving party." Schwartz v. Hospital of Univ. of Pa., 1993 WL 153810 at *2 (E.D. Pa. May 7, 1993). Furthermore, "[p]laintiff cannot "simply reassert factually unsupported allegations in its pleadings." Poles v. St. Joseph's Univ., 1995 WL 542246 at *5 (E.D. Pa. Sept. 11, 1995) (citing Celotex, 477 U.S. at 325). "Plaintiff

197A

must present affirmative evidence in order to defeat this properly supported motion for judgment." Id.

## IV.    LEGAL ARGUMENT

Plaintiff contends that his rights protected by the Fourth Amendment to the United States Constitution have been violated, and thus purports to bring this action pursuant to 42 U.S.C. §1983.

Section 1983 provides a remedy for the violation of rights secured by the United States Constitution.  That section states:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

See 42 U.S.C. §1983.  Section 1983 does not create substantive rights, it merely provides "remedies for deprivations of rights established elsewhere in the Constitution or federal laws." Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  A plaintiff seeking to advance a claim under §1983 must establish the deprivation of a right secured by the Constitution, and that the alleged violation was committed by a person acting under color of state law.  Parratt v. Taylor, 451 U.S. 527, 535 (1981).  Plaintiff cannot sustain this burden.

### A.    PLAINTIFF'S MALICIOUS PROSECUTION CLAIM FAILS AS A MATTER OF LAW.

In Albright v. Oliver, 510 U.S. 266 (1994), the Supreme Court addressed the burden of proof imposed upon a plaintiff in order to prevail in a malicious prosecution claim brought pursuant to §1983.   Plaintiff must demonstrate: 1) that the defendant initiated criminal

198A

proceedings; 2) the criminal proceedings ended in plaintiff's favor; 3) the proceedings were initiated without probable cause; and 4) that the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff has suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. Id.; See also, DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3rd Cir, 2005).

Plaintiff cannot satisfy all of these requirements, as he must in order to prevail on his §1983 malicious prosecution claim.

### 1.    Detective Warrender Had Probable Cause To Arrest Plaintiff.

Probable Cause existed to arrest the Plaintiff, Anthony Pritchett.

To establish a claim under 42 U.S.C. § 1983 ("Section 1983"), the plaintiff must show that the defendant, acting under color of law, deprived him of a right or privilege secured by the Constitution or laws of the United States.

The Third Circuit has noted that the lack of probable cause is "a sine qua non of malicious prosecution." Trabal v. Wells Fargo, 269 F.3d 243, 249, (3d Cir. 2001).   In an action for malicious prosecution, the plaintiff has the burden of proving that the defendant lacked probable cause when he/she initiated charges against the plaintiff. Camiolo v. State Farm, 334 F.3d 345, 363 (3d Cir. 2003); Trabal v. Wells Fargo, 269 F.3d 243, 249 (3d. Cir. 2001).

In evaluating the issue of whether police had probable cause to arrest, the Court should focus on the facts and circumstances known to the officer *at the time of the arrest.*  The Court should consider whether "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the plaintiff] had committed or was committing an offense."[1]  Beck v. Ohio, 379

---

[1] Of course, "probable cause" is a lower standard than "beyond a reasonable doubt." See United States v. Terselich, 885 F.2d 1094, 1096, n. 1 (3d Cir. 1989) ("[P]robable cause requires a lesser showing . . . than is required to sustain

199A

U.S. 89, 91 (1964); accord, Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000); United States v. Cruz, 910 F.2d 1072, 1076 (3d Cir. 1990) (probable cause for arrest exists when facts and circumstances within officer's knowledge are sufficient to warrant a reasonable person to believe an offense has been committed). While probable cause requires more than "mere suspicion" that a person has committed a crime, it does not require that the officer have sufficient evidence to prove guilt beyond a reasonable doubt. See United States v. Glasser, 750 F.2d 1197, 1205 (3d Cir. 1984).

As the Third Circuit stated in Sharrar v. Felsing, a Court evaluating whether probable cause existed "must look at 'the totality of the circumstances' and use a 'common sense' approach to the issue of probable cause." Id., 128 F.2d at 818 (citing cases).

In the present case, the Defendant Detective Shawn Warrender had probable cause to arrest Plaintiff Anthony Pritchett. On June 19, 2010. Sophie Solski, initiated a complaint with the Philadelphia Police Department alleging that Plaintiff, an employee at her company, had stolen her laptop computer. Solski, was the Plaintiff's immediate supervisor, who had the authority to give Plaintiff his work assignments and designate his hours. Solski told the Defendant Detective that Plaintiff had voluntarily deviated from his hours and work assignment. Furthermore, Plaintiff was found to be in the immediate area of the stolen property, an area that Plaintiff had no reason or cause to be in . On June 25, 2010, Solski provided Defendant Warrender with video surveillance to support her claim. Upon reviewing the video, which showed Plaintiff carrying items away from an area his supervisor (Solski) said he was not authorized to be in , Defendant Warrender issued an Arrest Warrant for Plaintiff. Any Detective who was provided with reasonably, trustworthy information, such as the information provided to Detective Warrender,

---

a judgment of conviction under the reasonable doubt standard."); Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995) ("Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt.").

200A

would also have Plaintiff arrested based upon the same circumstances. The video and statement of the employer provided the probable cause required for the arrest of Plaintiff. For these reasons, probable cause was established. Therefore, Defendant Warrender had probable cause under the law to have Plaintiff arrested for theft and similar charges.

**2.    Detective Warrender Did Not Institute Criminal Proceedings Against Plaintiff.**

Generally, a plaintiff cannot institute "malicious prosecution" proceedings against a police officer because "a prosecutor, not a police officer, 'initiates' criminal proceedings against an individual." Stango v. Rodden, 2001 WL 1175131 at *4 (E.D. Pa., Aug. 21, 2001) (quoting Harris v. City of Philadelphia, 1998 WL 481061 (E.D. Pa., Aug. 14, 1998) and citing Albright v. Oliver, 510 U.S. 266, 279 n.7 (1994)). A police officer may be found to have initiated criminal proceedings only where the police officer knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion. Id.

In this case, there is no evidence that Defendant Detective Warrender knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's independent evaluation of the charges filed against Plaintiff. The Criminal Complaint is sworn out by the District Attorney's Office. See Criminal Complaint, attached hereto as Exhibit "4", dated July 13, 2012. As is clear from the police paperwork, the police officer submits the information to the District Attorney's office, who then decides what, if any charges, will be filed against the individual. In this case, Warrendar had a statement and video surveillance from Sophie Solski - Plaintiff's supervisor - demonstrating that Plaintiff was in an area that he was not supposed to be in and an area where property was stolen. This information was provided to the district attorney, who then approved of and filed the charges against Plaintiff. For these reasons,

201A

Plaintiff cannot show that Det. Warrender instituted criminal proceedings against him, a necessary element of a malicious prosecution claim.

### 3.    Plaintiff cannot show that Detective Warrender acted maliciously or that he suffered a deprivation of liberty

Detective Warrender's actions were fully consistent with the mandates of the Fourth Amendment. There was probable cause to arrest the Plaintiff based upon the information provided by Sophie Solski.

## IN ANY EVENT, THE POLICE OFFICER DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Government officials performing discretionary functions generally are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald 457 U.S. 800, 818 (1982). The doctrine of qualified immunity "seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability by attaching liability only if the contours of the right violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right." United States v. Lanier, 520 U.S. 259, 270-71 (1997) (internal quotations and citations omitted). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Anderson v. Creighton, 483 U.S. 635, 638 (1987) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001), the United States Supreme Court discussed the two-step inquiry which should be used to determine whether police officers can be held liable for an alleged violation of plaintiff's constitutional rights. Once it is established that a constitutional right has been violated, the Court should consider whether the officer reasonably believed his actions were legal under the circumstances. See also Showers v.

Spangler, 182 F.2d 165, 171 (3d Cir. 2000); Kim v. Gant, 1997 WL 535138 at *10 (E.D. Pa. 1997).

The doctrine of qualified immunity is intended to give ample room for reasonable but mistaken judgments by police officers. See Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995). "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." Hunter, 502 U.S. at 229 (citation omitted). As the Supreme Court pointed out in Saucier:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If an officer's mistake as to what the law requires is reasonable, however, the officer is entitled to immunity defense.

Saucier, 121 S.Ct. at 2158.

The officer's subjective intent is immaterial to the resolution of questions of qualified immunity. "Instead, 'whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Showers, supra, 182 F.2d at 172 (quoting Anderson, supra).

"Qualified immunity protects government officials, in their individual capacities, from suit unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Pace v. Capobianco, et al., __ F.3d___, 2002 WL 331959 at 5-6 (11th Cir. March 1, 2002) (citing Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1149-1150 (11th Cir.1994) (en banc)). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating

203A

the law would have done such a thing, the government actor has immunity from suit." <u>Lassiter</u>,

28 F.3d at 1149.

### 1.    Plaintiff's Constitutional Rights Have Not Been Violated.

As discussed above, the record belies any contention that Plaintiff's constitutional

rights were violated.   Detective Warrender's actions were fully consistent with the mandates

of the Fourth Amendment.   There was probable cause to arrest the Plaintiff based upon the

information provided by Sophie Solski.

### 2.    A Reasonable Officer In Defendant's Position Would Have Believed that Their Actions Were Consistent With the Fourth Amendment.

Assuming *arguendo* that Plaintiff's constitutional rights were violated, the next part of

the qualified immunity analysis focuses on the "objective legal reasonableness" of the action,

assessed in light of the legal rules that were "clearly established" at the time it was taken.

<u>Showers</u>, <u>supra</u>, 182 F.2d at 172 (<u>quoting</u> <u>Anderson</u>, <u>supra</u>).   It was not "clearly established" as

of the date of Plaintiff's arrest that it was constitutionally impermissible to undertake the actions

taken by the Detective in the present case.

- The Detective had a statement from the Complainant, Plaintiff's supervisor, Sophie Solski.

- When Sophie Solski appeared at the police station on June 25, 2010 to give her statement, she provided video surveillance of Plaintiff's activity to support her claim.

Given this set of facts, it certainly cannot be said that it was "clearly established" that the

Defendant's conduct violated the Fourth Amendment.   Under an objective analysis, a reasonable

Detective with knowledge of these facts would not have believed that he or she was violating

204A

Plaintiff's Fourth Amendment Rights when he was arrested and charged with Theft and similar charges.

**B.    PLAINTIFF'S MUNICIPAL LIABILITY CLAIM AGAINST THE CITY OF PHILADELPHIA FAILS AS A MATTER OF LAW.**

Plaintiff avers in Count II of his Complaint that the City of Philadelphia has maintained policies, practices and customs exhibiting deliberate indifference to the Constitutional right of persons within the geographic and jurisdictional limits of Philadelphia County, which caused violations of Plaintiff's constitutional and other rights. See Plaintiff's Complaint, paragraph 45, attached hereto as Exhibit "A".

It is well-established that plaintiff cannot recover against the City of Philadelphia on a *respondeat superior* theory. In order to prevail against the City of Philadelphia, plaintiff must prove that his constitutionally-protected rights have been violated, and that the alleged violation resulted from a municipal "custom" or "policy" of deliberate indifference to rights of citizens. Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694-95 (1978); Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).

The Supreme Court held in Monell that a municipality potentially is liable under Section 1983 only if plaintiff can prove that city employees were executing an officially adopted **policy** declared by City officials; or that the employees were acting pursuant to an officially adopted **custom** of the municipality. Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978). Plaintiff must prove that the execution of a governmental policy, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicted the injury. Id. at 694. [2] A municipal "custom" within the meaning of Section 1983 are

---

[2]    The officials who can bind the municipality are those whose edicts or acts may fairly be said to present official policy. Monell, 436 U.S. at 694. Which official or officials has final policy-making authority for a municipality on a particular issue is a question of state law, to be decided by the judge by referring to state and local

205A

practices engaged in by state officials that are so permanent and well-settled as to constitute a

`custom or usage' with the force and effect of law. Id. at 691.

Moreover, "municipal liability under section 1983 attach[es] where – and only where – a

deliberate choice to follow a course of action is made from among various alternatives." Pembaur v.

City of Cincinnati, 475 U.S. 469, 483 (1986). Thus, before municipal liability will be imposed,

plaintiff must prove that the municipality's alleged unconstitutional practices are "so widespread as to

have the force of law." Board of County Commrs. of Bryan County v. Brown, 502 U.S. 397, 404

(1997), accord, Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996); Andrews v. City of

Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).

In this case, discovery closed on May 15, 2012. See Scheduling Order, dated February 15,

2012. As any litigants do, Plaintiff had an opportunity to conduct discovery in an attempt to adduce

evidence supporting his allegations of constitutional injury and City liability.

Plaintiff has developed no evidence that would support a claim against the City of Philadelphia.

Plaintiff has developed no evidence that the City of Philadelphia had a "pattern or practice" of violating

citizens' constitutionally-protected rights. Plaintiff has developed no scienter-like evidence of a

conscious decision or deliberate indifference of a high-level official to the constitutional rights of

citizens.

Having produced no evidence, Plaintiff's municipal liability claim against the City cannot

survive Summary Judgment. See Trap Rock Indust., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir.

1992) (a non-moving party may not "rest upon mere allegations, general denials or vague statements")

(citations omitted); DF Activities Corp. v. Brown, 851 F.2d 920, 922 (7th Cir. 1988) ("A plaintiff

---

law, as well as custom or usage having the force of law. Jett v. Dallas Independent School District, 491 U.S. 701
(1989).

206A

cannot withstand summary judgment by arguing that although in pretrial discovery he has gathered no evidence of the defendant's liability, his luck may improve at trial.").

For these reasons, summary judgment should be entered in favor of the City of Philadelphia.

## C.    PLAINTIFF'S SUPPLEMENTAL STATE LAW CLAIM OF MALICOUS PROSECUTION FAILS AS A MATTER OF LAW

In Count III of Plaintiff's Complaint, plaintiff alleges that he was arrested by Detective Warrender without probable cause when Defendant Detective Warrender provided a false affidavit and false testimony within the affidavit.

A state law malicious prosecution claim requires proof of these elements: the defendant must have instituted proceedings against the plaintiff 1) without probable cause, 2) with malice, and 3) the proceedings must have terminated in favor of the plaintiff. Kelley v. General Teamsters, Chauffeurs, and Helpers, Local Union 249, 518 Pa. 517, 520-21, 544 A.2d 940 (1988); LaFrankie v. Miklich, 152 Pa. Commw. 163, 168, 618 A.2d 1445 (1992).

As stated above, the Defendant Detective Shawn Warrender had probable cause to arrest Plaintiff Anthony Pritchett. On June 19, 2010, Sophie Solski, initiated a complaint with the Philadelphia Police Department alleging that Plaintiff, an employee at her company, had stolen her laptop computer. Solski, was the Plaintiff's immediate supervisor, who had the authority to give Plaintiff his work assignments and schedule. Upon interviewing Solski and being provided with video surveillance of the Plaintiff carrying objects away from an area he was not authorized to be in at that time, the Detective had probable cause to make out an Affidavit of Probable Cause and a subsequent arrest warrant.

The testimony in the affidavit was directly based upon the complainant's interview statement (See Exhibit 3) and the video, which was produced during discovery. Therefore, Plaintiff cannot demonstrate

207A

that the Defendant made or relied upon **ANY** false testimony. For these reasons, probable cause was established. Therefore, Defendant Warrender had probable cause under the law to have Plaintiff arrested.

The District Attorney's Office is the agency who officially charged the Plaintiff, because The Criminal Complaint is sworn out by the District Attorney's Office. See Criminal Complaint, attached hereto as Exhibit "4", dated July 13, 2010. As is clear from the police paperwork, the police officer submits the information to the District Attorney's office, who then decides what, if any charges, will be filed against the individual.

In this case, Detective Warrender had reliable information in the form of a statement and video surveillance from Sophie Solski, Plaintiff's supervisor. This information was provided to the district attorney, who then approved of and filed the charges against Plaintiff. For these reasons, Plaintiff cannot show that Det. Warrender instituted the criminal proceedings against him, a necessary element of a malicious prosecution claim.

## V.    CONCLUSION

For all the foregoing reasons, Plaintiff's claims against the City of Philadelphia and Detective Shawn Warrender should be dismissed with prejudice.

DATED: June 14, 2012                    BY:/s/ Niya L. Blackwell
                                        NIYA L. BLACKWELL
                                        Deputy City Solicitor
                                        1515 Arch Street
                                        14th Floor
                                        Philadelphia, PA  19102

208A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD HOLBROOK

            Plaintiff,            :        CIVIL ACTION

VS.                                :

                                      :

THE CITY OF PHILADELPHIA, et al    :        10-2563

                                      :

           Defendant           :

                                      :

                                      :

## CERTIFICATE OF SERVICE

I, NIYA L. BLACKWELL, hereby certify that on this date, the foregoing **DEFENDANTS' SUMMARY JUDGMENT MOTION** was served upon the following individuals by first class mail, postage prepaid, as follows:

         **Graham Baird, Esquire**
         **7 South Morton Avenue**
         **Morton, PA 19070**

Date: June 14, 2012           /s/Niya Blackwell
                                   NIYA L. BLACKWELL
                                   Deputy City Solicitor
                                   City of Philadelphia Law Department
                                   14th Floor, One Parkway Building
                                   1515 Arch Street
                                   Philadelphia, PA 19102-5397

209A

Case 2:11-cv-04682-TR   Document 1   Filed 07/26/11   Page 1 of 24

JS44 (Rev. 12/07)

## CIVIL COVER SHEET

11    4682

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
Anthony Pritchett

(b) County of Residence of First Listed Plaintiff  Philadelphia
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorney's (Firm Name, Address, and Telephone Number)
Weisberg Law, P.C., 7 S. Morton Ave., Morton, PA 19070
(610) 690-0801

### DEFENDANTS
Shawn Warrender, et. al.

County of Residence of First Listed Defendant  Philadelphia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | FEDERAL TAX SUITS | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | IMMIGRATION | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)
- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 42 U.S.C. §1983
Brief description of cause: MALICIOUS PROSECUTION ; 4TH AMENDMENT

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 149,999.99
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE 7/25/11
SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

1
210A

Case 2:11-cv-04682-TR   Document 1   Filed 07/26/11   Page 2 of 24   11-CV-4682

**JP**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA    DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 906 Rockland Street, Philadelphia, PA 19141

Address of Defendant: One Franklin Plaza, Philadelphia, PA 19106

Place of Accident, Incident or Transaction: Philadelphia, PA
(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    unknown    Yes☐ No☐

Does this case involve multidistrict litigation possibilities?    Yes☐ No☒

RELATED CASE, IF ANY:

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐ No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☐ No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐ No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐ No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. Federal Question Cases:

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☒ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify)

B. Diversity Jurisdiction Cases:

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability – Asbestos
9. ☐ All other Diversity Cases
    (Please specify)

ARBITRATION CERTIFICATION
(Check Appropriate Category)

I, _____, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: _____    _____    _____
Attorney-at-Law    Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 7/25/11    _____    85570
Attorney-at-Law    Attorney I.D.#

CIV 609 (6/08)

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

Anthony Pritchett                          :          CIVIL ACTION

          v.                               :

Shawn Warrender, et al.                    :          NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                   ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                      ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (X)

| | | |
|---|---|---|
| 7/25/11 | Matthew B. Weisberg | Plaintiff (s) |
| Date | Attorney-at-law | Attorney for |
| (610) 690-0801 | (610) 690-0880 | mweisberg@weisberglawoffices.com |
| Telephone | FAX Number | E-Mail Address |

(Civ. 660) 10/02

Case: 12-3906    Document: 003111246748    Page: 25    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR   Document 21-1   Filed 06/14/12   Page 4 of 24

Case 2:11-cv-04682-TR   Document 1   Filed 07/26/11   Page 4 of 24



## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

Anthony Pritchett
906 Rockland Street
Philadelphia, PA 19141

           Plaintiff

      v.

Shawn Warrender
Individually & in his official capacity as a
Detective in the City of Philadelphia
Police Department
One Franklin Plaza
Philadelphia, PA 19106

And

City of Philadelphia
1515 Arch Street
Philadelphia, PA 19102

And

John Does 1-10

          Defendants

CIVIL ACTION NO.:

## 11    4682

JURY OF TWELVE (12) JURORS DEMANDED

### CIVIL ACTION COMPLAINT

I.    **Preliminary Statement**

1.    This is an action for an award of attorney's fees and costs, compensatory, statutory, and punitive damages, also seeking equitable, injunctive and other relief, for Defendants' Civil Rights violations arising from Plaintiff, Anthony Pritchett's arrest, incarceration and prosecution without probable cause.

2.    Individually, jointly or severally, Defendants are liable to Plaintiff for, but not limited to, the below causes of action and aforesaid remedies, for the reasons stated, which reasons are averred upon information and belief, or will become known in discovery or at trial.

4

213A

3.    Plaintiff reserves the right to rely on the "Discovery Rule" and the Doctrine(s) of Equitable Tolling/Fraudulent Concealment, respectively.

4.    Plaintiff, Anthony Pritchett, was wrongfully imprisoned for over six (6) months without cause. His arrest, imprisonment, and trial was the direct result of the pervasive, intentional, and systematic misconduct of the individual defendants (including John Does) and the City of Philadelphia's policies, practices and customs regarding their constitutional failures to conduct criminal investigations in good faith, and to refrain from the fabrication or submission of false evidence and the use of false or perjured testimony.

## II.    Jurisdiction and Venue

5.    Jurisdiction in this Honorable Court is based on federal question conferred by 28 U.S.C. §1331; supplemental jurisdiction over state law claims is granted by 28 U.S.C. §1367.

6.    Venue lies in this District in that the events giving rise to this claim occurred here, at least one (1) Defendant resides, maintains a principal place of business, is incorporated or does business here, or the subject of this action is situated within this district.

## III.    Parties

7.    Plaintiff, Anthony Pritchett ("Plaintiff"), is an adult individual, an African-American, and citizen currently residing at the above-captioned address.

8.    Defendant, Detective Shawn Warrender, was at all times material a detective with the City of Philadelphia Police Department ("PPD"), was the primary official responsible for the investigation and charging relevant to this matter, and was operating in his official capacity as an employee, worker, or agent of co-Defendant (see below) at the above-captioned address, and he is being sued individually and in his official capacity, having acted under color of state law.

Case: 12-3906     Document: 003111246748     Page: 27     Date Filed: 05/01/2013
Case 2:11-cv-04682-TR   Document 21-1   Filed 06/14/12   Page 6 of 24

Case 2:11-cv-04682-TR   Document 1   Filed 07/26/11   Page 6 of 24

9.      Defendant, City of Philadelphia ("City"), is a municipality, registered to transact business in the Commonwealth of Pennsylvania, with agents authorized to receive service of process at the above-listed address, and owns, operates, manages, directs and controls the PPD, which Defendant, City, employs Defendant, Warrender.

10.     Defendants, John Does 1-10, is a moniker for individuals and entities currently unknown but will be substituted when known, as affiliated, associated or liable hereunder for the reasons set forth below or inferred therefrom.  Each of these parties are incorporated as Defendants in each and every Count and averment listed above and below.

### IV.    Operative Facts

11.     On or about June 9, 2010, Plaintiff was lawfully upon the premises of 1600 JFK Boulevard, Philadelphia, Pennsylvania – he was at work.

12.     At all times material, Plaintiff's employer is a commercial building cleaning service, Arthur Jackson.

13.     At the time of the incident giving rise to Plaintiff's claims, he had worked at Arthur Jackson for three years but had been suspended on June 10, 2010 (arising out of a personal dispute with his supervisor, Sophia Solski).

14.     On June 10, 2010, Solski, a non-party, made a complaint with Defendants that her laptop computer was stolen from her work locker.

15.     Solski advised Defendants that Plaintiff had stolen the laptop.

16.     Defendant Warrender interviewed Solski. (Exh. A.)

17.     During this interview, Solski and Warrender allegedly reviewed video surveillance of the room where Solski's locker was claimed broken into.

6
215A

18.     A warrant of probable cause was requested by Defendant Warrender based upon the supposed video surveillance. (Exh. A.)

19.     On July 29, 2010, Plaintiff was arrested, arraigned and charged with Theft by Unlawful Taking, Receipt of Stolen Property and Conspiracy by Engaging in Theft by Unlawful Taking. (Exh. B – Docket.)

20.     No video surveillance recording was ever produced, or turned over to Defendant and his counsel, at the criminal trial, nor viewed by any person other than Solski and Defendant Warrender.

21.     Plaintiff's criminal trial was continued twice as a result of the failure to produce the supposed video surveillance tape.

22.     On January 13, 2011, all charges against Plaintiff were withdrawn by the Commonwealth of Pennsylvania. Id.

23.     Warrender lacked legal, justifiable or probable cause to arrest Plaintiff. Plaintiff did nothing wrong (which Warrender well knew).

24.     Defendant was solely focused on attempting to build or find evidence against Plaintiff rather than trying to determine the truth; mainly, that Plaintiff had nothing to do with any theft of a laptop computer.

25.     Plaintiff was charged by Warrender, on behalf of the Commonwealth, with three (3) offenses (set forth above).

26.     Warrender filed an affidavit with the Court in support of the offenses.

27.     Plaintiff was incarcerated on the aforementioned charges from July 29, 2010, until January 13, 2011.

28.     During the period of this investigation and trial, Defendant, City, failed with deliberate indifference to properly train, supervise, and discipline its detectives with respect to their constitutional obligations to refrain from prosecutions without foundation.

29.     As a result of this failure to train, supervise, and discipline the individual detective and other officers within the City of Philadelphia Police Department, with respect to their constitutional duties and obligations, Defendant, City, caused the constitutional violations and other conduct alleged in this complaint.

30.     The conduct of the Defendant, City, was part of a custom, policy and/or practice and these customs, policies or practices caused the violations of Plaintiff's rights.

<u>Damages</u>

31.     The actions of Defendants deprived plaintiff of his rights, *inter alia*, guaranteed under the Fourth and Fourteenth Amendments of the United States Constitution; 42 U.S.C. §§1983, 1985, and 1988; and the laws of the Commonwealth of Pennsylvania.

32.     As a direct and proximate cause of defendants' acts, Plaintiff served approximately 5.5 months in prison where he was subjected to severe deprivation of his privacy and liberty interests, cruel and unusual punishment, and substantial physical and emotional pain and suffering.

33     Plaintiff suffered a loss of earning capacity, employment, and wages during his incarceration.

34.     Plaintiff has suffered and continues to suffer severe mental and psychological stress as a result.

V.     **Causes of Action**

<u>COUNT I</u>

## CIVIL RIGHTS VIOLATION- Malicious Prosecution
*Plaintiff v. Warrender & John Does, in their individual capacities*

35.    Paragraphs above are incorporated by reference as if fully set forth at length herein and below.

36.    At the time of Defendant's investigation, arrest, charges, imprisonment, and trial, Plaintiff had not committed any infraction to legally justify the incarceration and charges.

37.    Defendant's actions stated above, *inter alia*, were committed under color of state law and were violations of Plaintiff's clearly established and well-settled Constitutional and other legal rights.

38.    Defendants caused plaintiff to suffer a malicious prosecution by their wrongful conduct in subjecting Plaintiff to false criminal charges, all in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

39.    Defendants instituted criminal action against Plaintiff by way of an affidavit supporting the charges against Plaintiff, testifying, and failing to properly investigate the alleged theft.

40.    Plaintiff was seized from the time he was arrested and while he was imprisoned for over five (5) months, including but not limited to, the time period between July 29, 2010 and January 13, 2011.

41.    Defendant did not have probable nor any cause to arrest, charge, and/or accuse Plaintiff of the criminal acts.

42.    The criminal action terminated in Plaintiff's favor after the Commonwealth withdrew all charges due to a lack of any testimony or evidence.

43.    Defendant deliberately ignored and failed to advise prosecutors of evidence and accounts of the event that exonerated Plaintiff.

## COUNT II
### CIVIL RIGHTS VIOLATION-*MONELL*
*Plaintiff v. City of Philadelphia*

44.    Paragraphs above are incorporated by reference as if fully set forth at length herein and below.

45.    Prior to the events described herein, Defendant, City, developed and maintained policies, practices and customs exhibiting deliberate indifference to the Constitutional right of persons within the geographic and jurisdictional limits of Philadelphia County, which caused violations of Plaintiff's constitutional and other rights.

46.    Specifically, Defendants failed to adequately and properly supervise and train in various aspects of law enforcement, criminal prosecution procedure and substance, including, but not limited to, the nature and existence of good cause, evaluation of character, and the laws of the United States, Commonwealth of Pennsylvania, and otherwise.

47.    The actions and conduct of Defendant, Warrender, was caused by the failure of the City, with deliberate indifference, to properly train, control or supervise these police detectives with respect to their investigative power in accordance with the United States and Pennsylvania Constitutions.

48.    The above described acts or omissions by Defendants, demonstrated a deliberate indifference to the rights of those within Philadelphia County, such as Plaintiff, and were the cause of the violations of Plaintiff's rights as set forth herein.

## COUNT III
### *State Law Claim – Malicious Prosecution*
*Plaintiff v. Warrender & John Does*

49.    Paragraphs above are incorporated by reference as if fully set forth at length herein and below.

Case: 12-3906    Document: 003111246748    Page: 32    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR    Document 21-1    Filed 06/14/12    Page 11 of 24

Case 2:11-cv-04682-TR    Document 1    Filed 07/26/11    Page 11 of 24

50.    Plaintiff was arrested by Defendant without probable cause wherein Defendant provided

a false affidavit and false testimony within the affidavit.

VI.    **Prayer for Relief**

   **WHEREFORE,** Plaintiff requests this Honorable Court enter judgment in his favor and

against Defendants, individually, jointly and severally, plus such other and further relief as this

Honorable Court deems necessary and just, and to Order the following relief:

   a.  Injunctive relief including but not limited to monitoring and education;
   b.  Statutory damages;
   c.  Compensatory damages, including; and
       i.   Actual damages for financial injury (including but not limited to wage
            loss and loss of earning capacity, and attorneys fees related to the criminal
            action appeal) and emotional distress;
       ii.  Attorneys fees and expenses, and costs of suit; and
   d.  Punitive damages.


                         WEISBERG LAW, P.C.

                         /s/ Matthew B. Weisberg, Esquire
                         MATTHEW B. WEISBERG, ESQUIRE
                         Attorney for Plaintiff

Case: 12-3906   Document: 003111246748   Page: 33   Date Filed: 05/01/2013
Case 2:11-cv-04682-TR   Document 21-1   Filed 06/14/12   Page 12 of 24

Case 2:11-cv-04682-TR   Document 1   Filed 07/26/11   Page 12 of 24

# EXHIBIT A

Case: 12-3906    Document: 003111246748    Page: 34    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR    Document 21-1    Filed 06/14/12    Page 13 of 24

Case 2:11-cv-04682-TR    Document 1    Filed 07/26/11    Page 13 of 24

**Philadelphia Police Department Investigation Report**

DC Number    2010-09-027767
Report No    2010-09-027767.1
Report Date    6/25/2010 12:24:21 PM
Report Type    Investigation Report (75-49)

## A - Approved

Page 3 of 3

**Suspect S1: Pritchett, ANthony**

| | | | |
|---|---|---|---|
| AKA | | | |
| Alias(s) | | DOB | 10/21/1960 | SSN |
| Address | 913 Chester Ave | Age / Race / Sex | 49 / White / Male | OLN |
| CSZ | Yeadon, PA 19050 | Ethnicity | Not of Hispanic Origin | OLN State / Country / United States of America |
| Home Phone | 610 623-1261 | Place of Birth | | Build |
| Cell Phone | | Occupation/Grade | | Scars/Marks/Tattoos |
| Beeper | | Employer/School | | Teeth |
| Email | | Emp/Sch Address | | Facial Hair |
| Work Phone | 610 909-4190 | Emp/Sch CSZ | | Complexion |
| Attire | | Height / Weight / | | Hair Style / Length |
| Jewelry | | Eye / Hair Color / | | Blood Type |
| Suspect Notes | | Artif. Body Prts/Aids | | |

**Interview Section**

| | | | |
|---|---|---|---|
| Interview Date | | | |
| Interview Location | | Interviewed By | (PR / U) | 75-48s Completed |
| Interview Summary | | Others Present | | |

**Case Facts**

**MO**

**Actions Taken**

1. Action 1    Obtain video from Michael Zwolinski ( Carter management)

2. Action 2    Obtain additional video from P/O Walker (CCD)

3. Action 3    Interviews pending

4. Action 4    Spoke with complainant by phone will come in on 6/25/10 for interview

5. Action 5    Complainant did make a positive identification of the offender

6. Action 6    Affidavit submitted

7. Action 7    75-52 will follow if additional information is provided or an arrest is made

8. Victim Interview(s) Conducted    Yes

9. Arrest Warrant Affidavit Submitted    Yes

6/25/2010

IRMS_CR.rd v21

Case 2:11-cv-04682-TR   Document 1   Filed 07/26/11   Page 14 of 24

## Philadelphia Police Department Investigation Report

DC Number 2010-09-027767
Report No   2010-09-027767.2
Report Date 7/28/2010 6:17:06 PM
Report Type Disposition Change (75-52)

**A - Approved**

Page 1 of 3

Unit Control#: 2010-6200-005201-0

| | |
|---|---|
| Classification | 1201 - EMBEZZLEMENT FRAUDULENT CONVERSION |
| Previous Classification | #202 - EMBEZZLEMENT FRAUDULENT CONVERSION |
| Location of Occurrence | 1600 John F Kennedy Blvd #1010 |
| Dist/Sect of Occurrence | 9th District PSA 2 |
| Responding Officer | P/O MICHAEL SWEENEY JR (PR 263714 / #4645) |
| Assisted by | |
| Related Cases | |

Occurred On   6/9/2010 12:00:01 AM
Reported On   6/10/2010 4:26:43 PM
Disposition / Status   2 - Arrest
Clearing Unit   6200 - Central Detective Division
Investigating Officer   Det SHAWN WARRENDER(PR 224247/ #8130)
Dist/Unit Preparing   6200 - Central Detective Division

## Report Approval

| | | |
|---|---|---|
| Completed | 7/28/2010 6:17:06 PM | Det SHAWN WARRENDER (PR 224247 / #8130) |
| Approved | 7/29/2010 2:44:03 AM | Sgt MASSI MARTIN (PR 205433 / #8854) |

## Report Summary

defendant arrested under warrant # 4715-2010 inside 42 x 15th street, 2nd floor

Classification Detail: 1202 - EMBEZZLEMENT FRAUDULENT CONVERSION

| | | | | |
|---|---|---|---|---|
| Location | 027 - Office Buildings | | | |
| Offense Completed? | YES | | No. Prop. Entered | |
| Hate/Bias | None (No Bias) | Drug | Kenty Method | |
| Domestic Violence | NO | Criminal Activity | Type Security | |
| | | Weapon/Force | Tools | art |

## Property

| Description | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | Reported Value | Recovered Value |
| | | | | TOTAL | $0 | $0 |

## Witness W2: P/O MICHAEL SWEENEY (PR 263714 / #4645)

| | | | | |
|---|---|---|---|---|
| Address | | DOB | | Officer Payroll # | 163714 |
| CSZ | | Age / Race / Sex   / / | | District / Unit | 0900 - 9th District |
| Home Phone | | Ethnicity | | SSN | |
| Cell Phone | | Occupation/Grade | | OLN | |
| Beeper | | Employer/School | Philadelphia Police | OLN State / Country   / | |
| Email | | | Department | | |
| Work Phone | 215 686-1776 | Emp/Sch Address | One Franklin Sq | | |
| Witness Notes | | Emp/Sch CSZ | Philadelphia, PA 19106 | | |
| Interview Section | | | | | |
| Interview Date | | | | | |
| Interview Location | | Interviewed By | | | |
| Interview Summary | | Others Present   (PR / #) | | 75-483 Completed | |

## Witness W3: P/O JOSEPH DOYLE (PR 247358 / #9409)

| | | | | |
|---|---|---|---|---|
| Address | | DOB | | Officer Payroll # | 247358 |
| CSZ | | Age / Race / Sex   / / | | District / Unit | 0900 - 9th District |
| Home Phone | | Ethnicity | | SSN | |
| Cell Phone | | Occupation/Grade | | OLN | |
| Beeper | | Employer/School | Philadelphia Police | OLN State / Country   / | |
| Email | | | Department | | |
| Work Phone | 215 686-1776 | Emp/Sch Address | One Franklin Sq | | |
| Witness Notes | | Emp/Sch CSZ | Philadelphia, PA 19106 | | |
| Interview Section | | | | | |
| Interview Date | | | | | |
| Interview Location | | Interviewed By | | | |
| Interview Summary | | Others Present   (PR / #) | | 75-483 Completed | |

@IRMS_CR.rtf v21

Printed For_____
Printed: July 29, 2010 - 11:53 PM

**Philadelphia Police Department Investigation Report**

DC Number  2010-09-027767
Report No  2010-09-027767.2
Report Date  1/28/2010 6:17:06 PM
Report Type  Disposition Change (75-52)

**A - Approved**

Page 2 of 3

---

Witness W4: Det DAVID SMITH (PR 220202 / #8127)

| | | |
|---|---|---|
| Address | | Officer Payroll # 220202 |
| CSZ | DOB | District / Unit 6200 - Central Detective |
| | Age / Race / Sex / / | Division |
| Home Phone | Ethnicity | SSN |
| Cell Phone | Occupation/Grade | OLN |
| Beeper | Employer/School Philadelphia Police | OLN State / Country / |
| Email | Department | |
| Work Phone 215 616-1776 | Emp/Sch Address One Franklin Sq | |
| Witness Notes served arrest warrant | Emp/Sch CSZ Philadelphia, PA 19106 | |

Interview Section
Interview Date
Interview Location          Interviewed By  (PR / #)                    75-413 Completed
Interview Summary           Others Present

---

Arrestee A1: Pritchett, ANthony

| | | |
|---|---|---|
| AKA | | |
| Alias(s) | DOB 10/21/1960 | SSN |
| Address 513 Chester Ave | Age / Race / Sex 49 / White / Male | DLN |
| CSZ Yeadon, PA 19050 | Ethnicity | OLN State / Country / United States of America |
| Home Phone 610 613-1261 | Place of Birth Not of Hispanic Origin | |
| Cell Phone | Occupation/Grade | Build |
| Beeper | Employer/School | Scars/Marks/Tattoos |
| Email | Emp/Sch Address | Teeth |
| Work Phone 610 909-4190 | Emp/Sch CSZ | Facial Hair |
| Alley | Height / Weight 5' 8" / 180 | Complexion Light |
| Jewelry | Eye / Hair Color / Bald | Hair Style / Length / |
| | Anat. Body Part/Aids | Blood Type |
| Offender PID | CBN | Arrested Date 7/28/2010 4:00:00 PM |
| Arrest Type Arrest on Warrant | Arrested For 1202 - EMBEZZLEMENT | Arrest Location .42 S 15th St |
| | FRAUDULENT | |
| FBI No. | CONVERSION | |
| PA SID. | Arresting Officer 1 W3 | Booked On |
| Armed With 01 - Unarmed | Arresting Officer 2 W2 | Booked Location |
| Mult. Clearance Not Applicable | Number of Warrants | Released Location |
| Prev. Suspect No. S1 - Pritchett, ANthony | Notified | Released On |
| | Juvenile Disposition | Released By (PR / #) |
| Arrest Notes | | Release Reason |
| | | Held For |

Interview Section
Interview Date
Interview Location          Interviewed By  (PR / #)                    75-413 Completed
Interview Summary           Guardian Present                            Miranda Read
                            Others Present                              Miranda Waived

Case Facts

XO

Actions Taken

Defendant Statement Taken          No

Defendant Debriefed                No

MS_CR rlf v27

**Philadelphia Police Department Investigation Report**

DC Number  2010-09-027767
Report No   2010-09-027767.2
Report Date 7/28/2010 6:17:06 PM
Report Type Disposition Change (75-52)

A  Approved

Page 3 of 3

3. PA Crimes Code Charges Placed for Defendant — Yes

4. Checked defendant for gun permit — Yes

5. Criminal History Through Federal, State and Local Systems Records Check — Yes

6. NCIC/PCIC Offender Records Check — Yes

7. Arrest Warrant Served — Yes

7/28/2010

RMS_CR.rff v2f

Commonwealth of Pennsylvania
County of Philadelphia



AFFIDAVIT OF PROBABLE CAUSE

Copy

Police Incident Number (DC#):
1009027767

Warrant Control Number:
AFF-0004715-2010

DET SHAWN WARRENDER SHAWN 8130 Central Detective Division

PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:

1. That after investigation I have probable cause to believe that a warrant of arrest should be issued for:

Defendant Name: ANTHONY PRITCHETT

Alias:                                    Gender: M    Race: Black

DOB: 10/21/1961   Pid:

Address: 913 Chester AV Yeadon, PA 19050

CRIMES:

| DC Number | Code | Grade | Description | Count |
|-----------|------|-------|-------------|-------|
| 1009027767 | CC3921 | M1 | THEFT-UNLWF TAKING | 1 |
| | CC3925 | M1 | THEFT-RSP | 1 |
| | CC0903 | M1 | CRIMINAL CONSPIRACY | 1 |

2. That the facts tending to establish the grounds for the issuance of the warrant of arrest and the probable cause for my belief
are as follows:
( Note: If extended text exists, see following page(s))

1009027767    On 6/25/2010 at 8:45am inside Central Detectives the complainant did make the following statement:
On 6/9/2010 at 3:15pm at 1600 JKF Blvd, Concourse level, the complainant reported to work to find her HP laptop valued
at $ 1200.00 along with twenty employee files missing from her work station. The laptop was removed from a lock file
cabinet. There was a dent in the locking mechanism allowing access, and the immediate surrounding area was in
disarray. She immediately viewed security cameras and witnessed an employee who has worked for the company the
last two years enter the office where the laptop was located and then exit with a storage box and proceed to the loading
dock. According to the complainant's statement, the offender has no right to be in this area and is not allowed on the
loading dock during normal business hours, a direct violation of company policy. Additional surveillance shows the
offender placing the storage box in the back of a pickup truck and that truck flees the parking area. No tag was captured.
The offender then returns to work for twenty more minutes, leaves and never returns back to work. The offender still had
several hours left to the completion of his shift. The identity of the second male is unknown.
The offender is a custodian and does have a right to be in the areas surrounding the scene of the theft (outside of the
office) but has no legal right to be inside the office where the laptop was secured.
The affiant believes that sufficient probable cause exists for issuance of an arrest warrant for the offender for theft and
RSP.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE
AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF AND THAT PROBABLE
CAUSE TO ARREST EXISTS.

Affiant: DET SHAWN WARRENDER SHAWN 8130 Central Detective Division
Sworn to or affirmed and subscribed before me this 13 day of July , 2010

_____
Affiant Signature

_____
Issuing Authority Signature

ANTHONY PRITCHETT

Page 1 of 1 Page

Printed: 07/13/2010 11:35 AM

80  'P.08      8b:EL  0102 92 ʌoN      b6L8-989-SIZ:xɐ⅃      ⅄NO⅃Ǝ⅃

17

226A

Case: 12-3906    Document: 003111246748    Page: 39    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR   Document 21-1   Filed 06/14/12   Page 18 of 24
Case 2:11-cv-04682-TR   Document 1   Filed 07/26/11   Page 18 of 24

## Philadelphia Police Department Arrest Report

**Defendant:** last name: **PRITCHETT**

Page 1 of 1 PARS

first name: **ANTHONY**

middle initial:

Sex: Male    SSN: 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    DOB: 10/21/1961

Address: 913 Chester    AV Yeadon PA 19050-

Race: Black    Birth-Place: Philadelphia

| | | | Phone #: 215-000-0000 |
|---|---|---|---|
| Year: 2010 | District: 09 | DC#: 10-09-027767 | Sector: A    Ctl#: 05201 |
| PID: 0735573 | SID: 16058103 | OTN: N6938562 | Event: 171006452    CBN: 997364 |
| Crime Class: 1202 | Desc: Embezzlement fraudulent conversion | | Authority: Philadelphia Police Department |
| DFJ: | | | |

FBI / FIO:

Arrest Name: ANTHONY PRITCHETT

DOB: 00/00/0000    SSN:

**ARREST INFORMATION:**

Date / Time: 07/28/2010 12:00AM    District: 09    Inside/Outside: I    Arrest Type: WA

42 S 15th ST  Philadelphia PA 19100-

Slating Date:    Slating Time: 00:00AM    Sum/War:    Issued By AC Magistrate:

**OCCURRENCE:**

Date / Time: 06/08/2010 12:00AM    Date reported: 06/10/2010 04:36PM

1500 JOHN F KENNEDY BLVD BL  Philadelphia PA 19100-    Inside/Outside: I    Codefendants?: N

**FACTS OF THE CASE:**

Refer to Affidavit 0004715-2010 for case facts.

**CHARGES:**

| Code | OC | Description | Grade | Counts |
|---|---|---|---|---|
| CC0903 | | CRIMINAL CONSPIRACY | M1 | 001 |
| CC3921 | | THEFT-UNLWF TAKING | M1 | 001 |
| CC3925 | | THEFT-RSP | M1 | 001 |

**REQUESTED HEARING DATE:**

08/25/2010 00:00

**REQUESTED HEARING LOCATION:**

405 CJC; 1301 Filbert Street

**COMPLAINANTS AND WITNESSES:**

Complainant(s)

sophie zolski

1 wheelwright LN  cherry hill NJ 08003-    Age: 40    Phone(H): 267-716-2577  Phone(W): 215-000-0000  SSN:

**ARREST REPORT BY:**

224247  WARRENDER SHAWN SHAWN    Badge Description

8130  62 Central Detective Division    Unit Id. Platoon  Squad  Group Id
0    2  B

**ARREST REPORT APPROVED BY:**

Supervisor- payroll no:    MARTIN MASSI MASSI    205493    Approval Code: Approved

**POLICE PERSONNEL:**

| Employee Name | Payroll Number | Badge | Dist/Unit | Platoon/Group | Vacation Dates | Vacation Description | Needed At Hearing Police/Sup | Arrest OFC. |
|---|---|---|---|---|---|---|---|---|
| SMITH DAVID DAVID | 220202 | 8127 | 62/0 | 2A | | | N / Y | N |
| WARRENDER SHAWN SHAWN | 224247 | 8130 | | B | | | Y / Y | N |
| DOYLE JOSEPH JOSEPH | 247358 | 9409 | 03/0 | 2A | 11/22/2010 to 12/26/2010 | Vacation | N / Y | Y |
| SWEENEY JR MICH MICHAEL | 263714 | 4645 | | B | | | N / Y | Y |

**ADDITIONAL INFORMATION:**

Hits: Y    Statement?:    Lab User Fees Requested?:    ADA Concerns?:

**EMPLOYER INFORMATION:**

Occupation: unemployed    Employer: unknown

0000 0 unknown 00 APT/Suite: 0000 Philadelphia PA    Phone: 215-000-0000

**DESCRIPTIVE DATA:**

| | | |
|---|---|---|
| Complexion | CLEAR | |
| Eye Color | BRO | Eye Characteristics NORMAL |
| Glasses (Y=Yes) | 0 | Facial Hair    BEARD W_MUSTACHE |
| Hair Length | ABOVE EARS | Hair Color    GRY |
| Teeth | NORMAL | Hair Style    STRAIGHT |

ev. 11/1998

CE

07/29/2010 01:52:06

Case 2:11-cv-04682-TR    Document 1    Filed 07/26/11    Page 19 of 24

Commonwealth of Pennsylvania
Court of Common Pleas

County of: Philadelphia
First Judicial District



**WARRANT OF ARREST**

Copy

COMMONWEALTH OF PENNSYLVANIA

v.

ANTHONY PRITCHETT

Issuing Authority

AC Magistrate JAMES O'BRIEN

Defendant's Address(es):

913 Chester AV Yeadon, PA 19050

Citation/Complaint No : COM-0004715-2010
Docket No :
Warrant Control No : WAR-0004715-2010
Date Citation/Complaint Filed : 07/13/2010

Charge(s):

| Code | Grade | Description | Count |
|------|-------|-------------|-------|
| CC3921 | M1 | THEFT-UNLWF TAKING | 1 |
| CC3925 | M1 | THEFT-RSP | 1 |
| CC0903 | M1 | CRIMINAL CONSPIRACY | 1 |

Additional charges, if any, are listed on separate page

**DESCRIPTIVE INFORMATION:**

Social Security Number:

Sex: Male
Date of Birth: 10/21/1961
Telephone Number: (215)000-0000

Age: 49
Height: 5'08
Weight: 170

Race: Black
Eye Color: Brown
Hair Color: Bald

Distinguishing features (scars, tattoos, facial hair, disability, etc):

Alias(es):

**TO POLICE OFFICER:**

In the name of the Commonwealth of Pennsylvania, you are commanded to take the defendant, into custody for 1202 Embezzlement fraudulent conversion    ANTHONY PRITCHETT
Issued under my hand this 13 day of July , 2010

Signature

, Issuing Authority

ANTHONY PRITCHETT.    DC#: 1009027757    Page 1 of 1    04072    Printed: 07/13/2010 11:56 AM

# EXHIBIT B

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET

**Docket Number: MC-51-CR-0032386-2010**

## CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania

v.

Anthony  Pritchett

Page 1 of 4

## CASE INFORMATION

Cross Court Docket Nos: PARS-MC-51-CR-0032386-2010

Judge Assigned:

OTN: N6938562

Initial Issuing Authority:

Arresting Agency: Philadelphia Pd

Case Local Number Type(s)

    District Control Number

Date Filed: 07/29/2010    Initiation Date: 07/28/2010

Lower Court Docket No: MC-51-CR-0032386-2010

Final Issuing Authority:

Arresting Officer: DOYLE, JOSEPH J

Case Local Number(s)

    1009027767

## STATUS INFORMATION

Case Status: Closed

| Status Date | Processing Status | | |
|---|---|---|---|
| 01/13/2011 | Completed | Arrest Date: | 07/28/2010 |
| 09/10/2010 | Awaiting Trial | | |
| 07/29/2010 | Awaiting Status Listing | | |
| 07/29/2010 | Awaiting Preliminary Hearing | | |

Complaint Date:    07/28/2010

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Preliminary Arraignment | 07/29/2010 | 1:48 am | B08 | Arraignment Court Magistrate James O'Brien | Scheduled |
| Arraignment Status | 09/10/2010 | 8:00 am | 503 | Judge Marsha H. Neifield | Scheduled |
| Trial | 10/04/2010 | 9:00 am | 404 | Judge Joseph C. Waters | Continued |
| Trial | 11/23/2010 | 8:00 am | 903 | Judge Thomas F. Gehret | Continued |
| Trial | 01/13/2011 | 8:00 am | 903 | Judge Joseph J. O'Neill | Scheduled |

## CONFINEMENT INFORMATION

| Confinement Known As Of | Confinement Type | Destination Location | Confinement Reason | Still in Custody |
|---|---|---|---|---|

## DEFENDANT INFORMATION

Date Of Birth:    10/21/1961    City/State/Zip: Yeadon, PA 19050

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Pritchett, Anthony |

Printed: 07/05/2011

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

21

230A

Case: 12-3906    Document: 003111246748    Page: 43    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR    Document 21-1    Filed 06/14/12    Page 22 of 24

Case 2:11-cv-04682-TR    Document 1    Filed 07/26/11    Page 22 of 24

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET

Docket Number: MC-51-CR-0032386-2010

### CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania
v.
Anthony Pritchett

Page 2 of 4

## BAIL INFORMATION

Pritchett, Anthony

Nebbia Status: None

| Bail Action | Date | Bail Type | Percentage | Amount | Bail Posting Status | Posting Date |
|---|---|---|---|---|---|---|
| Set | 07/29/2010 | ROR | | $0.00 | | |
| | | | | | Posted | 07/29/2010 |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 18 § 3921 §§ | Theft By Unlaw Taking-Movable Prop | 06/09/2010 | N6938562 |
| 2 | 2 | | 18 § 3925 §§ | Receiving Stolen Property | 06/09/2010 | N6938562 |
| 3 | 3 | | 18 § 3921 §§ | Criminal Conspiracy Engaging Theft By Unlaw Taking-Movable Prop | 06/09/2010 | N6938562 |

## DISPOSITION SENTENCING/PENALTIES

| Disposition | Disposition Date | Final Disposition |
|---|---|---|
| Case Event | Offense Disposition | Grade    Section |
| Sequence/Description | Sentence Date | Credit For Time Served |
| Sentencing Judge | Incarceration/Diversionary Period | Start Date |
| Sentence/Diversion Program Type | | |
| Sentence Conditions | | |
| Linked Offense - Sentence | Link Type | Linked Docket Number |

**Proceed to Court**

Preliminary Arraignment — 07/29/2010 — Not Final

1 / Theft By Unlaw Taking-Movable Prop — Proceed to Court
2 / Receiving Stolen Property — Proceed to Court — 18§3921§§A
3 / Criminal Conspiracy Engaging Theft By Unlaw Taking-Movable Prop — Proceed to Court — 18§3925§§A
18§903§§A1

**Withdrawn**

Trial — 01/13/2011 — Final Disposition

1 / Theft By Unlaw Taking-Movable Prop — Withdrawn
2 / Receiving Stolen Property — Withdrawn — 18§3921§§A
3 / Criminal Conspiracy Engaging Theft By Unlaw Taking-Movable Prop — Withdrawn — 18§3925§§A
18§903§§A1

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

22
231A

Case: 12-3906    Document: 003111246748    Page: 44    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR   Document 21-1   Filed 06/14/12   Page 23 of 24

Case 2:11-cv-04682-TR   Document 1   Filed 07/26/11   Page 23 of 24

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET

Docket Number: MC-51-CR-0032386-2010

## CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania
v.
Anthony Pritchett

Page 3 of 4

### COMMONWEALTH INFORMATION

| | |
|---|---|
| Name: | Philadelphia County District Attorney's Office |
| | Prosecutor |
| Supreme Court No: | |
| Phone Number(s): | |
| (215) 686-8000 | {Phone} |
| Address: | |
| 3 South Penn Square | |
| Philadelphia PA 19107 | |

### ATTORNEY INFORMATION

| | |
|---|---|
| Name: | Scott Lawrence Kramer |
| | Private |
| Supreme Court No: | 093165 |
| Rep. Status: | Active |
| Phone Number(s): | |
| (610) 891-1499 | (Phone) |
| (610) 565-6488 | (Fax) |
| Address: | |
| 11 S Olive St Ste 100 | |
| Media PA 19063 | |

Representing: Pritchett, Anthony

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 07/29/2010 | | |
| PARS Transfer | | | Municipal Court - Philadelphia County |
| 2 | 07/29/2010 | | |
| Bail Set - Pritchett, Anthony | | | O'Brien, James |
| 3 | 07/29/2010 | | |
| Bail Posted - Pritchett, Anthony | | | Pritchett, Anthony |
| 1 | 09/10/2010 | | |
| Trial Scheduled 10/4/2010 9:00AM | | | Municipal Court - Philadelphia County |
| 1 | 10/04/2010 | | |
| Trial Scheduled 11/23/2010 8:00AM | | | Municipal Court - Philadelphia County |
| 3 | 10/04/2010 | | |
| Trial Continued | | | Waters, Joseph C. |

Commonwealth Request - Witness Failed To Appear
Video Missing – Must pass video ten (10) days prior to next listing
NCD: 11/23/10 Room 903

By The Court,

_____, J.

AOPC 2220 - Rev 07/05/2011

Printed: 07/05/2011

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

23

232A

Case: 12-3906    Document: 003111246748    Page: 45    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR    Document 21-1    Filed 06/14/12    Page 24 of 24

Case 2:11-cv-04682-TR    Document 1    Filed 07/26/11    Page 24 of 24

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET

Docket Number: MC-51-CR-0032386-2010

### CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania
v.
Anthony  Pritchett

Page 4 of 4

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | | Filed By |
|---|---|---|---|---|
| 1 | 11/23/2010 | | | |

Trial Scheduled 1/13/2011 8:00AM

Municipal Court - Philadelphia County

| 3 | 11/23/2010 | | | |

Order Granting Motion for Continuance

Gehret, Thomas F.

Defense: Advance request for continuance.
Commonwealth: Not ready; Discovery is incomplete.
Video is needed.

NCD: 01/13/2011, Room 903
ADA: Tanner Rouse; Defense: Tricia Henning
Court Reporter: Danielle O'Connor; Court Clerk: Alyssia Williams

By the Court,

_____ J.

| 1 | 01/13/2011 | | | |

Withdrawn

O'Neill, Joseph J.

ADA Moore, Atty S. Kramer, Steno McShane, Court Clerk Washington. Commonwealth not ready - witness failed
to appear

AOPC 2220 - Rev 07/05/2011

Printed: 07/05/2011

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial
System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed
data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can
only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record
Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

24
233A

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

NO. 11-4682

ANTHONY D. PRITCHETT,   )   DEPOSITION UPON
                        )
            Plaintiff,  )   ORAL EXAMINATION
                        )
    - vs -               )          OF
                        )
CITY OF PHILADELPHIA,   )   .
                        )   ANTHONY D.
            Defendant.  )   PRITCHETT
 - - - - - - - - - - -  )
                        )


TRANSCRIPT OF DEPOSITION,
taken by and before CHRISTOPHER M. PILOT,
Professional Reporter and Notary Public, at
the CITY OF PHILADELPHIA, 1515 Arch Street,
15th Floor, Philadelphia, Pennsylvania, on
Thursday, January 5, 2012, commencing at
11:05 a.m.


- - -

ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA   19103
(215) 564 1233

**2**

```
 1   A P P E A R A N C E S :
 2
 3
 4
 5
 6
 7        WEISBERG LAW, P.C.
 8        BY:  GRAHAM F. BAIRD, ESQUIRE
 9          7 South Morton Avenue
            Morton, Pennsylvania  19070
10          Attorney for the Plaintiff
11
12        CITY OF PHILADELPHIA
          BY:  NIYA BLACKWELL, ESQUIRE
13          The Law Department
            1515 Arch Street
14          15th Floor
            Philadelphia, Pennsylvania  19102
15          Attorney for the Defendant
16
17
18
19
20
21   ALSO PRESENT:
     Shawn D. Warrender
22
23
24
```

**3**

```
 1
 2             I N D E X
 3
 4   WITNESS                  PAGE
 5
 6   ANTHONY D. PRITCHETT
 7
 8        By: Ms. Blackwell      4
 9
10
11
12             - - -
13
14
15           E X H I B I T S
16             PAGE    PAGE
17   NUMBER  DESCRIPTION   MARKED ATTACHED
18
19
20
21        (No Exhibits Were Marked)
22
23
24
```

**4**

```
 1
 2             (By agreement of counsel, the
 3        signing, sealing, filing, and certification
 4        of the transcript have been waived; and all
 5        objections, except as to the form of the
 6        question, have been reserved until the time
 7        of trial.)
 8
 9             ANTHONY D. PRITCHETT, having been
10        duly sworn, was examined and testified as
11        follows:
12
13   BY MS. BLACKWELL:
14   Q.     Good morning, Mr. Pritchett -- is it
15   Pritchett?
16   A.     Pritchett.
17   Q.     Pritchett.  Okay.
18        Mr. Pritchett, my name is Niya Blackwell,
19   and I represent the defendant, Detective Warrender,
20   in this matter, and I'm going to take your
21   deposition today.
22        First, I would like to ask, have you ever
23   had your deposition taken before?
24   A.     Yes.
```

**5**

```
 1   Q.     Do you know when that was?
 2   A.     I don't remember the exact day.  It was
 3   last month.
 4   Q.     You had a deposition taken last month?
 5   A.     Well, actually, I didn't go in the room.
 6   It was down on --
 7   Q.     Oh.  That actually was not a deposition.
 8   That was actually a pretrial, a conflict, a hearing
 9   between the attorneys.
10   A.     Oh, okay.  I'm sorry.
11   Q.     That's okay.
12        Well, I'll assume that you haven't had a
13   deposition taken before, and I'll explain what that
14   is.
15   A.     Okay.
16   Q.     You're having your deposition taken now,
17   and I will ask you a series of questions.
18        You are under oath, and the court reporter,
19   as you see, will be taking down every word that I
20   say and every word that you say.  For that reason,
21   you need to speak as opposed to using gestures, so
22   verbally state your answers as opposed to using your
23   hands as you see me doing now --
24   A.     Okay.
```

2  (Pages 2 to 5)

ELECTRONIC  REPORTING  STENOGRAPHIC  AFFILIATES

26

6

1  Q.    -- or nodding uh-huh or huh-uh because the
2  court reporter can't take down gestures.
3        It's also important that we not speak over
4  each other because he's taking down everything that
5  we say, and it's impossible for him to take down
6  conversations that are crossing or overlapping.
7        If for any reason you need to take a break,
8  I ask that if I'm in the middle of asking you a
9  question you allow me to finish the question.
10       If you're in the middle of giving an
11 answer, and you feel like you need to take a break,
12 I ask that you finish the answer, and then let me
13 know that you need to take a break, speak with your
14 attorney, and we'll go off the record?
15       Are you under the influence of any kind of
16 medication today?
17 A.    No.
18 Q.    Have you had any alcohol in the past 24
19 hours?
20 A.    No.
21 Q.    Have you had any kind of drugs in the last
22 24 hours?
23 A.    No.
24 Q.    Is there any reason that you believe that

7

1  you can't testify truthfully today?
2  A.    No.
3  Q.    Okay, we'll begin.
4        You've already stated your name for the
5  record, but have you gone by any other name?
6  A.    No.
7  Q.    No nickname or anything like that?
8  A.    No.
9  Q.    What's your present address?
10 A.    906 West Rockland Street, Philadelphia,
11 Pennsylvania 19141.
12 Q.    And how many years have you been living on
13 Rockland Street?
14 A.    Approximately for four years.
15 Q.    Okay. And what's your marital status?
16 A.    Single -- well, I'm divorced.
17 Q.    You're divorced.
18       How many years have you been divorced?
19 A.    For 14 years.
20 Q.    Okay. Do you have any children?
21 A.    Yes.
22 Q.    How many children?
23 A.    Two.
24 Q.    Okay. The ages?

8

1  A.    My oldest son is 22, and my younger son is
2  15.
3  Q.    Okay. And are you presently employed?
4  A.    No.
5  Q.    Okay. When was your -- when was your most
6  recent date of employment?
7  A.    With Arthur Jackson until this date of
8  arrest.
9  Q.    Okay. So the last time you were employed
10 was the date of your arrest?
11 A.    Yes.
12 Q.    And what date was that?
13 A.    I was arrested July 28th, 2010.
14       I was let go approximately two weeks before
15 that.
16 Q.    Okay. Now, I'm going to -- well, I'll get
17 back to that.
18       Now, what was the highest grade that you
19 completed in school?
20 A.    I graduated 12th.
21 Q.    Okay. And what high school?
22 A.    Oley High.
23 Q.    Oley High. Okay.
24       And after graduating from Oley High, what

9

1  was your first job?
2  A.    The Marine Corps.
3  Q.    And how long were you in there?
4  A.    Ten years.
5  Q.    And why did you leave the service?
6  A.    After leaving Beirut, I wanted to get out.
7  Q.    Okay. What kind of discharge was it?
8  A.    Honorable.
9  Q.    Did you hold any other kind of job after
10 that?
11 A.    Yes. I did office furniture -- modular
12 furniture. I did that for approximately -- about 14
13 years.
14 Q.    And the name of the company?
15 A.    It was many.
16 Q.    Many companies?
17 A.    Yes.
18 Q.    Well, just to the best of your recollection
19 name the companies.
20 A.    Well, the last one was Architectural
21 Installations of Atlanta.
22 Q.    And from what year?
23 A.    '90 to maybe '98.
24 Q.    Okay. And prior to that?

3  (Pages 6 to 9)

27
a36A

10

1    A.    Well, I kind of broke off, on and off
2    because the company went -- had, you know, a bunch
3    of problems, so I went to different companies. But
4    I don't know all the names of the company.
5    Q.    Okay. I'm going to now direct your
6    attention to the incident of June 9th, 2010.
7          Who were you employed with on June 9th,
8    2010?
9    A.    Arthur Jackson.
10   Q.    Okay. And what kind of company is Arthur
11   Jackson?
12   A.    It's a cleaning company.
13   Q.    What kind of cleaning?
14   A.    They -- we clean office buildings.
15   Q.    Okay. And how long were you employed with
16   Arthur Jackson?
17   A.    Almost four years.
18   Q.    And what was your position?
19   A.    Day porter -- lead -- well, leadman for day
20   porters.
21   Q.    You said leadman?
22   A.    Yes.
23   Q.    What does that mean?
24   A.    Well, there's only three of us.

11

1          We have one male under me and one female.
2    She does the ladies' restrooms, and we -- we all
3    have our certain details that we do, but I -- I
4    basically -- I just run -- run only two people.
5    Q.    Okay. Did you supervise those two people?
6    A.    Yes.
7    Q.    Were you considered their supervisor?
8    A.    Yes.
9    Q.    And they reported to you?
10   A.    Yes.
11   Q.    And you gave them their assignments?
12   A.    Yes.
13   Q.    Okay. And so there were just two people
14   who you supervised?
15   A.    Right.
16   Q.    All right. What were your hours?
17   A.    7 -- they started at 7 to 3, then they
18   changed it from 7:30 to 3:30.
19   Q.    7:30 a.m. --
20   A.    Yes.
21   Q.    -- to 3:30 a.m.?
22         On June 9th, 2010, what were the hours?
23   A.    I got off at 3:30. It was 7 to 3:30.
24   Q.    7 to 3:30?

12

1    A.    Yes.
2    Q.    Now, you mentioned -- what was your last
3    day of employment at Arthur Jackson?
4    A.    I believe it was June 9th.
5    Q.    That was June 9th?
6    A.    Yes.
7    Q.    But were you suspended prior to that or
8    were you suspended on June 9th?
9    A.    I was suspended June 9th, right.
10         I wasn't terminated, I wasn't fired, I was
11   suspended.
12   Q.    You were just suspended on June 9th.
13         All right. And what were you suspended
14   for?
15   A.    Leaving ten minutes earlier.
16   Q.    Okay. So what time were you supposed to
17   leave?
18   A.    3:30.
19   Q.    3:30. That was the time?
20         Do you clock out? Do you use a clock to
21   clock out or any kind of a --
22   A.    Yes, I clock out.
23   Q.    And you left at -- you left ten minutes
24   prior to that?

13

1    A.    3:20.
2    Q.    Okay. Who did you report to at that time
3    in terms of -- who was your supervisor?
4    A.    Sofie's my supervisor, but she doesn't come
5    in until 3:30.
6    Q.    Okay. Sofie.
7          What was her last name?
8    A.    Solski, I think.
9    Q.    Okay. And she was your immediate
10   supervisor?
11   A.    Yes.
12   Q.    And is she the person that suspended you?
13   A.    Well, actually, I got a phone call from
14   the -- what do you call it?
15         It's the representative from the union.
16   She works actually with the night crew, her name's
17   Barbara. She's the one that called me and told me I
18   was being suspended for five days?
19   Q.    And she called you prior to June 9th?
20   A.    No, on June 9th.
21   Q.    On June 9th.
22         See, I'm trying to get out when you were
23   notified that -- she called you at the job on June
24   9th?

4 (Pages 10 to 13)

28
237A

14

1   A.    No.  She called me at home.
2   Q.    On June 9th?
3   A.    Yeah.
4   Q.    Okay.  After you clocked out?
5   A.    Yeah.  After I clocked out I went home --
6   Q.    Okay.
7   A.    -- that's when I got -- I got the phone
8   call maybe 4:30.
9   Q.    And so the day that you clocked out ten
10  minutes early, that was June 9th?
11  A.    Yes.
12  Q.    Okay.  And so you didn't return -- you were
13  not supposed to return to the building.
14        Incidentally, where is the building from
15  where you were working?
16  A.    1500 JFK.
17  Q.    1500?
18  A.    Yeah, 4 Penn Center.
19  Q.    Okay.
20  A.    Actually, no, 1600 JFK.
21  Q.    Okay.  Were you given any kind of pink slip
22  on that day or any kind of --
23  A.    Nothing.
24  Q.    Okay.  You were just told by a union rep

15

1   once you got home --
2   A.    Right.
3   Q.    -- that you should not return?
4   A.    No.  She told me I'm going to be suspended
5   for five days.
6         I was not told not to come back so I went
7   to work that morning, and that's when I was told I
8   wasn't allowed back in the building because of these
9   charges.
10  Q.    Okay.  You went to work the next morning?
11  A.    Yes.
12  Q.    That would have been June 10th?
13  A.    Yes.
14  Q.    And so you showed up at work on June 10th
15  as normal?
16  A.    Yes.
17  Q.    Did you clock in?
18  A.    No.  I wasn't allowed in the building.
19  Q.    Okay.  Who told you -- please tell me who
20  you met first at the building on June 10th with.
21  A.    Well, the security guard.
22  Q.    Okay.
23  A.    But the revolving doors weren't open yet,
24  nothing's opened.

16

1         I mean, I could see him through the glass,
2   and when I knocked -- I always knock because I ride
3   my bike to work, and he was like, no, you can't come
4   in.
5   Q.    What was that security guard's name?
6   A.    Sadeek.
7   Q.    Do you know his last name?
8   A.    No.
9   Q.    Okay.  And what's Sadeek's race?
10  A.    Black.
11  Q.    He's African American --
12  A.    Yeah.
13  Q.    He's African American?
14  A.    Yes.
15  Q.    And he was a security guard?
16  A.    Yeah.  He's the third shift security guard.
17  Q.    Do you know what company he works for?
18  A.    No.
19  Q.    Okay.  What did you do when Sadeek told you
20  that you couldn't enter the building?
21  A.    I got back on my bike and went home.
22  Q.    Okay.  And so you didn't enter the building
23  that day at all?
24  A.    No, because like I said, I wasn't allowed

17

1   in the building.
2   Q.    Okay.  Did you, at any time, return to 1600
3   JFK?
4   A.    No.  Later on that day I went to the union
5   hall to see what was going on.
6   Q.    Okay.  And where is the union hall?
7   A.    It's at 16th and Chestnut.
8   Q.    Okay.  And so that's also in Center City?
9   A.    Yes.  That's where he arrested me.
10  Q.    Okay.  So when you went to the union hall,
11  who did you see?
12  A.    Her name is -- I saw it -- the union rep --
13  her name is -- I can't remember her name.
14  Q.    You don't know her name?
15  A.    I have everything written down.  I
16  didn't -- I didn't bring it.
17        MS. BLACKWELL:  Okay.  I'm going
18  to make a request for the -- who he spoke
19  to at the union hall.
20        MR. BAIRD:  Sure.  We'll produce
21  that.
22  BY MS. BLACKWELL:
23  Q.    And that would be -- she was your union
24  representative?

5  (Pages 14 to 17)

18

1   A.    Yes.
2   Q.    Okay.  Did you file any kind of grievance
3   with her?
4   A.    Yes.
5   Q.    Okay.  Did you have any kind of hearing on
6   that grievance?
7   A.    That's the day I was arrested.
8   Q.    Okay.  What day?  Was that June 10th?
9   A.    No, July 28th.
10  Q.    July 28th.
11        And so between June 10th and July 28th, did
12  you return to the building where you were working?
13  A.    No.
14  Q.    Between June 10th and July 28th -- or prior
15  to the 28th, did you go to the union hall at any
16  time?
17  A.    No.  Just -- well, actually I went before.
18        I was supposed to have one hearing, nobody
19  showed up, and then this second hearing is when this
20  took place.
21  Q.    Okay.  So the second hearing, that was June
22  28th?
23  A.    Yes.
24  Q.    And you arrived at the union hall?

19

1   A.    Yes.
2   Q.    And what happened when you arrived at the
3   union hall?
4   A.    I sat down with the union rep.
5         Nobody was there, so we were waiting and
6   waiting.  They finally showed up maybe 30 minutes
7   late.  They all sat down and --
8   Q.    Who arrived 30 minutes late?
9   A.    Sofie, Charles and -- Charlene, she's the
10  secretary for the building manager, Sofie and
11  Charles.  He's a manager for Arthur Jackson --
12  Q.    Okay.
13  A.    -- and they set up the laptop, and they
14  were trying to play the videotape and supposedly it
15  wouldn't play, and that's when these two guys came
16  and told me I was under arrest.
17  Q.    So let's go back.
18        You were suspended for clocking out too
19  early --
20  A.    Yes.
21  Q.    -- ten minutes early.  That was your
22  official suspension?
23  A.    Yes.
24  Q.    And you were notified from the union that

20

1   you were to be suspended for five days?
2   A.    No, the union rep.
3   Q.    The union rep?
4   A.    Right.  She called me.  She says, why did
5   you leave early?  I said, what's the big deal, I
6   never left early before.
7   Q.    Did you leave early?
8   A.    Yes, I did.
9   Q.    Okay.
10  A.    Yeah.  I left ten minutes earlier.
11  Q.    Okay.  And why did you leave ten minutes
12  early?
13  A.    Because -- it got to a point where Sofie --
14  I couldn't leave at 3:30 because she wants to sit
15  down and talk.  I always left a half an hour later
16  than I was supposed to leave.  And this particular
17  day I didn't want to talk.
18  Q.    Okay.  Sofie is your supervisor?
19  A.    Yes.
20  Q.    And she's your immediate supervisor?
21  A.    Yes.
22  Q.    And you said you didn't want to talk to her
23  and that's why you left early?
24  A.    Yes.

21

1   Q.    What do you mean when you say you didn't
2   want to talk to your supervisor?
3   A.    I was kind of like her -- like her
4   counselor.
5         She wanted to talk about her problems and
6   all this and all that.  This day I wanted to go
7   home.  I just wanted to leave and go home.
8   Q.    Okay.  When you say you used to talk to her
9   and you were like her counselor, did you often have
10  conversations once you clocked out with your
11  supervisor?
12  A.    Every day.
13  Q.    Every day.
14        How many days a week did you work?
15  A.    Five.
16  Q.    Was that Monday through Friday?
17  A.    Yes.
18  Q.    Okay.  And how often would you say, if you
19  can -- if you can tell me approximately how many
20  times a week would you stay over the time?
21  A.    Every day.
22  Q.    Every day.
23        But for how long?
24  A.    Average, 15 minutes or more.

6  (Pages 18 to 21)

**22**

1  Q.    Okay. How long of a period of time did
2  this last where you would stay after work and speak
3  with Sofie?
4  A.    My whole time I was at the building.
5  Q.    I'm not sure how long you were -- I don't
6  know how long you were at the building.
7  A.    I was at the building for approximately
8  three years.
9  Q.    Okay. And so when did it begin? When did
10 this kind of rapport begin with Sofie?
11 A.    After we got to know each other -- maybe
12 six months after we were in the building, she made
13 me leadman because the other leadman, he died, and
14 she made me leadman, and then we just built this
15 sort of relationship.
16       And when she went to inspect the building,
17 she always wanted me to tag along with her, and then
18 it just went from there. And then she always wanted
19 to talk, and then she had my hours changed.
20       I went to the building manager. I
21 requested my hours to be changed back because I
22 didn't want to be there 3:30 when she came in
23 because she's always -- no, don't leave. Can we
24 talk?

**23**

1  Q.    Did you feel that you had to stay and talk
2  with her because of your position?
3  A.    No.
4  Q.    So you --
5  A.    Because everything -- there was never no
6  complaints. We didn't have to talk.
7  Q.    Okay. But you stayed anyway to talk?
8  A.    Yes.
9  Q.    So it was voluntary?
10 A.    Yes.
11 Q.    You didn't feel as though you had to
12 because she was your supervisor?
13 A.    No. I know I didn't have to, but.
14 Q.    And you didn't feel as though your job was
15 in jeopardy if you did not stay and talk to her?
16 A.    No.
17 Q.    Okay. Now, did you socialize with Sofie
18 outside of work?
19 A.    No. Only on Thursdays -- no. Wednesdays
20 she came in early at lunchtime.
21       We ate lunch together.
22 Q.    So you would go out to lunch on Wednesdays?
23 A.    Yes.
24 Q.    This was every Wednesday --

**24**

1  A.    Yeah. That was the only day she came in
2  early was at twelve o'clock.
3  Q.    Every Wednesday?
4  A.    Yes.
5  Q.    For how long of a period of time?
6  A.    Every -- every Wednesday.
7  Q.    For the entire three or four years that you
8  worked --
9  A.    Yes, that was her day for building
10 inspection.
11 Q.    Did anyone else go to lunch with you and
12 Sofie?
13 A.    Yes.
14 Q.    On those Wednesdays?
15 A.    Yes.
16 Q.    Who else went to lunch with you?
17 A.    The -- both the -- both the -- my -- my
18 coworkers.
19 Q.    So it was four of you at lunch?
20 A.    Yes.
21 Q.    And this took place every Wednesday?
22 A.    Every Wednesday.
23 Q.    What was the name of the other coworkers,
24 please?

**25**

1  A.    All right. Bill -- well, Bill's gone now.
2  Q.    Bill, does he have a last name?
3  A.    I don't remember his last name. He passed
4  away about --
5  Q.    And he's passed away?
6  A.    About -- at least two years ago.
7  Q.    And the other person's name?
8  A.    The other one's name is -- she still works
9  there now. I can't remember her name right now.
10 Q.    But she used to attend lunch for three
11 years every Wednesday with you?
12 A.    Yes.
13 Q.    And you were her supervisor?
14 A.    Yes.
15 Q.    But you don't recall her name?
16 A.    It's -- can I look at my phone?
17 Q.    Yeah, you may.
18       MS. BLACKWELL: We can go off the
19 record for now.
20       (At this time, a discussion was
21 held off the record.)
22       MS. BLACKWELL: Okay. We're
23 going to go back on the record.
24       THE WITNESS: Okay.

7 (Pages 22 to 25)

31
240A

26

1           My other coworker's name is Greg,
2      that was --
3   BY MS. BLACKWELL:
4      Q.    This was the gentleman that passed away?
5      A.    No.  This is the new guy.
6      Q.    Okay.
7      A.    We all, you know -- after Bill passed --
8      okay, we all ate -- he ate lunch with us too.
9      Q.    Okay.
10     A.    And the female name is Rosalba.
11     Q.    And was this weekly luncheon considered,
12     you know, the company taking the workers to lunch or
13     was it personal?
14     A.    No, because when she would come in during
15     lunchtime, she would offer to buy us lunch and --
16     actually, we took turns buying each other lunch, so
17     we all would ate together.
18     Q.    So sometimes you buy Sofie lunch as well?
19     A.    Yes.
20     Q.    And the others?
21     A.    Yes.
22     Q.    And this went on for a period of three to
23     four years?
24     A.    Yes.

27

1      Q.    Outside of work, did you talk to Sofie over
2      the phone?
3      A.    No.
4      Q.    Did you date Sofie at all?
5      A.    No.
6      Q.    So the relationship was not romantic?
7      A.    No.
8      Q.    Are you sure about that?
9      A.    Yes.
10     Q.    Okay.  Do you believe that Sofie considered
11     it romantic?
12     A.    I believe she wanted it to be.
13     Q.    And what makes you say that?
14     A.    Well, because she always wanted to be
15     around me, and she had my hours changed.  And that
16     was her doing.
17     Q.    She had your hours changed to a time where
18     she would see you more?
19     A.    Yeah.
20     Q.    Okay.
21     A.    And I complained to the building manager.
22           You can question him, I went to him.  I
23     said, please get my hours changed back.
24     Q.    When did you request for your hours to be

28

1      changed?
2      A.    Maybe after my second year there.
3      Q.    And what was that building manager's name?
4      A.    Mike.
5      Q.    Do you know his last name?
6      A.    Zolinski, I think.
7      Q.    And what happened with your request?
8      A.    He actually had it changed.
9      Q.    And --
10     A.    It only lasted two weeks.
11     Q.    -- Sofie changed them back?
12     A.    Yes.
13     Q.    Now, during this period of time, did you
14     still continue to stay after work and talk with
15     Sofie?
16     A.    No, because I didn't see her.
17     Q.    Okay.
18     A.    I would leave at 3.
19     Q.    You left at 3.  Okay.
20     A.    She wouldn't see me.  She had a real
21     problem with that.
22     Q.    How long did the -- the shift changed to
23     three o'clock; how long did that last?
24     A.    Just two weeks I believe it was.

29

1      Q.    Okay.  And then you were returned to 3:30?
2      A.    Yes.
3      Q.    And that lasted for the duration of the
4      time that you worked there?
5      A.    Yes.
6      Q.    Up until the time when you were suspended
7      on June 9th, had you still been staying after to
8      speak with Sofie every day?
9      A.    After June 9th?
10     Q.    No.  I'm sorry, prior to June 9th.
11     A.    Oh, yes.
12     Q.    Even up until that day -- no, you didn't
13     see her on that day, but even up until --
14     A.    Yes.
15     Q.    -- June 8th you were still staying after
16     every single day?
17     A.    Every single day.
18     Q.    Did you ever complain to anyone else that
19     you didn't want to stay?
20     A.    Just the building manager, Mike.
21     Q.    And that was two years prior when you
22     wanted your shift changed.
23           Did you complain after that?
24     A.    Yes, I did.

8 (Pages 26 to 29)

32
241A

30

1   Q.    To the building manager?
2   A.    Yes.
3   Q.    How often?
4   A.    A couple days a week.
5         He kept telling me he would see what he
6   could do.
7   Q.    Did you tell him why you wanted your hours
8   changed?
9   A.    Yes.
10  Q.    What did you say?
11  A.    I told him I was tired of being her
12  counselor, and you know, listening to her problems.
13  I was sick of it.
14  Q.    And what did he say?
15  A.    He said he will see what he can do.
16        He put me on pressure -- pressure washing.
17  I was coming -- I was coming actually at
18  six o'clock, pressure washing, but once I was done
19  with that, then everything went back as normal, and
20  I didn't like that.
21        It went back to, you know, she wants to
22  talk about her problems.  And I just -- every time I
23  saw -- I mean, I didn't go to him all the time, but
24  when I would see him in the hallway, wherever --

31

1   because he used to always talk to me.
2         We went on -- we went on bike events
3   together -- we went on four bike -- me and Mike were
4   real good friends.
5   Q.    And this was the building manager?
6   A.    Yes.
7   Q.    Did you ever make any of these requests in
8   writing?
9   A.    No.
10  Q.    Did you ever make a request or speak to
11  your union representative about your hours being
12  changed?
13  A.    No.
14  Q.    You never requested it of the union?
15  A.    No.
16  Q.    Okay.  Why not?
17  A.    There's nothing the union could do.
18  Q.    Nothing the union could do about your
19  hours?
20  A.    No.
21  Q.    Okay.  Now, prior to June 9th, had you ever
22  been suspended before?
23  A.    No.
24  Q.    Have you ever come in late before?

32

1   A.    No.
2   Q.    Have you ever clocked out early before?
3   A.    No.
4   Q.    Have you ever abused any sick time before?
5   A.    No.
6   Q.    You've never been written up for anything?
7   A.    No.
8   Q.    Okay.
9   A.    The only time I took leave was for my hip
10  replacement, and I was gone for three months.  That
11  was it.
12  Q.    Okay.  And when was that?
13  A.    Let's see, I've had my new hip now for --
14  maybe three years.
15  Q.    Okay.
16  A.    Or less than three years.
17  Q.    Okay.  Now, please describe your job
18  duties.
19  A.    Okay.  My details were to take care of the
20  lobby, the out -- the perimeter of the building, all
21  the elevators and care to all the tenants' needs.
22        You know, take care of all the work orders.
23  The secretary would print them out, I would take
24  them and do whatever needs to be done.

33

1   Q.    Did you have to use a computer yourself for
2   any reason?
3   A.    No.
4   Q.    You never had to?
5   A.    We didn't have a computer.
6   Q.    You didn't have a computer.
7         Did you use anyone else's computer --
8   A.    No.
9   Q.    -- either for social reasons or anything?
10  A.    No.
11  Q.    Did you ever use anyone's laptop?
12  A.    No.
13  Q.    Do you recall seeing a laptop around?
14  A.    Well, Sofie brought hers in every day --
15  Q.    Okay.
16  A.    -- to do her schoolwork, and she would ask
17  me, what do you think of this, you know, because she
18  goes to college, and she would show me stuff, and
19  you know, ask me what I think of it.
20        And that's another reason why I didn't like
21  to stay, because she always wanted me to look over
22  her homework, and I didn't want to do that.
23  Q.    Okay.  So when you -- when Sofie was
24  showing you her homework, she was showing you the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

33

242A

34

1  homework that she recorded on her laptop?
2  A.    Yes.
3  Q.    And you said she wanted you to review her
4  homework?
5  A.    Yes.
6  Q.    And so when you reviewed her homework, did
7  you use the laptop at all?
8  A.    No.
9  Q.    You would just view it?
10  A.    Yup.
11  Q.    In her presence?
12  A.    Or a lot of times she would print stuff and
13  let me read it, but sometimes she was always in
14  there doing some kind of transcript or something and
15  ask me to read over it and see if there are any
16  mistakes or whatever.
17  Q.    Can you describe Sofie's laptop?
18  A.    I know it was black.
19  Q.    Okay.  Have you ever -- do you recall Sofie
20  leaving her laptop unattended ever?
21  A.    She left it unattended quite a few times.
22       When we would leave the office she would
23  lock her cubical, and we would go to get coffee or
24  whatever.

35

1       But the other crew wasn't in yet, so she
2  didn't have no need to, you know, put it in her
3  filing cabinet.
4  Q.    Okay.  Were you aware — well, let me
5  withdraw that.
6       Where did Sofie keep her laptop?
7  A.    She always had like a little carrying case.
8  Q.    And so she kept it on her herself?
9  A.    She would bring it in every day.
10  Q.    Okay.  And where would she leave it, in the
11  office?
12  A.    On her desk.
13  Q.    On her desk.
14       Would she lock it up at all?
15  A.    She would lock the cubical, that's it.
16       I mean, I built the cubical, and she -- she
17  used to put a lock on it.
18  Q.    And she would -- would she lock her
19  computer in the cubical?
20  A.    Yes.
21  Q.    Okay.  And she did this every day?
22  A.    Yeah, just about.
23  Q.    Okay.  Now, did you ever take that
24  computer?

36

1  A.    No.
2  Q.    Okay.  Are you aware that anyone else --
3  you know, did anyone else, to your knowledge, use
4  her computer?
5  A.    I wouldn't know.
6  Q.    Did you ever see anyone else with her
7  computer?
8  A.    No.  I mean, after 3:30 I was out.
9       I mean, there's approximately 15 to 20
10  people in there -- I mean, I don't know what went on
11  after I left.
12  Q.    Okay.  Now, on July 28th, 2010, what
13  happened at the time of the hearing, the grievance
14  hearing?
15  A.    Actually nothing happened.
16       They were too busy trying to get her laptop
17  to work, and then when these two guys showed up,
18  that was the end of it.
19  Q.    When you say "these two guys," are you
20  referring to Detective Warrender, who's sitting
21  here?
22  A.    Yes.
23  Q.    And what happened with -- when did you
24  first see Detective Warrender, on July 28th?

37

1  A.    Actually, I didn't see him.
2       I was facing Sofie and Charlene and
3  Charles, and these two guys came from behind.
4  Q.    Was Detective Warrender one of those guys?
5  A.    Yes.
6  Q.    And what happened next?
7  A.    He says -- well, he had this warrant and
8  says, you're under arrest for receiving stolen
9  property and the other charges.
10  Q.    And what did you do at that time?
11  A.    I didn't do anything.  I stood up, and they
12  put the cuffs on me and we walked out.
13       I told him about my bike, and he was kind
14  enough, you know, to let me have -- to let me grab
15  my bike.
16  Q.    And where were you taken?
17  A.    I don't know what precinct -- I don't
18  remember.
19  Q.    Okay.  Now, at any time following your
20  suspension -- I think I asked you this before, but
21  I'm going to ask it again; did you return to the
22  building?
23  A.    During my suspension?
24  Q.    At any time after your suspension.

10  (Pages 34 to 37)

34

243A

38

1   A.    No.
2   Q.    Okay.  Did you return to -- or did you have
3   occasion to walk in the area of the loading dock?
4   A.    What, during my suspension?
5   Q.    Any time after your suspension.
6   A.    No.  I never went back to the building.
7   Q.    Okay.  All right.
8         On June 9th, were you in the area of the
9   loading dock?
10  A.    Yes.
11  Q.    Where were you?  Where were you
12  specifically?
13  A.    I went to pack stuff out of my locker since
14  I was going to get five days off.  I packed my
15  stuff.  I mean, I'm on the loading dock all the
16  time.
17  Q.    And what do you do on the loading dock?
18  A.    Take trash out, because we use those big
19  Dumpsters.
20        A lot of tenants throw out books and when
21  people get fired.  And I throw stuff in the
22  compactor.
23  Q.    Now, are you permitted to be in a loading
24  dock area during certain hours?

39

1   A.    Anytime.  Anytime.
2   Q.    You're permitted anytime?
3   A.    Yes.
4   Q.    Are you're sure of that?
5   A.    I'm positive of that.
6   Q.    Is there a written policy anywhere that
7   gives you that permission?
8   A.    No -- I mean, if we have to take trash out,
9   we have to take it out.
10  Q.    Okay.  And so it's yourself and the other
11  two people that work for you that are all allowed
12  to --
13  A.    Well, Rose --
14        MR. BAIRD:  Wait until she asks
15        her full question before you start to
16        answer.
17        THE WITNESS:  Okay.
18  BY MS. BLACKWELL:
19  Q.    Are you and the other two employees who
20  worked for you, are you all permitted to be in the
21  loading dock area?
22  A.    Yes.
23  Q.    I believe you were going to -- you said
24  Rosa?

40

1   A.    Rosalba.
2   Q.    Rosalba.  She's allowed as well?
3   A.    Yes.  I mean, most of the time she does it
4   because we do all the heavy lifting.  So every now
5   and then, Rosa, she'll go, but it's mainly just me
6   and the other guy because Rosa can't lift heavy
7   stuff.
8   Q.    Do you take storage boxes to and from that
9   area?
10  A.    Yes.
11  Q.    Okay.  And did you do that on June 9th?
12        Did you take any kind of storage box in the
13  area of the loading dock?
14  A.    Yeah, I took my box.
15  Q.    Your box?
16  A.    Yeah.
17  Q.    And what did your box have in it?
18' A.    It's all my stuff out in my locker.
19  Q.    So you were cleaning out your locker
20  because you were leaving for the day?
21  A.    Leaving for a week.
22  Q.    And this was on June 9th?
23  A.    Yes.
24  Q.    Okay.  And you took everything that you

41

1   had?
2   A.    Well, stuff that I considered of value.
3         I mean, I left my uniform in there, but as
4   far as other stuff, my personal clothes, my extra
5   stuff and my bike, that's what I took.
6   Q.    Was anyone else walking away with you at
7   the time in the loading dock area?
8   A.    No, because Greg -- I waited for Greg to
9   show up because I just didn't want to leave.
10        Greg showed up.  He showed up at 7 because
11  he always comes in an hour early.  He's not supposed
12  to show up until 8, and I just didn't want to leave.
13        I turned my keys in to security -- I waited
14  until he showed up.  I handed him my keys -- my
15  master keys, because I'm the only one that has
16  master keys.
17        We called Sofie on the phone to let her
18  know I wasn't feeling good and that I was going
19  home.
20  Q.    Now, the area where you -- where Sofie
21  keeps her laptop, you said that you frequented that
22  area?
23  A.    No.
24  Q.    You said you didn't?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

35
244A

42

1   A.   No, because it's all -- it's one office.
2   It's one big office.
3   Q.   And you didn't go in that office?
4   A.   No.
5   Q.   Okay.  You've never gone in the office,
6   that area?
7   A.   Only when she comes in and she wants, you
8   know -- I -- she's got two seats where she talks to
9   employees, and that's where I used to sit and talk
10   with her.
11   Q.   So you go in that area when you're with
12   Sofie?
13   A.   Yes.
14   Q.   But do you go in that area without Sofie?
15   A.   No.
16   Q.   Are you permitted to go in that area
17   without Sofie?
18   A.   No.
19   Q.   Okay.
20   A.   She keeps it locked.
21   Q.   Okay.  Now, on the day that you were taking
22   your things away, on June 9th, did you take your
23   things and the storage box -- and where did you put
24   them when you were taking them out of the building?

43

1   A.   I just packed them up.
2   Q.   Okay.  Do you ride your bike to work?  You
3   said you ride your bike --
4   A.   I ride it every day.
5   Q.   Okay.  And so how are you going to take
6   that box home and ride your bike?
7   A.   I called a friend of mine.
8   Q.   So a friend of yours came to the job.
9   What kind of vehicle did the friend have?
10   A.   He has a pickup truck.
11   Q.   Can you describe it?
12   A.   It's like a gold color.  I don't know what
13   model it is.  I mean, I don't see him that often --
14   actually, he's a friend of a friend.
15   I called my buddy.  He said, I can send
16   somebody over because the box is too big for me to
17   put on my bike.
18   I couldn't put the stuff in my backpack.  I
19   ride with my backpack every day.
20   Q.   So you put the storage box into your
21   friend's truck?
22   A.   Yes.
23   Q.   What's that friend's name?
24   A.   I don't know his name.

44

1   Q.   You don't know his name at all?
2   A.   No.
3   Q.   Okay.  When you put the box into his truck,
4   did he drive away with that box?
5   A.   Yes.
6   Q.   Okay.  And did you return to the building
7   at that time?
8   A.   No.
9   Q.   Where did you go after that?
10   A.   I left.
11   Q.   You left.
12   You didn't go back to the building at all?
13   A.   Well, actually, I waited for my coworker to
14   show up, to let him know.
15   I gave him the keys.  I didn't want to go
16   up to security and hand them my keys.  I said,
17   please turn my keys in.  He said, what's going on?
18   I said, man, I'm not feeling good.
19   We called Sofie to let her know I was
20   leaving.  She was like fine.  She was a little
21   pissed off.
22   Q.   And were you under the impression at that
23   moment that you were under suspension or were going
24   to be suspended?

45

1   A.   Yes.
2   Q.   Okay.  Did you mention the suspension --
3   A.   Well, we actually had a conversation that
4   night.
5   You know, we got into a heated argument,
6   cursing back and forth.
7   Q.   Who did you have this argument with?
8   A.   With Sofie.
9   Q.   Okay.  And where did you have this
10   conversation?
11   A.   Well, Barbara, the union rep, called me
12   approximately 4:30, and Sofie called me around 7.
13   Q.   Where were you?
14   A.   Home.
15   Q.   Okay.  And what happened?
16   A.   We got into a heated argument.
17   I'm like, how can you suspend me for five
18   days for leaving ten minutes early?  So we went back
19   and forth.  I'm like, you leave early every day, so
20   how are you going to come down on me for leaving ten
21   minutes early?
22   Q.   Okay.  Let's go back, because I believe I'm
23   a little bit confused.
24   Which day did you leave early?

12 (Pages 42 to 45)

36
245A

46

1    A.    I think it was June 9th.
2    Q.    Okay.  And is that the same day that you
3    took your storage -- your storage box away?
4    A.    No.  That was on the 10th.
5    Q.    Okay.  Where -- okay, that makes more
6    sense, so after --
7    A.    Because the 11th was the day that I showed
8    up -- that was that Friday that I showed up for
9    work, and they told me that I wasn't allowed in the
10   building.
11   Q.    Previously you said that that was on the
12   10th --
13           MS. BLACKWELL:  Is that your
14        recollection, Counsel, that he showed up on
15        the 10th, the next day, after the 9th --
16   BY MS. BLACKWELL:
17   Q.    And that's when I believe you said that the
18   security guard told you that you couldn't come in
19   the building?
20   A.    Yes.  I didn't bring my notes.  I don't
21   really remember the exact dates.
22   Q.    You don't remember the exact dates.
23   A.    Because you're saying that you came back
24   the 11th.  That would be a Thursday that you

47

1    returned to this building --
2    A.    Okay.
3    Q.    -- if you're saying the 11th.
4           In your complaint you state that June 9th
5    you were at work on the premises and that a
6    complaint was made, that you were suspended on the
7    10th?
8    A.    By the shop steward.  That's -- that's her
9    title.
10   Q.    And she called you at home --
11   A.    Yes.
12   Q.    -- on the 10th?  Okay.
13           So which day did you take your things out
14   in a storage box?
15   A.    That next day.
16   Q.    The 10th?
17   A.    Yes.
18   Q.    Are you sure it was the 10th?
19   A.    I'm not sure the exact date.
20   Q.    Okay.  She called you at home, though?
21   A.    Yeah, I was home.
22   Q.    And told you you were suspended.  Okay.
23           And you went back one more time to the
24   building?

48

1    A.    I went back to work to pack -- pack my
2    stuff.
3    Q.    Okay.  And so you took your things away in
4    a storage box?
5    A.    Yes.
6    Q.    Now, you said you had an argument with
7    Sofie about this.
8    A.    Yes.
9    Q.    Was that the same day that you took your
10   things away --
11   A.    Yes.  Yes, that same day -- no, that was
12   the day prior --
13   Q.    The day before?
14   A.    -- when I got the call from the shop
15   steward.
16           She called me about 4:30 and then Sofie
17   called me -- because I told her to tell Sofie to
18   call me so we can talk about this.
19           We talked, and we just got into a heated
20   argument.
21   Q.    Now, let me ask you a question.
22           You asked your shop steward to have your
23   supervisor call you?
24   A.    Yes.

49

1    Q.    And the supervisor called you?
2    A.    Yes, she did.
3    Q.    And you asked the supervisor why you were
4    suspended?
5    A.    Yes.
6    Q.    And what did she say?
7    A.    Well, me -- she said, why did you -- you
8    know I wanted to talk to you.  She just was going on
9    and on.  I'm like, what's the big deal me leaving
10   ten minutes early?
11           Well, you know I wanted to talk to you,
12   blah, blah, blah, come in in the morning and we'll
13   talk.
14   Q.    And what did you say?
15   A.    I said I didn't want to talk.
16   Q.    And that's when --
17   A.    And that's when we started cursing back and
18   forth, and she hung up on me.
19   Q.    Okay.  And you felt comfortable cursing at
20   your supervisor?
21   A.    Well, she was cursing at me.
22   Q.    Okay.  Did you often have this kind of
23   communication --
24   A.    No.

13  (Pages 46 to 49)

37
246A

50

```
1    Q.    -- with your supervisor?
2    A.    No. Never.
3    Q.    Did you consider her a friend as well as a
4    supervisor?
5    A.    Yes.
6    Q.    Okay. And so could you be lighthearted in
7    your conversation with your supervisor, meaning, did
8    you ever use curse words -- maybe even if you're not
9    arguing but in conversations?
10   A.    No.
11   Q.    Okay. How did the conversation end with
12   Sofie?
13   A.    She said come in tomorrow and we'll talk
14   about this.
15   Q.    And what happened then?
16   A.    I said I didn't want to talk about it.
17   Q.    Did you go in the next day?
18   A.    Yes.
19   Q.    And that's when you were told that you
20   couldn't come into the building?
21   A.    Yes.
22   Q.    Okay. Now, after you were arrested you
23   were taken to -- I believe you said the district in
24   Center City?
```

51

```
1    A.    Yes.
2    Q.    And were you processed there?
3    A.    Yes.
4    Q.    And where were you taken after that?
5    A.    Graterford.
6    Q.    Okay. And how long did you stay at
7    Graterford?
8    A.    Seven months.
9    Q.    Okay. Did you have any hearings in between
10   that time?
11   A.    I had quite a few.
12   Q.    Okay. Now, when you were kept at
13   Graterford, did you have a detainer on you for any
14   reason?
15   A.    Yes, I did.
16   Q.    Okay. And that was for?
17   A.    Because I was -- I'm on parole.
18   Q.    You were on parole?
19   A.    Yes.
20   Q.    Okay. When were you convicted of a crime?
21   A.    When?
22   Q.    Yeah.
23   A.    2001.
24   Q.    2001.
```

52

```
1          And that was for?
2    A.    Aggravated of assaulting a police officer.
3    Q.    That was your -- that's when you were
4    convicted, but what was the date of arrest for this
5    aggravated of assaulting a police officer?
6    A.    August 3rd, 2006 -- I'm sorry, 2001.
7    Q.    August 3rd, 2001 you were arrested?
8    A.    Yes.
9    Q.    And where did the arrest -- where were you
10   arrested?
11   A.    Atlanta, Georgia.
12   Q.    So that was in the state of Georgia and not
13   here?
14   A.    Right.
15   Q.    And you were convicted in Georgia?
16   A.    Yes.
17   Q.    And where did -- where were you serving
18   your time?
19   A.    Rogers State Prison.
20   Q.    And where is that?
21   A.    Reidsville, Georgia.
22   Q.    And how many years were you incarcerated?
23   A.    Six.
24   Q.    And when did you come to Philadelphia?
```

53

```
1    A.    August 2006.
2    Q.    Okay. Now, aside from the arrest of August
3    3rd, 2001, had you ever been arrested before?
4    A.    One time. I believe it was in '90.
5    Q.    Do you know the arrest date?
6    A.    No.
7    Q.    What were you arrested for?
8    A.    I believe it was domestic violence.
9    Q.    And you were charged with assaulting
10   someone?
11   A.    Or actually it was -- me and the officer
12   got into an altercation, but I wasn't charged with
13   aggravated assaulting a police officer.
14   Q.    What were you charged with?
15   A.    I don't remember because that was so long
16   ago.
17   Q.    Well, were you convicted of anything?
18   A.    No.
19   Q.    Did you plead guilty at all?
20   A.    No.
21   Q.    Okay. You didn't receive any kind of
22   sentence for this incident?
23   A.    No.
24   Q.    Are you sure of that?
```

14   (Pages 50 to 53)

54

1   A.    I'm positive.
2   Q.    You weren't on probation for this incident?
3   A.    I'm not sure.
4   Q.    Okay.  And so aside from this arrest in
5   1990 -- and you said you don't remember the date.
6       Have you been arrested any other time?
7   A.    No.
8   Q.    Not including this incident?
9   A.    No.
10  Q.    Okay.  Have you spoken with Sofie since you
11  were suspended?
12  A.    No.
13  Q.    So since the time of the conversation that
14  you had -- or you describe it as the argument, was
15  that the last conversation you had with Sofie?
16  A.    Yes.
17  Q.    Did you ever see Sofie again?
18  A.    No.
19  Q.    Okay.  Aside from the day that you had the
20  hearing, the date of your arrest, you saw her on
21  that day?
22  A.    Yeah.  The last time I saw her was at the
23  union hearing on July 28th.
24  Q.    Okay.  Did you see anyone else who you

55

1   worked with --
2   A.    No.
3   Q.    You haven't seen them.
4       Have you spoken with anyone about this
5   case?
6   A.    No.
7   Q.    Okay.  Did you ask anyone from -- what's
8   the name of the company again, I'm sorry?
9   A.    Arthur Jackson.
10  Q.    Arthur Jackson.
11      Have you spoken with anyone at Arthur
12  Jackson about I'm testifying for you or giving a
13  statement in this case?
14  A.    No.
15  Q.    To your knowledge has anyone that you
16  worked with given a statement about this incident?
17  A.    Not to my knowledge.
18  Q.    Okay.  Do you intend on calling anyone as a
19  witness in this case?
20  A.    No.
21  Q.    Okay.
22      MS. BLACKWELL:  I don't have
23  anything further.
24      MR. BAIRD:  Okay.  And just to

56

1   put on the record -- I mean, whether he
2   knows or doesn't know whether to -- you
3   know, he's not going to be calling or
4   asking people to testify.
5       Obviously we will notify you --
6       MS. BLACKWELL:  If he has any
7   knowledge of anyone.  Okay.
8   BY MS. BLACKWELL:
9   Q.    All right.  Have you spoken with anyone
10  that you worked with about this case?
11  A.    No.
12      MS. BLACKWELL:  Okay.  Nothing
13  further.
14      MR. BAIRD:  Okay.
15
16      (Witness excused.)
17      (Deposition concluded at 11:49
18'  a.m.)
19
20
21
22
23
24

57

1
2           C E R T I F I C A T I O N
3
4
5           I, Christopher M. Pilot,
6   Professional Court Reporter and Notary
7   Public, do hereby certify that the
8   foregoing is a true and accurate transcript
9   of the stenographic notes taken by me in
10  the aforementioned matter.
11
12
13           - - -
14
15
16
17
18
19
20
21  DATE:  _____
22           Christopher M. Pilot
23           Professional Reporter
24

15  (Pages 54 to 57)

39
248A

Case: 12-3906    Document: 003111246748    Page: 61    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR    Document 21-2    Filed 06/14/12    Page 16 of 22

58

**A**

abused 32:4
accurate 57:8
address 7:9
aforementioned 57:10
African 16:11,13
ages 7:24
aggravated 52:2,5 53:13
ago 25:6 53:16
agreement 4:2
alcohol 6:18
allow 6:9
allowed 15:8,18 16:24 39:11 40:2 46:9
altercation 53:12
American 16:11,13
answer 6:11,12 39:16
answers 5:22
ANTHONY 1:3,7 3:6 4:9
anyone's 33:11
anytime 39:1,1,2
anyway 23:7
approximately 7:14 8:14 9:12 21:19 22:7 36:9 45:12
Arch 1:15 2:13
Architectural 9:20
area 38:3,8,24 39:21 40:9,13 41:7,20,22 42:6,11,14,16
arguing 50:9
argument 45:5,7,16 48:6,20 54:14
arrest 8:8,10 19:16 37:8 52:4,9 53:2,5 54:4,20
arrested 8:13 17:9 18:7 50:22 52:7,10 53:3,7 54:6
arrived 18:24 19:2,8
Arthur 8:7 10:9,10 10:16 12:3 19:11 55:9,10,11
aside 53:2 54:4,19

asked 37:20 48:22 49:3
asking 6:8 56:4
asks 39:14
assaulting 52:2,5 53:9,13
assignments 11:11
assume 5:12
ate 23:21 26:8,8,17
Atlanta 9:21 52:11
ATTACHED 3:17
attend 25:10
attention 10:6
attorney 2:10,15 6:14
attorneys 5:9
August 52:6,7 53:1,2
Avenue 2:9
Average 21:24
aware 35:4 36:2
a.m 1:18 11:19,21 56:18

**B**

B 3:15
back 8:17 15:6,8 16:21 19:17 22:21 25:23 27:23 28:11 30:19,21 38:6 44:12 45:6,18,22 46:23 47:23 48:1 49:17
backpack 43:18,19
BAIRD 2:8 17:20 39:14 55:24 56:14
Barbara 13:17 45:11
basically 11:4
Beirut 9:6
believe 6:24 12:4 27:10,12 28:24 39:23 45:22 46:17 50:23 53:4,8
best 9:18
big 20:5 38:18 42:2 43:16 49:9
bike 16:3,21 31:2,3 37:13,15 41:5 43:2 43:3,6,17
Bill 25:1,2 26:7
Bill's 25:1

bit 45:23
black 16:10 34:18
Blackwell 2:12 3:8 4:13,18 17:17,22 25:18,22 26:3 39:18 46:13,16 55:22 56:6 56:8,12
blah 49:12,12,12
books 38:20
box 40:12,14,15,17 42:23 43:6,16,20 44:3,4 46:3 47:14 48:4
boxes 40:8
break 6:7,11,13
bring 17:16 35:9 46:20
broke 10:1
brought 38:14
buddy 43:15
building 14:13,14 15:8,18,20 16:20,22 17:1 18:12 19:10 22:4,6,7,12,16,20 24:9 27:21 28:3 29:20 30:1 31:5 32:20 37:22 38:6 42:24 44:6,12 46:10 46:19 47:1,24 50:20
buildings 10:14
built 22:14 35:16
bunch 10:2
busy 36:16
buy 26:15,18
buying 26:16

**C**

C 2:1 57:2,2
cabinet 35:3
call 13:13,14 14:8 48:14,18,23
called 13:17,19,23 14:1 20:4 41:17 43:7,15 44:19 45:11 45:12 47:10,20 48:16,17 49:1
calling 55:18 56:3
care 32:19,21,22

carrying 35:7
case 35:7 55:5,13,19 56:10
Center 14:18 17:8 50:24
certain 11:3 38:24
certification 4:3
certify 57:7
changed 11:18 22:19 22:21 27:15,17,23 28:1,8,11,22 29:22 30:8 31:12
charged 53:9,12,14
charges 15:9 37:9
Charlene 19:9 37:2
Charles 19:9,11 37:3
Chestnut 17:7
children 7:20,22
Christopher 1:13 57:5,22
City 1:6,15 2:12 17:8 50:24
clean 10:14
cleaning 10:12,13 40:19
clock 12:20,20,21,22 15:17
clocked 14:4,5,9 21:10 32:2
clocking 19:18
clothes 41:4
coffee 34:23
college 33:18
color 43:12
come 13:4 15:6 16:3 26:14 31:24 45:20 46:18 49:12 50:13 50:20 52:24
comes 41:11 42:7
comfortable 49:19
coming 30:17,17
commencing 1:17
communication 49:23
compactor 38:22
companies 9:16,19 10:3
company 9:14 10:2,4

Case: 12-3906    Document: 003111246748    Page: 62    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR    Document 21-2    Filed 06/14/12    Page 17 of 22

59

10:10,12 16:17
26:12 55:8
complain 29:18,23
complained 27:21
complaint 47:4,6
complaints 23:6
completed 8:19
computer 35:1,5,6,7
35:19,24 36:4,7
concluded 56:17
conflict 5:8
confused 45:23
consider 50:3
considered 11:7
26:11 27:10 41:2
continue 28:14
conversation 45:3,10
50:7,11 54:13,15
conversations 6:6
21:10 50:9
convicted 51:20 52:4
52:15 53:17
Corps 9:2
counsel 4:2 46:14
counselor 21:4,9
30:12
couple 30:4
court 1:1,20 5:18 6:2
57:6
coworker 44:13
coworkers 24:18,23
coworker's 26:1
crew 13:16 35:1
crime 51:20
crossing 6:6
cubical 34:23 35:15
35:16,19
cuffs 37:12
curse 50:8
cursing 45:6 49:17,19
49:21

**D**

D 1:3,7 2:21 3:2,6 4:9
date 8:6,7,10,12 27:4
47:19 52:4 53:5
54:5,20 57:21
dates 46:21,22

day 5:2 10:19,19 12:3
14:9,22 16:23 17:4
18:7,8 20:17 21:6
21:12,13,21,22 24:1
24:9 29:8,12,13,16
29:17 33:14 35:9,21
40:20 42:21 43:4,19
45:19,24 46:2,7,15
47:13,15 48:9,11,12
48:13 50:17 54:19
54:21
days 13:18 15:5 20:1
21:14 30:4 38:14
45:18
deal 20:5 49:9
defendant 1:7 2:15
4:19
Department 2:13
deposition 1:3,12
4:21,23 5:4,7,13,16
56:17
describe 32:17 34:17
43:11 54:14
DESCRIPTION 3:17
desk 35:12,13
details 11:3 32:19
detainer 51:13
Detective 4:19 36:20
36:24 37:4
died 22:13
different 10:3
direct 10:5
discharge 9:7
discussion 25:20
district 1:1,1 50:23
divorced 7:16,17,18
dock 38:3,9,15,17,24
39:21 40:13 41:7
doing 5:23 27:16
34:14
domestic 53:8
doors 15:23
drive 44:4
drugs 6:21
duly 4:10
Dumpsters 38:19
duration 29:3
duties 32:18

**E**

E 2:1,1 3:2,15 57:2
earlier 12:15 20:10
early 14:10 19:19,21
20:5,6,7,12,23
23:20 24:2 32:2
41:11 45:18,19,21
45:24 49:10
either 33:9
elevators 32:21
else's 33:7
employed 8:3,9 10:7
10:15
employees 39:19 42:9
employment 8:6 12:3
enter 16:20,22
entire 24:7
ERSA 1:20
ESQUIRE 2:8,12
events 31:2
exact 5:2 46:21,22
47:19
EXAMINATION 1:4
examined 4:10
excused 56:16
Exhibits 3:21
explain 5:13
extra 41:4

**F**

F 2:8 57:2
facing 37:2
far 41:4
feel 6:11 23:1,11,14
feeling 41:18 44:18
felt 49:19
female 11:1 26:10
file 18:2
filing 4:3 35:3
finally 19:6
fine 44:20
finish 6:9,12
fired 12:10 38:21
first 4:22 9:1 15:20
36:24
five 13:18 15:5 20:1
21:15 38:14 45:17
Floor 1:16 2:14

following 37:19
follows 4:11
foregoing 57:8
form 4:5
forth 45:6,19 49:18
four 7:14 10:17 24:7
24:19 26:23 31:3
frequented 41:21
Friday 21:16 46:8
friend 43:7,8,9,14,14
50:3
friends 31:4
friend's 43:21,23
full 39:15
furniture 9:11,12
further 55:23 56:13

**G**

gentleman 26:4
Georgia 52:11,12,15
52:21
gestures 5:21 6:2
given 14:21 55:16
gives 39:7
giving 6:10 55:12
glass 16:1
go 5:5 6:14 8:14
18:15 19:17 21:6,7
23:22 24:11 25:18
25:23 30:23 34:23
40:5 42:3,11,14,16
44:9,12,15 45:22
50:17
goes 33:18
going 4:20 8:16 10:5
15:4 17:5,17 25:23
37:21 38:14 39:23
41:18 43:5 44:17,23
45:20 49:8 56:3
gold 43:12
good 4:14 31:4 41:18
44:18
grab 37:14
grade 8:18
graduated 8:20
graduating 8:24
GRAHAM 2:8
Graterford 51:5,7,13

Case: 12-3906    Document: 003111246748    Page: 63    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR    Document 21-2    Filed 06/14/12    Page 18 of 22

60

**Greg** 26:1 41:8,8,10
**grievance** 18:2,6
  36:13
**guard** 15:21 16:15,16
  46:18
**guard's** 16:5
**guilty** 53:19
**guy** 26:5 40:6
**guys** 19:15 36:17,19
  37:3,4

**H**

**H** 3:15
**half** 20:15
**hall** 17:5,6,10,19
  18:15,24 19:3
**hallway** 30:24
**hand** 44:16
**handed** 41:14
**hands** 5:23
**happened** 19:2 28:7
  36:13,15,23 37:6
  45:15 50:15
**hearing** 5:8 18:5,18
  18:19,21 36:13,14
  54:20,23
**hearings** 51:9
**heated** 45:5,16 48:19
**heavy** 40:4,6
**held** 25:21
**high** 8:21,22,23,24
**highest** 8:18
**hip** 32:9,13
**hold** 9:9
**home** 14:1,5 15:1
  16:21 21:7,7 41:19
  43:6 45:14 47:10,20
  47:21
**homework** 33:22,24
  34:1,4,6
**Honorable** 9:8
**hour** 20:15 41:11
**hours** 6:19,22 11:16
  11:22 22:19,21
  27:15,17,23,24 30:7
  31:11,19 38:24
**huh-uh** 6:1
**hung** 49:18

**I**

**immediate** 13:9
  20:20
**important** 6:3
**impossible** 6:5
**impression** 44:22
**incarcerated** 52:22
**incident** 10:6 53:22
  54:2,8 55:16
**Incidentally** 14:14
**including** 54:8
**influence** 6:15
**inspect** 22:16
**inspection** 24:10
**Installations** 9:21
**intend** 55:18

**J**

**Jackson** 8:7 10:9,11
  10:16 12:3 19:11
  55:9,10,12
**January** 1:17
**jeopardy** 23:15
**JFK** 14:16,20 17:3
**job** 9:1,9 13:23 23:14
  32:17 43:8
**July** 8:13 18:9,10,11
  18:14 36:12,24
  54:23
**June** 10:6,7 11:22
  12:4,5,8,9,12 13:19
  13:20,21,23 14:2,10
  15:12,14,20 18:8,11
  18:14,21 29:7,9,10
  29:15 31:21 38:8
  40:11,22 42:22 46:1
  47:4

**K**

**keep** 35:6
**keeps** 41:21 42:20
**kept** 30:5 35:8 51:12
**keys** 41:13,14,15,16
  44:15,16,17
**kind** 6:15,21 9:7,9
  10:1,10,13 12:21
  14:21,22 18:2,5
  21:3 22:10 34:14

37:13 40:12 43:9
  49:22 53:21
**knock** 16:2
**knocked** 16:2
**know** 5:1 6:13 10:2,4
  16:7,17 17:14 22:6
  22:11 23:13 26:7,12
  28:5 30:12,21 32:22
  33:17,19 34:18 35:2
  36:3,5,10 37:14,17
  41:18 42:8 43:12,24
  44:1,14,19 45:5
  49:8,11 53:5 56:2,3
**knowledge** 36:3
  55:15,17 56:7
**knows** 56:2

**L**

**ladies** 11:2
**laptop** 19:13 33:11
  33:13 34:1,7,17,20
  35:6 36:16 41:21
**lasted** 28:10 29:3
**late** 19:7,8 31:24
**Law** 2:7,13
**lead** 10:19
**leadman** 10:19,21
  22:13,13,14
**leave** 9:5 12:17 20:5
  20:7,11,14,16 21:7
  22:23 28:18 32:9
  34:22 35:10 41:9,12
  45:19,24
**leaving** 9:6 12:15
  34:20 40:20,21
  44:20 45:18,20 49:9
**left** 12:23,23 20:6,10
  20:15,23 28:19
  34:21 36:11 41:3
  44:10,11
**let's** 19:17 32:13
  45:22
**lift** 40:6
**lifting** 40:4
**lighthearted** 50:6
**listening** 30:12
**little** 35:7 44:20
  45:23

**living** 7:12
**loading** 38:3,9,15,17
  38:23 39:21 40:13
  41:7
**lobby** 32:20
**lock** 34:23 35:14,15
  35:17,18
**locked** 42:20
**locker** 38:13 40:18,19
**long** 9:3 10:15 21:23
  22:1,5,6 24:5 28:22
  28:23 51:6 53:15
**look** 25:16 33:21
**lot** 34:12 38:20
**lunch** 23:21,22 24:11
  24:16,19 25:10 26:8
  26:12,15,16,18
**luncheon** 26:11
**lunchtime** 23:20
  26:15

**M**

**M** 1:13 57:5,22
**male** 11:1
**man** 44:18
**manager** 19:10,11
  22:20 27:21 29:20
  30:1 31:5
**manager's** 28:3
**Marine** 9:2
**marital** 7:15
**Marked** 3:17,21
**master** 41:15,16
**matter** 4:20 57:10
**mean** 10:23 16:1 21:1
  30:23 35:16 36:8,9
  36:10 38:15 39:8
  40:3 41:3 43:13
  56:1
**meaning** 50:7
**medication** 6:16
**mention** 45:2
**mentioned** 12:2
**met** 15:20
**middle** 6:8,10
**Mike** 28:4 29:20 31:3
**mine** 43:7
**minutes** 12:15,23

Case: 12-3906    Document: 003111246748    Page: 64    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR    Document 21-2    Filed 06/14/12    Page 19 of 22

61

14:10 19:6,8,21
20:10,11 21:24
45:18,21 49:10
mistakes 34:16
model 43:13
modular 9:11
moment 44:23
Monday 21:16
month 5:3,4
months 22:12 32:10
51:8
morning 4:14 15:7,10
49:12
Morton 2:9,9

N

N 2:1 3:2 57:2
name 4:18 7:4,5 9:14
9:19 13:7 16:5,7
17:12,13,13,14
24:23 25:2,3,7,8,9
25:15 26:1,10 28:3
28:5 43:23,24 44:1
55:8
names 10:4
name's 13:16
need 5:21 6:7,11,13
35:2
needs 32:21,24
never 20:6 23:5 31:14
32:6 33:4 38:6 42:5
50:2
new 26:5 32:13
nickname 7:7
night 13:16 45:4
Niya 2:12 4:18
nodding 6:1
normal 15:15 30:19
Notary 1:14 57:6
notes 46:20 57:9
nothing's 15:24
notified 13:23 19:24
notify 56:5
NUMBER 3:17

O

O 57:2
oath 5:18

objections 4:5
Obviously 56:5
occasion 38:3
offer 26:15
office 9:11 10:14
34:22 35:11 42:1,2
42:3,5
officer 52:2,5 53:11
53:13
official 19:22
Oh 5:7,10 29:11
okay 4:17 5:10,11,15
5:24 7:3,15,20,24
8:3,5,9,16,21,23 9:7
9:24 10:5,10,15
11:5,13 12:16 13:2
13:6,9 14:4,6,12,19
14:21,24 15:10,19
15:22 16:9,19,22
17:2,6,8,10,17 18:2
18:5,8,21 19:12
20:9,11,18 21:8,18
22:1,9 23:7,17
25:22,24 26:6,8,9
27:10,20 28:17,19
29:1 31:16,21 32:8
32:12,15,17,19
33:15,23 34:19 35:4
35:10,21,23 36:2,12
37:19 38:2,7 39:10
39:17 40:11,24 42:5
42:19,21 43:2,5
44:3,6 45:2,9,15,22
46:2,5,5 47:2,12,20
47:22 48:3 49:19,22
50:6,11,22 51:6,9
51:12,16,20 53:2,21
54:4,10,19,24 55:7
55:18,21,24 56:7,12
56:14
oldest 8:1
Oley 8:22,23,24
once 15:1 21:10
30:18
one's 25:8
open 15:23
opened 15:24
opposed 5:21,22

ORAL 1:4
orders 32:22
outside 23:18 27:1
overlapping 6:6
o'clock 24:2 28:23
30:18

P

P 2:1,1
PA 1:23
pack 38:13 48:1,1
packed 38:14 43:1
PAGE 3:4,16,16
parole 51:17,18
particular 20:16
passed 25:3,5 26:4,7
Penn 14:18
Pennsylvania 1:1,16
2:9,14 7:11
people 11:4,5,13
36:10 38:21 39:11
56:4
perimeter 32:20
period 22:1 24:5
26:22 28:13
permission 39:7
permitted 38:23 39:2
39:20 42:16
person 13:12
personal 26:13 41:4
person's 25:7
Philadelphia 1:6,15
1:16,23 2:12,14
7:10 52:24
phone 13:13 14:7
25:16 27:2 41:17
pickup 43:10
Pilot 1:13 57:5,22
pink 14:21
pissed 44:21
place 18:20 24:21
Plaintiff 1:4 2:10
play 19:14,15
Plaza 1:22
plead 53:19
please 15:19 24:24
27:23 32:17 44:17
point 20:13

police 52:2,5 53:13
policy 39:6
porter 10:19
porters 10:20
position 10:18 23:2
positive 39:5 54:1
precinct 37:17
premises 47:5
presence 34:11
present 2:21 7:9
presently 8:3
pressure 30:16,16,18
pretrial 5:8
Previously 46:11
print 32:23 34:12
prior 9:24 12:7,24
13:19 18:14 29:10
29:21 31:21 48:12
Prison 52:19
Pritchett 1:3,7 3:6
4:9,14,15,16,17,18
probation 54:2
problem 28:21
problems 10:3 21:5
30:12,22
processed 51:2
produce 17:20
Professional 1:14
57:6,23
property 37:9
Public 1:14 57:7
put 30:16 35:2,17
37:12 42:23 43:17
43:18,20 44:3 56:1
P.C 2:7

Q

question 4:6 6:9,9
27:22 39:15 48:21
questions 5:17
quite 34:21 51:11

R

R 2:1 57:2
race 16:9
rapport 22:10
read 34:13,15
real 28:20 31:4

Case: 12-3906    Document: 003111246748    Page: 65    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR   Document 21-2   Filed 06/14/12   Page 20 of 22

62

really 46:21
reason 5:20 6:7,24
    33:2,20 51:14
reasons 33:9
recall 25:15 33:13
    34:19
receive 53:21
receiving 37:8
recollection 9:18
    46:14
record 6:14 7:5 25:19
    25:21,23 56:1
recorded 34:1
referring 36:20
Reidsville 52:21
relationship 22:15
    27:6
remember 5:2 17:13
    25:3,9 37:18 46:21
    46:22 53:15 54:5
rep 14:24 17:12 19:4
    20:2,3 45:11
replacement 32:10
report 13:2
reported 11:9
reporter 1:14 5:18
    6:2 57:6,23
REPORTERS 1:20
represent 4:19
representative 13:15
    17:24 31:11
request 17:18 27:24
    28:7 31:10
requested 22:21
    31:14
requests 31:7
reserved 4:6
restrooms 11:2
return 14:12,13 15:3
    17:2 18:12 37:21
    38:2 44:6
returned 29:1 47:1
review 34:3
reviewed 34:6
revolving 15:23
ride 16:2 43:2,3,4,6
    43:19
right 11:15,16 12:9

12:13 15:2 20:4
    25:1,9 38:7 52:14
    56:9
Rockland 7:10,13
Rogers 52:19
romantic 27:6,11
room 5:5
Rosa 39:24 40:5,6
Rosalba 26:10 40:1,2
Rose 39:13
run 11:4,4

―――――――――――
          S
―――――――――――
S 2:1 3:15
Sadeek 16:6,19
Sadeek's 16:9
sat 19:4,7
saw 17:12 30:23
    54:20,22
saying 46:23 47:3
says 20:4 37:7,8
school 8:19,21
schoolwork 33:16
sealing 4:3
seats 42:8
second 18:19,21 28:2
secretary 19:10 32:23
security 15:21 16:5
    16:15,16 41:13
    44:16 46:18
see 5:19,23 13:22
    16:1 17:5,11 27:18
    28:16,20 29:13 30:5
    30:15,24 32:13
    34:15 36:6,24 37:1
    43:13 54:17,24
seeing 33:13
seen 55:3
send 43:15
sense 46:6
sentence 53:22
series 5:17
service 9:5
serving 52:17
set 19:13
Seven 51:8
Shawn 2:21
she'll 40:5

shift 16:16 28:22
    29:22
shop 47:8 48:14,22
show 33:18 41:9,12
    44:14
showed 15:14 18:19
    19:6 36:17 41:10,10
    41:14 46:7,8,14
showing 33:24,24
sick 30:13 32:4
signing 4:3
single 7:16 29:16,17
sit 20:14 42:9
sitting 36:20
six 22:12 30:18 52:23
slip 14:21
social 33:9
socialize 23:17
Sofie 13:6 19:9,10
    20:13,18 22:3,10
    23:17 24:12 26:18
    27:1,4,10 28:11,15
    29:8 33:14,23 34:19
    35:6 37:2 41:17,20
    42:12,14,17 44:19
    45:8,12 48:7,16,17
    50:12 54:10,15,17
Sofie's 13:4 34:17
Solski 13:8
somebody 43:16
son 8:1,1
sorry 5:10 29:10 52:6
    55:8
sort 22:15
South 1:21 2:9
speak 5:21 6:3,13
    22:2 29:8 31:10
specifically 38:12
spoke 17:18
spoken 54:10 55:4,11
    56:9
start 39:15
started 11:17 49:17
state 5:22 47:4 52:12
    52:19
stated 7:4
statement 55:13,16
STATES 1:1

status 7:15
stay 21:20 22:2 23:1
    23:15 28:14 29:19
    33:21 51:6
stayed 23:7
staying 29:7,15
stenographic 57:9
steward 47:8 48:15
    48:22
stolen 37:8
stood 37:11
storage 40:8,12 42:23
    43:20 46:3,3 47:14
    48:4
Street 1:15,21 2:13
    7:10,13
stuff 33:18 34:12
    38:13,15,21 40:7,18
    41:2,4,5 43:18 48:2
Suite 1:22
supervise 11:5
supervised 11:14
supervisor 11:7 13:3
    13:4,10 20:18,20
    21:2,11 23:12 25:13
    48:23 49:1,3,20
    50:1,4,7
supposed 12:16
    14:13 18:18 20:16
    41:11
supposedly 19:14
sure 17:20 22:5 27:8
    39:4 47:18,19 53:24
    54:3
suspend 45:17
suspended 12:7,8,9
    12:11,12,13 13:12
    13:18 15:4 19:18
    20:1 29:6 31:22
    44:24 47:6,22 49:4
    54:11
suspension 19:22
    37:20,23,24 38:4,5
    44:23 45:2
sworn 4:10

―――――――――――
          T
―――――――――――
T 3:15 57:2,2

Case: 12-3906    Document: 003111246748    Page: 66    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR    Document 21-2    Filed 06/14/12    Page 21 of 22

63

tag 22:17
take 4:20 6:2,5,7,11
  6:13 32:19,22,23
  35:23 38:18 39:8,9
  40:8,12 42:22 43:5
  47:13
taken 1:13 4:23 5:4
  5:13,16 37:16 50:23
  51:4 57:9
talk 20:15,17,22 21:2
  21:5,8 22:19,24
  23:1,6,7,15 27:1
  28:14 30:22 31:1
  42:9 48:18 49:8,11
  49:13,15 50:13,16
talked 48:19
talks 42:8
tell 15:19 21:19 30:7
  48:17
telling 30:5
ten 9:4 12:15,23 14:9
  19:21 20:10,11
  45:18,20 49:10
tenants 32:21 38:20
terminated 12:10
terms 13:3
testified 4:10
testify 7:1 56:4
testifying 55:12
things 42:22,23 47:13
  48:3,10
think 13:8 28:6 33:17
  33:19 37:20 46:1
third 16:16
three 10:24 22:8 24:7
  25:10 26:22 28:23
  32:10,14,16
throw 38:20,21
Thursday 1:17 46:24
Thursdays 23:19
time 4:6 8:9 12:16,19
  13:2 17:2 18:16
  21:20 22:1,4 24:5
  25:20 27:17 28:13
  29:4,6 30:22,23
  32:4,9 36:13 37:10
  37:19,24 38:5,16
  40:3 41:7 44:7

47:23 51:10 52:18
  53:4 54:6,13,22
times 21:20 34:12,21
tired 30:11
title 47:9
today 4:21 6:16 7:1
told 13:17 14:24 15:4
  15:6,7,19 16:19
  19:16 30:11 37:13
  46:9,18 47:22 48:17
  50:19
tomorrow 50:13
transcript 1:12 4:4
  34:14 57:8
trash 38:18 39:8
trial 4:7
truck 43:10,21 44:3
true 57:8
truthfully 7:1
trying 13:22 19:14
  36:16
turn 44:17
turned 41:13
turns 26:16
twelve 24:2
two 7:23 8:14 11:4,5
  11:13 19:15 25:6
  28:10,24 29:21
  36:17,19 37:3 39:11
  39:19 42:8

U

uh-huh 6:1
unattended 34:20,21
uniform 41:3
union 13:15 14:24
  17:4,6,10,12,19,23
  18:15,24 19:3,4,24
  20:2,3 31:11,14,17
  31:18 45:11 54:23
United 1:1,22
use 12:20 33:1,7,11
  34:7 36:3 38:18
  50:8

V

value 41:2
vehicle 43:9

verbally 5:22
videotape 19:14
view 34:9
violence 53:8
voluntary 23:9
vs 1:5

W

Wait 39:14
waited 41:8,13 44:13
waiting 19:5,6
waived 4:4
walk 38:3
walked 37:12
walking 41:6
want 20:17,22 21:2
  22:22 29:19 33:22
  41:9,12 44:15 49:15
  50:16
wanted 9:6 21:5,6,7
  22:17,18 27:12,14
  29:22 30:7 33:21
  34:3 49:8,11
wants 20:14 30:21
  42:7
warrant 37:7
Warrender 2:21 4:19
  36:20,24 37:4
washing 30:16,18
wasn't 12:10,10 15:8
  15:18 16:24 35:1
  41:18 46:9 53:12
Wednesday 23:24
  24:3,6,21,22 25:11
Wednesdays 23:19
  23:22 24:14
week 21:14,20 30:4
  40:21
weekly 26:11
weeks 8:14 28:10,24
WEISBERG 2:7
went 10:2,3 14:5 15:6
  15:10 16:21 17:4,10
  18:17 22:16,18,20
  24:16 26:22 27:22
  30:19,21 31:2,2,3
  36:10 38:6,13 45:18
  47:23 48:1

weren't 15:23 54:2
West 7:10
we'll 6:14 7:3 17:20
  49:12 50:13
We're 25:22
withdraw 35:5
witness 3:4 25:24
  39:17 55:19 56:16
word 5:19,20
words 50:8
work 15:7,10,14 16:3
  21:14 22:2 23:18
  27:1 28:14 32:22
  36:17 39:11 43:2
  46:9 47:5 48:1
worked 24:8 29:4
  39:20 55:1,16 56:10
workers 26:12
working 14:15 18:12
works 13:16 16:17
  25:8
wouldn't 19:15 28:20
  36:5
writing 31:8
written 17:15 32:6
  39:6

X

X 3:2,15

Y

Yeah 14:3,5,18 16:12
  16:16 20:10 24:1
  25:17 27:19 35:22
  40:14,16 47:21
  51:22 54:22
year 9:22 28:2
years 7:12,14,18,19
  9:4,13 10:17 22:8
  24:7 25:6,11 26:23
  29:21 32:14,16
  52:22
younger 8:1
Yup 34:10

Z

Zolinski 28:6

1

Case: 12-3906    Document: 003111246748    Page: 67    Date Filed: 05/01/2013
Case 2:11-cv-04682-TR   Document 21-2   Filed 06/14/12   Page 22 of 22

64

**10th** 15:12,14,20 18:8
  18:11,14 46:4,12,15
  47:7,12,16,18
**11th** 46:7,24 47:3
**11-4682** 1:2
**11:05** 1:18
**11:49** 56:17
**12th** 8:20
**1233** 1:24
**14** 7:19 9:12
**15** 8:2 21:24 36:9
**15th** 1:16 2:14
**1500** 14:16,17
**1515** 1:15 2:13
**1520** 1:22
**16th** 17:7
**1600** 14:20 17:2
**17th** 1:21
**19070** 2:9
**19102** 2:14
**19103** 1:23
**19141** 7:11
**1990** 54:5

_____**2**_____

**20** 36:9
**2001** 51:23,24 52:6,7
  53:3
**2006** 52:6 53:1
**2010** 8:13 10:6,8
  11:22 36:12
**2012** 1:17
**215)564** 1:24
**22** 8:1
**24** 6:18,22
**28th** 8:13 18:9,10,11
  18:14,15,22 36:12
  36:24 54:23

_____**3**_____

**3** 11:17 28:18,19
**3rd** 52:6,7 53:3
**3:20** 13:1
**3:30** 11:18,21,23,23
  11:24 12:18,19 13:5
  20:14 22:22 29:1
  36:8
**30** 1:21 19:6,8

_____**4**_____

**4** 3:8 14:18
**4:30** 14:8 45:12 48:16

_____**5**_____

**5** 1:17

_____**7**_____

**7** 2:9 11:17,17,23,24
  41:10 45:12
**7:30** 11:18,19

_____**8**_____

**8** 41:12
**8th** 29:15

_____**9**_____

**9th** 10:6,7 11:22 12:4
  12:5,8,9,12 13:19
  13:20,21,24 14:2,10
  29:7,9,10 31:21
  38:8 40:11,22 42:22
  46:1,15 47:4
**90** 9:23 53:4
**906** 7:10
**98** 9:23

Commonwealth of Pennsylvania
County of Philadelphia



AFFIDAVIT OF PROBABLE CAUSE

Copy

Police Incident Number (DC#):
1009027767

Warrant Control Number:
AFF-0004715-2010

DET SHAWN WARRENDER SHAWN 8130 Central Detective Division

PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:

1. That after investigation I have probable cause to believe that a warrant of arrest should be issued for:

Defendant Name: ANTHONY PRITCHETT

Alias: Gender: M Race: Black

DOB: 10/21/1961 Pid:

Address: 913 Chester AV Yeadon, PA 19050

CRIMES:

| DC Number | Code | Grade | Description | Count |
|---|---|---|---|---|
| 1009027767 | CC3921 | M1 | THEFT-UNLWF TAKING | 1 |
| | CC3925 | M1 | THEFT-RSP | 1 |
| | CC0903 | M1 | CRIMINAL CONSPIRACY | 1 |

2. That the facts tending to establish the grounds for the issuance of the warrant of arrest and the probable cause for my belief are as follows: ( Note: if extended text exists, see following page(s))

1009027767 On 6/25/2010 at 8:45am inside Central Detectives the complainant did make the following statement: On 6/9/2010 at 3:15pm at 1600 JKF Blvd, Concourse level, the complainant reported to work to find her HP laptop valued at $ 1200.00 along with twenty employee files missing from her work station. The laptop was removed from a lock file cabinet. There was a dent in the locking mechanism allowing access, and the immediate surrounding area was in disarray. She immediately viewed security cameras and witnessed an employee who has worked for the company the last two years enter the office where the laptop was located and then exit with a storage box and proceed to the loading dock. According to the complainant's statement, the offender has no right to be this area and is not allowed on the loading dock during normal business hours, a direct violation of company policy. Additional surveillance shows the offender placing the storage box in the back of a pickup truck and that truck flees the parking area. No tag was captured. The offender then returns to work for twenty more minutes, leaves and never returns back to work. The offender still had several hours left to the completion of his shift. The identity of the second male is unknown. The offender is a custodian and does have a right to be in the areas surrounding the scene of the theft (outside of the office) but has no legal right to be inside the office where the laptop was secured. The affiant believes that sufficient probable cause exists for issuance of an arrest warrant for the offender for theft and RSP.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF AND THAT PROBABLE CAUSE TO ARREST EXISTS.

Affiant: DET SHAWN WARRENDER SHAWN 8130 Central Detective Division
Sworn to or affirmed and subscribed before me this 13 day of July, 2010

Affiant Signature

Issuing Authority Signature

EXHIBIT
Exhibit "I"

NTHONY PRITCHETT



Printed: 07/13/2010 11:35 AM

FELONY Fax:215-686-8794 Nov 26 2010 13:48 P.08

Commonwealth of Pennsylvania
Court of Common Pleas

County of: Philadelphia
First Judicial District

WARRANT OF ARREST
Copy
COMMONWEALTH OF PENNSYLVANIA
V.
ANTHONY PRITCHETT



Issuing Authority

AC Magistrate JAMES O'BRIEN

Defendant's Address(es):

913 Chester AV Yeadon, PA 19050

Citation/Complaint No : COM-0004715-2010
Docket No :
Warrant Control No : WAR-0004715-2010
Date Citation/Complaint Filed : 07/13/2010

Charge(s):

| Code | Grade | Description | Count |
|------|-------|-------------|-------|
| CC3921 | M1 | THEFT-UNLWF TAKING | 1 |
| CC3925 | M1 | THEFT-RSP | 1 |
| CC0903 | M1 | CRIMINAL CONSPIRACY | 1 |

Additional charges, if any, are listed on separate page

DESCRIPTIVE INFORMATION:

Social Security Number:

Sex: Male
Date of Birth: 10/21/1961
Telephone Number: (215)000-0000

Age: 49
Height: 5'08
Weight: 170

Race: Black
Eye Color: Brown
Hair Color: Bald

Distinguishing features (scars, tattoos, facial hair, disability, etc):

Alias(es):

TO POLICE OFFICER:

In the name of the Commonwealth of Pennsylvania, you are commanded to take
the defendant, into custody for 1202 Embezzlement fraudulent conversion   ANTHONY PRITCHETT
issued under my hand this 13 day of July , 2010

Signature

, Issuing Authority

THONY PRITCHETT,   DC#: 1009027767   Page 1 of 1   04072   Printed: 07/13/2010 11:08 AM

EXHIBIT

P.10   Nov 26 2010  13:49   Fax:215-686-8794   FELONY   51
257A



**Philadelphia Police Department**
**Central Detective Division**
**Investigation Interview Record**

| | | |
|---|---|---|
| Case No. | 5201 | |
| Interviewer: | Det. Warrender # 8130 | |

| Name: Sophie Solski | Age: 40 | Race: White | Sex: Female | Dob: 09 21 1970 |
|---|---|---|---|---|

| Address: 1 wheelwright lane cherry hill nj 08003 | | Apt # | Phone Number: 267 716 2577 |
|---|---|---|---|

| Name of Employer/School: Arthur jackson Co | | | Soc. Sec. No: |
|---|---|---|---|

| Address of Employer/School: 1600 JFK Blvd | Department: | Phone Number: |
|---|---|---|

| Dates of Planned Vacations: | Dates of Planned Business Trips: |
|---|---|

| Name of Closest Relative: | Address of Relative: | Phone Number: |
|---|---|---|

| Arresting Officer: | Arresting Officer: |
|---|---|

| Location of Arrest: | Time of Arrest: |
|---|---|

| Place of Interview: Central Detective Division | Date of Interview: 6/25/10 | Time of Interview: 8:45am |
|---|---|---|

| Brought In By: | Date: | Time: |
|---|---|---|

| We are questioning you concerning: | Witness: |
|---|---|

| Warnings Given By: | Date: | Time: |
|---|---|---|

| Answers: (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

**Q:** can you tell me what happened at 1600 JFK Blvd on 6/9/2010 that brings you to CDD

**A:** I arrived for work at 3; 15pm and was looking for my laptop which was inside the file cabinet, which was locked. I saw a dent in the lock. This is how it was opened. I noticed that the items that were on the partition was knocked off, which told me that someone had moved the partition. I immediately noticed my laptop missing and twenty employee files were gone. I then went to the building manager and reviewed video together and saw unusual activity by the offender. I saw that he was working at 5; 50am, but is not scheduled until 7:00am. Also, he didn't punch in until 6:50am. His duties was to sweep the lobby, and outside of the building. He was doing what appeared to be trash removal, which wasn't his scheduled assignment that day. I saw him take a large trash can into the room where the laptop was located, there is no reason, there is no trash I that room. Then I saw him with a storage box on top of the trash can, he didn't have it when he walked in there. He then proceeded to walk

Signature _____   Date: 6-25-10

Police (75-483)

EXHIBIT

Page 1

to the loading dock; it was now 7:15am.  He is not supposed to be there at all.  No trash is too placed in the loading during day time hours, trash is supposed to be placed in the trash room.

Q: What company does the Anthony work for?

A: Arthur Jackson

Q: What is job description?

A: day porter, he does everything we ask him to do

Q: What is schedule that day on 6/9/2010?

A: 7:00am - 3:30pm, every day

Q: Who owns the laptop?

A: it's my personal laptop, HP

Q: What is the value?

A: $1200

Q: have you spoken with Anthony since the incident

A: no

Q: Has he been back to work since 6/9/10

A: yes, he came back on the 10th of June, but he wasn't allowed in the building

Q: how long has Anthony been employed with you

A: 2 years

Q: does Anthony have a drinking problem

A: yes, he drinks heavily and has been known to come to work intoxicated


Q: we are going to view video #1 please tell what is occurring

A: it shows Anthony going into a El Savir and removing a large trash barrel, then proceed to supply room and then to the locker room.  He opens the door to the freight elevator, half way blocking the camera.  He was told that this door is to be left open completely or closed, never half way.  In the background you can see the door to locker room opening, where the laptop was stored.  He then walks to the freight elevator with a box on top of the trash barrel.


Q: we are going to view disc # 2, please tell me what is occurring

A: nothing of evidentiary value


Q: we are going to view disc # 3 can you tell what is occurring?


Signature  V  _____                    Date: _6-25-10_____

Police (75-483)                                                        Page 2

53

259A

A: it shows Anthony entering the loading dock with the trash barrel and the storage box on top, then walk down the ramp to the parking area and then reach inside the barrel and place the storage box in the back of a pickup truck.  The male (who remains unidentified) then drives away.  Anthony then returns back to work for another 20 minutes and never returns.

AT THIS POINT, I WANT YOU TO READ THIS INTERVIEW AND MAKE ANY CORRECTIONS THAT NEED TO BE MADE.

Final: You have read your statement, and by signing, you affirm as to its truthfulness and accept it as your spoken word.

Signature: _____Date:_____

Interview concluded at

Signature _____                      Date:  6-25-10

Police (75-483)

Page 3

54

260A

*PARS*



### COMMONWEALTH OF PENNSYLVANIA
### PHILADELPHIA COUNTY

DC# : 10-09-027767
Dckt/MC#: MC51-CR-0032386-2010
Date : Jul 13,2010
Complaint : COM-0004715-2010

---

**Criminal Complaint**    *Misdemeanor*                         Original

**COMMONWEALTH OF PENNSYLVANIA VS. ANTHONY PRITCHETT**

I, the undersigned, do hereby state under oath or affirmation:

(1) My name is: **SHAWN WARRENDER SHAWN  Central Detective Division**

(2) I accuse **ANTHONY PRITCHETT**

who lives at **913 Chester AV Yeadon, PA 19050**

with violating the Penal Laws of Pennsylvania on or about **Wednesday, June 09, 2010**

in the county of Philadelphia.

(3) The acts committed by the accused were:

AT 1600 JFL BLVD THE DEFENDANT, ACTING IN CONCERT WITH ANOTHER, UNLAWFULLY TOOK A LAPTOP COMPUTER AND COMPANY FILES WITHOUT THE CONSENT OF THE COMPLAINANT/OWNER, SOPHIE SOLSKI WITH THE INTENT TO DEPRIVE COMPL THEREOF

In violation of Pennsylvania Penal Laws,  section(s) and title(s)

**CHARGES:**

| Code | Grade | Description | Counts |
|------|-------|-------------|--------|
| CC3921 | M1 | THEFT-UNLWF TAKING | 001 |
| CC3925 | M1 | THEFT-RSP | 001 |
| CC0903 | M1 | CRIMINAL CONSPIRACY | 001 |

All of which is against the peace and dignity of the Commonwealth of Pennsylvania

(4) I ask that a warrant of arrest or a summons be issued and that the accused be required to answer the charges I have made. This complaint has been reviewed and approved by   **A.D.A. ANDREW JENEMANN**

(5) I swear to or affirm the within complaint upon my knowledge, information and belief, and sign it on **07/13/2010** before Philadelphia Municipal Court Judge/Arraignment Court Magistrate.



_____
Signature of Arraignment Court Magistrate.

_____
Signature of Affiant

---

On **07/13/2010**    , the above named affiant swore or affirmed that the facts set forth in the complaint were true and correct to the best of his/her knowledge, information and belief, and signed it in my presence. I believe the within affiant to be a responsible person and that there is probable cause for the issuance of process.



EXHIBIT
Exhibit "Y"

_____
Issuing Authority

Seal

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Anthony Pritchett | : | |
| 906 Rockland Street | : | |
| Philadelphia, PA 19141 | : | |
| Plaintiff, | : | CIVIL ACTION NO.: 11-4682 |
| v. | : | |
| | : | |
| City of Philadelphia, et al. | : | |
| 1515 Arch Street | : | |
| Philadelphia, PA 19102 | : | JURY TRIAL DEMAND |
| Defendants. | : | |

## ORDER

AND NOW this _____ day of _____, 2012 upon consideration of

Defendants' Motion for Summary Judgment and Plaintiff's response thereto, it is hereby

ORDERED and DECREED that Defendants' Motion for Summary Judgment is hereby

DENIED.


_____

Timothy R. Rice, J.

262 A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Anthony Pritchett | : | |
| 906 Rockland Street | : | |
| Philadelphia, PA 19141 | : | |
|             Plaintiff, | : | CIVIL ACTION NO.: 11-4682 |
|     vi. | : | |
| | : | |
| City of Philadelphia, et al. | : | |
| 1515 Arch Street | : | |
| Philadelphia, PA 19102 | : | JURY TRIAL DEMAND |
|            Defendants. | : | |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Anthony Pritchett, by and through his undersigned attorneys, hereby files this opposition to the Defendants, City of Philadelphia and Shawn Warrender's Motion for Summary Judgment.

Pursuant to Local Rule 7.1(c), Plaintiff hereby incorporates by reference the attached Memorandum of Law as if fully set forth at length herein.

WEISBERG LAW, P.C.

/s/ Graham F. Baird, Esquire
Matthew B. Weisberg, Esquire
Graham F. Baird, Esquire
Attorneys for Plaintiffs

263 A

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Anthony Pritchett | : | |
| 906 Rockland Street | : | |
| Philadelphia, PA 19141 | : | |
|        Plaintiff, | : | CIVIL ACTION NO.: 11-4682 |
|    v. | : | |
| | : | |
| City of Philadelphia, et al. | : | |
| 1515 Arch Street | : | |
| Philadelphia, PA 19102 | : | JURY TRIAL DEMAND |
|       Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Anthony Pritchett ("Plaintiff"), by and through his undersigned attorneys, hereby opposes the Motion for Summary Judgment filed by Defendants, City of Philadelphia and Shawn Warrender ("Defendant").

### I.  Introduction

As an initial matter, Plaintiff hereby withdraws any and all claims against Defendant, City of Philadelphia as there is no evidence that a Monell claim exists as against the City of Philadelphia.

Plaintiff opposes the Motion for Summary Judgment filed by Defendant, Shawn Warrender, a detective with the Philadelphia Police Department, in his individual capacity, on the grounds that Defendant Warrender caused a malicious prosecution of Plaintiff by arresting Plaintiff without probable cause.

Accordingly, summary judgment should be denied and Plaintiff's case should be allowed to proceed to trial.

### II.  Plaintiff's Opposition to the Defendants' Statement of Undisputed Facts

1-5.  Admitted.

264 A

6.    Admitted.

7.    Admitted.

8.    Admitted.

9.    Denied. The investigation interview record is a writing and as such speaks for itself.

10.    Denied as stated. Plaintiff has no information or knowledge sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph 10 of Defendants' Statement of Material Facts. By way of further answer, in the video provided by Defendants in this litigation pursuant to Plaintiff's Request for Production of Documents, there is no video surveillance of the actual room where Solski's locker is claimed to be located. At no time does the video show Plaintiff taking any property or otherwise depict Plaintiff opening the locker. Additionally, there is no video surveillance of the locker being broken into, and certainly no video surveillance of Plaintiff breaking into any locker and no video surveillance of Plaintiff's alleged theft. 9Exh. A, video surveillance produced by Defendants.[1])

11.    Denied. The video surveillance is a recording and as such speaks for itself. By way of further answer, the video surveillance shows nothing more than Plaintiff performing his typical and usual job duties. (Exh. A.)

12.    Denied. The Affidavit of Probable Cause is a writing and as such speaks for itself.

13.    Denied. The Affidavit of Probable Cause is a writing and as such speaks for itself. By way of further answer, Defendant Warrender at all times lacked probable cause to arrest Plaintiff.

14.    Admitted.

15.    Admitted.

---

[1] Due to the size and format of the video surveillance produced by Defendants, Plaintiff is filing a copy of the surveillance via CD-Rom disc to the Clerk of Courts. Upon information and belief, Defendants submitted the video as Exhibit 3 to the Motion for Summary Judgment.

265A

16.     Denied.  The allegations set forth in paragraph 16 of Defendants' Statement of Material

Facts is a conclusion of law and as such no response is required.  By way of further answer, the

detainer was placed on Plaintiff as a result of the arrest effectuated by Defendant Warrender.

Had Defendant Warrender never arrested Plaintiff without probable cause, a detainer never

would have been placed upon Plaintiff.

17.     Admitted in part; denied in part.  It is admitted that Plaintiff was detained by the City of

Philadelphia from July 29, 2010 until January 13, 2011.  Further, Plaintiff was incarcerated on

charges instituted an arrest effectuated by Defendant Warrender.  (Exh. B, affidavit of probable

cause.)

18.     Admitted.

19.     Admitted.

### III.    Plaintiff's Statement of Material Facts

1.     On or about June 9, 2010 Plaintiff was lawfully upon the premises of 1600 JFK

Boulevard, Philadelphia, Pennsylvania where he worked for Arthur Jackson, a company which

provided janitorial services to office buildings.  (Exh. C, Plaintiff's deposition transcript, p. 10.)

2.     On June 10, 2010, Sophia Solski, a non-party made a complaint with Defendants City of

Philadelphia in Defendant Warrender that her laptop computer was stolen from her work locker.

(Exh. D, statement of Sophie Solski.)

3.     Solski advised Defendants that Plaintiff had stolen the laptop.  (Exh. D.)

4.     Defendant Warrender interviewed Solski.  (Exh. D.)

5.     During this interview, Solski and Warrender claim they reviewed video surveillance of

the room where Solski's locker was claimed to be broken into.  (Exh. A.)

266A

6.    The video surveillance does not depict Plaintiff committing any crime or violation. (Exh. A.)

7.    The video surveillance merely shows Plaintiff typical and usual job duties in association with his employment, i.e., removing garbage from 1600 JFK Boulevard.

8.    Defendant Warrender issued an Affidavit of Probable Cause against Plaintiff. (Exh. B.)

9.    On July 29, 2010, Plaintiff was arrested, arraigned and charged with theft by unlawful taking, receipt of stolen property and conspiracy by engaging in theft by unlawful taking. (Exh. E; Docket.)

10.    Up until the time of trial, Defendants never produced any video surveillance at the criminal trial of Plaintiff. (Exh. E.)

11.    As a result of the failure by Defendants to produce the supposed video surveillance tape depicting Plaintiff committing a crime, Plaintiff's criminal trial was continued twice. (Exh. E.)

12.    On January 13, 2011 all charges against Plaintiff were withdrawn by the Commonwealth of Pennsylvania, as a result of the failure to produce a videotape depicting Plaintiff committing any crime. (Exh. E.)

13.    At all times material hereto, Plaintiff and complaining witness Sophie Solski had been engaged in a disagreement at work, giving rise to Solski's false claims against Plaintiff. (Exh. C, pp. 20-24.)

14.    Defendant Warrender charged the Plaintiff, on behalf of the Commonwealth of Pennsylvania, with three offenses, Theft By Unlawful Taking, 18 Pa.C.S.A. § 3912; Receipt of Stolen Property, 18 Pa.C.S.A. § 3925; and Criminal Conspiracy Engaging in Theft By Unlawful Taking, 18 Pa.C.S.A. § 903. (Exh. E.)

267A

15.     Plaintiff was incarcerated on the aforementioned charges from July 29, 2010 until January 13, 2011.  (Exh. E.)

16.     The Affidavit of Probable Cause contains false information.  (Exh. B.)

17.     The false statements set forth in the Affidavit of Probable Cause include the statement that "additional surveillance shows the offender placing the storage box in the back of a pickup truck and that truck flees the parking area."  (Exh. B.)

18.     The surveillance videos supplied in this case does not depict Plaintiff placing a storage box in the back of a pickup truck.  (Exh. A.)

19.     The Affidavit of Probable Cause contains other false information including the statement that "the offender is a custodian and does have a right to be in the areas surrounding the scene of the theft (outside of the office) but has no legal right to be inside the office where the laptop was secured."  (Exh. B.)

20.     At no time did any individual make a statement that Plaintiff did not have the legal right to be inside the office.  (Exh. D.)

21.     The only statement that was made by the complaining witness, Solski, in which she said that it was irregular and/or unusual that Plaintiff would have been inside the office at the time Solski claimed he was there.  (Exh. D.)

22.     Defendant Warrender did nothing to verify whether the Plaintiff had a right to be in the office, and did no investigation to determine whether the Plaintiff actually was inside the office, other than based upon the word of Solski.  (Exh. F, deposition of Warrender, p. 16.)

23.     The video surveillance supplied by Plaintiff in this case does not depict Plaintiff actually entering in the office.  (Exh. A.)

268A

## IV.    Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law." An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In Anderson, the court explained that the judge's role when adjudicating a motion for summary judgment "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In making this determination, a court is to draw all reasonable inferences in favor of the non-moving party. See Berner Int'l Corp. v. Mars Sales Co., 987 F.2d 975, 978 (3d Cir. 1993.) In other words, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celetox Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## V.    Legal Argument

### A.    Defendant Shawn Warrender Arrested Plaintiff without Probable Cause.

The determination of whether an officer had probable cause to arrest a citizen involves a mixed question of fact (the historical events that occurred) and law (whether the facts, viewed from the standpoint of an objectively reasonable officer, amounts to probable cause). Gardenhire v. Schubert, 205 F.3d 303 (C.A.6 2000). In general, the existence of probable cause in a § 1983 action is a jury question. Id.; Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782 (C.A.3 2000).

On summary judgment on a claim that a police officer knowingly or recklessly gave false information to obtain an arrest warrant or purposefully omitted exculpatory information, i.e.,

269A

lacked probable cause to arrest, the District Court must disregard all properly contested statements in the affidavit, include relevant exculpatory evidence left out of the affidavit, and then determine whether the warrant would establish probable cause without the allegedly false information. Freeman v. County of Bexar, 210 F.3d 550 (5th Cir. 2000). Then, Plaintiff must demonstrate an issue of material fact as to whether a reasonably competent officer, possessing all the information defendants had when the affidavit was sworn to, could have concluded that a warrant should issue. Id. The court must look at the totality of the circumstances as they appear to defendants at the time to determine whether probable cause exists. Id. Omissions are made with reckless disregard if an officer withholds the fact that any reasonable person would know was the kind of things that the judge would wish to know. Wilson v. Russo, 212 F.3d 781 (3rd Cir. 2000).

Assertions can be made with reckless disregard for the truth even if they involve minor details – recklessness is determined not by the relevance of the information but by the willingness to affirmatively distort the truth. Id. An assertion is made with reckless disregard for the truth when, viewing all the evidence, the affiant must have had serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of what he reported. Id. To determine "materiality" the Court must excise the offending inaccuracies and insert the facts recklessly omitted and then decide whether the "corrected" warrant affidavit would establish probable cause. Id.

A Fourth Amendment violation may be established if a plaintiff can show that officers intentionally or recklessly omitted material, exculpatory facts from information presented to a magistrate. Burke v. Town of Walpole, 405 F.3d 66 (1st Cir. 2005). Recklessness may be inferred where the omitted information was critical to the probable cause determination. The law

270A

has clearly established that a police officer has a constitutional duty to disclose exculpatory evidence in seeking warrants based on probable cause, and an officer who failed to do so was not entitled to qualified immunity. Id.

An officer is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing alone) suggests that probable cause exists. Court must analyze the weight of the all evidence in determining whether probable cause to arrest was present. Kuehl v. Burtis, 173 F.3d 646 (C.A.8 1999). An officer was not entitled to qualified immunity where he ignored plainly exculpatory evidence where there was no evidence of exigent circumstances. Id. In attempting to discover reliable information that would constitute a probable cause to believe a suspect has committed a crime, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. Gardenhire, supra.

Here, there are three notable omissions from Defendant Warrender's affidavit of probable cause. First, as an initial matter, Defendant Warrender never produced the video surveillance which was nearly the entire basis for his affidavit of probable cause. The Court was never able to review the video surveillance and based the arrest warrant solely on Warrender's erroneous interpretation of the video surveillance. Had the criminal trial court been able to review the video surveillance at the time that Defendant Warrender requested an arrest affidavit, the affidavit would never have issued as there is simply no visual evidence contained in the affidavit to suggest criminal activity on the part of the Plaintiff. Specifically, nothing contained in the video surveillance actually depicts Plaintiff stealing Solski's laptop.

Additionally, there are several false statements contained in the affidavit of probable cause. As set forth above, and as set forth in the affidavit of probable cause, Defendant Warrender swore that "additional surveillance shows the offender placing the storage box in the

271A

back of a pickup truck and that truck flees the parking area." (Exh. B.) The surveillance videos
supplied in this case does not depict Plaintiff placing a storage box in the back of a pickup truck.
(Exh. A.) Further, Defendant swore that, "the offenders is a custodian and does have a right to
be in the areas surrounding the scene of the theft (outside of the office) but has no legal right to
be inside the office where the laptop was secured." At no time did any individual make a
statement that Plaintiff did not have the legal right to be inside the office. The only statement
that was made by the complaining witness, Solski, in which she said that it was irregular and/or
unusual that Plaintiff would have been inside the office at the time Solski claimed he was there.
Finally, Defendant Warrender did nothing to verify whether the Plaintiff had a right to be in the
office, and did no investigation to determine whether the Plaintiff actually was inside the office,
other than based upon the word of Solski. (Exh. F, deposition of Warrender, p. 16.)

The omission of exculpatory evidence (the video surveillance) from the affidavit of
probable cause, and the presence of false statements contained in the affidavit of probable cause
certainly create a material issue of fact as to whether Defendant Warrender lacked probable
cause to arrest the Plaintiff.

**B.      Defendant Shawn Warrender is Not Entitled to Qualified Immunity.**

In recognition of the complex task performed by law enforcement officials, the Supreme
Court has held that officers are entitled to qualified immunity from civil liability under 42 U.S.C.
§ 1983. See Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In
Harlow, the Court stated that "government officials performing discretionary functions, generally
are shielded from liability for civil damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a reasonable person would have known."
Id. at 818, 102 S.Ct. at 2738. The Supreme Court's decisions place a special emphasis on the

272A

reasonableness of an officer's actions, requiring courts to make an objective inquiry into the facts facing the officer at the time of the alleged improper act.  See Harlow, 457 U.S. at 815-19, 102 S.Ct. at 2736-39.  The objective nature of the inquiry is designed both to limit exhaustive inquiries into an individual officer's subjective state of mind, id. at 816-17, 107 S.Ct. at 3034-38, and to safeguard the general interests of law enforcement from the intrusions of extended litigation, see Hunter v. Bryant, 502 U.S. 224, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991).

As an accommodation of competing values, qualified immunity strikes a balance by permitting a plaintiff to recover for constitutional violations where the defendant officer was plainly incompetent or knowingly violated the law, while immunizing an officer who made a reasonable mistake about the legal constraints on his actions.  Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir.2007).  The analysis begins with the threshold qualified immunity question to determine whether a jury could find that Plaintiff was deprived of a constitutional right.

Further, a decision at the summary judgment stage on qualified immunity will be premature when there are unresolved issues of historical fact relevant to the immunity analysis. The existence of disputed historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue.  Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002). Conflicting statements, by themselves, create a genuine dispute of material fact and of credibility that can only be resolved by the jury.  Wallis by and through Wallis v. Spencer, 193 F.3d 1054 (9th Cir. 1999).

Here, the qualified immunity analysis hinges on whether the officer in question has violated the Plaintiff's constitutional rights, and as set forth in subsection A infra, because Defendant Warrender arrested the Plaintiff without probable cause, he is not entitled to any qualified immunity.  See, generally, Mitchell v. Obenski, 134 Fed.Appx. 548 (C.A.3 Pa.2005).

273A

## VI.    Conclusion

WHEREFORE, Plaintiff respectfully requests this Honorable Court deny the Defendants'

Motion for Summary Judgment.

**WEISBERG LAW, P.C.**

/s/ Graham F. Baird, Esquire
Matthew B. Weisberg, Esquire
Graham F. Baird, Esquire
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Anthony Pritchett | : | |
| 906 Rockland Street | : | |
| Philadelphia, PA 19141 | : | |
| Plaintiff, | : | CIVIL ACTION NO.: 11-4682 |
| vi. | : | |
| | : | |
| City of Philadelphia, et al. | : | |
| 1515 Arch Street | : | |
| Philadelphia, PA 19102 | : | JURY TRIAL DEMAND |
| Defendants. | : | |

### CERTIFICATE OF SERVICE

I, Graham F. Baird, Esquire, hereby certify that on this 16th day of July, 2012, a true and

correct copy of the foregoing Plaintiff's Opposition to Defendants' Motion for Summary

Judgment and Memorandum of Law in support thereof was served via ECF upon the following

parties:

Niya L. Blackwell, Esq.
City of Philadelphia Law Dept.
1515 Arch Street
Philadelphia, PA 19107


WEISBERG LAW, P.C.


/s/ Graham F. Baird, Esquire
Matthew B. Weisberg, Esquire
Graham F. Baird, Esquire
Attorneys for Plaintiffs

275A

**Commonwealth of Pennsylvania**
**County of Philadelphia**



**AFFIDAVIT OF PROBABLE CAUSE**

Copy

| | Police Incident Number (DC#): | Warrant Control Number: |
|---|---|---|
| | 1009027767 | AFF-0004715-2010 |

DET SHAWN WARRENDER SHAWN 8130 Central Detective Division

**PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:**

1. That after investigation I have probable cause to believe that a warrant of arrest should be issued for:

Defendant Name: **ANTHONY PRITCHETT**                Gender: **M**   Race: **Black**

Alias:

DOB: <u>10/21/1961</u> Pid:

Address: 913 Chester AV Yeadon, PA 19050

**CRIMES:**

| DC Number | Code | Grade | Description | Count |
|---|---|---|---|---|
| 1009027767 | CC3921 | M1 | THEFT-UNLWF TAKING | 1 |
| | CC3925 | M1 | THEFT-RSP | 1 |
| | CC0903 | M1 | CRIMINAL CONSPIRACY | 1 |

2. That the facts tending to establish the grounds for the issuance of the warrant of arrest and the probable cause for my belief are as follows:     ( Note: if extended text exists, see following page(s))

1009027767   On 6/25/2010 at 8:45am inside Central Detectives the complainant did make the following statement:
On 6/9/2010 at 3:15pm at 1600 JKF Blvd, Concourse level, the complainant reported to work to find her HP laptop valued at $ 1200.00 along with twenty employee files missing from her work station. The laptop was removed from a lock file cabinet. There was a dent in the locking mechanism allowing access, and the immediate surrounding area was in disarray. She immediately viewed security cameras and witnessed an employee who has worked for the company the last two years enter the office where the laptop was located and then exit with a storage box and proceed to the loading dock. According to the complainant's statement, the offender has no right to be this area and is not allowed on the loading dock during normal business hours, a direct violation of company policy. Additional surveillance shows the offender placing the storage box in the back of a pickup truck and that truck flees the parking area. No tag was captured. The offender then returns to work for twenty more minutes, leaves and never returns back to work. The offender still had several hours left to the completion of his shift. The identity of the second male is unknown.
The offender is a custodian and does have a right to be in the areas surrounding the scene of the theft (outside of the office) but has no legal right to be inside the office where the laptop was secured.
The affiant believes that sufficient probable cause exists for issuance of an arrest warrant for the offender for theft and RSP.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF AND THAT PROBABLE CAUSE TO ARREST EXISTS.

Affiant: DET SHAWN WARRENDER SHAWN 8130 Central Detective Division

Sworn to or affirmed and subscribed before me this 13 day of July , 2010

_____
Affiant Signature

_____
Issuing Authority Signature

ANTHONY PRITCHETT                    Page 1 of 1 Page                    Printed: 07/13/2010 11:35 AM

276A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

NO. 11-4682

| | | |
|---|---|---|
| ANTHONY D. PRITCHETT, | ) | DEPOSITION UPON |
| | ) | |
| Plaintiff, | ) | ORAL EXAMINATION |
| | ) | |
| - vs - | ) | OF |
| | ) | |
| CITY OF PHILADELPHIA, | ) | |
| | ) | ANTHONY D. |
| Defendant. | ) | PRITCHETT |
| - - - - - - - - - - - | ) | |
| | ) | |

TRANSCRIPT OF DEPOSITION,
taken by and before CHRISTOPHER M. PILOT,
Professional Reporter and Notary Public, at
the CITY OF PHILADELPHIA, 1515 Arch Street,
15th Floor, Philadelphia, Pennsylvania, on
Thursday, January 5, 2012, commencing at
11:05 a.m.

- - -

ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA 19103

277A

ANTHONY D. PRITCHETT

2

A P P E A R A N C E S:


            WEISBERG LAW, P.C.
            BY:  GRAHAM F. BAIRD, ESQUIRE
              7 South Morton Avenue
              Morton, Pennsylvania  19070
                  Attorney for the Plaintiff

            CITY OF PHILADELPHIA
            BY:  NIYA BLACKWELL, ESQUIRE
              The Law Department
              1515 Arch Street
              15th Floor
              Philadelphia, Pennsylvania  19102
                  Attorney for the Defendant




    ALSO PRESENT:
    Shawn D. Warrender

278A

ANTHONY D. PRITCHETT

3

```
 1                    I N D E X

 2

 3   WITNESS                                    PAGE

 4

 5   ANTHONY D. PRITCHETT

 6

 7              By:  Ms. Blackwell              4

 8

 9

10

11                     -  -  -

12

13

14              E X H I B I T S

15                              PAGE     PAGE

16   NUMBER       DESCRIPTION     MARKED   ATTACHED

17

18

19

20         (No Exhibits Were Marked)

21

22

23

24
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

279A

ANTHONY D. PRITCHETT

4

```
 1                    (By agreement of counsel, the

 2              signing, sealing, filing, and certification

 3              of the transcript have been waived; and all

 4              objections, except as to the form of the

 5              question, have been reserved until the time

 6              of trial.)

 7

 8                    ANTHONY D. PRITCHETT, having been

 9              duly sworn, was examined and testified as

10              follows:

11

12    BY MS. BLACKWELL:

13    Q.      Good morning, Mr. Pritchett -- is it

14    Pritchett?

15    A.      Pritchett.

16    Q.      Pritchett.  Okay.

17            Mr. Pritchett, my name is Niya Blackwell,

18    and I represent the defendant, Detective Warrender,

19    in this matter, and I'm going to take your

20    deposition today.

21            First, I would like to ask, have you ever

22    had your deposition taken before?

23    A.      Yes.

24    Q.      Do you know when that was?
```

280A

ANTHONY D. PRITCHETT

5

1    A.        I don't remember the exact day.  It was

2    last month.

3    Q.        You had a deposition taken last month?

4    A.        Well, actually, I didn't go in the room.

5    It was down on --

6    Q.        Oh.  That actually was not a deposition.

7    That was actually a pretrial, a conflict, a hearing

8    between the attorneys.

9    A.        Oh, okay.  I'm sorry.

10   Q.        That's okay.

11             Well, I'll assume that you haven't had a

12   deposition taken before, and I'll explain what that

13   is.

14   A.        Okay.

15   Q.        You're having your deposition taken now,

16   and I will ask you a series of questions.

17             You are under oath, and the court reporter,

18   as you see, will be taking down every word that I

19   say and every word that you say.  For that reason,

20   you need to speak as opposed to using gestures, so

21   verbally state your answers as opposed to using your

22   hands as you see me doing now --

23   A.        Okay.

24   Q.        -- or nodding uh-huh or huh-uh because the

281 A

ANTHONY D. PRITCHETT

6

1    court reporter can't take down gestures.

2            It's also important that we not speak over

3    each other because he's taking down everything that

4    we say, and it's impossible for him to take down

5    conversations that are crossing or overlapping.

6            If for any reason you need to take a break,

7    I ask that if I'm in the middle of asking you a

8    question you allow me to finish the question.

9            If you're in the middle of giving an

10   answer, and you feel like you need to take a break,

11   I ask that you finish the answer, and then let me

12   know that you need to take a break, speak with your

13   attorney, and we'll go off the record?

14           Are you under the influence of any kind of

15   medication today?

16   A.      No.

17   Q.      Have you had any alcohol in the past 24

18   hours?

19   A.      No.

20   Q.      Have you had any kind of drugs in the last

21   24 hours?

22   A.      No.

23   Q.      Is there any reason that you believe that

24   you can't testify truthfully today?

282A

ANTHONY D. PRITCHETT

7

```
 1    A.        No.
 2    Q.        Okay, we'll begin.
 3              You've already stated your name for the
 4    record, but have you gone by any other name?
 5    A.        No.
 6    Q.        No nickname or anything like that?
 7    A.        No.
 8    Q.        What's your present address?
 9    A.        906 West Rockland Street, Philadelphia,
10    Pennsylvania  19141.
11    Q.        And how many years have you been living on
12    Rockland Street?
13    A.        Approximately for four years.
14    Q.        Okay.  And what's your marital status?
15    A.        Single -- well, I'm divorced.
16    Q.        You're divorced.
17              How many years have you been divorced?
18    A.        For 14 years.
19    Q.        Okay.  Do you have any children?
20    A.        Yes.
21    Q.        How many children?
22    A.        Two.
23    Q.        Okay.  The ages?
24    A.        My oldest son is 22, and my younger son is
```

283A

ANTHONY D. PRITCHETT

8

```
 1    15.

 2    Q.        Okay.  And are you presently employed?

 3    A.        No.

 4    Q.        Okay.  When was your -- when was your most

 5    recent date of employment?

 6    A.        With Arthur Jackson until this date of

 7    arrest.

 8    Q.        Okay.  So the last time you were employed

 9    was the date of your arrest?

10    A.        Yes.

11    Q.        And what date was that?

12    A.        I was arrested July 28th, 2010.

13              I was let go approximately two weeks before

14    that.

15    Q.        Okay.  Now, I'm going to -- well, I'll get

16    back to that.

17              Now, what was the highest grade that you

18    completed in school?

19    A.        I graduated 12th.

20    Q.        Okay.  And what high school?

21    A.        Oley High.

22    Q.        Oley High.  Okay.

23              And after graduating from Oley High, what

24    was your first job?
```

284A

ANTHONY D. PRITCHETT

9

```
 1   A.        The Marine Corps.

 2   Q.        And how long were you in there?

 3   A.        Ten years.

 4   Q.        And why did you leave the service?

 5   A.        After leaving Beirut, I wanted to get out.

 6   Q.        Okay.  What kind of discharge was it?

 7   A.        Honorable.

 8   Q.        Did you hold any other kind of job after

 9   that?

10   A.        Yes.  I did office furniture -- modular

11   furniture.  I did that for approximately -- about 14

12   years.

13   Q.        And the name of the company?

14   A.        It was many.

15   Q.        Many companies?

16   A.        Yes.

17   Q.        Well, just to the best of your recollection

18   name the companies.

19   A.        Well, the last one was Architectural

20   Installations of Atlanta.

21   Q.        And from what year?

22   A.        '90 to maybe '98.

23   Q.        Okay.  And prior to that?

24   A.        Well, I kind of broke off, on and off
```

285A

ANTHONY D. PRITCHETT

10

```
 1    because the company went -- had, you know, a bunch
 2    of problems, so I went to different companies.  But
 3    I don't know all the names of the company.
 4    Q.      Okay.  I'm going to now direct your
 5    attention to the incident of June 9th, 2010.
 6            Who were you employed with on June 9th,
 7    2010?
 8    A.      Arthur Jackson.
 9    Q.      Okay.  And what kind of company is Arthur
10    Jackson?
11    A.      It's a cleaning company.
12    Q.      What kind of cleaning?
13    A.      They -- we clean office buildings.
14    Q.      Okay.  And how long were you employed with
15    Arthur Jackson?
16    A.      Almost four years.
17    Q.      And what was your position?
18    A.      Day porter -- lead -- well, leadman for day
19    porters.
20    Q.      You said leadman?
21    A.      Yes.
22    Q.      What does that mean?
23    A.      Well, there's only three of us.
24            We have one male under me and one female.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

286A

ANTHONY D. PRITCHETT

```
 1    She does the ladies' restrooms, and we -- we all
 2    have our certain details that we do, but I -- I
 3    basically -- I just run -- run only two people.
 4    Q.      Okay.  Did you supervise those two people?
 5    A.      Yes.
 6    Q.      Were you considered their supervisor?
 7    A.      Yes.
 8    Q.      And they reported to you?
 9    A.      Yes.
10    Q.      And you gave them their assignments?
11    A.      Yes.
12    Q.      Okay.  And so there were just two people
13    who you supervised?
14    A.      Right.
15    Q.      All right.  What were your hours?
16    A.      7 -- they started at 7 to 3, then they
17    changed it from 7:30 to 3:30.
18    Q.      7:30 a.m. --
19    A.      Yes.
20    Q.      -- to 3:30 a.m.?
21            On June 9th, 2010, what were the hours?
22    A.      I got off at 3:30.  It was 7 to 3:30.
23    Q.      7 to 3:30?
24    A.      Yes.
```

287A

ANTHONY D. PRITCHETT

12

```
 1   Q.        Now, you mentioned -- what was your last

 2   day of employment at Arthur Jackson?

 3   A.        I believe it was June 9th.

 4   Q.        That was June 9th?

 5   A.        Yes.

 6   Q.        But were you suspended prior to that or

 7   were you suspended on June 9th?

 8   A.        I was suspended June 9th, right.

 9             I wasn't terminated, I wasn't fired, I was

10   suspended.

11   Q.        You were just suspended on June 9th.

12             All right.  And what were you suspended

13   for?

14   A.        Leaving ten minutes earlier.

15   Q.        Okay.  So what time were you supposed to

16   leave?

17   A.        3:30.

18   Q.        3:30.  That was the time?

19             Do you clock out?  Do you use a clock to

20   clock out or any kind of a --

21   A.        Yes, I clock out.

22   Q.        And you left at -- you left ten minutes

23   prior to that?

24   A.        3:20.
```

288A

ANTHONY D. PRITCHETT

13

1   Q.        Okay.  Who did you report to at that time

2   in terms of -- who was your supervisor?

3   A.        Sofie's my supervisor, but she doesn't come

4   in until 3:30.

5   Q.        Okay.  Sofie.

6             What was her last name?

7   A.        Solski, I think.

8   Q.        Okay.  And she was your immediate

9   supervisor?

10  A.        Yes.

11  Q.        And is she the person that suspended you?

12  A.        Well, actually, I got a phone call from

13  the -- what do you call it?

14            It's the representative from the union.

15  She works actually with the night crew, her name's

16  Barbara.  She's the one that called me and told me I

17  was being suspended for five days?

18  Q.        And she called you prior to June 9th?

19  A.        No, on June 9th.

20  Q.        On June 9th.

21            See, I'm trying to get out when you were

22  notified that -- she called you at the job on June

23  9th?

24  A.        No.  She called me at home.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

289A

ANTHONY D. PRITCHETT

14

```
 1    Q.        On June 9th?

 2    A.        Yeah.

 3    Q.        Okay.  After you clocked out?

 4    A.        Yeah.  After I clocked out I went home --

 5    Q.        Okay.

 6    A.        -- that's when I got -- I got the phone

 7    call maybe 4:30.

 8    Q.        And so the day that you clocked out ten

 9    minutes early, that was June 9th?

10    A.        Yes.

11    Q.        Okay.  And so you didn't return -- you were

12    not supposed to return to the building.

13              Incidentally, where is the building from

14    where you were working?

15    A.        1500 JFK.

16    Q.        1500?

17    A.        Yeah, 4 Penn Center.

18    Q.        Okay.

19    A.        Actually, no, 1600 JFK.

20    Q.        Okay.  Were you given any kind of pink slip

21    on that day or any kind of --

22    A.        Nothing.

23    Q.        Okay.  You were just told by a union rep

24    once you got home --
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

290A

ANTHONY D. PRITCHETT

15

```
 1   A.        Right.

 2   Q.        -- that you should not return?

 3   A.        No.  She told me I'm going to be suspended

 4   for five days.

 5             I was not told not to come back so I went

 6   to work that morning, and that's when I was told I

 7   wasn't allowed back in the building because of these

 8   charges.

 9   Q.        Okay.  You went to work the next morning?

10   A.        Yes.

11   Q.        That would have been June 10th?

12   A.        Yes.

13   Q.        And so you showed up at work on June 10th

14   as normal?

15   A.        Yes.

16   Q.        Did you clock in?

17   A.        No.  I wasn't allowed in the building.

18   Q.        Okay.  Who told you -- please tell me who

19   you met first at the building on June 10th with.

20   A.        Well, the security guard.

21   Q.        Okay.

22   A.        But the revolving doors weren't open yet,

23   nothing's opened.

24             I mean, I could see him through the glass,
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

291A

ANTHONY D. PRITCHETT

16

1    and when I knocked -- I always knock because I ride

2    my bike to work, and he was like, no, you can't come

3    in.

4    Q.        What was that security guard's name?

5    A.        Sadeek.

6    Q.        Do you know his last name?

7    A.        No.

8    Q.        Okay.  And what's Sadeek's race?

9    A.        Black.

10   Q.        He's African American --

11   A.        Yeah.

12   Q.        He's African American?

13   A.        Yes.

14   Q.        And he was a security guard?

15   A.        Yeah.  He's the third shift security guard.

16   Q.        Do you know what company he works for?

17   A.        No.

18   Q.        Okay.  What did you do when Sadeek told you

19   that you couldn't enter the building?

20   A.        I got back on my bike and went home.

21   Q.        Okay.  And so you didn't enter the building

22   that day at all?

23   A.        No, because like I said, I wasn't allowed

24   in the building.

292A

ANTHONY D. PRITCHETT

17

```
 1   Q.        Okay.  Did you, at any time, return to 1600

 2   JFK?

 3   A.        No.  Later on that day I went to the union

 4   hall to see what was going on.

 5   Q.        Okay.  And where is the union hall?

 6   A.        It's at 16th and Chestnut.

 7   Q.        Okay.  And so that's also in Center City?

 8   A.        Yes.  That's where he arrested me.

 9   Q.        Okay.  So when you went to the union hall,

10   who did you see?

11   A.        Her name is -- I saw it -- the union rep --

12   her name is -- I can't remember her name.

13   Q.        You don't know her name?

14   A.        I have everything written down.  I

15   didn't -- I didn't bring it.

16                     MS. BLACKWELL:  Okay.  I'm going

17             to make a request for the -- who he spoke

18             to at the union hall.

19                     MR. BAIRD:  Sure.  We'll produce

20             that.

21   BY MS. BLACKWELL:

22   Q.        And that would be -- she was your union

23   representative?

24   A.        Yes.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

293A

ANTHONY D. PRITCHETT

18

```
 1   Q.        Okay.  Did you file any kind of grievance
 2   with her?
 3   A.        Yes.
 4   Q.        Okay.  Did you have any kind of hearing on
 5   that grievance?
 6   A.        That's the day I was arrested.
 7   Q.        Okay.  What day?  Was that June 10th?
 8   A.        No, July 28th.
 9   Q.        July 28th.
10             And so between June 10th and July 28th, did
11   you return to the building where you were working?
12   A.        No.
13   Q.        Between June 10th and July 28th -- or prior
14   to the 28th, did you go to the union hall at any
15   time?
16   A.        No.  Just -- well, actually I went before.
17             I was supposed to have one hearing, nobody
18   showed up, and then this second hearing is when this
19   took place.
20   Q.        Okay.  So the second hearing, that was June
21   28th?
22   A.        Yes.
23   Q.        And you arrived at the union hall?
24   A.        Yes.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

294A

ANTHONY D. PRITCHETT

19

1    Q.        And what happened when you arrived at the
2    union hall?
3    A.        I sat down with the union rep.
4              Nobody was there, so we were waiting and
5    waiting.  They finally showed up maybe 30 minutes
6    late.  They all sat down and --
7    Q.        Who arrived 30 minutes late?
8    A.        Sofie, Charles and -- Charlene, she's the
9    secretary for the building manager, Sofie and
10   Charles.  He's a manager for Arthur Jackson --
11   Q.        Okay.
12   A.        -- and they set up the laptop, and they
13   were trying to play the videotape and supposedly it
14   wouldn't play, and that's when these two guys came
15   and told me I was under arrest.
16   Q.        So let's go back.
17             You were suspended for clocking out too
18   early --
19   A.        Yes.
20   Q.        -- ten minutes early.  That was your
21   official suspension?
22   A.        Yes.
23   Q.        And you were notified from the union that
24   you were to be suspended for five days?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

295A

ANTHONY D. PRITCHETT

20

```
 1   A.        No, the union rep.

 2   Q.        The union rep?

 3   A.        Right.  She called me.  She says, why did

 4   you leave early?  I said, what's the big deal, I

 5   never left early before.

 6   Q.        Did you leave early?

 7   A.        Yes, I did.

 8   Q.        Okay.

 9   A.        Yeah.  I left ten minutes earlier.

10   Q.        Okay.  And why did you leave ten minutes

11   early?

12   A.        Because -- it got to a point where Sofie --

13   I couldn't leave at 3:30 because she wants to sit

14   down and talk.  I always left a half an hour later

15   than I was supposed to leave.  And this particular

16   day I didn't want to talk.

17   Q.        Okay.  Sofie is your supervisor?

18   A.        Yes.

19   Q.        And she's your immediate supervisor?

20   A.        Yes.

21   Q.        And you said you didn't want to talk to her

22   and that's why you left early?

23   A.        Yes.

24   Q.        What do you mean when you say you didn't
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

296A

ANTHONY D. PRITCHETT

21

```
 1    want to talk to your supervisor?

 2    A.        I was kind of like her -- like her

 3    counselor.

 4              She wanted to talk about her problems and

 5    all this and all that.  This day I wanted to go

 6    home.  I just wanted to leave and go home.

 7    Q.        Okay.  When you say you used to talk to her

 8    and you were like her counselor, did you often have

 9    conversations once you clocked out with your

10    supervisor?

11    A.        Every day.

12    Q.        Every day.

13              How many days a week did you work?

14    A.        Five.

15    Q.        Was that Monday through Friday?

16    A.        Yes.

17    Q.        Okay.  And how often would you say, if you

18    can -- if you can tell me approximately how many

19    times a week would you stay over the time?

20    A.        Every day.

21    Q.        Every day.

22              But for how long?

23    A.        Average, 15 minutes or more.

24    Q.        Okay.  How long of a period of time did
```

297A

ANTHONY D. PRITCHETT

22

1    this last where you would stay after work and speak

2    with Sofie?

3    A.        My whole time I was at the building.

4    Q.        I'm not sure how long you were -- I don't

5    know how long you were at the building.

6    A.        I was at the building for approximately

7    three years.

8    Q.        Okay.  And so when did it begin?  When did

9    this kind of rapport begin with Sofie?

10   A.        After we got to know each other -- maybe

11   six months after we were in the building, she made

12   me leadman because the other leadman, he died, and

13   she made me leadman, and then we just built this

14   sort of relationship.

15           And when she went to inspect the building,

16   she always wanted me to tag along with her, and then

17   it just went from there.  And then she always wanted

18   to talk, and then she had my hours changed.

19           I went to the building manager.  I

20   requested my hours to be changed back because I

21   didn't want to be there 3:30 when she came in

22   because she's always -- no, don't leave.  Can we

23   talk?

24   Q.        Did you feel that you had to stay and talk

298A

ANTHONY D. PRITCHETT

23

```
 1    with her because of your position?

 2    A.       No.

 3    Q.       So you --

 4    A.       Because everything -- there was never no

 5    complaints.  We didn't have to talk.

 6    Q.       Okay.  But you stayed anyway to talk?

 7    A.       Yes.

 8    Q.       So it was voluntary?

 9    A.       Yes.

10    Q.       You didn't feel as though you had to

11    because she was your supervisor?

12    A.       No.  I know I didn't have to, but.

13    Q.       And you didn't feel as though your job was

14    in jeopardy if you did not stay and talk to her?

15    A.       No.

16    Q.       Okay.  Now, did you socialize with Sofie

17    outside of work?

18    A.       No.  Only on Thursdays -- no.  Wednesdays

19    she came in early at lunchtime.

20             We ate lunch together.

21    Q.       So you would go out to lunch on Wednesdays?

22    A.       Yes.

23    Q.       This was every Wednesday --

24    A.       Yeah.  That was the only day she came in
```

299A

ANTHONY D. PRITCHETT

24

```
 1    early was at twelve o'clock.

 2    Q.        Every Wednesday?

 3    A.        Yes.

 4    Q.        For how long of a period of time?

 5    A.        Every -- every Wednesday.

 6    Q.        For the entire three or four years that you

 7    worked --

 8    A.        Yes, that was her day for building

 9    inspection.

10    Q.        Did anyone else go to lunch with you and

11    Sofie?

12    A.        Yes.

13    Q.        On those Wednesdays?

14    A.        Yes.

15    Q.        Who else went to lunch with you?

16    A.        The -- both the -- both the -- my -- my

17    coworkers.

18    Q.        So it was four of you at lunch?

19    A.        Yes.

20    Q.        And this took place every Wednesday?

21    A.        Every Wednesday.

22    Q.        What was the name of the other coworkers,

23    please?

24    A.        All right.  Bill -- well, Bill's gone now.
```

300 A

ANTHONY D. PRITCHETT

25

1    Q.       Bill, does he have a last name?

2    A.       I don't remember his last name.  He passed

3    away about --

4    Q.       And he's passed away?

5    A.       About -- at least two years ago.

6    Q.       And the other person's name?

7    A.       The other one's name is -- she still works

8    there now.  I can't remember her name right now.

9    Q.       But she used to attend lunch for three

10   years every Wednesday with you?

11   A.       Yes.

12   Q.       And you were her supervisor?

13   A.       Yes.

14   Q.       But you don't recall her name?

15   A.       It's -- can I look at my phone?

16   Q.       Yeah, you may.

17                MS. BLACKWELL:  We can go off the

18           record for now.

19                (At this time, a discussion was

20           held off the record.)

21                MS. BLACKWELL:  Okay.  We're

22           going to go back on the record.

23                THE WITNESS:  Okay.

24                My other coworker's name is Greg,

301A

ANTHONY D. PRITCHETT

26

```
 1              that was --

 2    BY MS. BLACKWELL:

 3    Q.        This was the gentleman that passed away?

 4    A.        No.  This is the new guy.

 5    Q.        Okay.

 6    A.        We all, you know -- after Bill passed --

 7    okay, we all ate -- he ate lunch with us too.

 8    Q.        Okay.

 9    A.        And the female name is Rosalba.

10    Q.        And was this weekly luncheon considered,

11    you know, the company taking the workers to lunch or

12    was it personal?

13    A.        No, because when she would come in during

14    lunchtime, she would offer to buy us lunch and --

15    actually, we took turns buying each other lunch, so

16    we all would ate together.

17    Q.        So sometimes you buy Sofie lunch as well?

18    A.        Yes.

19    Q.        And the others?

20    A.        Yes.

21    Q.        And this went on for a period of three to

22    four years?

23    A.        Yes.

24    Q.        Outside of work, did you talk to Sofie over
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

302A

ANTHONY D. PRITCHETT

27

```
 1    the phone?

 2    A.        No.

 3    Q.        Did you date Sofie at all?

 4    A.        No.

 5    Q.        So the relationship was not romantic?

 6    A.        No.

 7    Q.        Are you sure about that?

 8    A.        Yes.

 9    Q.        Okay.  Do you believe that Sofie considered

10    it romantic?

11    A.        I believe she wanted it to be.

12    Q.        And what makes you say that?

13    A.        Well, because she always wanted to be

14    around me, and she had my hours changed.  And that

15    was her doing.

16    Q.        She had your hours changed to a time where

17    she would see you more?

18    A.        Yeah.

19    Q.        Okay.

20    A.        And I complained to the building manager.

21              You can question him, I went to him.  I

22    said, please get my hours changed back.

23    Q.        When did you request for your hours to be

24    changed?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

303A

ANTHONY D. PRITCHETT

28

```
 1   A.        Maybe after my second year there.

 2   Q.        And what was that building manager's name?

 3   A.        Mike.

 4   Q.        Do you know his last name?

 5   A.        Zolinski, I think.

 6   Q.        And what happened with your request?

 7   A.        He actually had it changed.

 8   Q.        And --

 9   A.        It only lasted two weeks.

10   Q.        -- Sofie changed them back?

11   A.        Yes.

12   Q.        Now, during this period of time, did you

13   still continue to stay after work and talk with

14   Sofie?

15   A.        No, because I didn't see her.

16   Q.        Okay.

17   A.        I would leave at 3.

18   Q.        You left at 3.  Okay.

19   A.        She wouldn't see me.  She had a real

20   problem with that.

21   Q.        How long did the -- the shift changed to

22   three o'clock; how long did that last?

23   A.        Just two weeks I believe it was.

24   Q.        Okay.  And then you were returned to 3:30?
```

304A

ANTHONY D. PRITCHETT

1    A.        Yes.

2    Q.        And that lasted for the duration of the

3    time that you worked there?

4    A.        Yes.

5    Q.        Up until the time when you were suspended

6    on June 9th, had you still been staying after to

7    speak with Sofie every day?

8    A.        After June 9th?

9    Q.        No.  I'm sorry, prior to June 9th.

10   A.        Oh, yes.

11   Q.        Even up until that day -- no, you didn't

12   see her on that day, but even up until --

13   A.        Yes.

14   Q.        -- June 8th you were still staying after

15   every single day?

16   A.        Every single day.

17   Q.        Did you ever complain to anyone else that

18   you didn't want to stay?

19   A.        Just the building manager, Mike.

20   Q.        And that was two years prior when you

21   wanted your shift changed.

22             Did you complain after that?

23   A.        Yes, I did.

24   Q.        To the building manager?

305A

ANTHONY D. PRITCHETT

30

```
1    A.        Yes.

2    Q.        How often?

3    A.        A couple days a week.

4              He kept telling me he would see what he

5    could do.

6    Q.        Did you tell him why you wanted your hours

7    changed?

8    A.        Yes.

9    Q.        What did you say?

10   A.        I told him I was tired of being her

11   counselor, and you know, listening to her problems.

12   I was sick of it.

13   Q.        And what did he say?

14   A.        He said he will see what he can do.

15             He put me on pressure -- pressure washing.

16   I was coming -- I was coming actually at

17   six o'clock, pressure washing, but once I was done

18   with that, then everything went back as normal, and

19   I didn't like that.

20             It went back to, you know, she wants to

21   talk about her problems.  And I just -- every time I

22   saw -- I mean, I didn't go to him all the time, but

23   when I would see him in the hallway, wherever --

24   because he used to always talk to me.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

306A

ANTHONY D. PRITCHETT

31

```
 1              We went on -- we went on bike events
 2     together -- we went on four bike -- me and Mike were
 3     real good friends.
 4     Q.       And this was the building manager?
 5     A.       Yes.
 6     Q.       Did you ever make any of these requests in
 7     writing?
 8     A.       No.
 9     Q.       Did you ever make a request or speak to
10     your union representative about your hours being
11     changed?
12     A.       No.
13     Q.       You never requested it of the union?
14     A.       No.
15     Q.       Okay.  Why not?
16     A.       There's nothing the union could do.
17     Q.       Nothing the union could do about your
18     hours?
19     A.       No.
20     Q.       Okay.  Now, prior to June 9th, had you ever
21     been suspended before?
22     A.       No.
23     Q.       Have you ever come in late before?
24     A.       No.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

307A

ANTHONY D. PRITCHETT

32

```
1    Q.       Have you ever clocked out early before?

2    A.       No.

3    Q.       Have you ever abused any sick time before?

4    A.       No.

5    Q.       You've never been written up for anything?

6    A.       No.

7    Q.       Okay.

8    A.       The only time I took leave was for my hip

9    replacement, and I was gone for three months.  That

10   was it.

11   Q.       Okay.  And when was that?

12   A.       Let's see, I've had my new hip now for --

13   maybe three years.

14   Q.       Okay.

15   A.       Or less than three years.

16   Q.       Okay.  Now, please describe your job

17   duties.

18   A.       Okay.  My details were to take care of the

19   lobby, the out -- the perimeter of the building, all

20   the elevators and care to all the tenants' needs.

21            You know, take care of all the work orders.

22   The secretary would print them out, I would take

23   them and do whatever needs to be done.

24   Q.       Did you have to use a computer yourself for
```

308A

ANTHONY D. PRITCHETT

33

```
 1    any reason?

 2    A.        No.

 3    Q.        You never had to?

 4    A.        We didn't have a computer.

 5    Q.        You didn't have a computer.

 6              Did you use anyone else's computer --

 7    A.        No.

 8    Q.        -- either for social reasons or anything?

 9    A.        No.

10    Q.        Did you ever use anyone's laptop?

11    A.        No.

12    Q.        Do you recall seeing a laptop around?

13    A.        Well, Sofie brought hers in every day --

14    Q.        Okay.

15    A.        -- to do her schoolwork, and she would ask

16    me, what do you think of this, you know, because she

17    goes to college, and she would show me stuff, and

18    you know, ask me what I think of it.

19              And that's another reason why I didn't like

20    to stay, because she always wanted me to look over

21    her homework, and I didn't want to do that.

22    Q.        Okay.  So when you -- when Sofie was

23    showing you her homework, she was showing you the

24    homework that she recorded on her laptop?
```

309 A

ANTHONY D. PRITCHETT

34

```
 1   A.        Yes.

 2   Q.        And you said she wanted you to review her

 3   homework?

 4   A.        Yes.

 5   Q.        And so when you reviewed her homework, did

 6   you use the laptop at all?

 7   A.        No.

 8   Q.        You would just view it?

 9   A.        Yup.

10   Q.        In her presence?

11   A.        Or a lot of times she would print stuff and

12   let me read it, but sometimes she was always in

13   there doing some kind of transcript or something and

14   ask me to read over it and see if there are any

15   mistakes or whatever.

16   Q.        Can you describe Sofie's laptop?

17   A.        I know it was black.

18   Q.        Okay.  Have you ever -- do you recall Sofie

19   leaving her laptop unattended ever?

20   A.        She left it unattended quite a few times.

21             When we would leave the office she would

22   lock her cubical, and we would go to get coffee or

23   whatever.

24             But the other crew wasn't in yet, so she
```

310A

ANTHONY D. PRITCHETT

35

    1    didn't have no need to, you know, put it in her

    2    filing cabinet.

    3    Q.        Okay.  Were you aware -- well, let me

    4    withdraw that.

    5              Where did Sofie keep her laptop?

    6    A.        She always had like a little carrying case.

    7    Q.        And so she kept it on her herself?

    8    A.        She would bring it in every day.

    9    Q.        Okay.  And where would she leave it, in the

   10    office?

   11    A.        On her desk.

   12    Q.        On her desk.

   13              Would she lock it up at all?

   14    A.        She would lock the cubical, that's it.

   15              I mean, I built the cubical, and she -- she

   16    used to put a lock on it.

   17    Q.        And she would -- would she lock her

   18    computer in the cubical?

   19    A.        Yes.

   20    Q.        Okay.  And she did this every day?

   21    A.        Yeah, just about.

   22    Q.        Okay.  Now, did you ever take that

   23    computer?

   24    A.        No.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

311A

ANTHONY D. PRITCHETT

36

```
1    Q.        Okay.  Are you aware that anyone else --
2    you know, did anyone else, to your knowledge, use
3    her computer?
4    A.        I wouldn't know.
5    Q.        Did you ever see anyone else with her
6    computer?
7    A.        No.  I mean, after 3:30 I was out.
8              I mean, there's approximately 15 to 20
9    people in there -- I mean, I don't know what went on
10   after I left.
11   Q.        Okay.  Now, on July 28th, 2010, what
12   happened at the time of the hearing, the grievance
13   hearing?
14   A.        Actually nothing happened.
15             They were too busy trying to get her laptop
16   to work, and then when these two guys showed up,
17   that was the end of it.
18   Q.        When you say "these two guys," are you
19   referring to Detective Warrender, who's sitting
20   here?
21   A.        Yes.
22   Q.        And what happened with -- when did you
23   first see Detective Warrender, on July 28th?
24   A.        Actually, I didn't see him.
```

312A

ANTHONY D. PRITCHETT

37

```
 1              I was facing Sofie and Charlene and
 2    Charles, and these two guys came from behind.
 3    Q.        Was Detective Warrender one of those guys?
 4    A.        Yes.
 5    Q.        And what happened next?
 6    A.        He says -- well, he had this warrant and
 7    says, you're under arrest for receiving stolen
 8    property and the other charges.
 9    Q.        And what did you do at that time?
10    A.        I didn't do anything.  I stood up, and they
11    put the cuffs on me and we walked out.
12              I told him about my bike, and he was kind
13    enough, you know, to let me have -- to let me grab
14    my bike.
15    Q.        And where were you taken?
16    A.        I don't know what precinct -- I don't
17    remember.
18    Q.        Okay.  Now, at any time following your
19    suspension -- I think I asked you this before, but
20    I'm going to ask it again; did you return to the
21    building?
22    A.        During my suspension?
23    Q.        At any time after your suspension.
24    A.        No.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

313A

ANTHONY D. PRITCHETT

38

1    Q.        Okay.  Did you return to -- or did you have
2    occasion to walk in the area of the loading dock?
3    A.        What, during my suspension?
4    Q.        Any time after your suspension.
5    A.        No.  I never went back to the building.
6    Q.        Okay.  All right.
7              On June 9th, were you in the area of the
8    loading dock?
9    A.        Yes.
10   Q.        Where were you?  Where were you
11   specifically?
12   A.        I went to pack stuff out of my locker since
13   I was going to get five days off.  I packed my
14   stuff.  I mean, I'm on the loading dock all the
15   time.
16   Q.        And what do you do on the loading dock?
17   A.        Take trash out, because we use those big
18   Dumpsters.
19             A lot of tenants throw out books and when
20   people get fired.  And I throw stuff in the
21   compactor.
22   Q.        Now, are you permitted to be in a loading
23   dock area during certain hours?
24   A.        Anytime.  Anytime.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

314A

ANTHONY D. PRITCHETT

39

```
 1    Q.        You're permitted anytime?

 2    A.        Yes.

 3    Q.        Are you're sure of that?

 4    A.        I'm positive of that.

 5    Q.        Is there a written policy anywhere that

 6    gives you that permission?

 7    A.        No -- I mean, if we have to take trash out,

 8    we have to take it out.

 9    Q.        Okay.  And so it's yourself and the other

10    two people that work for you that are all allowed

11    to --

12    A.        Well, Rose --

13                    MR. BAIRD:  Wait until she asks

14            her full question before you start to

15            answer.

16                    THE WITNESS:  Okay.

17    BY MS. BLACKWELL:

18    Q.        Are you and the other two employees who

19    worked for you, are you all permitted to be in the

20    loading dock area?

21    A.        Yes.

22    Q.        I believe you were going to -- you said

23    Rosa?

24    A.        Rosalba.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

315A

ANTHONY D. PRITCHETT

40

1    Q.        Rosalba.  She's allowed as well?

2    A.        Yes.  I mean, most of the time she does it

3    because we do all the heavy lifting.  So every now

4    and then, Rosa, she'll go, but it's mainly just me

5    and the other guy because Rosa can't lift heavy

6    stuff.

7    Q.        Do you take storage boxes to and from that

8    area?

9    A.        Yes.

10   Q.        Okay.  And did you do that on June 9th?

11             Did you take any kind of storage box in the

12   area of the loading dock?

13   A.        Yeah, I took my box.

14   Q.        Your box?

15   A.        Yeah.

16   Q.        And what did your box have in it?

17   A.        It's all my stuff out in my locker.

18   Q.        So you were cleaning out your locker

19   because you were leaving for the day?

20   A.        Leaving for a week.

21   Q.        And this was on June 9th?

22   A.        Yes.

23   Q.        Okay.  And you took everything that you

24   had?

316A

ANTHONY D. PRITCHETT

41

1    A.        Well, stuff that I considered of value.

2              I mean, I left my uniform in there, but as

3    far as other stuff, my personal clothes, my extra

4    stuff and my bike, that's what I took.

5    Q.        Was anyone else walking away with you at

6    the time in the loading dock area?

7    A.        No, because Greg -- I waited for Greg to

8    show up because I just didn't want to leave.

9              Greg showed up.  He showed up at 7 because

10   he always comes in an hour early.  He's not supposed

11   to show up until 8, and I just didn't want to leave.

12             I turned my keys in to security -- I waited

13   until he showed up.  I handed him my keys -- my

14   master keys, because I'm the only one that has

15   master keys.

16             We called Sofie on the phone to let her

17   know I wasn't feeling good and that I was going

18   home.

19   Q.        Now, the area where you -- where Sofie

20   keeps her laptop, you said that you frequented that

21   area?

22   A.        No.

23   Q.        You said you didn't?

24   A.        No, because it's all -- it's one office.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

317A

ANTHONY D. PRITCHETT

42

```
 1    It's one big office.

 2    Q.      And you didn't go in that office?

 3    A.      No.

 4    Q.      Okay.  You've never gone in the office,

 5    that area?

 6    A.        Only when she comes in and she wants, you

 7    know -- I -- she's got two seats where she talks to

 8    employees, and that's where I used to sit and talk

 9    with her.

10    Q.      So you go in that area when you're with

11    Sofie?

12    A.      Yes.

13    Q.      But do you go in that area without Sofie?

14    A.      No.

15    Q.      Are you permitted to go in that area

16    without Sofie?

17    A.      No.

18    Q.      Okay.

19    A.      She keeps it locked.

20    Q.      Okay.  Now, on the day that you were taking

21    your things away, on June 9th, did you take your

22    things and the storage box -- and where did you put

23    them when you were taking them out of the building?

24    A.        I just packed them up.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

318A

ANTHONY D. PRITCHETT

43

```
 1    Q.        Okay.  Do you ride your bike to work?  You
 2    said you ride your bike --
 3    A.        I ride it every day.
 4    Q.        Okay.  And so how are you going to take
 5    that box home and ride your bike?
 6    A.        I called a friend of mine.
 7    Q.        So a friend of yours came to the job.
 8              What kind of vehicle did the friend have?
 9    A.        He has a pickup truck.
10    Q.        Can you describe it?
11    A.        It's like a gold color.  I don't know what
12    model it is.  I mean, I don't see him that often --
13    actually, he's a friend of a friend.
14              I called my buddy.  He said, I can send
15    somebody over because the box is too big for me to
16    put on my bike.
17              I couldn't put the stuff in my backpack.  I
18    ride with my backpack every day.
19    Q.        So you put the storage box into your
20    friend's truck?
21    A.        Yes.
22    Q.        What's that friend's name?
23    A.        I don't know his name.
24    Q.        You don't know his name at all?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

319 A

ANTHONY D. PRITCHETT

44

1    A.        No.

2    Q.        Okay.  When you put the box into his truck,

3    did he drive away with that box?

4    A.        Yes.

5    Q.        Okay.  And did you return to the building

6    at that time?

7    A.        No.

8    Q.        Where did you go after that?

9    A.        I left.

10   Q.        You left.

11             You didn't go back to the building at all?

12   A.        Well, actually, I waited for my coworker to

13   show up, to let him know.

14             I gave him the keys.  I didn't want to go

15   up to security and hand them my keys.  I said,

16   please turn my keys in.  He said, what's going on?

17   I said, man, I'm not feeling good.

18             We called Sofie to let her know I was

19   leaving.  She was like fine.  She was a little

20   pissed off.

21   Q.        And were you under the impression at that

22   moment that you were under suspension or were going

23   to be suspended?

24   A.        Yes.

320 A

ANTHONY D. PRITCHETT

45

```
 1   Q.        Okay.  Did you mention the suspension --

 2   A.        Well, we actually had a conversation that

 3   night.

 4             You know, we got into a heated argument,

 5   cursing back and forth.

 6   Q.        Who did you have this argument with?

 7   A.        With Sofie.

 8   Q.        Okay.  And where did you have this

 9   conversation?

10   A.        Well, Barbara, the union rep, called me

11   approximately 4:30, and Sofie called me around 7.

12   Q.        Where were you?

13   A.        Home.

14   Q.        Okay.  And what happened?

15   A.        We got into a heated argument.

16             I'm like, how can you suspend me for five

17   days for leaving ten minutes early?  So we went back

18   and forth.  I'm like, you leave early every day, so

19   how are you going to come down on me for leaving ten

20   minutes early?

21   Q.        Okay.  Let's go back, because I believe I'm

22   a little bit confused.

23             Which day did you leave early?

24   A.        I think it was June 9th.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

321A

ANTHONY D. PRITCHETT

46

1    Q.        Okay.  And is that the same day that you

2    took your storage -- your storage box away?

3    A.        No.  That was on the 10th.

4    Q.        Okay.  Where -- okay, that makes more

5    sense, so after --

6    A.        Because the 11th was the day that I showed

7    up -- that was that Friday that I showed up for

8    work, and they told me that I wasn't allowed in the

9    building.

10   Q.        Previously you said that that was on the

11   10th --

12                   MS. BLACKWELL:  Is that your

13             recollection, Counsel, that he showed up on

14             the 10th, the next day, after the 9th --

15   BY MS. BLACKWELL:

16   Q.        And that's when I believe you said that the

17   security guard told you that you couldn't come in

18   the building?

19   A.        Yes.  I didn't bring my notes.  I don't

20   really remember the exact dates.

21   Q.        You don't remember the exact dates.

22             Because you're saying that you came back

23   the 11th.  That would be a Thursday that you

24   returned to this building --

322A

ANTHONY D. PRITCHETT

47

```
 1   A.        Okay.

 2   Q.        -- if you're saying the 11th.

 3             In your complaint you state that June 9th

 4   you were at work on the premises and that a

 5   complaint was made, that you were suspended on the

 6   10th?

 7   A.        By the shop steward.  That's -- that's her

 8   title.

 9   Q.        And she called you at home --

10   A.        Yes.

11   Q.        -- on the 10th?  Okay.

12             So which day did you take your things out

13   in a storage box?

14   A.        That next day.

15   Q.        The 10th?

16   A.        Yes.

17   Q.        Are you sure it was the 10th?

18   A.        I'm not sure the exact date.

19   Q.        Okay.  She called you at home, though?

20   A.        Yeah, I was home.

21   Q.        And told you you were suspended.  Okay.

22             And you went back one more time to the

23   building?

24   A.        I went back to work to pack -- pack my
```

323A

ANTHONY D. PRITCHETT

48

```
 1    stuff.

 2    Q.        Okay.  And so you took your things away in

 3    a storage box?

 4    A.        Yes.

 5    Q.        Now, you said you had an argument with

 6    Sofie about this.

 7    A.        Yes.

 8    Q.        Was that the same day that you took your

 9    things away --

10    A.        Yes.  Yes, that same day -- no, that was

11    the day prior --

12    Q.        The day before?

13    A.        -- when I got the call from the shop

14    steward.

15              She called me about 4:30 and then Sofie

16    called me -- because I told her to tell Sofie to

17    call me so we can talk about this.

18              We talked, and we just got into a heated

19    argument.

20    Q.        Now, let me ask you a question.

21              You asked your shop steward to have your

22    supervisor call you?

23    A.        Yes.

24    Q.        And the supervisor called you?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

324A

ANTHONY D. PRITCHETT

49

```
 1   A.        Yes, she did.

 2   Q.        And you asked the supervisor why you were

 3   suspended?

 4   A.        Yes.

 5   Q.        And what did she say?

 6   A.        Well, me -- she said, why did you -- you

 7   know I wanted to talk to you.  She just was going on

 8   and on.  I'm like, what's the big deal me leaving

 9   ten minutes early?

10           Well, you know I wanted to talk to you,

11   blah, blah, blah, come in in the morning and we'll

12   talk.

13   Q.        And what did you say?

14   A.        I said I didn't want to talk.

15   Q.        And that's when --

16   A.        And that's when we started cursing back and

17   forth, and she hung up on me.

18   Q.        Okay.  And you felt comfortable cursing at

19   your supervisor?

20   A.        Well, she was cursing at me.

21   Q.        Okay.  Did you often have this kind of

22   communication --

23   A.        No.

24   Q.        -- with your supervisor?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

325A

ANTHONY D. PRITCHETT

50

```
 1    A.        No.  Never.

 2    Q.        Did you consider her a friend as well as a

 3    supervisor?

 4    A.        Yes.

 5    Q.        Okay.  And so could you be lighthearted in

 6    your conversation with your supervisor, meaning, did

 7    you ever use curse words -- maybe even if you're not

 8    arguing but in conversations?

 9    A.        No.

10    Q.        Okay.  How did the conversation end with

11    Sofie?

12    A.        She said come in tomorrow and we'll talk

13    about this.

14    Q.        And what happened then?

15    A.        I said I didn't want to talk about it.

16    Q.        Did you go in the next day?

17    A.        Yes.

18    Q.        And that's when you were told that you

19    couldn't come into the building?

20    A.        Yes.

21    Q.        Okay.  Now, after you were arrested you

22    were taken to -- I believe you said the district in

23    Center City?

24    A.        Yes.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

326A

ANTHONY D. PRITCHETT

51

```
 1    Q.        And were you processed there?

 2    A.        Yes.

 3    Q.        And where were you taken after that?

 4    A.        Graterford.

 5    Q.        Okay.  And how long did you stay at

 6    Graterford?

 7    A.        Seven months.

 8    Q.        Okay.  Did you have any hearings in between

 9    that time?

10    A.        I had quite a few.

11    Q.        Okay.  Now, when you were kept at

12    Graterford, did you have a detainer on you for any

13    reason?

14    A.        Yes, I did.

15    Q.        Okay.  And that was for?

16    A.        Because I was -- I'm on parole.

17    Q.        You were on parole?

18    A.        Yes.

19    Q.        Okay.  When were you convicted of a crime?

20    A.        When?

21    Q.        Yeah.

22    A.        2001.

23    Q.        2001.

24              And that was for?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

327A

ANTHONY D. PRITCHETT

52

```
 1   A.        Aggravated of assaulting a police officer.

 2   Q.        That was your -- that's when you were

 3   convicted, but what was the date of arrest for this

 4   aggravated of assaulting a police officer?

 5   A.        August 3rd, 2006 -- I'm sorry, 2001.

 6   Q.        August 3rd, 2001 you were arrested?

 7   A.        Yes.

 8   Q.        And where did the arrest -- where were you

 9   arrested?

10   A.        Atlanta, Georgia.

11   Q.        So that was in the state of Georgia and not

12   here?

13   A.        Right.

14   Q.        And you were convicted in Georgia?

15   A.        Yes.

16   Q.        And where did -- where were you serving

17   your time?

18   A.        Rogers State Prison.

19   Q.        And where is that?

20   A.        Reidsville, Georgia.

21   Q.        And how many years were you incarcerated?

22   A.        Six.

23   Q.        And when did you come to Philadelphia?

24   A.        August 2006.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

328A

ANTHONY D. PRITCHETT

53

```
1   Q.        Okay.  Now, aside from the arrest of August

2   3rd, 2001, had you ever been arrested before?

3   A.        One time.  I believe it was in '90.

4   Q.        Do you know the arrest date?

5   A.        No.

6   Q.        What were you arrested for?

7   A.        I believe it was domestic violence.

8   Q.        And you were charged with assaulting

9   someone?

10  A.        Or actually it was -- me and the officer

11  got into an altercation, but I wasn't charged with

12  aggravated assaulting a police officer.

13  Q.        What were you charged with?

14  A.        I don't remember because that was so long

15  ago.

16  Q.        Well, were you convicted of anything?

17  A.        No.

18  Q.        Did you plead guilty at all?

19  A.        No.

20  Q.        Okay.  You didn't receive any kind of

21  sentence for this incident?

22  A.        No.

23  Q.        Are you sure of that?

24  A.        I'm positive.
```

329A

ANTHONY D. PRITCHETT

54

1    Q.        You weren't on probation for this incident?

2    A.        I'm not sure.

3    Q.        Okay.  And so aside from this arrest in

4    1990 -- and you said you don't remember the date.

5              Have you been arrested any other time?

6    A.        No.

7    Q.        Not including this incident?

8    A.        No.

9    Q.        Okay.  Have you spoken with Sofie since you

10   were suspended?

11   A.        No.

12   Q.        So since the time of the conversation that

13   you had -- or you describe it as the argument, was

14   that the last conversation you had with Sofie?

15   A.        Yes.

16   Q.        Did you ever see Sofie again?

17   A.        No.

18   Q.        Okay.  Aside from the day that you had the

19   hearing, the date of your arrest, you saw her on

20   that day?

21   A.        Yeah.  The last time I saw her was at the

22   union hearing on July 28th.

23   Q.        Okay.  Did you see anyone else who you

24   worked with --

330 A

ANTHONY D. PRITCHETT

55

```
 1   A.        No.

 2   Q.        You haven't seen them.

 3             Have you spoken with anyone about this

 4   case?

 5   A.        No.

 6   Q.        Okay.  Did you ask anyone from -- what's

 7   the name of the company again, I'm sorry?

 8   A.        Arthur Jackson.

 9   Q.        Arthur Jackson.

10             Have you spoken with anyone at Arthur

11   Jackson about I'm testifying for you or giving a

12   statement in this case?

13   A.        No.

14   Q.        To your knowledge has anyone that you

15   worked with given a statement about this incident?

16   A.        Not to my knowledge.

17   Q.        Okay.  Do you intend on calling anyone as a

18   witness in this case?

19   A.        No.

20   Q.        Okay.

21                    MS. BLACKWELL:  I don't have

22             anything further.

23                    MR. BAIRD:  Okay.  And just to

24             put on the record -- I mean, whether he
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

331A

ANTHONY D. PRITCHETT

56

```
 1              knows or doesn't know whether to -- you

 2              know, he's not going to be calling or

 3              asking people to testify.

 4                      Obviously we will notify you --

 5                      MS. BLACKWELL:  If he has any

 6              knowledge of anyone.  Okay.

 7    BY MS. BLACKWELL:

 8    Q.      All right.  Have you spoken with anyone

 9    that you worked with about this case?

10    A.      No.

11                      MS. BLACKWELL:  Okay.  Nothing

12              further.

13                      MR. BAIRD:  Okay.

14

15                      (Witness excused.)

16                      (Deposition concluded at 11:49

17              a.m.)

18

19

20

21

22

23

24
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

332A

ANTHONY D. PRITCHETT

57

```
1                 C E R T I F I C A T I O N

2

3

4                         I, Christopher M. Pilot,

5         Professional Court Reporter and Notary

6         Public, do hereby certify that the

7         foregoing is a true and accurate transcript

8         of the stenographic notes taken by me in

9         the aforementioned matter.

10

11

12                       - - -

13

14

15

16

17

18

19

20

21

22         DATE:        _____

23                      Christopher M. Pilot

24                      Professional Reporter
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

3334

ANTHONY D. PRITCHETT

**A**

abused 32:3
accurate 57:7
address 7:8
aforementioned 57:9
African 16:10,12
ages 7:23
aggravated 52:1,4
  53:12
ago 25:5 53:15
agreement 4:1
alcohol 6:17
allow 6:8
allowed 15:7,17
  16:23 39:10 40:1
  46:8
altercation 53:11
American 16:10,12
answer 6:10,11 39:15
answers 5:21
ANTHONY 1:3,7 3:5
  4:8
anyone's 33:10
anytime 38:24,24
  39:1
anyway 23:6
approximately 7:13
  8:13 9:11 21:18
  22:6 36:8 45:11
Arch 1:15 2:12
Architectural 9:19
area 38:2,7,23 39:20
  40:8,12 41:6,19,21
  42:5,10,13,15
arguing 50:8
argument 45:4,6,15
  48:5,19 54:13
arrest 8:7,9 19:15
  37:7 52:3,8 53:1,4
  54:3,19
arrested 8:12 17:8
  18:6 50:21 52:6,9
  53:2,6 54:5
arrived 18:23 19:1,7
Arthur 8:6 10:8,9,15
  12:2 19:10 55:8,9
  55:10

aside 53:1 54:3,18
asked 37:19 48:21
  49:2
asking 6:7 56:3
asks 39:13
assaulting 52:1,4
  53:8,12
assignments 11:10
assume 5:11
ate 23:20 26:7,7,16
Atlanta 9:20 52:10
ATTACHED 3:16
attend 25:9
attention 10:5
attorney 2:9,14 6:13
attorneys 5:8
August 52:5,6,24
  53:1
Avenue 2:8
Average 21:23
aware 35:3 36:1
a.m 1:18 11:18,20
  56:17

**B**

B 3:14
back 8:16 15:5,7
  16:20 19:16 22:20
  25:22 27:22 28:10
  30:18,20 38:5 44:11
  45:5,17,21 46:22
  47:22,24 49:16
backpack 43:17,18
BAIRD 2:7 17:19
  39:13 55:23 56:13
Barbara 13:16 45:10
basically 11:3
Beirut 9:5
believe 6:23 12:3
  27:9,11 28:23 39:22
  45:21 46:16 50:22
  53:3,7
best 9:17
big 20:4 38:17 42:1
  43:15 49:8
bike 16:2,20 31:1,2
  37:12,14 41:4 43:1

43:2,5,16
Bill 24:24 25:1 26:6
Bill's 24:24
bit 45:22
black 16:9 34:17
Blackwell 2:11 3:7
  4:12,17 17:16,21
  25:17,21 26:2 39:17
  46:12,15 55:21 56:5
  56:7,11
blah 49:11,11,11
books 38:19
box 40:11,13,14,16
  42:22 43:5,15,19
  44:2,3 46:2 47:13
  48:3
boxes 40:7
break 6:6,10,12
bring 17:15 35:8
  46:19
broke 9:24
brought 33:13
buddy 43:14
building 14:12,13
  15:7,17,19 16:19,21
  16:24 18:11 19:9
  22:3,5,6,11,15,19
  24:8 27:20 28:2
  29:19,24 31:4 32:19
  37:21 38:5 42:23
  44:5,11 46:9,18,24
  47:23 50:19
buildings 10:13
built 22:13 35:15
bunch 10:1
busy 36:15
buy 26:14,17
buying 26:15

**C**

C 2:1 57:1,1
cabinet 35:2
call 13:12,13 14:7
  48:13,17,22
called 13:16,18,22,24
  20:3 41:16 43:6,14
  44:18 45:10,11 47:9

47:19 48:15,16,24
calling 55:17 56:2
care 32:18,20,21
carrying 35:6
case 35:6 55:4,12,18
  56:9
Center 14:17 17:7
  50:23
certain 11:2 38:23
certification 4:2
certify 57:6
changed 11:17 22:18
  22:20 27:14,16,22
  27:24 28:7,10,21
  29:21 30:7 31:11
charged 53:8,11,13
charges 15:8 37:8
Charlene 19:8 37:1
Charles 19:8,10 37:2
Chestnut 17:6
children 7:19,21
Christopher 1:13
  57:4,23
City 1:6,15 2:11 17:7
  50:23
clean 10:13
cleaning 10:11,12
  40:18
clock 12:19,19,20,21
  15:16
clocked 14:3,4,8 21:9
  32:1
clocking 19:17
clothes 41:3
coffee 34:22
college 33:17
color 43:11
come 13:3 15:5 16:2
  26:13 31:23 45:19
  46:17 49:11 50:12
  50:19 52:23
comes 41:10 42:6
comfortable 49:18
coming 30:16,16
commencing 1:17
communication
  49:22

334A

ANTHONY D. PRITCHETT

59

compactor 38:21
companies 9:15,18
  10:2
company 9:13 10:1,3
  10:9,11 16:16 26:11
  55:7
complain 29:17,22
complained 27:20
complaint 47:3,5
complaints 23:5
completed 8:18
computer 32:24 33:4
  33:5,6 35:18,23
  36:3,6
concluded 56:16
conflict 5:7
confused 45:22
consider 50:2
considered 11:6
  26:10 27:9 41:1
continue 28:13
conversation 45:2,9
  50:6,10 54:12,14
conversations 6:5
  21:9 50:8
convicted 51:19 52:3
  52:14 53:16
Corps 9:1
counsel 4:1 46:13
counselor 21:3,8
  30:11
couple 30:3
court 1:1,22 5:17 6:1
  57:5
coworker 44:12
coworkers 24:17,22
coworker's 25:24
crew 13:15 34:24
crime 51:19
crossing 6:5
cubical 34:22 35:14
  35:15,18
cuffs 37:11
curse 50:7
cursing 45:5 49:16
  49:18,20

**D**

D 1:3,7 2:20 3:1,5 4:8
date 8:5,6,9,11 27:3
  47:18 52:3 53:4
  54:4,19 57:22
dates 46:20,21
day 5:1 10:18,18 12:2
  14:8,21 16:22 17:3
  18:6,7 20:16 21:5
  21:11,12,20,21
  23:24 24:8 29:7,11
  29:12,15,16 33:13
  35:8,20 40:19 42:20
  43:3,18 45:18,23
  46:1,6,14 47:12,14
  48:8,10,11,12 50:16
  54:18,20
days 13:17 15:4
  19:24 21:13 30:3
  38:13 45:17
deal 20:4 49:8
defendant 1:7 2:14
  4:18
Department 2:12
deposition 1:3,12
  4:20,22 5:3,6,12,15
  56:16
describe 32:16 34:16
  43:10 54:13
DESCRIPTION 3:16
desk 35:11,12
details 11:2 32:18
detainer 51:12
Detective 4:18 36:19
  36:23 37:3
died 22:12
different 10:2
direct 10:4
discharge 9:6
discussion 25:19
district 1:1,1 50:22
divorced 7:15,16,17
dock 38:2,8,14,16,23
  39:20 40:12 41:6
doing 5:22 27:15
  34:13
domestic 53:7

doors 15:22
drive 44:3
drugs 6:20
duly 4:9
Dumpsters 38:18
duration 29:2
duties 32:17

**E**

E 2:1,1 3:1,14 57:1
earlier 12:14 20:9
early 14:9 19:18,20
  20:4,5,6,11,22
  23:19 24:1 32:1
  41:10 45:17,18,20
  45:23 49:9
either 33:8
elevators 32:20
else's 33:6
employed 8:2,8 10:6
  10:14
employees 39:18 42:8
employment 8:5 12:2
enter 16:19,21
entire 24:6
ERSA 1:22
ESQUIRE 2:7,11
events 31:1
exact 5:1 46:20,21
  47:18
EXAMINATION 1:4
examined 4:9
excused 56:15
Exhibits 3:20
explain 5:12
extra 41:3

**F**

F 2:7 57:1
facing 37:1
far 41:3
feel 6:10 22:24 23:10
  23:13
feeling 41:17 44:17
felt 49:18
female 10:24 26:9
file 18:1

filing 4:2 35:2
finally 19:5
fine 44:19
finish 6:8,11
fired 12:9 38:20
first 4:21 8:24 15:19
  36:23
five 13:17 15:4 19:24
  21:14 38:13 45:16
Floor 1:16 2:13
following 37:18
follows 4:10
foregoing 57:7
form 4:4
forth 45:5,18 49:17
four 7:13 10:16 24:6
  24:18 26:22 31:2
frequented 41:20
Friday 21:15 46:7
friend 43:6,7,8,13,13
  50:2
friends 31:3
friend's 43:20,22
full 39:14
furniture 9:10,11
further 55:22 56:12

**G**

gentleman 26:3
Georgia 52:10,11,14
  52:20
gestures 5:20 6:1
given 14:20 55:15
gives 39:6
giving 6:9 55:11
glass 15:24
go 5:4 6:13 8:13
  18:14 19:16 21:5,6
  23:21 24:10 25:17
  25:22 30:22 34:22
  40:4 42:2,10,13,15
  44:8,11,14 45:21
  50:16
goes 33:17
going 4:19 8:15 10:4
  15:3 17:4,16 25:22
  37:20 38:13 39:22

335A

ANTHONY D. PRITCHETT

41:17 43:4 44:16,22
45:19 49:7 56:2
**gold** 43:11
**good** 4:13 31:3 41:17
44:17
**grab** 37:13
**grade** 8:17
**graduated** 8:19
**graduating** 8:23
**GRAHAM** 2:7
**Graterford** 51:4,6,12
**Greg** 25:24 41:7,7,9
**grievance** 18:1,5
36:12
**guard** 15:20 16:14,15
46:17
**guard's** 16:4
**guilty** 53:18
**guy** 26:4 40:5
**guys** 19:14 36:16,18
37:2,3

**H**

**H** 3:14
**half** 20:14
**hall** 17:4,5,9,18 18:14
18:23 19:2
**hallway** 30:23
**hand** 44:15
**handed** 41:13
**hands** 5:22
**happened** 19:1 28:6
36:12,14,22 37:5
45:14 50:14
**hearing** 5:7 18:4,17
18:18,20 36:12,13
54:19,22
**hearings** 51:8
**heated** 45:4,15 48:18
**heavy** 40:3,5
**held** 25:20
**high** 8:20,21,22,23
**highest** 8:17
**hip** 32:8,12
**hold** 9:8
**home** 13:24 14:4,24
16:20 21:6,6 41:18

43:5 45:13 47:9,19
47:20
**homework** 33:21,23
33:24 34:3,5
**Honorable** 9:7
**hour** 20:14 41:10
**hours** 6:18,21 11:15
11:21 22:18,20
27:14,16,22,23 30:6
31:10,18 38:23
**huh-uh** 5:24
**hung** 49:17

**I**

**immediate** 13:8
20:19
**important** 6:2
**impossible** 6:4
**impression** 44:21
**incarcerated** 52:21
**incident** 10:5 53:21
54:1,7 55:15
**Incidentally** 14:13
**including** 54:7
**influence** 6:14
**inspect** 22:15
**inspection** 24:9
**Installations** 9:20
**intend** 55:17

**J**

**Jackson** 8:6 10:8,10
10:15 12:2 19:10
55:8,9,11
**January** 1:17
**jeopardy** 23:14
**JFK** 14:15,19 17:2
**job** 8:24 9:8 13:22
23:13 32:16 43:7
**July** 8:12 18:8,9,10
18:13 36:11,23
54:22
**June** 10:5,6 11:21
12:3,4,7,8,11 13:18
13:19,20,22 14:1,9
15:11,13,19 18:7,10
18:13,20 29:6,8,9

29:14 31:20 38:7
40:10,21 42:21
45:24 47:3

**K**

**keep** 35:5
**keeps** 41:20 42:19
**kept** 30:4 35:7 51:11
**keys** 41:12,13,14,15
44:14,15,16
**kind** 6:14,20 9:6,8,24
10:9,12 12:20 14:20
14:21 18:1,4 21:2
22:9 34:13 37:12
40:11 43:8 49:21
53:20
**knock** 16:1
**knocked** 16:1
**know** 4:24 6:12 10:1
10:3 16:6,16 17:13
22:5,10 23:12 26:6
26:11 28:4 30:11,20
32:21 33:16,18
34:17 35:1 36:2,4,9
37:13,16 41:17 42:7
43:11,23,24 44:13
44:18 45:4 49:7,10
53:4 56:1,2
**knowledge** 36:2
55:14,16 56:6
**knows** 56:1

**L**

**ladies** 11:1
**laptop** 19:12 33:10
33:12,24 34:6,16,19
35:5 36:15 41:20
**lasted** 28:9 29:2
**late** 19:6,7 31:23
**Law** 2:7,12
**lead** 10:18
**leadman** 10:18,20
22:12,12,13
**leave** 9:4 12:16 20:4
20:6,10,13,15 21:6
22:22 28:17 32:8
34:21 35:9 41:8,11

45:18,23
**leaving** 9:5 12:14
34:19 40:19,20
44:19 45:17,19 49:8
**left** 12:22,22 20:5,9
20:14,22 28:18
34:20 36:10 41:2
44:9,10
**let's** 19:16 32:12
45:21
**lift** 40:5
**lifting** 40:3
**lighthearted** 50:5
**listening** 30:11
**little** 35:6 44:19
45:22
**living** 7:11
**loading** 38:2,8,14,16
38:22 39:20 40:12
41:6
**lobby** 32:19
**lock** 34:22 35:13,14
35:16,17
**locked** 42:19
**locker** 38:12 40:17
40:18
**long** 9:2 10:14 21:22
21:24 22:4,5 24:4
28:21,22 51:5 53:14
**look** 25:15 33:20
**lot** 34:11 38:19
**lunch** 23:20,21 24:10
24:15,18 25:9 26:7
26:11,14,15,17
**luncheon** 26:10
**lunchtime** 23:19
26:14

**M**

**M** 1:13 57:4,23
**male** 10:24
**man** 44:17
**manager** 19:9,10
22:19 27:20 29:19
29:24 31:4
**manager's** 28:2
**Marine** 9:1

336A

ANTHONY D. PRITCHETT

marital 7:14
Marked 3:16,20
master 41:14,15
matter 4:19 57:9
mean 10:22 15:24
  20:24 30:22 35:15
  36:7,8,9 38:14 39:7
  40:2 41:2 43:12
  55:24
meaning 50:6
medication 6:15
mention 45:1
mentioned 12:1
met 15:19
middle 6:7,9
Mike 28:3 29:19 31:2
mine 43:6
minutes 12:14,22
  14:9 19:5,7,20 20:9
  20:10 21:23 45:17
  45:20 49:9
mistakes 34:15
model 43:12
modular 9:10
moment 44:22
Monday 21:15
month 5:2,3
months 22:11 32:9
  51:7
morning 4:13 15:6,9
  49:11
Morton 2:8,8

**N**

N 2:1 3:1 57:1
name 4:17 7:3,4 9:13
  9:18 13:6 16:4,6
  17:11,12,12,13
  24:22 25:1,2,6,7,8
  25:14,24 26:9 28:2
  28:4 43:22,23,24
  55:7
names 10:3
name's 13:15
need 5:20 6:6,10,12
  35:1
needs 32:20,23

never 20:5 23:4
  31:13 32:5 33:3
  38:5 42:4 50:1
new 26:4 32:12
nickname 7:6
night 13:15 45:3
Niya 2:11 4:17
nodding 5:24
normal 15:14 30:18
Notary 1:14 57:5
notes 46:19 57:8
nothing's 15:23
notified 13:22 19:23
notify 56:4
NUMBER 3:16

**O**

O 57:1
oath 5:17
objections 4:4
Obviously 56:4
occasion 38:2
offer 26:14
office 9:10 10:13
  34:21 35:10 41:24
  42:1,2,4
officer 52:1,4 53:10
  53:12
official 19:21
Oh 5:6,9 29:10
okay 4:16 5:9,10,14
  5:23 7:2,14,19,23
  8:2,4,8,15,20,22 9:6
  9:23 10:4,9,14 11:4
  11:12 12:15 13:1,5
  13:8 14:3,5,11,18
  14:20,23 15:9,18,21
  16:8,18,21 17:1,5,7
  17:9,16 18:1,4,7,20
  19:11 20:8,10,17
  21:7,17,24 22:8
  23:6,16 25:21,23
  26:5,7,8 27:9,19
  28:16,18,24 31:15
  31:20 32:7,11,14,16
  32:18 33:14,22
  34:18 35:3,9,20,22

36:1,11 37:18 38:1
  38:6 39:9,16 40:10
  40:23 42:4,18,20
  43:1,4 44:2,5 45:1,8
  45:14,21 46:1,4,4
  47:1,11,19,21 48:2
  49:18,21 50:5,10,21
  51:5,8,11,15,19
  53:1,20 54:3,9,18
  54:23 55:6,17,20,23
  56:6,11,13
oldest 7:24
Oley 8:21,22,23
once 14:24 21:9
  30:17
one's 25:7
open 15:22
opened 15:23
opposed 5:20,21
ORAL 1:4
orders 32:21
outside 23:17 26:24
overlapping 6:5
o'clock 24:1 28:22
  30:17

**P**

P 2:1,1
PA 1:24
pack 38:12 47:24,24
packed 38:13 42:24
PAGE 3:3,15,15
parole 51:16,17
particular 20:15
passed 25:2,4 26:3,6
Penn 14:17
Pennsylvania 1:1,16
  2:8,13 7:10
people 11:3,4,12 36:9
  38:20 39:10 56:3
perimeter 32:19
period 21:24 24:4
  26:21 28:12
permission 39:6
permitted 38:22 39:1
  39:19 42:15
person 13:11

personal 26:12 41:3
person's 25:6
Philadelphia 1:6,15
  1:16,24 2:11,13 7:9
  52:23
phone 13:12 14:6
  25:15 27:1 41:16
pickup 43:9
Pilot 1:13 57:4,23
pink 14:20
pissed 44:20
place 18:19 24:20
Plaintiff 1:4 2:9
play 19:13,14
Plaza 1:23
plead 53:18
please 15:18 24:23
  27:22 32:16 44:16
point 20:12
police 52:1,4 53:12
policy 39:5
porter 10:18
porters 10:19
position 10:17 23:1
positive 39:4 53:24
precinct 37:16
premises 47:4
presence 34:10
present 2:20 7:8
presently 8:2
pressure 30:15,15,17
pretrial 5:7
Previously 46:10
print 32:22 34:11
prior 9:23 12:6,23
  13:18 18:13 29:9,20
  31:20 48:11
Prison 52:18
Pritchett 1:3,7 3:5
  4:8,13,14,15,16,17
  probation 54:1
problem 28:20
problems 10:2 21:4
  30:11,21
processed 51:1
produce 17:19
Professional 1:14

337A

ANTHONY D. PRITCHETT

62

57:5,24
**property** 37:8
**Public** 1:14 57:6
**put** 30:15 35:1,16
  37:11 42:22 43:16
  43:17,19 44:2 55:24
**P.C** 2:7

**Q**

**question** 4:5 6:8,8
  27:21 39:14 48:20
**questions** 5:16
**quite** 34:20 51:10

**R**

**R** 2:1 57:1
**race** 16:8
**rapport** 22:9
**read** 34:12,14
**real** 28:19 31:3
**really** 46:20
**reason** 5:19 6:6,23
  33:1,19 51:13
**reasons** 33:8
**recall** 25:14 33:12
  34:18
**receive** 53:20
**receiving** 37:7
**recollection** 9:17
  46:13
**record** 6:13 7:4 25:18
  25:20,22 55:24
**recorded** 33:24
**referring** 36:19
**Reidsville** 52:20
**relationship** 22:14
  27:5
**remember** 5:1 17:12
  25:2,8 37:17 46:20
  46:21 53:14 54:4
**rep** 14:23 17:11 19:3
  20:1,2 45:10
**replacement** 32:9
**report** 13:1
**reported** 11:8
**reporter** 1:14 5:17
  6:1 57:5,24

**REPORTERS** 1:22
**represent** 4:18
**representative** 13:14
  17:23 31:10
**request** 17:17 27:23
  28:6 31:9
**requested** 22:20
  31:13
**requests** 31:6
**reserved** 4:5
**restrooms** 11:1
**return** 14:11,12 15:2
  17:1 18:11 37:20
  38:1 44:5
**returned** 28:24 46:24
**review** 34:2
**reviewed** 34:5
**revolving** 15:22
**ride** 16:1 43:1,2,3,5
  43:18
**right** 11:14,15 12:8
  12:12 15:1 20:3
  24:24 25:8 38:6
  52:13 56:8
**Rockland** 7:9,12
**Rogers** 52:18
**romantic** 27:5,10
**room** 5:4
**Rosa** 39:23 40:4,5
**Rosalba** 26:9 39:24
  40:1
**Rose** 39:12
**run** 11:3,3

**S**

**S** 2:1 3:14
**Sadeek** 16:5,18
**Sadeek's** 16:8
**sat** 19:3,6
**saw** 17:11 30:22
  54:19,21
**saying** 46:22 47:2
**says** 20:3 37:6,7
**school** 8:18,20
**schoolwork** 33:15
**sealing** 4:2
**seats** 42:7

**second** 18:18,20 28:1
**secretary** 19:9 32:22
**security** 15:20 16:4
  16:14,15 41:12
  44:15 46:17
**see** 5:18,22 13:21
  15:24 17:4,10 27:17
  28:15,19 29:12 30:4
  30:14,23 32:12
  34:14 36:5,23,24
  43:12 54:16,23
**seeing** 33:12
**seen** 55:2
**send** 43:14
**sense** 46:5
**sentence** 53:21
**series** 5:16
**service** 9:4
**serving** 52:16
**set** 19:12
**Seven** 51:7
**Shawn** 2:20
**she'll** 40:4
**shift** 16:15 28:21
  29:21
**shop** 47:7 48:13,21
**show** 33:17 41:8,11
  44:13
**showed** 15:13 18:18
  19:5 36:16 41:9,9
  41:13 46:6,7,13
**showing** 33:23,23
**sick** 30:12 32:3
**signing** 4:2
**single** 7:15 29:15,16
**sit** 20:13 42:8
**sitting** 36:19
**six** 22:11 30:17 52:22
**slip** 14:20
**social** 33:8
**socialize** 23:16
**Sofie** 13:5 19:8,9
  20:12,17 22:2,9
  23:16 24:11 26:17
  26:24 27:3,9 28:10
  28:14 29:7 33:13,22
  34:18 35:5 37:1

**41**:16,19 42:11,13
  42:16 44:18 45:7,11
  48:6,15,16 50:11
  54:9,14,16
**Sofie's** 13:3 34:16
**Solski** 13:7
**somebody** 43:15
**son** 7:24,24
**sorry** 5:9 29:9 52:5
  55:7
**sort** 22:14
**South** 1:23 2:8
**speak** 5:20 6:2,12
  22:1 29:7 31:9
**specifically** 38:11
**spoke** 17:17
**spoken** 54:9 55:3,10
  56:8
**start** 39:14
**started** 11:16 49:16
**state** 5:21 47:3 52:11
  52:18
**stated** 7:3
**statement** 55:12,15
**STATES** 1:1
**status** 7:14
**stay** 21:19 22:1,24
  23:14 28:13 29:18
  33:20 51:5
**stayed** 23:6
**staying** 29:6,14
**stenographic** 57:8
**steward** 47:7 48:14
  48:21
**stolen** 37:7
**stood** 37:10
**storage** 40:7,11 42:22
  43:19 46:2,2 47:13
  48:3
**Street** 1:15,23 2:12
  7:9,12
**stuff** 33:17 34:11
  38:12,14,20 40:6,17
  41:1,3,4 43:17 48:1
**Suite** 1:23
**supervise** 11:4
**supervised** 11:13

338A

ANTHONY D. PRITCHETT

supervisor 11:6 13:2
  13:3,9 20:17,19
  21:1,10 23:11 25:12
  48:22,24 49:2,19,24
  50:3,6
supposed 12:15
  14:12 18:17 20:15
  41:10
supposedly 19:13
sure 17:19 22:4 27:7
  39:3 47:17,18 53:23
  54:2
suspend 45:16
suspended 12:6,7,8
  12:10,11,12 13:11
  13:17 15:3 19:17,24
  29:5 31:21 44:23
  47:5,21 49:3 54:10
suspension 19:21
  37:19,22,23 38:3,4
  44:22 45:1
sworn 4:9

**T**

T 3:14 57:1,1
tag 22:16
take 4:19 6:1,4,6,10
  6:12 32:18,21,22
  35:22 38:17 39:7,8
  40:7,11 42:21 43:4
  47:12
taken 1:13 4:22 5:3
  5:12,15 37:15 50:22
  51:3 57:8
talk 20:14,16,21 21:1
  21:4,7 22:18,23,24
  23:5,6,14 26:24
  28:13 30:21,24 42:8
  48:17 49:7,10,12,14
  50:12,15
talked 48:18
talks 42:7
tell 15:18 21:18 30:6
  48:16
telling 30:4
ten 9:3 12:14,22 14:8
  19:20 20:9,10 45:17

45:19 49:9
tenants 32:20 38:19
terminated 12:9
terms 13:2
testified 4:9
testify 6:24 56:3
testifying 55:11
things 42:21,22 47:12
  48:2,9
think 13:7 28:5 33:16
  33:18 37:19 45:24
third 16:15
three 10:23 22:7 24:6
  25:9 26:21 28:22
  32:9,13,15
throw 38:19,20
Thursday 1:17 46:23
Thursdays 23:18
time 4:5 8:8 12:15,18
  13:1 17:1 18:15
  21:19,24 22:3 24:4
  25:19 27:16 28:12
  29:3,5 30:21,22
  32:3,8 36:12 37:9
  37:18,23 38:4,15
  40:2 41:6 44:6
  47:22 51:9 52:17
  53:3 54:5,12,21
times 21:19 34:11,20
tired 30:10
title 47:8
today 4:20 6:15,24
told 13:16 14:23 15:3
  15:5,6,18 16:18
  19:15 30:10 37:12
  46:8,17 47:21 48:16
  50:18
tomorrow 50:12
transcript 1:12 4:3
  34:13 57:7
trash 38:17 39:7
trial 4:6
truck 43:9,20 44:2
true 57:7
truthfully 6:24
trying 13:21 19:13
  36:15

turn 44:16
turned 41:12
turns 26:15
twelve 24:1
two 7:22 8:13 11:3,4
  11:12 19:14 25:5
  28:9,23 29:20 36:16
  36:18 37:2 39:10,18
  42:7

**U**

uh-huh 5:24
unattended 34:19,20
uniform 41:2
union 13:14 14:23
  17:3,5,9,11,18,22
  18:14,23 19:2,3,23
  20:1,2 31:10,13,16
  31:17 45:10 54:22
United 1:1,23
use 12:19 32:24 33:6
  33:10 34:6 36:2
  38:17 50:7

**V**

value 41:1
vehicle 43:8
verbally 5:21
videotape 19:13
view 34:8
violence 53:7
voluntary 23:8
vs 1:5

**W**

Wait 39:13
waited 41:7,12 44:12
waiting 19:4,5
waived 4:3
walk 38:2
walked 37:11
walking 41:5
want 20:16,21 21:1
  22:21 29:18 33:21
  41:8,11 44:14 49:14
  50:15
wanted 9:5 21:4,5,6

22:16,17 27:11,13
  29:21 30:6 33:20
  34:2 49:7,10
wants 20:13 30:20
  42:6
warrant 37:6
Warrender 2:20 4:18
  36:19,23 37:3
washing 30:15,17
wasn't 12:9,9 15:7,17
  16:23 34:24 41:17
  46:8 53:11
Wednesday 23:23
  24:2,5,20,21 25:10
Wednesdays 23:18
  23:21 24:13
week 21:13,19 30:3
  40:20
weekly 26:10
weeks 8:13 28:9,23
WEISBERG 2:7
went 10:1,2 14:4 15:5
  15:9 16:20 17:3,9
  18:16 22:15,17,19
  24:15 26:21 27:21
  30:18,20 31:1,1,2
  36:9 38:5,12 45:17
  47:22,24
weren't 15:22 54:1
West 7:9
we'll 6:13 7:2 17:19
  49:11 50:12
We're 25:21
withdraw 35:4
witness 3:3 25:23
  39:16 55:18 56:15
word 5:18,19
words 50:7
work 15:6,9,13 16:2
  21:13 22:1 23:17
  26:24 28:13 32:21
  36:16 39:10 43:1
  46:8 47:4,24
worked 24:7 29:3
  39:19 54:24 55:15
  56:9
workers 26:11

339A

ANTHONY D. PRITCHETT

64

**working** 14:14 18:11
**works** 13:15 16:16
25:7
**wouldn't** 19:14 28:19
36:4
**writing** 31:7
**written** 17:14 32:5
39:5

### X

**X** 3:1,14

### Y

**Yeah** 14:2,4,17 16:11
16:15 20:9 23:24
25:16 27:18 35:21
40:13,15 47:20
51:21 54:21
**year** 9:21 28:1
**years** 7:11,13,17,18
9:3,12 10:16 22:7
24:6 25:5,10 26:22
29:20 32:13,15
52:21
**younger** 7:24
**Yup** 34:9

### Z

**Zolinski** 28:5

### 1

**10th** 15:11,13,19 18:7
18:10,13 46:3,11,14
47:6,11,15,17
**11th** 46:6,23 47:2
**11-4682** 1:2
**11:05** 1:18
**11:49** 56:16
**12th** 8:19
**14** 7:18 9:11
**15** 8:1 21:23 36:8
**15th** 1:16 2:13
**1500** 14:15,16
**1515** 1:15 2:12
**1520** 1:23
**16th** 17:6
**1600** 14:19 17:1

**17th** 1:23
**19070** 2:8
**19102** 2:13
**19103** 1:24
**19141** 7:10
**1990** 54:4

### 2

**20** 36:8
**2001** 51:22,23 52:5,6
53:2
**2006** 52:5,24
**2010** 8:12 10:5,7
11:21 36:11
**2012** 1:17
**22** 7:24
**24** 6:17,21
**28th** 8:12 18:8,9,10
18:13,14,21 36:11
36:23 54:22

### 3

**3** 11:16 28:17,18
**3rd** 52:5,6 53:2
**3:20** 12:24
**3:30** 11:17,20,22,22
11:23 12:17,18 13:4
20:13 22:21 28:24
36:7
**30** 1:23 19:5,7

### 4

**4** 3:7 14:17
**4:30** 14:7 45:11 48:15

### 5

**5** 1:17

### 7

**7** 2:8 11:16,16,22,23
41:9 45:11
**7:30** 11:17,18

### 8

**8** 41:11
**8th** 29:14

### 9

**9th** 10:5,6 11:21 12:3
12:4,7,8,11 13:18
13:19,20,23 14:1,9
29:6,8,9 31:20 38:7
40:10,21 42:21
45:24 46:14 47:3
49:22 53:3
**90** 9:22 53:3
**906** 7:9
**98** 9:22

340A

## Philadelphia Police Department
## Central Detective Division
## Investigation Interview Record

| | | | | |
|---|---|---|---|---|
| | | | Case No. 5201 | |
| | | | Interviewer: Det. Warrender # 8130 | |

| Name: **Sophie Solski** | Age: **40** | Race: **White** | Sex: **Female** | Dob: **09 21 1970** |
|---|---|---|---|---|

| Address: **1 wheelwright lane cherry hill nj 08003** | Apt # | Phone Number: **267 716 2577** |
|---|---|---|

| Name of Employer/School **Arthur jackson Co** | | Soc. Sec. No: |
|---|---|---|

| Address of Employer/School **1600 JFK Blvd** | Department: | Phone Number: |
|---|---|---|

| Dates of Planned Vacations: | Dates of Planned Business Trips: |
|---|---|

| Name of Closest Relative: | Address of Relative: | Phone Number: |
|---|---|---|

| Arresting Officer: | Arresting Officer: |
|---|---|

| Location of Arrest: | Time of Arrest: |
|---|---|

| Place of Interview: **Central Detective Division** | Date of Interview: **6/25/10** | Time of Interview: **8:45am** |
|---|---|---|

| Brought In By: | Date: | Time: |
|---|---|---|

| We are questioning you concerning: | Witness: |
|---|---|

| Warnings Given By: | Date: | Time: |
|---|---|---|

| Answers: (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q: can you tell me what happened at 1600 JFK Blvd on 6/9/2010 that brings you to CDD

A: I arrived for work at 3:15pm and was looking for my laptop which was inside the file cabinet, which was locked. I saw a dent in the lock. This is how it was opened. I noticed that the items that were on the partition was knocked off, which told me that someone had moved the partition. I immediately noticed my laptop missing and twenty employee files were gone. I then went to the building manager and reviewed video together and saw unusual activity by the offender. I saw that he was working at 5:50am, but is not scheduled until 7:00am. Also, he didn't punch in until 6:50am. His duties was to sweep the lobby, and outside of the building. He was doing what appeared to be trash removal, which wasn't his scheduled assignment that day. I saw him take a large trash can into the room where the laptop was located, there is no reason, there is no trash I that room. Then I saw him with a storage box on top of the trash can; he didn't have it when he walked in there. He then proceeded to walk

Signature _____    Date: 6-25-10

Police (75-483)

Page 1

341A

to the loading dock; it was now 7:15am. He is not supposed to be there at all. No trash is too placed in the loading during day time hours, trash is supposed to be placed in the trash room.

Q: What company does the Anthony work for?

A: Arthur Jackson

Q: What is job description?

A: day porter, he does everything we ask him to do

Q: What is schedule that day on 6/9/2010?

A: 7:00am – 3:30pm, every day

Q: Who owns the laptop?

A: it's my personal laptop, HP

Q: What is the value?

A: $1200

Q: have you spoken with Anthony since the incident

A: no

Q: Has he been back to work since 6/9/10

A: yes, he came back on the 10th of June, but he wasn't allowed in the building

Q: how long has Anthony been employed with you

A: 2 years

Q: does Anthony have a drinking problem

A: yes, he drinks heavily and has been known to come to work intoxicated.

Q: we are going to view video #1 please tell what is occurring

A: it shows Anthony going into a El Savir and removing a large trash barrel, then proceed to supply room and then to the locker room. He opens the door to the freight elevator, half way blocking the camera. He was told that this door is to be left open completely or closed, never half way. In the background you can see the door to locker room opening, where the laptop was stored. He then walks to the freight elevator with a box on top of the trash barrel.

Q: we are going to view disc # 2, please tell me what is occurring

A: nothing of evidentiary value

Q: we are going to view disc # 3 can you tell what is occurring?

Signature _____          Date: 6-25-10

Police (75-483)

Page 2

A: it shows Anthony entering the loading dock with the trash barrel and the storage box on top, then walk down the ramp to the parking area and then reach inside the barrel and place the storage box in the back of a pickup truck. The male (who remains unidentified) then drives away. Anthony then returns back to work for another 20 minutes and never returns.

AT THIS POINT, I WANT YOU TO READ THIS INTERVIEW AND MAKE ANY CORRECTIONS THAT NEED TO BE MADE.

Final: You have read your statement, and by signing, you affirm as to its truthfulness and accept it as your spoken word.

Signature: _____     Date: _____

Interview concluded at _____

Signature  _____     Date: 6-25-10

Police (75-483)

Page 3

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0032386-2010**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anthony Pritchett

Page 1 of 4

## CASE INFORMATION

Cross Court Docket Nos: PARS-MC-51-CR-0032386-2010

Judge Assigned: | Date Filed: 07/29/2010 | Initiation Date: 07/28/2010
OTN: N6938562 | Lower Court Docket No: MC-51-CR-0032386-2010
Initial Issuing Authority: | Final Issuing Authority:
Arresting Agency: Philadelphia Pd | Arresting Officer: DOYLE, JOSEPH J
Case Local Number Type(s) | Case Local Number(s)
District Control Number | 1009027767

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 07/28/2010 |
|---|---|---|---|---|---|
| | | 01/13/2011 | Completed | | |
| | | 09/10/2010 | Awaiting Trial | | |
| | | 07/29/2010 | Awaiting Status Listing | | |
| | | 07/29/2010 | Awaiting Preliminary Hearing | | |

Complaint Date: 07/28/2010

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Preliminary Arraignment | 07/29/2010 | 1:48 am | B08 | Arraignment Court Magistrate James O'Brien | Scheduled |
| Arraignment Status | 09/10/2010 | 8:00 am | 503 | Judge Marsha H. Neifield | Scheduled |
| Trial | 10/04/2010 | 9:00 am | 404 | Judge Joseph C. Waters | Continued |
| Trial | 11/23/2010 | 8:00 am | 903 | Judge Thomas F. Gehret | Continued |
| Trial | 01/13/2011 | 8:00 am | 903 | Judge Joseph J. O'Neill | Scheduled |

## CONFINEMENT INFORMATION

| Confinement Known As Of | Confinement Type | Destination Location | Confinement Reason | Still In Custody |
|---|---|---|---|---|

## DEFENDANT INFORMATION

Date Of Birth: 10/21/1961    City/State/Zip: Yeadon, PA 19050

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Pritchett, Anthony |

Printed: 07/05/2011

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed date, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

344A

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET

**Docket Number: MC-51-CR-0032386-2010**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anthony Pritchett

Page 2 of 4

## BAIL INFORMATION

**Pritchett, Anthony**                                                     **Nebbia Status:  None**

| Bail Action | Date | Bail Type | Percentage | Amount | Bail Posting Status | Posting Date |
|---|---|---|---|---|---|---|
| Set | 07/29/2010 | ROR | | $0.00 | Posted | 07/29/2010 |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 18 § 3921 §§ | Theft By Unlaw Taking-Movable Prop | 06/09/2010 | N6938562 |
| 2 | 2 | | 18 § 3925 §§ | Receiving Stolen Property | 06/09/2010 | N6938562 |
| 3 | 3 | | 18 § 3921 §§ | Criminal Conspiracy Engaging Theft By Unlaw Taking-Movable Prop | 06/09/2010 | N6938562 |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|---|---|---|---|
|   Sequence/Description |   Offense Disposition | Grade | Section |
|     Sentencing Judge |     Sentence Date | Credit For Time Served | |
|       Sentence/Diversion Program Type |       Incarceration/Diversionary Period |   Start Date | |
|         Sentence Conditions | | | |
|         Linked Offense - Sentence |     Link Type |   Linked Docket Number | |

| | | | |
|---|---|---|---|
| **Proceed to Court** | | | |
| Preliminary Arraignment | 07/29/2010 | Not Final | |
|   1 / Theft By Unlaw Taking-Movable Prop |   Proceed to Court | | 18§3921§§A |
|   2 / Receiving Stolen Property |   Proceed to Court | | 18§3925§§A |
|   3 / Criminal Conspiracy Engaging Theft By Unlaw Taking-Movable Prop |   Proceed to Court | | 18§903§§A1 |
| **Withdrawn** | | | |
| Trial | 01/13/2011 | Final Disposition | |
|   1 / Theft By Unlaw Taking-Movable Prop |   Withdrawn | | 18§3921§§A |
|   2 / Receiving Stolen Property |   Withdrawn | | 18§3925§§A |
|   3 / Criminal Conspiracy Engaging Theft By Unlaw Taking-Movable Prop |   Withdrawn | | 18§903§§A1 |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

345A

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0032386-2010**

### CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anthony  Pritchett

Page 3 of 4

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| **Name:**  Philadelphia County District Attorney's Office  Prosecutor | **Name:**  Scott Lawrence Kramer  Private |
| **Supreme Court No:** | **Supreme Court No:**  093165 |
| **Phone Number(s):** | **Rep. Status:**  Active |
| (215) 686-8000   (Phone) | **Phone Number(s):** |
| **Address:** | (610) 891-1499   (Phone) |
| 3 South Penn Square  Philadelphia PA 19107 | (610) 565-6488   (Fax) |
| | **Address:** |
| | 11 S Olive St Ste 100  Media PA 19063 |
| | Representing: Pritchett, Anthony |

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 07/29/2010 | | Municipal Court -  Philadelphia County |
| PARS Transfer | | | |
| 2 | 07/29/2010 | | O'Brien, James |
| Bail Set - Pritchett, Anthony | | | |
| 3 | 07/29/2010 | | Pritchett, Anthony |
| Bail Posted - Pritchett, Anthony | | | |
| 1 | 09/10/2010 | | Municipal Court -  Philadelphia County |
| Trial Scheduled 10/4/2010 9:00AM | | | |
| 1 | 10/04/2010 | | Municipal Court -  Philadelphia County |
| Trial Scheduled 11/23/2010 8:00AM | | | |
| 3 | 10/04/2010 | | Waters, Joseph C. |
| Trial Continued | | | |

Commonwealth Request - Witness Failed To Appear
Video Missing -- Must pass video ten (10) days prior to next listing
NCD: 11/23/10 Room 903

By The Court,

_____, J.

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

346A

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0032386-2010**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anthony  Pritchett

Page 4 of 4

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 11/23/2010 | | Municipal Court - Philadelphia County |

Trial Scheduled 1/13/2011  8:00AM

| 3 | 11/23/2010 | | Gehret, Thomas F. |

Order Granting Motion for Continuance

  Defense: Advance request for continuance.
  Commonwealth: Not ready; Discovery is incomplete.
  Video is needed.

  NCD: 01/13/2011, Room 903
  ADA: Tanner Rouse; Defense: Tricia Henning
  Court Reporter: Danielle O'Connor; Court Clerk: Alyssia Williams

        By the Court,

       _____ J.

| 1 | 01/13/2011 | | O'Neill, Joseph J. |

Withdrawn

  ADA Moore, Atty S. Kramer,  Steno McShane,  Court Clerk Washington.  Commonwealth not ready – witness failed
  to appear

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial
System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed
data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can
only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record
Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

347A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

NO. 11-4682

|  |  |  |
|---|---|---|
| | ) | DEPOSITION UPON |
| ANTHONY D. PRITCHETT, | ) | |
| | ) | ORAL EXAMINATION |
| Plaintiff, | ) | |
| | ) | OF |
| - vs - | ) | |
| | ) | |
| CITY OF PHILADELPHIA, | ) | SHAWN D. WARRENDER |
| | ) | |
| Defendant. | ) | |
| - - - - - - - - - - - | ) | |

TRANSCRIPT OF DEPOSITION,
taken by and before CHRISTOPHER M. PILOT,
Professional Reporter and Notary Public, at
the CITY OF PHILADELPHIA, 1515 Arch Street,
15th Floor, Philadelphia, Pennsylvania, on
Thursday, January 5, 2012, commencing
at 10:27 a.m.

- - -

ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA  19103

348 A

SHAWN D. WARRENDER

2

A P P E A R A N C E S:


WEISBERG LAW, P.C.
BY:  GRAHAM F. BAIRD, ESQUIRE
  7 South Morton Avenue
  Morton, Pennsylvania  19070
    Attorney for the Plaintiff

CITY OF PHILADELPHIA
BY:  NIYA BLACKWELL, ESQUIRE
  The Law Department
  1515 Arch Street
  15th Floor
  Philadelphia, Pennsylvania  19102
    Attorney for the Defendant


ALSO PRESENT:
Anthony Pritchett

349A
380A

SHAWN D. WARRENDER

3

```
 1                    I N D E X

 2

 3    WITNESS                              PAGE

 4

 5    SHAWN D. WARRENDER

 6

 7            By:  Mr. Baird               4

 8

 9

10

11                  - - -

12

13

14              E X H I B I T S

15                        PAGE    PAGE

16    NUMBER      DESCRIPTION    MARKED   ATTACHED

17

18

19

20          (No Exhibits Were Marked)

21

22

23

24
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

350A

SHAWN D. WARRENDER

4

```
 1                    (By agreement of counsel, the

 2            signing, sealing, filing, and certification

 3            of the transcript have been waived; and all

 4            objections, except as to the form of the

 5            question, have been reserved until the time

 6            of trial.)

 7

 8                    SHAWN D. WARRENDER, having been

 9            duly sworn, was examined and testified as

10            follows:

11

12   BY MR. BAIRD:

13   Q.       Good morning.

14   A.       Good morning.

15   Q.       My name is Graham Baird, and I represent

16   Anthony Pritchett in a lawsuit that he's filed

17   against you and others arising out of his arrest

18   occurring back in the summertime of 2010.

19            Today we're here for your deposition, and

20   before we start I'm just going to give you some

21   instructions to make this go as smoothly and quickly

22   as possible.

23   A.       Okay.

24   Q.       A deposition is a question-and-answer
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

351A

SHAWN D. WARRENDER

5

1    session.  I'm here to ask questions concerning your

2    knowledge surrounding Mr. Pritchett's arrest, okay?

3    A.        Yes.

4    Q.        It's important because we have a court

5    reporter that is taking down everything that is said

6    in the room that you and I communicate verbally, all

7    right?

8              A shrug of the shoulders, nodding of the

9    head, shaking of the head, uh-huh, huh-uh, we try to

10   stay away from these things, because it's difficult

11   for him to take that stuff down.

12   A.        Sure.

13   Q.        The other instruction I'll give is, that

14   you and I should not talk over each other, okay?

15             Even if you can forecast where my question

16   is going to be, it's again better for a clear record

17   that you wait until I ask the full question before

18   you start to answer, and I'll obviously give you the

19   courtesy of waiting until you give me a full and

20   complete answer before I ask another question.

21             You can take a break at any time for

22   whatever reason, okay?  I don't anticipate this

23   going for a long time, but that's certainly your

24   right --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

35aA

SHAWN D. WARRENDER

6

1    A.        Sure.

2    Q.        -- just let me know.

3    A.        Okay.

4    Q.        The only rule that accompanies that

5    instruction is that you should wait to take a break

6    until after your answer to a question, that is to

7    say, you should not leave a question pending.

8            You can't -- I can't ask a question and

9    then you say, can I take a break; you have to answer

10   it before we take that break, okay?

11   A.        Yes.

12   Q.        I don't want you to guess at anything.  If

13   you don't know, you don't know.

14   A.        Okay.

15   Q.        If you don't remember something, you don't

16   remember, but keep in mind that, I don't know and I

17   don't remember are two separate things, okay?

18   A.        Right.

19   Q.        Even though I don't want you to guess, it's

20   okay to give estimates to things like dates or the

21   sequence of events, time, distances, things like

22   that, okay?

23   A.        Okay.

24   Q.        Just let us know if you're going to make an

353A

SHAWN D. WARRENDER

7

```
 1    estimate.

 2    A.        Okay.

 3    Q.        With that said, have you ever given

 4    deposition testimony before?

 5    A.        First question already -- right.

 6              I think I did.  I believe so.

 7    Q.        Okay.

 8    A.        It's hard to say.

 9              It's really -- I don't think I ever did.

10    Q.        Okay.

11    A.        Yeah.  Not in my police capacity -- I don't

12    think I have.

13    Q.        Not in your police capacity?

14    A.        I gave one when I witnessed an auto

15    accident once --

16    Q.        Okay.

17    A.        -- but not in my police capacity.

18    Q.        Okay.  I do understand that there has

19    been -- you have been sued before; is that true?

20    A.        I have been sued.

21    Q.        Okay.  Have you been sued in your capacity

22    as a police officer before?

23    A.        Yes, I have.

24    Q.        Okay.  Do you recall how long ago any of
```

354A

SHAWN D. WARRENDER

8

```
 1    those lawsuits were?

 2    A.        The lawsuit for the City had to have been

 3    in 2000 --

 4    Q.        Okay.

 5    A.        -- the year 2000.

 6              The auto accident, I don't recall.

 7    Q.        Okay.  All right.

 8              My understanding is then you've been sued

 9    twice before?

10    A.        I only recall once.

11    Q.        Okay.

12    A.        I only recall once.

13    Q.        Okay.  All right.

14              The lawsuit that you remember --

15    A.        Yes.

16    Q.        -- what do you recall, if anything, about

17    the allegations in that lawsuit?

18    A.        The allegations -- I don't remember the

19    exact allegations, because I know the case was

20    settled.  So I really didn't speak or -- it was more

21    or less a gentleman had overdosed.

22              They had transported him to the hospital,

23    and he had just -- unfortunately, he had died --

24    Q.        Okay.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

355A

SHAWN D. WARRENDER

9

```
 1   A.        -- prior to us trying to get him to the

 2   emergency room.

 3   Q.        Okay.

 4   A.        And the family sued the City.

 5   Q.        Okay.  And you mentioned that that lawsuit

 6   had settled?

 7   A.        Yeah.  That's correct.

 8   Q.        Did you give a deposition in that case?

 9   A.        No, not a deposition, just Internal

10   Affairs.

11   Q.        Okay.  So you were asked about what

12   happened by an Internal Affairs detective --

13   A.        Right -- yes.

14   Q.        -- but the case never got to the point

15   where you came in and are doing what we're doing

16   today?

17   A.        No.

18   Q.        Okay.

19   A.        No.

20   Q.        Okay.  Describe for me your educational

21   background.

22   A.        A bachelor's in criminal justice from

23   Temple University.

24   Q.        Okay.  Where did you graduate high school?
```

356A

SHAWN D. WARRENDER

10

1    A.         Northeast Catholic.

2    Q.         Do you have any advanced degrees or course

3    work towards an advanced degree?

4    A.         No, just a bachelor's.

5    Q.         When did you get that bachelor's degree

6    from Temple?

7    A.         In May of '91.

8    Q.         Okay.  Who do you work for today?

9    A.         Philadelphia Police Department.

10   Q.         Okay.  And what is your job title?

11   A.         Detective.

12   Q.         Okay.  Are you assigned out of a specific

13   office or unit?

14   A.         Central detectives.

15   Q.         Okay.  Where is that office?

16   A.         401 North 21st Street.

17   Q.         All right.  Right by Whole Foods?

18   A.         Connected -- exactly.  Yup.

19   Q.         Okay.  All right.

20              How long have you been a detective?

21   A.         Eight years.

22   Q.         All right.  Is there a certain unit that

23   you're assigned to today?  Do you focus on a certain

24   type of crime?

357A

SHAWN D. WARRENDER

11

1    A.        No.

2    Q.        Okay.  So would you say you investigate

3    homicides?

4    A.        No.  Homicides we don't investigate.

5    Q.        Okay.  Would you investigate, say,

6    aggravated assaults or fights, things like that?

7    A.        Yes.

8    Q.        Okay.  And you'd also investigate property

9    crimes; is that true?

10   A.        Yes.

11   Q.        Okay.  And has your job duties in that

12   respect ever changed since you've been a detective?

13   A.        No.

14   Q.        Okay.  All right.

15             How long have you been working for

16   Philadelphia Police Department overall?

17   A.        Going on -- February will be 16 years.

18   Q.        Okay.  Did you ever work for any other

19   police departments besides --

20   A.        No.

21   Q.        -- Philly -- okay.

22             Now, did you look at any documents or

23   review anything in preparation for your deposition

24   today?

35BA

SHAWN D. WARRENDER

12

```
 1   A.        I looked over the interview this morning --

 2   Q.        Okay.  Okay.

 3   A.        -- just to refresh my memory.

 4   Q.        Okay.  You're referring to a document that

 5   memorializes an interview that you had?

 6   A.        Solski, she's the complainant.

 7   Q.        Okay.  All right.

 8             This is a case arising out of an arrest

 9   wherein you prepared the affidavit of probable cause

10   for an arrest warrant involving Anthony Pritchett --

11   A.        That is correct.

12   Q.        Do you recall anything sitting here today

13   about the investigation?

14   A.        I don't understand your question.

15   Q.        Okay.  Can you tell me anything about -- is

16   there anything you remember at all about the crime

17   itself, the complaint, anything of that nature?

18   A.        You're asking me if I recall the job?

19   Q.        Yeah, the job.

20   A.        Basically, it was just a complaint of a

21   theft of a laptop.

22   Q.        Okay.

23   A.        I had spoken to Ms. Solski inside central,

24   interviewed her, she presented me with some
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

359A

SHAWN D. WARRENDER

13

1    videotape of the incident.

2           Based on that, as well as the interview, I

3    submitted an affidavit to the district attorney's

4    office for probable cause.

5           They reviewed it.  They felt there was

6    enough probable cause for an arrest.  I had the

7    warrant signed, and I arrested Mr. Pritchett.

8    Q.      Okay.  You mentioned that you reviewed the

9    interview sheet --

10   A.      Yes.

11   Q.      -- before the deposition this morning?

12   A.      Yes.

13   Q.      Okay.  Is there anything that is not

14   contained in that interview that you remember about

15   your interview with Ms. Solski?

16   A.      I don't remember anything other than what's

17   written on paper.

18   Q.      Okay.

19   A.      Yeah.

20   Q.      Fine.  Fine.

21          Can you tell me what the video depicted

22   that Ms. Solski showed you?

23   A.      Ms. Solski basically walked me through the

24   actions of Mr. Pritchett.

360 A

SHAWN D. WARRENDER

14

1        As the video progressed, she would

2    basically show him entering rooms that according to

3    her he did not have permission to enter and then

4    showed Mr. Pritchett exiting onto the loading dock,

5    which he has no authority nor any business to be on

6    the loading dock.

7        The video also depicts Mr. Pritchett

8    walking down a loading dock carrying a large trash

9    can, like a recyclable trash can, him coming to the

10   bottom of the ramp, a pickup truck pulls up, you see

11   Mr. Pritchett reach into the bin, pull out what

12   appears to be like a storage box -- like a pier

13   storage-type box -- they're all over the place --

14   put it in the back of the pickup truck, pickup truck

15   leaves, then he goes back through the loading dock

16   and back onto the floor of wherever he works.

17   Q.      Okay.  Do you know what kind of business it

18   was where they were working?

19   A.      I don't know what -- I don't know what kind

20   of business she worked at.

21       He, according to her I think was just like

22   a -- kind of like a go-to guy, whatever needed to be

23   done he did.

24   Q.      Okay.  Maintenance man, janitor type of

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

361A

SHAWN D. WARRENDER

15

1    thing?

2    A.        Something like -- something along those

3    lines.

4    Q.        Okay.  Now, you mentioned that he went down

5    a ramp in a place where he was not -- had no

6    business being?

7    A.        According to her, correct.

8    Q.        And that information was according to Ms.

9    Solski?

10   A.        Ms. Solski.

11   Q.        Okay.  Did you talk to or interview anyone

12   else for the purpose of verifying anything that Ms.

13   Solski was telling you?

14   A.        No.  I spoke to a Michael -- a mention of a

15   Michael Zwolski, who was -- I think he was the

16   property manager of the building.  He made the

17   initial police report.

18              I alone with Detective Rocks met him up in

19   his office.  He just basically said, look, what's

20   going on?

21              I'm just referring you to Ms. Solski --

22   basically, it's her laptop, she's going to make the

23   complaint, and that's where I got involved with

24   her -- not necessarily with him, he had nothing to

362A

SHAWN D. WARRENDER

16

```
 1    do with it, he just kind of like -- he must -- he's
 2    in charge of everything, so basically anything that
 3    goes on in the building, it's his responsibility.
 4    Q.        Okay.  Did he have any discussion other
 5    than what you talked about concerning the facts of
 6    what Pritchett was alleged to have done?
 7    A.        No.  No.
 8    Q.        Okay.  Did he talk to you at any -- about
 9    where Pritchett was supposed to be versus where he
10    was not supposed to be in the building?
11    A.        No.  No.
12    Q.        Okay.  Is it fair for me to say that all
13    that information that you relied upon came from Ms.
14    Solski concerning were Pritchett was supposed to be
15    and where he was not supposed to be?
16    A.        It's safe to assume that.
17    Q.        Okay.  You mentioned that there was another
18    detective who assisted you when you went up to talk
19    to the property manager?
20    A.        Yeah.  That was Detective Rocks.
21    Q.        Rocks.  Can you spell that for me?
22    A.        R-O-C-K-S.
23    Q.        Okay.  All right.
24              What's his first name?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

363A

SHAWN D. WARRENDER

17

1    A.        Mike.

2    Q.        Okay.  Did any other detectives work with

3    you with regards to this case?

4    A.        For the arrest of Mr. Pritchett, Detective

5    Smith was present during the arrest.

6    Q.        Okay.  Did Detective Smith have any input

7    in gathering the facts --

8    A.        No.

9    Q.        -- leading up to the arrest?

10   A.        I'm sorry, no.  I apologize.

11   Q.        That's all right.

12             Do you remember where you obtained the

13   videotape from; was it from Ms. Solski or was it

14   from this Michael Zwolski?

15   A.        It wasn't from Michael.  The videotape

16   wasn't ready when I spoke with Michael.

17             The initial report I believe was -- the

18   theft occurred on the 6th, I think I caught up with

19   Solski on the 7th of September --

20   Q.        Okay.

21   A.        -- and then the formal interview was on the

22   21st.

23   Q.        Okay.

24   A.        Now, there's officers that work underground

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

364A

SHAWN D. WARRENDER

```
 1    at Penn Center.

 2              He -- I forget the officer's name.  He

 3    provided me with a videotape.  And I don't recall if

 4    Ms. Solski actually gave me one, I don't remember.

 5              I have like a couple of them, so I'm not

 6    really sure where I got them from to be honest with

 7    you.

 8    Q.        Okay.  All right.

 9    A.        And the one was from the officer for a

10    fact.

11    Q.        The officer from Penn Center?

12    A.        Right.

13    Q.        All right.  And how long were these

14    videotapes that you watched?

15    A.        I don't know.

16    Q.        Okay.  All right.

17              Do you have the videotapes today?

18    A.        I gave them to Counsel.

19    Q.        Okay.

20                   MS. BLACKWELL:  And I just

21              received them for the first time, because I

22              don't have --

23                   MR. BAIRD:  Today?

24                   MS. BLACKWELL:  Today.  Yes.
```

365A

SHAWN D. WARRENDER

```
 1                    MR. BAIRD:  Okay.  All right.
 2                In light of the fact that we're
 3          just receiving the videos -- well, in light
 4          of the fact that Ms. Blackwell has just
 5          received the video today, and she has
 6          represented that she will distribute a copy
 7          to me -- the plaintiff I think is going to
 8          reserve the right to potentially bring
 9          Detective Warrender back to ask him about
10          certain points of the videotape.
11                I don't anticipate that we will
12          have to do that, but we're going to reserve
13          the right to do it anyway.
14   BY MR. BAIRD:
15   Q.      Where did you obtain those videos prior to
16   bringing them to your counsel today?  Where did you
17   get them from?
18   A.      Like I said, I think the officer gave me
19   one, and then Ms. Solski I think gave me one -- I'm
20   not a hundred percent sure, but I think, and then at
21   that time is where I had to review it with her
22   because she had to walk me through what doors --
23   because I don't know the building --
24   Q.      Right.
```

366A

SHAWN D. WARRENDER

```
 1   A.        -- to tell me basically where he was going,

 2   what he was doing, the time frame he was doing it

 3   in.  I didn't have privy to that.

 4   Q.        Understood.  So she basically walked you

 5   through the video describing essentially what you

 6   were watching?

 7   A.        Exactly.

 8   Q.        Okay.  And did you ever ask Ms. Solski

 9   about any relationship with Mr. Pritchett at all?

10   A.        No.

11   Q.        Okay.  Did you ever ask her anything about

12   whether she would have reason to -- like was angry

13   with Mr. Pritchett?

14   A.        No.

15   Q.        Okay.  Do the two videotapes that you

16   provided to Counsel today, do they depict the same

17   thing or are they different?

18   A.        No.  They're different.

19   Q.        Okay.  How so?

20   A.        One shows him on the floor -- I'm trying to

21   recall.  One shows him on the floor going to the

22   room I believe when the theft occurred, and then the

23   other shows him actually exiting onto the loading

24   dock and loading the property into a pickup truck.
```

367A

SHAWN D. WARRENDER

```
 1   Q.        Okay.  All right.

 2             And these video surveillances are taken

 3   from two separate cameras; is that true?

 4   A.        I believe so, yes.

 5   Q.        Okay.  Did you arrest Mr. Pritchett?

 6   A.        Yes, I did.

 7   Q.        Do you remember where you were when you

 8   arrested him?

 9   A.        Not exactly.

10             I know -- I think it was actually in the

11   building where he worked.

12             He was going for an unemployment hearing --

13   Q.        Okay.

14   A.        -- I believe it was Mr. Zwolski and Ms.

15   Solski that gave me a call and told me that he would

16   be at a certain place at a certain time, and that's

17   when I along with Detective Smith were there and

18   just made the arrest.

19   Q.        Okay.  Was anyone else present when you

20   made the arrest?

21   A.        There was more people in the room he was

22   meeting with.  I don't know who they were, though.

23   Q.        Okay.  And it was at an unemployment

24   hearing?
```

368 A

SHAWN D. WARRENDER

22

```
 1   A.        He was going for an unemployment hearing.

 2   Q.        Okay.  All right.

 3             Do you know who the unemployment hearing

 4   was with?  Was it with the Board of Unemployment,

 5   State of Pennsylvania, something like that?

 6   A.        No -- that, I don't know.

 7   Q.        Okay.  Fair enough.

 8             Did you have any discussions with him

 9   either before or after you arrested him?

10   A.        I don't remember.

11   Q.        Okay.  Did you ever interview him about the

12   alleged crime?

13   A.        No.

14   Q.        Okay.  Did you ever interview anyone else

15   besides Ms. Solski and the property manager?

16   A.        No.

17   Q.        Okay.  You mentioned that the video

18   depicted Mr. Pritchett putting a box -- like a

19   Banker's Box or storage box into a pickup truck?

20   A.        Yes.

21   Q.        Did the video ever show you the license

22   plate of the pickup truck?

23   A.        No, the camera never caught that.

24   Q.        Could you tell what make and model the
```

369 A

SHAWN D. WARRENDER

1    truck was?

2    A.        It appeared to be a Chevy pickup truck.

3    Q.        Okay.  Did you ever determine who the

4    person was inside of the truck?

5    A.        No.

6    Q.        Did you ever ask Mr. Pritchett or anyone

7    else if they could identify who the person inside

8    the truck was?

9    A.        No.

10   Q.        Okay.  And is there any reason, sitting

11   here today, you can think of why or why you did not

12   inquire as to who was in the pickup truck?

13   A.        No.

14   Q.        Okay.  Did you ever actually see the laptop

15   being placed in the truck on the video surveillance?

16   A.        No.

17   Q.        Did you ever see any proof from Ms. Solski

18   or from any source that she indeed owned a laptop,

19   like a receipt or a photograph with her with the

20   computer, anything like that?

21   A.        No.

22   Q.        Okay.  In your affidavit of probable

23   cause -- strike that.

24             Did you have a chance to review your

370 A

SHAWN D. WARRENDER

24

1    affidavit of probable cause before your deposition

2    today?

3    A.        I looked it over briefly.

4    Q.        Okay.  All right.

5              In the affidavit of probable cause -- and I

6    will allow you to look at this if you want.

7    A.        Okay.

8    Q.        I only have one copy of it in here.

9    A.        Okay.

10   Q.        It indicates that the laptop was removed

11   from a locked file cabinet.  There was a dent in the

12   locking mechanism allowing access.

13             Did I read that correctly?

14   A.        That's correct.

15   Q.        Okay.  Did you ever look at the file

16   cabinet or in any way inspect where Ms. Solski was

17   saying the laptop was stolen from?

18   A.        No, I never did.

19             Like I indicated earlier, the initial job

20   arrived on my desk on the 6th --

21   Q.        Okay.

22   A.        -- I only saw the manager on the 7th.

23             I didn't physically speak to her until the

24   21st of -- of September --

371A

SHAWN D. WARRENDER

25

1    Q.        Okay.

2    A.        -- which was two weeks.

3              So I didn't look to see if there was any

4    kind of scene if that's what you're asking, so, no,

5    I did not --

6    Q.        Okay.

7    A.        -- because of the time frame.

8    Q.        Do you know where this information came

9    from?

10   A.        From Ms. Solski.

11   Q.        From Ms. Solski?

12   A.        Yes.

13   Q.        Do you know whether any other patrolman or

14   any other police officer with Philly looked at the

15   scene?

16   A.        Not to my knowledge, no.

17   Q.        Okay.  Where did you transport

18   Mr. Pritchett after the initial arrest?

19   A.        Central detectives.

20   Q.        Okay.  Did you ask him at any time to give

21   any kind of statement?

22   A.        No.

23   Q.        Do you know if any other detectives or

24   police officers ever obtained a statement from him

372A

SHAWN D. WARRENDER

26

```
 1    about this?

 2    A.        No.

 3    Q.        Okay.  What happened to him when he went to

 4    central detectives?

 5    A.        Basically, he was arrested inside there --

 6    he rode in on his bike, so he called for a patrol

 7    car to take his bike and him to central.

 8              He was taken downstairs, and he was checked

 9    into a cell room.

10    Q.        So you called for a car to pick him up and

11    his bike?

12    A.        Correct.

13    Q.        Take him to central detectives?

14    A.        Correct.

15    Q.        Okay.  And then was he -- did he get

16    fingerprinted, processed, photos?

17    A.        That -- I don't get involved with that.

18              In essence, my job is basically done at

19    that point.  He was charged for the charges that I

20    submitted, and that's the last I saw of him.

21    Q.        Okay.  And I think the charges that you

22    submitted were M-1 theft, unlawful taking; M-1

23    theft, RSP?

24    A.        Correct.
```

373 A

SHAWN D. WARRENDER

1   Q.      What does RSP stand for?

2   A.      Receiving stolen property.

3   Q.      Okay.  And M-1 criminal conspiracy?

4   A.      Correct.

5   Q.      Okay.  Any other charges?

6   A.      That's all the district attorney could

7   prove.

8   Q.      Okay.  All right.

9           And M stands for misdemeanor?

10  A.      Misdemeanor, that's correct.

11  Q.      Okay.  Did you ever attend any court

12  hearings or anything of that nature with regards to

13  Mr. Pritchett?

14  A.      No.

15  Q.      Okay.  Did you ever receive notice that

16  you're aware of to go to any court hearings for

17  Mr. Pritchett?

18  A.      If I did, I would have went.  I didn't

19  receive any.

20  Q.      Okay.  Were you ever asked by anyone other

21  than Ms. Blackwell to produce this videotape

22  surveillance?

23  A.      No.

24  Q.      Okay.  So from the time that Mr. Pritchett

374A

SHAWN D. WARRENDER

1    was arrested until Ms. Blackwell requested those

2    videotapes, you had not had any other requests to

3    obtain those; is that true?

4    A.        Correct.

5    Q.        Okay.  And where did you keep those

6    videotapes?

7    A.        My case folder.

8    Q.        Okay.  And where did you keep your case

9    folder?

10   A.        With all my other case folders in the

11   central file system.  In central detectives.

12   Q.        Okay.  So there's a central filing system

13   at central detectives --

14   A.        Yes.

15   Q.        -- for each case that crosses your desk?

16   A.        Exactly.

17   Q.        Do you create a file for those cases?

18   A.        Correct.

19   Q.        Sometimes there's paper in them, documents,

20   sometimes there's other types of evidence --

21   A.        Correct.

22   Q.        -- including videos?

23   A.        Correct.

24   Q.        So when you keep a case file there, do you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

375A

SHAWN D. WARRENDER

29

1    personally go to where the file is and put the

2    documents in, the evidence in or is that handled by

3    some kind of a filing clerk?

4    A.        I'm the only one who touches it.

5    Q.        Okay.  All right.

6              Does anyone else have access to your

7    specific case files at central detectives?

8    A.        Anyone can get it, it's not in a locked

9    drawer, but nobody touches them.

10   Q.        Okay.  But any other detective could if

11   they --

12   A.        If they so desire?

13   Q.        If they so desire --

14   A.        Yes.

15   Q.        -- can go in and look at that stuff?

16   A.        Correct.

17   Q.        Okay.  Would they need to sign any kind of

18   custody sheets, anything like that?

19   A.        No.

20   Q.        Okay.  How about people from the district

21   attorney's office, would they have access to that

22   stuff if they wanted to?

23   A.        No.  They wouldn't have access unless I

24   gave it to them -- actually, I stand corrected.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

376 A

SHAWN D. WARRENDER

30

```
1              I apologize.  They have access to
2    everything.  We have a new system.  It's a PIN
3    system.  It's a scanning system, so it would be the
4    discovery related to Mr. Pritchett's case that they
5    would have access to with the exception of the
6    video, because we actually can't scan video in.
7    Q.       Okay.
8    A.       They would have everything excluding video.
9    Q.       All right.  Did you ever have any other
10   communications with anyone after the arrest of
11   Mr. Pritchett up until notice of a lawsuit
12   concerning his case?
13   A.       No.
14   Q.       Okay.  Was Mr. Pritchett handcuffed when he
15   was arrested?
16   A.       Yes.
17   Q.       Can you describe for me his demeanor when
18   he was arrested?
19   A.       He was calm.
20   Q.       Okay.  He didn't resist in any way?
21   A.       No, not at all.
22   Q.       Okay.  And you didn't need to use any force
23   on him?
24   A.       Not at all.
```

377A

SHAWN D. WARRENDER

```
 1   Q.        Okay.  Do you know whether any Internal

 2   Affairs complaint was ever filed with regard to this

 3   incident?

 4   A.        No.

 5   Q.        Okay.  And just so we're clear, is that no,

 6   you don't know or, no, you -- do you know if there

 7   was any --

 8   A.        No.  I was never advised or notified.

 9   Q.        Okay.  Do you know whether any other police

10   officer, detective with the City of Philadelphia

11   have made any inquiry into the identity of the

12   individual who was the driver of the pickup truck?

13   A.        No.

14   Q.        And again, I'm asking clumsy questions, but

15   is that, no you are not aware of anyone doing it or

16   no, that didn't happen?

17   A.        No, I'm not aware of it.

18   Q.        Okay.  How long are these case files kept

19   after the, say, arrest is made on this?

20   A.        Usually we keep -- well, I keep them four

21   years, actually.

22   Q.        Okay.

23   A.        I mean, I have cases from '06.

24   Q.        Okay.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

378A

SHAWN D. WARRENDER

```
 1   A.       After the previous year, I would store them

 2   in my, you know, the locker -- my locker to make

 3   room for the new calendar year, but then I -- I just

 4   keep them for a couple of years.

 5   Q.       Okay.  All right.

 6            Have you given everything that was in your

 7   case file to your attorney in this case?

 8   A.       I don't know what she has.

 9   Q.       Okay.  All right.

10            I need you to look at what she has, and

11   then go back and just verify for me that everything

12   that you had that was actually in your case

13   file is given to Ms. Blackwell, okay?

14   A.       Okay.

15                    MR. BAIRD:  All right.  I think

16            that's all I have.

17                    MS. BLACKWELL:  If you have any

18            specifics -- okay, that's all?

19                    MR. BAIRD:  Yes.  That's all I

20            think I have for now.

21                    MS. BLACKWELL:  Okay.  Then I

22            don't need to ask the next question, then.

23                    Thank you.

24
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHAWN D. WARRENDER

33

1                          (Witness excused.)

2                          (Deposition concluded at 11:00

3            a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

380A

SHAWN D. WARRENDER

34

| 1 | C E R T I F I C A T I O N |
| 2 | |
| 3 | |
| 4 | I, Christopher M. Pilot, |
| 5 | Professional Court Reporter and Notary |
| 6 | Public, do hereby certify that the |
| 7 | foregoing is a true and accurate transcript |
| 8 | of the stenographic notes taken by me in |
| 9 | the aforementioned matter. |
| 10 | |
| 11 | |
| 12 | - - - |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | DATE: _____ |
| 23 | Christopher M. Pilot |
| 24 | Professional Reporter |

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

381A

SHAWN D. WARRENDER

35

## A

**access** 24:12 29:6,21 29:23 30:1,5
**accident** 7:15 8:6
**accompanies** 6:4
**accurate** 34:7
**actions** 13:24
**advanced** 10:2,3
**advised** 31:8
**Affairs** 9:10,12 31:2
**affidavit** 12:9 13:3 23:22 24:1,5
**aforementioned** 34:9
**aggravated** 11:6
**ago** 7:24
**agreement** 4:1
**allegations** 8:17,18 8:19
**alleged** 16:6 22:12
**allow** 24:6
**allowing** 24:12
**angry** 20:12
**answer** 5:18,20 6:6,9
**Anthony** 1:4 2:20 4:16 12:10
**anticipate** 5:22 19:11
**anyway** 19:13
**apologize** 17:10 30:1
**appeared** 23:2
**appears** 14:12
**Arch** 1:15 2:12
**arising** 4:17 12:8
**arrest** 4:17 5:2 12:8 12:10 13:6 17:4,5,9 21:5,18,20 25:18 30:10 31:19
**arrested** 13:7 21:8 22:9 26:5 28:1 30:15,18
**arrived** 24:20
**asked** 9:11 27:20
**asking** 12:18 25:4 31:14
**assaults** 11:6
**assigned** 10:12,23
**assisted** 16:18
**assume** 16:16

## ATTACHED 3:16

**attend** 27:11
**attorney** 2:9,14 27:6 32:7
**attorney's** 13:3 29:21
**authority** 14:5
**auto** 7:14 8:6
**Avenue** 2:8
**aware** 27:16 31:15,17
**a.m** 1:18 33:3

## B

**B** 3:14
**bachelor's** 9:22 10:4 10:5
**back** 4:18 14:14,15 14:16 19:9 32:11
**background** 9:21
**Baird** 2:7 3:7 4:12,15 18:23 19:1,14 32:15 32:19
**Banker's** 22:19
**Based** 13:2
**basically** 12:20 13:23 14:2 15:19,22 16:2 20:1,4 26:5,18
**believe** 7:6 17:17 20:22 21:4,14
**better** 5:16
**bike** 26:6,7,11
**bin** 14:11
**Blackwell** 2:11 18:20 18:24 19:4 27:21 28:1 32:13,17,21
**Board** 22:4
**bottom** 14:10
**box** 14:12,13 22:18 22:19,19
**break** 5:21 6:5,9,10
**briefly** 24:3
**bring** 19:8
**bringing** 19:16
**building** 15:16 16:3 16:10 19:23 21:11
**business** 14:5,17,20 15:6

## C

**C** 2:1 34:1,1
**cabinet** 24:11,16
**calendar** 32:3
**call** 21:15
**called** 26:6,10
**calm** 30:19
**camera** 22:23
**cameras** 21:3
**capacity** 7:11,13,17 7:21
**car** 26:7,10
**carrying** 14:8
**case** 8:19 9:8,14 12:8 17:3 28:7,8,10,15 28:24 29:7 30:4,12 31:18 32:7,7,12
**cases** 28:17 31:23
**Catholic** 10:1
**caught** 17:18 22:23
**cause** 12:9 13:4,6 23:23 24:1,5
**cell** 26:9
**Center** 18:1,11
**central** 10:14 12:23 25:19 26:4,7,13 28:11,11,12,13 29:7
**certain** 10:22,23 19:10 21:16,16
**certainly** 5:23
**certification** 4:2
**certify** 34:6
**chance** 23:24
**changed** 11:12
**charge** 16:2
**charged** 26:19
**charges** 26:19,21 27:5
**checked** 26:8
**Chevy** 23:2
**Christopher** 1:13 34:4,23
**City** 1:7,15 2:11 8:2 9:4 31:10
**clear** 5:16 31:5
**clerk** 29:3
**clumsy** 31:14

**coming** 14:9
**commencing** 1:17
**communicate** 5:6
**communications** 30:10
**complainant** 12:6
**complaint** 12:17,20 15:23 31:2
**complete** 5:20
**computer** 23:20
**concerning** 5:1 16:5 16:14 30:12
**concluded** 33:2
**Connected** 10:18
**conspiracy** 27:3
**contained** 13:14
**copy** 19:6 24:8
**correct** 9:7 12:11 15:7 24:14 26:12,14 26:24 27:4,10 28:4 28:18,21,23 29:16
**corrected** 29:24
**correctly** 24:13
**counsel** 4:1 18:18 19:16 20:16
**couple** 18:5 32:4
**course** 10:2
**court** 1:1,22 5:4 27:11,16 34:5
**courtesy** 5:19
**create** 28:17
**crime** 10:24 12:16 22:12
**crimes** 11:9
**criminal** 9:22 27:3
**crosses** 28:15
**custody** 29:18

## D

**D** 1:4,7 3:1,5 4:8
**DATE** 34:22
**dates** 6:20
**Defendant** 1:8 2:14
**degree** 10:3,5
**degrees** 10:2
**demeanor** 30:17
**dent** 24:11

382A

SHAWN D. WARRENDER

36

**Department** 2:12
  10:9 11:16
**departments** 11:19
**depict** 20:16
**depicted** 13:21 22:18
**depicts** 14:7
**deposition** 1:3,12
  4:19,24 7:4 9:8,9
  11:23 13:11 24:1
  33:2
**describe** 9:20 30:17
**describing** 20:5
**DESCRIPTION** 3:16
**desire** 29:12,13
**desk** 24:20 28:15
**detective** 9:12 10:11
  10:20 11:12 15:18
  16:18,20 17:4,6
  19:9 21:17 29:10
  31:10
**detectives** 10:14 17:2
  25:19,23 26:4,13
  28:11,13 29:7
**determine** 23:3
**died** 8:23
**different** 20:17,18
**difficult** 5:10
**discovery** 30:4
**discussion** 16:4
**discussions** 22:8
**distances** 6:21
**distribute** 19:6
**district** 1:1,1 13:3
  27:6 29:20
**dock** 14:4,6,8,15
  20:24
**document** 12:4
**documents** 11:22
  28:19 29:2
**doing** 9:15,15 20:2,2
  31:15
**doors** 19:22
**downstairs** 26:8
**drawer** 29:9
**driver** 31:12
**duly** 4:9
**duties** 11:11

**E**

**E** 2:1,1 3:1,14 34:1
**earlier** 24:19
**educational** 9:20
**Eight** 10:21
**either** 22:9
**emergency** 9:2
**enter** 14:3
**entering** 14:2
**ERSA** 1:22
**ESQUIRE** 2:7,11
**essence** 26:18
**essentially** 20:5
**estimate** 7:1
**estimates** 6:20
**events** 6:21
**evidence** 28:20 29:2
**exact** 8:19
**exactly** 10:18 20:7
  21:9 28:16
**EXAMINATION** 1:4
**examined** 4:9
**exception** 30:5
**excluding** 30:8
**excused** 33:1
**Exhibits** 3:20
**exiting** 14:4 20:23

**F**

**F** 2:7 34:1
**fact** 18:10 19:2,4
**facts** 16:5 17:7
**fair** 16:12 22:7
**family** 9:4
**February** 11:17
**felt** 13:5
**fights** 11:6
**file** 24:11,15 28:11,17
  28:24 29:1 32:7,13
**filed** 4:16 31:2
**files** 29:7 31:18
**filing** 4:2 28:12 29:3
**Fine** 13:20,20
**fingerprinted** 26:16
**first** 7:5 16:24 18:21
**floor** 1:16 2:13 14:16
  20:20,21

**focus** 10:23
**folder** 28:7,9
**folders** 28:10
**follows** 4:10
**Foods** 10:17
**force** 30:22
**forecast** 5:15
**foregoing** 34:7
**forget** 18:2
**form** 4:4
**formal** 17:21
**four** 31:20
**frame** 20:2 25:7
**full** 5:17,19

**G**

**gathering** 17:7
**gentleman** 8:21
**give** 4:20 5:13,18,19
  6:20 9:8 25:20
**given** 7:3 32:6,13
**go** 4:21 27:16 29:1,15
  32:11
**goes** 14:15 16:3
**going** 4:20 5:16,23
  6:24 11:17 15:20,22
  19:7,12 20:1,21
  21:12 22:1
**Good** 4:13,14
**go-to** 14:22
**graduate** 9:24
**Graham** 2:7 4:15
**guess** 6:12,19
**guy** 14:22

**H**

**H** 3:14
**handcuffed** 30:14
**handled** 29:2
**happen** 31:16
**happened** 9:12 26:3
**hard** 7:8
**head** 5:9,9
**hearing** 21:12,24
  22:1,3
**hearings** 27:12,16
**high** 9:24

**homicides** 11:3,4
**honest** 18:6
**hospital** 8:22
**huh-uh** 5:9
**hundred** 19:20

**I**

**identify** 23:7
**identity** 31:11
**important** 5:4
**incident** 13:1 31:3
**including** 28:22
**indicated** 24:19
**indicates** 24:10
**individual** 31:12
**information** 15:8
  16:13 25:8
**initial** 15:17 17:17
  24:19 25:18
**input** 17:6
**inquire** 23:12
**inquiry** 31:11
**inside** 12:23 23:4,7
  26:5
**inspect** 24:16
**instruction** 5:13 6:5
**instructions** 4:21
**Internal** 9:9,12 31:1
**interview** 12:1,5 13:2
  13:9,14,15 15:11
  17:21 22:11,14
**interviewed** 12:24
**investigate** 11:2,4,5,8
**investigation** 12:13
**involved** 15:23 26:17
**involving** 12:10

**J**

**janitor** 14:24
**January** 1:17
**job** 10:10 11:11
  12:18,19 24:19
  26:18
**justice** 9:22

**K**

**keep** 6:16 28:5,8,24

383A

SHAWN D. WARRENDER

31:20,20 32:4
**kept** 31:18
**kind** 14:17,19,22
  16:1 25:4,21 29:3
  29:17
**know** 6:2,13,13,16,24
  8:19 14:17,19,19
  18:15 19:23 21:10
  21:22 22:3,6 25:8
  25:13,23 31:1,6,6,9
  32:2,8
**knowledge** 5:2 25:16

**L**

**laptop** 12:21 15:22
  23:14,18 24:10,17
**large** 14:8
**Law** 2:7,12
**lawsuit** 4:16 8:2,14
  8:17 9:5 30:11
**lawsuits** 8:1
**leading** 17:9
**leave** 6:7
**leaves** 14:15
**license** 22:21
**light** 19:2,3
**lines** 15:3
**loading** 14:4,6,8,15
  20:23,24
**locked** 24:11 29:8
**locker** 32:2,2
**locking** 24:12
**long** 5:23 7:24 10:20
  11:15 18:13 31:18
**look** 11:22 15:19 24:6
  24:15 25:3 29:15
  32:10
**looked** 12:1 24:3
  25:14

**M**

**M** 1:13 27:9 34:4,23
**Maintenance** 14:24
**man** 14:24
**manager** 15:16 16:19
  22:15 24:22
**Marked** 3:16,20

**matter** 34:9
**mean** 31:23
**mechanism** 24:12
**meeting** 21:22
**memorializes** 12:5
**memory** 12:3
**mention** 15:14
**mentioned** 9:5 13:8
  15:4 16:17 22:17
**met** 15:18
**Michael** 15:14,15
  17:14,15,16
**Mike** 17:1
**mind** 6:16
**misdemeanor** 27:9
  27:10
**model** 22:24
**morning** 4:13,14
  12:1 13:11
**Morton** 2:8,8
**M-1** 26:22,22 27:3

**N**

**N** 2:1 3:1 34:1
**name** 4:15 16:24 18:2
**nature** 12:17 27:12
**necessarily** 15:24
**need** 29:17 30:22
  32:10,22
**needed** 14:22
**never** 9:14 22:23
  24:18 31:8
**new** 30:2 32:3
**NIYA** 2:11
**nodding** 5:8
**North** 10:16
**Northeast** 10:1
**Notary** 1:14 34:5
**notes** 34:8
**notice** 27:15 30:11
**notified** 31:8
**NUMBER** 3:16

**O**

**O** 34:1
**objections** 4:4
**obtain** 19:15 28:3

**obtained** 17:12 25:24
**obviously** 5:18
**occurred** 17:18 20:22
**occurring** 4:18
**office** 10:13,15 13:4
  15:19 29:21
**officer** 7:22 18:9,11
  19:18 25:14 31:10
**officers** 17:24 25:24
**officer's** 18:2
**okay** 4:23 5:2,14,22
  6:3,10,14,17,20,22
  6:23 7:2,7,10,16,18
  7:21,24 8:4,7,11,13
  8:24 9:3,5,11,18,20
  9:24 10:8,10,12,15
  10:19 11:2,5,8,11
  11:14,18,21 12:2,2
  12:4,7,15,22 13:8
  13:13,18 14:17,24
  15:4,11 16:4,8,12
  16:17,23 17:2,6,20
  17:23 18:8,16,19
  19:1 20:8,11,15,19
  21:1,5,13,19,23
  22:2,7,11,14,17
  23:3,10,14,22 24:4
  24:7,9,15,21 25:1,6
  25:17,20 26:3,15,21
  27:3,5,8,11,15,20
  27:24 28:5,8,12
  29:5,10,17,20 30:7
  30:14,20,22 31:1,5
  31:9,18,22,24 32:5
  32:9,13,14,18,21
**once** 7:15 8:10,12
**ORAL** 1:4
**overall** 11:16
**overdosed** 8:21
**owned** 23:18

**P**

**P** 2:1,1
**PA** 1:24
**PAGE** 3:3,15,15
**paper** 13:17 28:19
**patrol** 26:6

**patrolman** 25:13
**pending** 6:7
**Penn** 18:1,11
**Pennsylvania** 1:1,16
  2:8,13 22:5
**people** 21:21 29:20
**percent** 19:20
**permission** 14:3
**person** 23:4,7
**personally** 29:1
**Philadelphia** 1:7,15
  1:16,24 2:11,13
  10:9 11:16 31:10
**Philly** 11:21 25:14
**photograph** 23:19
**photos** 26:16
**physically** 24:23
**pick** 26:10
**pickup** 14:10,14,14
  20:24 22:19,22 23:2
  23:12 31:12
**pier** 14:12
**Pilot** 1:13 34:4,23
**PIN** 30:2
**place** 14:13 15:5
  21:16
**placed** 23:15
**plaintiff** 1:5 2:9 19:7
**plate** 22:22
**Plaza** 1:23
**point** 9:14 26:19
**points** 19:10
**police** 7:11,13,17,22
  10:9 11:16,19 15:17
  25:14,24 31:9
**possible** 4:22
**potentially** 19:8
**preparation** 11:23
**prepared** 12:9
**present** 2:20 17:5
  21:19
**presented** 12:24
**previous** 32:1
**prior** 9:1 19:15
**Pritchett** 1:4 2:20
  4:16 12:10 13:7,24
  14:4,7,11 16:6,9,14

384A

SHAWN D. WARRENDER

38

17:4 20:9,13 21:5
22:18 23:6 25:18
27:13,17,24 30:11
30:14
**Pritchett's** 5:2 30:4
**privy** 20:3
**probable** 12:9 13:4,6
23:22 24:1,5
**processed** 26:16
**produce** 27:21
**Professional** 1:14
34:5,24
**progressed** 14:1
**proof** 23:17
**property** 11:8 15:16
16:19 20:24 22:15
27:2
**prove** 27:7
**provided** 18:3 20:16
**Public** 1:14 34:6
**pull** 14:11
**pulls** 14:10
**purpose** 15:12
**put** 14:14 29:1
**putting** 22:18
**P.C** 2:7

**Q**

**question** 4:5 5:15,17
5:20 6:6,7,8 7:5
12:14 32:22
**questions** 5:1 31:14
**question-and-answ...**
4:24
**quickly** 4:21

**R**

**R** 2:1 34:1
**ramp** 14:10 15:5
**reach** 14:11
**read** 24:13
**ready** 17:16
**really** 7:9 8:20 18:6
**reason** 5:22 20:12
23:10
**recall** 7:24 8:6,10,12
8:16 12:12,18 18:3

20:21
**receipt** 23:19
**receive** 27:15,19
**received** 18:21 19:5
**receiving** 19:3 27:2
**record** 5:16
**recyclable** 14:9
**referring** 12:4 15:21
**refresh** 12:3
**regard** 31:2
**regards** 17:3 27:12
**related** 30:4
**relationship** 20:9
**relied** 16:13
**remember** 6:15,16
6:17 8:14,18 12:16
13:14,16 17:12 18:4
21:7 22:10
**removed** 24:10
**report** 15:17 17:17
**reporter** 1:14 5:5
34:5,24
**REPORTERS** 1:22
**represent** 4:15
**represented** 19:6
**requested** 28:1
**requests** 28:2
**reserve** 19:8,12
**reserved** 4:5
**resist** 30:20
**respect** 11:12
**responsibility** 16:3
**review** 11:23 19:21
23:24
**reviewed** 13:5,8
**right** 5:7,24 6:18 7:5
8:7,13 9:13 10:17
10:17,19,22 11:14
12:7 16:23 17:11
18:8,12,13,16 19:1
19:8,13,24 21:1
22:2 24:4 27:8 29:5
30:9 32:5,9,15
**Rocks** 15:18 16:20,21
**rode** 26:6
**room** 5:6 9:2 20:22
21:21 26:9 32:3

**rooms** 14:2
**RSP** 26:23 27:1
**rule** 6:4
**R-O-C-K-S** 16:22

**S**

**S** 2:1 3:14
**safe** 16:16
**saw** 24:22 26:20
**saying** 24:17
**scan** 30:6
**scanning** 30:3
**scene** 25:4,15
**school** 9:24
**sealing** 4:2
**see** 14:10 23:14,17
25:3
**separate** 6:17 21:3
**September** 17:19
24:24
**sequence** 6:21
**session** 5:1
**settled** 8:20 9:6
**shaking** 5:9
**SHAWN** 1:7 3:5 4:8
**sheet** 13:9
**sheets** 29:18
**shoulders** 5:8
**show** 14:2 22:21
**showed** 13:22 14:4
**shows** 20:20,21,23
**shrug** 5:8
**sign** 29:17
**signed** 13:7
**signing** 4:2
**sitting** 12:12 23:10
**Smith** 17:5,6 21:17
**smoothly** 4:21
**Solski** 12:6,23 13:15
13:22,23 15:9,10,13
15:21 16:14 17:13
17:19 18:4 19:19
20:8 21:15 22:15
23:17 24:16 25:10
25:11
**sorry** 17:10
**source** 23:18

**South** 1:23 2:8
**speak** 8:20 24:23
**specific** 10:12 29:7
**specifics** 32:18
**spell** 16:21
**spoke** 15:14 17:16
**spoken** 12:23
**stand** 27:1 29:24
**stands** 27:9
**start** 4:20 5:18
**State** 22:5
**statement** 25:21,24
**STATES** 1:1
**stay** 5:10
**stenographic** 34:8
**stolen** 24:17 27:2
**storage** 14:12 22:12
**storage-type** 14:13
**store** 32:1
**Street** 1:15,23 2:12
10:16
**strike** 23:23
**stuff** 5:11 29:15,22
**submitted** 13:3 26:20
26:22
**sued** 7:19,20,21 8:8
9:4
**Suite** 1:23
**summertime** 4:18
**supposed** 16:9,10,14
16:15
**sure** 5:12 6:1 18:6
19:20
**surrounding** 5:2
**surveillance** 23:15
27:22
**surveillances** 21:2
**sworn** 4:9
**system** 28:11,12 30:2
30:3,3

**T**

**T** 3:14 34:1,1
**take** 5:11,21 6:5,9,10
26:7,13
**taken** 1:13 21:2 26:8
34:8

385A

SHAWN D. WARRENDER

39

talk 5:14 15:11 16:8
    16:18
talked 16:5
tell 12:15 13:21 20:1
    22:24
telling 15:13
Temple 9:23 10:6
testified 4:9
testimony 7:4
Thank 32:23
theft 12:21 17:18
    20:22 26:22,23
thing 15:1 20:17
things 5:10 6:17,20
    6:21 11:6
think 7:6,9,12 14:21
    15:15 17:18 19:7,18
    19:19,20 21:10
    23:11 26:21 32:15
    32:20
Thursday 1:17
time 4:5 5:21,23 6:21
    18:21 19:21 20:2
    21:16 25:7,20 27:24
title 10:10
today 4:19 9:16 10:8
    10:23 11:24 12:12
    18:17,23,24 19:5,16
    20:16 23:11 24:2
told 21:15
touches 29:4,9
transcript 1:12 4:3
    34:7
transport 25:17
transported 8:22
trash 14:8,9
trial 4:6
truck 14:10,14,14
    20:24 22:19,22 23:1
    23:2,4,8,12,15
    31:12
true 7:19 11:9 21:3
    28:3 34:7
try 5:9
trying 9:1 20:20
twice 8:9
two 6:17 20:15 21:3

25:2
type 10:24 14:24
types 28:20

U
uh-huh 5:9
underground 17:24
understand 7:18
    12:14
understanding 8:8
Understood 20:4
unemployment 21:12
    21:23 22:1,3,4
unfortunately 8:23
unit 10:13,22
United 1:1,23
University 9:23
unlawful 26:22
use 30:22
Usually 31:20

V
verbally 5:6
verify 32:11
verifying 15:12
versus 16:9
video 13:21 14:1,7
    19:5 20:5 21:2
    22:17,21 23:15 30:6
    30:6,8
videos 19:3,15 28:22
videotape 13:1 17:13
    17:15 18:3 19:10
    27:21
videotapes 18:14,17
    20:15 28:2,6
vs 1:6

W
wait 5:17 6:5
waiting 5:19
waived 4:3
walk 19:22
walked 13:23 20:4
walking 14:8
want 6:12,19 24:6
wanted 29:22

warrant 12:10 13:7
Warrender 1:7 3:5
    4:8 19:9
wasn't 17:15,16
watched 18:14
watching 20:6
way 24:16 30:20
weeks 25:2
WEISBERG 2:7
went 15:4 16:18 26:3
    27:18
we're 4:19 9:15 19:2
    19:12 31:5
Witness 3:3 33:1
witnessed 7:14
work 10:3,8 11:18
    17:2,24
worked 14:20 21:11
working 11:15 14:18
works 14:16
wouldn't 29:23
written 13:17

X
X 3:1,14

Y
Yeah 7:11 9:7 12:19
    13:19 16:20
year 8:5 32:1,3
years 10:21 11:17
    31:21 32:4
Yup 10:18

Z
Zwolski 15:15 17:14
    21:14

0
06 31:23

1
10:27 1:18
11-4682 1:2
11:00 33:2
15th 1:16 2:13
1515 1:15 2:12
1520 1:23

16 11:17
17th 1:23
19070 2:8
19102 2:13
19103 1:24

2
2000 8:3,5
2010 4:18
2012 1:17
21st 10:16 17:22
    24:24

3
30 1:23

4
4 3:7
401 10:16

5
5 1:17

6
6th 17:18 24:20

7
7 2:8
7th 17:19 24:22

9
91 10:7

386A